ACCEPTED
15-24-00111-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/27/2025 2:14 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00111-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/27/2025 2:14:01 PM
CHRISTOPHER A. PRINE
Clerk

# IN THE COURT OF APPEALS
## FOR THE FIFTEENTH JUDICIAL DISTRICT
## AUSTIN, TEXAS

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas**
*Appellants*,

v.

**ChampionX, LLC**,
*Appellee*.

On Appeal from the 419th Judicial District Court
Travis County, Texas
Cause No. D-1-GN-20-000139

## APPELLEE'S BRIEF

Deborah S. Sloan
State Bar No. 00786230
dsloan@jonesday.com
Jones Day
2727 N. Harwood Street
Suite 500
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

John M. Allan (*pro hac vice*)
jmallan@jonesday.com
Antoinette L. Ellison (*pro hac vice*)
aellison@jonesday.com
Jones Day
1221 Peachtree Street NE
Suite 400
Atlanta, Georgia 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330

*Counsel for Appellee*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ....................................................................... viii

STATEMENT REGARDING ORAL ARGUMENT .............................................ix

ISSUES PRESENTED ......................................................................................ix

STATEMENT OF FACTS ..................................................................................1

    A.    ChampionX's Chemical Manufacturing Business ..............................1

    B.    The Property .........................................................................................2

    C.    Regulation of the Property ...................................................................3

    D.    Manufacturing Process .........................................................................4

    E.    Delivery Process ..................................................................................6

    F.    Property Reconditioning, Return, and Phase-Out Process...................7

    G.    The Trial Court's Judgment .................................................................7

SUMMARY OF THE ARGUMENTS .................................................................10

STANDARD OF REVIEW ...............................................................................14

ARGUMENTS.................................................................................................15

I.    The Trial Court Properly Rejected Appellants' Argument that the Unrelated Exemption Under Section 151.322 Bars ChampionX's Property from Qualifying for the Manufacturing Exemptions in Texas Tax Code § 151.318 ...............................................................................16

    A.    The Two Provisions Do Not Share the Same Purpose......................17

    B.    Even Assuming the Two Provisions Share the Same Purpose, They Do Not Irreconcilably Conflict .................................................20

    C.    Even Assuming a Conflict, Section 151.318 Controls as the More Specific Provision.................................................................21

    D.    The Manufacturing Exemptions Under 151.318 Control as the Latest-Amended Provision..............................................................23

i

E.  *East Texas Oxygen* Does Not Address the Manufacturing
    Exemptions and Has No Application Here ........................................24

II.  The Trial Court Was Correct in Ruling the Property at Issue Qualifies
     for, and Is Not Excluded from, the Manufacturing Exemptions in
     Texas Tax Code § 151.318 ..............................................................27

     A.  The Manufacturing Exemptions ........................................................28

     B.  Appellants Misconstrue the Manufacturing Exemptions Sought
         by ChampionX and Awarded by the Trial Court ...............................30

     C.  Appellants Have Waived the Right to Appeal ChampionX's
         Satisfaction of the Terms of Manufacturing Exemptions (a)(5),
         (a)(8), and (a)(10) ...........................................................................32

         1.  Appellants failed to preserve any Subsection (a)(5),
             (a)(8), or (a)(10) arguments in the trial court ..........................32

         2.  Appellants likewise waived any Subsection (a)(5), (a)(8),
             or (a)(10) arguments in this Court by failing to brief them
             on appeal. ................................................................................34

     D.  The Court Should in any Event Affirm the Trial Court Holding
         that ChampionX Has Satisfied the Elements of the
         Manufacturing Exemptions (a)(5), (a)(8), and (a)(10) ......................36

         1.  The Property satisfies the threshold requirements for
             Subsections (a)(5), (a)(8), and (a)(10). ....................................36

         2.  The Property satisfies the other requirements for
             Subsections (a)(5), (a)(8), and (a)(10). ....................................39

             a.  The Property is exempt under 151.318(a)(10)
                 because its use was necessary and essential to
                 comply with requirements related to public health. .......39

             b.  The Property is independently exempt under
                 151.318(a)(8) because its use was necessary and
                 essential to a quality control process. ...........................43

             c.  The Property is independently exempt under
                 151.318(a)(5) because its use was necessary and
                 essential to a pollution control process ..........................45

E.     Subsection (c) Does Not Exclude the Property from the Manufacturing Exemptions ..................................................................46

      1.     The exclusion under Subsection (c)(3) does not apply.............47

      2.     The exclusion under Subsection(c)(4) does not apply..............50

III.    The Trial Court Properly Held the Related Services Performed on ChampionX's Property Are Exempt from Taxation Pursuant to Texas Tax Code § 151.3111 ........................................................................52

PRAYER ....................................................................................................55

CERTIFICATE OF COMPLIANCE ..........................................................57

CERTIFICATE OF SERVICE ...................................................................58

iii

# INDEX OF AUTHORITIES

**Page**

**CASES**

*Alejos v. State*,
555 S.W.2d 444 (Tex. Crim. App. 1977) ........................................................17

*Allstate Ins. Co. v. Hegar*,
484 S.W.3d 611 (Tex. App.—Austin 2016, pet. denied) ...................................52

*City of Houston v. Clear Creek Basin Auth.*,
589 S.W.2d 671 (Tex. 1979) ...........................................................................33

*Combs v. Health Care Services Corp.*,
No. 03–09–00617–CV, 2011 WL 1005419 (Tex. App. Austin—
Mar. 16, 2011, pet. granted), *aff'd in relevant part and rev'd in
part on other grounds*, 401 S.W.3d 623 (Tex. 2013) ........................................26

*Cook v. Nissimov*,
580 S.W.3d 745 (Tex. App.—Houston 2019)....................................................14

*Cunningham v. Waymire*,
612 S.W.3d 47 (Tex. App.—Houston 2019, no pet.).........................................35

*Delta Cnty. Appraisal Dist. v. PPF Gin & Warehouse, LLC*,
632 S.W.3d 637 (Tex. App.—Texarkana 2021, pet. denied).............................35

*East Texas Oxygen Co. v. State*,
681 S.W.2d 741 (Tex. App.—Austin 1984, no writ) .............................19, 25, 26

*Gard v. Bandera Cnty. Appraisal Dist.*,
293 S.W.3d 613 (Tex. App.—San Antonio 2009, no pet.) ................................30

*Gulf Coast State Bank v. Emenhiser*,
562 S.W.2d 449 (Tex. 1978) ...........................................................................34

*Hegar v. El Paso Elec. Co.*,
629 S.W.3d 518 (Tex. App.—Austin 2021)......................................................15

*Horizon/CMS Healthcare Corp. v. Auld*,
34 S.W.3d 887 (Tex. 2000)..............................................................................16

*In re J.M.R.*,
149 S.W.3d 289 (Tex. App.—Austin 2004).......................................18

*In re M.N.*,
262 S.W.3d 799 (Tex. 2008) .............................................................24

*In re Office of Att'y Gen.*,
422 S.W.3d 623 (Tex. 2013) .............................................................24

*Jatex Oil & Gas Expl. L.P. v. Nadel & Gussman Permian, LLC*,
629 S.W.3d 397 (Tex. App.—Eastland 2020, no pet.).......................14

*Los Compadres Pescadores v. Valdez*,
622 S.W.3d 771 (Tex. 2021) .............................................................34

*Malooly Bros., Inc. v. Napier*,
461 S.W.2d 119 (Tex. 1970)..............................................................35

*McIntyre v. Ramirez*,
109 S.W.3d 741 (Tex. 2003) .............................................................14

*Mitchell v. MAP Res., Inc.*,
649 S.W.3d 180 (Tex. 2022) .............................................................33

*Ramos v. State*,
928 S.W.2d 160 (Tex. App.—Houston 1996, pet. ref'd) ..................22

*Rosetta Res. Operating, LP v. Martin*,
645 S.W.3d 212 (Tex. 2022) .............................................................36

*San Jacinto River Auth. v. Duke*,
783 S.W.2d 209 (Tex. 1990) .............................................................34

*Schlusselberg v. Calvert*,
443 S.W.2d 695 (Tex. 1969) .............................................................26

*Sharp v. Tyler Pipe Indus., Inc.*,
919 S.W.2d 157 (Tex. App.—Austin 1996, writ denied)..................18

*Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*,
521 S.W.3d 749 (Tex. 2017) .............................................................20

*Springer v. Johnson*,
280 S.W.3d 322 (Tex. App.—Amarillo 2008, no pet.) .....................22

*State v. B.F. Goodrich Co.*,
617 S.W.2d 835 (Tex. Civ. App. 1981)........................................................50, 51

*State v. Wiesman*,
269 S.W.3d 769 (Tex. App.—Austin 2008)...................................................18, 19

*Texas Indus. Energy Consumers v. CenterPoint Energy Houston
Elec., LLC*,
324 S.W.3d 95 (Tex. 2010)...............................................................................20

*Texas State Bd. of Chiropractic Examiners v. Abbott*,
391 S.W.3d 343 (Tex. App.—Austin 2013)...................................................17, 18

*Texas Student Hous. Auth. v. Brazos Cnty. Appraisal Dist.*,
460 S.W.3d 137 (Tex. 2015) .............................................................................14

*United States v. Sellers*,
926 F.2d 410 (5th Cir. 1991) ............................................................................41

**STATUTES**

49 U.S.C.
§ 5101...............................................................................................................40
§ 5103...............................................................................................................40

Tex. Gov. Code
§ 311.026..............................................................................................17, 20, 23

Tex. Tax Code
§ 151.005...........................................................................................................15
§ 151.006...........................................................................................................25
§ 151.051...........................................................................................................15
§ 151.101...........................................................................................................15
§ 151.302...........................................................................................................25
§ 151.318....................................................................................................*passim*
§ 151.322....................................................................................................*passim*
§ 151.3111..................................................................................................*passim*

**RULES**

Tex. R. App. P. 38.2..........................................................................................16

Tex. R. Civ. P. 166a(c) .................................................................................14, 33

**REGULATIONS**

49 C.F.R.
    § 171.8.................................................................................40
    § 172.101.............................................................................40
    § 173.2.................................................................................40

34 Tex. Admin. Code
    § 3.300....................................................................... *passim*
    § 3.314(b)(1) ...........................................................38, 51, 52

**OTHER AUTHORITIES**

Tex. Comptroller's Decision
    No. 12,587 (June 28, 1982) ...............................................47
    No. 24,833 (Apr. 10, 1990) ................................................48
    No. 24,833 (Apr. 10, 1990) ................................................47
    No. 27,919 (Oct. 23, 1991) ................................................48
    No. 40,875 (July 1, 2008) ..................................................41
    No. 43,944 (Aug. 6, 2007) .................................................46
    No. 48,097 (Dec. 4, 2008) .................................................55
    No. 48,097 (Dec. 4, 2008) .................................................54
    No. 102,273 (May 20, 2011) ..............................................54
    No. 106,331 (Feb. 27, 2015) ..............................................44
    No. 106,795 (Jan. 24, 2017) ..............................................55
    No. 115,803 (Jan 11, 2023) ...........................................45, 46

Tex. Pol'y Letter Rulings
    No. 200108400L (Aug. 6, 2001) ........................................38
    No. 9904382L (Apr. 7, 1999) .............................................38
    No. 9911987L (Nov. 5, 1999) ............................................45

Tex. Sess. Laws,
    Acts 1981, 67th Leg., p. 1566, ch. 389, § 1.......................23
    Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 14.10 ..................23
    Acts 1999, 76th Leg., ch. 1467, § 2.19...........................23, 24
    Acts 2001, 77th Leg., ch. 1263, § 22.................................24

## STATEMENT OF THE CASE

*Nature of the Case:*

This is a tax refund suit that addresses two questions: (i) whether ChampionX, LLC's purchase and lease of porta-feed drums, tanks, and totes (the "Property") used to package chemicals manufactured for sale to customers are exempt from sales and use tax pursuant to the exemptions for property used in manufacturing codified in Texas Tax Code § 151.318 (the "Manufacturing Exemptions"); and (ii) whether ChampionX's purchase of cleaning, delivery, and pick-up services performed on the Property (the "Related Services") are exempt from sales and use tax pursuant to the exemption for services performed on exempt property under Texas Tax Code § 151.3111 (the "Services Exemption").

*Trial Court:*

No. D-1-GN-20-000139, 419th Judicial District
Hon. Madeleine Connor

*Course of Proceedings:*

The parties filed cross-motions for summary judgment on these two legal issues. Upon consideration of the pleadings, motions, responses, replies, argument of counsel, and the summary judgment evidence on file, on March 20, 2024, the trial court issued an order granting ChampionX's motion and denying Appellants' motion and thus holding that the Property is exempt under the Manufacturing Exemptions and the Related Services are exempt under the Services Exemption. CR1 864 (Appendix A). The trial court issued a Final Judgment on September 20, 2024. CR1 916-18 (Appendix B).

## STATEMENT REGARDING ORAL ARGUMENT

ChampionX requests oral argument to emphasize and clarify the written arguments presented in this brief, demonstrating that the trial court correctly applied Texas Tax Code § 151.318 (Appendix C) and Texas Tax Code § 151.3111 (Appendix D) to the stipulated and undisputed facts in granting judgment in favor of ChampionX. *See* Tex. R. App. P. 39.1 & 39.2.

## ISSUES PRESENTED

1. Whether the trial court properly rejected Appellants' contention that a separate and distinct exemption for sales of containers under Texas Tax Code § 151.322 (Appendix E) bars the Property ChampionX used to package the chemicals it manufactured and sold to customers from qualifying for the Manufacturing Exemptions in Texas Tax Code § 151.318?

2. Whether the trial court properly granted summary judgment that ChampionX's purchase and lease of the Property used to package the chemicals ChampionX manufactured and sold to customers are exempt from tax pursuant to Manufacturing Exemptions in Texas Tax Code § 151.318?

3. Whether the trial court properly granted summary judgment that ChampionX's purchase of the Related Services performed on the Property is exempt from sales and use tax pursuant to the Services Exemption in Texas Tax Code § 151.3111?

## STATEMENT OF FACTS

### A. ChampionX's Chemical Manufacturing Business

As Appellants concede, ChampionX is a manufacturer that manufactures chemicals, including hazardous chemicals, for sale to customers in a wide range of industries: "[B]etween March 2011 and October 2018 (the 'Periods at Issue'), Champion[X] manufactured chemicals for use in water treatment applications and for customers in the oil and gas industries who were involved in oil exploration, production, refining, and in chemical processing." App. Br. 1 (citing CR1 158, 194); *see also* CR1 216 (Joint Stipulation).[1]

ChampionX's manufacturing process involved packaging the chemicals it produced into porta-feed drums, tanks, and totes (the "Property") at its plants, including for testing the chemicals and for transferring them to customers. CR1 194, 206-08, 218. ChampionX purchased or leased the Property from vendors. CR1 195. It also purchased services related to the Property; namely, cleaning, pick-up, and delivery services for Property shipped to and used by customers (the "Related Services"). *Id.* ChampionX filed sales and use tax refund claims for the Periods at Issue asserting it is owed a refund of taxes related to its purchase and lease of the Property and the Related Services. *Id.*

---

[1] ChampionX will use the same record reference designations as Appellants. ChampionX will refer to Appellants' Brief as "App. Br."

**B.     The Property**

The drums, tanks, and totes at issue come in a range of sizes and are made of different materials. CR1 198-99. ChampionX's choice of Property for a particular customer depends on the type of chemical to be packaged in it. CR1 198.

ChampionX designed the Property to package and safeguard hazardous chemicals and to meet or exceed associated legal requirements. CR1 197, 201. Appellants admit that the Property ensures the chemicals "do not have a reaction" with the Property or with the environment, preserve the chemical composition of the product, and "meet government regulations and standards." CR1 197, 218 (Joint Stipulation). Hazardous materials that are typically packaged and delivered in the Property include regulated materials such as flammables, oxidizers, organic peroxides, and corrosives. CR1 197. At least 60% of chemicals that ChampionX manufactures and transfers to customers contain one or more classes of hazardous materials subject to U.S. Department of Transportation ("DOT") regulations and United Nations ("UN") standards. CR1 198.

The Property "offer[s] easier chemical handling, safeguard[s] employees, and protect[s] the environment." *Id.* The Property has been designed to stop spillage and leaks while in use, and, because the items are reusable, to minimize hazardous waste by lessening the number of disposed plastic drums, tanks, and totes with left-over chemicals inside. CR1 199.

## C. Regulation of the Property

The Property used to deliver ChampionX's chemical products to customers must adhere to DOT regulations and UN standards, and was designed and tested to meet them. CR1 201. The DOT regulations relating to hazardous materials include requirements for packaging and are based on international standards in the UN's Model Regulations. 49 C.F.R. parts 100-185; CR1 199-00.

ChampionX sold more than 600 chemical products that it manufactured and packaged into Property to transfer to customers in Texas. CR1 200. The majority of these chemicals contained one or more classes of hazardous regulated materials. CR1 198. Of the top ten chemical products by volume that ChampionX sold to customers in Texas, nine contained hazardous materials regulated by the DOT. CR1 200.

ChampionX ensures that Property larger than 119 gallons meets or exceeds the DOT's intermediate bulk container ("IBC") regulations (also known as "bulk packaging" regulations) under 49 C.F.R. parts 100-185. CR1 201. DOT and UN regulations and standards generally require IBCs used to transfer hazardous products to be inspected every two-and-a-half years with a follow-up inspection every five years. CR1 202. ChampionX prepared 2.5 Year and 5 Year Recertification Guidelines to establish procedures necessary to comply with the governing regulations and standards. *Id.* The 2.5 Year inspection includes an

external visual inspection, service equipment functionality check, leakproofness test, verification of UN markings, and (if the unit is polyethylene lined) a continuity test to verify lining integrity. CR1 203. The 5 Year follow up inspection includes an additional external visual inspection; internal inspection for corrosion, pitting, damage, or anything else that may make the unit unsuitable for hazardous materials; material-thickness test; leakproofness test; verification of UN markings; and (if the unit is polyethylene lined) a continuity test to verify lining integrity. *Id.*

For Property smaller than 119 gallons, ChampionX ensures that the Property complies with the DOT's "non-bulk packaging" or "drum" regulations under 49 C.F.R. parts 100-185. CR1 201. DOT regulations and UN standards generally require leakproofness testing to be conducted on non-bulk packaging or drums every time they are reused. CR1 202. ChampionX performs the required testing on applicable drum-sized Property subject to a special DOT permit. *Id.*

### D.    Manufacturing Process

ChampionX manufacturers its chemicals in batches on a made-to-order basis depending on customer specifications. CR1 205. Customer orders are received by ChampionX, verified, and scheduled. *Id.* Property requirements are determined during the ordering process based on the chemical product type and amount of product ordered. *Id.* A "Bill of Material" is produced that corresponds with each order and indicates the raw materials to be used and quantity of the product that

should be made. *Id.* ChampionX's chemical manufacturing process involves filling reactors with raw materials (such as monomers, acids, bases, solvents, and other materials), blending the materials in the reactors, and, if necessary, adding a catalyst (solid, liquid, or gas) to initiate a chemical reaction. CR1 205-06. The product is cooled and transferred using a hose from the reactor into selected Property at ChampionX's plant. CR1 206.

ChampionX developed specifications for its chemical products. *Id.* Each batch of chemicals must satisfy certain specifications in order to satisfy customer and industry expectations. *Id.* ChampionX tests the product to ensure these specifications are met. *Id.* After chemicals are filled into the Property, samples of the chemicals are tested for quality control, contamination, and retention of the desired specifications. *Id.* Testing includes a visual inspection and a Fourier Transform Infrared Spectroscopy ("FTIR") test. CR1 207. If testing confirms that applicable specifications are satisfied, the Property with the product are closed, and the valves on the Property are tagged and sealed for shipment to the customer. CR1 207.

Use of the Property is necessary and essential to the overall process of manufacturing ChampionX's chemical products. *Id.* The chemical products must be packaged in the Property in order to be transferred to and used by customers at their sites. *Id.*

## E.    Delivery Process

ChampionX delivers its chemicals in the Property to its customers. CR1 208; 218 (Joint Stipulation). If it is discovered that a tag has been broken on Property at the time of delivery, then that Property will not be used as it may have been contaminated. CR1 208.

The delivery method for transferring the Property depends on each customer's needs. *Id.* Customers generally choose to take possession of and keep the Property at their facilities for an extended period of time until the customers are finished using the Property to feed the chemical products into the customers' processes. CR1 208-09. Customers can also choose to have ChampionX transfer chemical products from the Property in which the products were packaged at ChampionX's plant to tanks at the customers' facilities. CR1 209. Under this option, ChampionX's employees ensure that the correct product is being transferred to the customer and inspect the customers' tanks to ensure the tanks can properly hold the product and that it would be proper to transfer the product into the customers' tanks. *Id.* Customers may also transfer the chemical products from the Property to their own tanks. *Id.* Any separate customer-owned tank used to hold ChampionX's chemical products for feeding into customer processes must have properties similar to those of ChampionX's Property to ensure compatibility

with the specific type of chemicals and compliance with all environmental, health and safety regulations. *Id.*

## F. Property Reconditioning, Return, and Phase-Out Process

When a customer is finished with the Property, ChampionX arranges for a third-party vendor to pick up the Property and deliver it to a third-party cleaning service provider to recondition and clean the returned Property. CR1 210. The service provider cleans and inspects the Property and performs a leakproofness check. *Id.* The provider also performs a DOT recertification (if needed) on Property used to deliver chemicals to customers. *Id.*

After the Property is cleaned at a third-party reconditioning facility, it is sent to one of ChampionX's plants, where ChampionX inserts the cleaned and repaired Property back into the manufacturing process. *Id.* Each piece of Property can be reused for 20 to 30 years. CR1 211.

## G. The Trial Court's Judgment

ChampionX paid sales tax and/or accrued use tax on the Property as well as the Related Services performed on the Property. CR1 195. It filed sales and use tax refund claims for the Periods at Issue on the basis that (1) the Property sold and leased to it is exempt from tax pursuant to Manufacturing Exemptions in Section 151.318; and (2) the Related Services are exempt from tax pursuant to the Services Exemption in Section 151.3111. *Id.*

7

The Comptroller denied ChampionX's refund claims. CR1 196. Upon administrative appeal, the Administrative Hearings Section and State Office of Administrative Hearings recommended denying the refund claims. *Id.*

ChampionX appealed the administrative rulings by filing three petitions (each identical but covering different time periods) that were consolidated under the caption *ChampionX, LLC, v. Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas*, Cause No. D-1-GN-20-000139 in the 419th Judicial District Court in Travis County, Texas. *See* CR1 196-97; CR1 4-29; CR2 3-27 & 41-43; CR3 3-31 & 36-39.

After agreeing to stipulated facts, the parties submitted the legal issues to the trial court on summary judgment. Regarding the Property, ChampionX moved for judgment on the basis that it qualified for three separate Manufacturing Exemptions: §§ 151.318(a)(5), (a)(8), and (a)(10). CR1 163-75. Appellants moved for summary judgment at the same time, making three arguments concerning the Property: (1) Appellants argued that ChampionX is not entitled to Manufacturing Exemption (a)(1); (2) Appellants claimed that exclusions in Section 151.318(c) barred any Manufacturing Exemption under Subsection (a); and (3) Appellants argued that the Property is taxable under the exemption for containers in Texas Tax Code § 151.322. CR1 494-96. ChampionX opposed Appellants' motion, arguing that it qualifies for  exemptions(a)(5), (a)(8) and (a)(10) and confirming that it did

8

not claim exemption (a)(1). CR1 516-17, 519-23. Plus, ChampionX established that Subsection (c) does not bar the three exemptions it claims, and the exemption for containers in Section 151.322 does not preclude the (a)(5), (a)(8), and (a)(10) exemptions either. CR1 523-32.

The trial court heard oral argument on the cross-motions for summary judgment in December 2023. CR1 864. During oral argument, ChampionX confirmed that it did not seek an exemption under 151.318(a)(1). The trial court therefore could not have considered the Subsection (a)(1) exemption in granting ChampionX summary judgment. The grant of summary judgment in favor of ChampionX also necessarily reflects the trial court's conclusion that ChampionX was entitled to exemptions under one or more of Subsections (a)(5), (a)(8), and (a)(10)—the exemptions that ChampionX did claim.

The court granted ChampionX's summary judgment motion and denied Appellants' motion on March 20, 2024. CR1 864. It entered a Final Judgment, which ordered and adjudged that:

> 1. The exemption for property used in manufacturing under Tex. Tax Code § 151.318 exempts the portafeed drums, tanks, and totes (the "Property") at issue from Texas sales and use tax;

> 2. The exemption for services on exempted property under Tex. Tax Code § 151.3111 applies to the cleaning, delivery, and/or pickup services performed on the Property at issue[.]

CR1 916-18.

## SUMMARY OF THE ARGUMENTS

This court should affirm the trial court's summary judgment ruling because ChampionX demonstrated as a matter of law, based on undisputed, stipulated facts, that the Property used by ChampionX in its manufacturing processes is exempt from tax pursuant to three different Manufacturing Exemptions in Texas Tax Code § 151.318. Although ChampionX's proof of entitlement to any one of these exemptions would suffice for affirmance, ChampionX has established its entitlement to all three. Moreover, this Court should reject Appellants' meritless argument that the exemption for certain containers found in Texas Tax Code § 151.322 displaces the plain terms of the Manufacturing Exemptions, which ChampionX satisfies. Further, neither of the exclusions to the Manufacturing Exemptions relied on by Appellants applies. Additionally, ChampionX demonstrated that the Related Services are exempt from tax pursuant to the Services Exemption under Texas Tax Code § 151.3111.

Section 151.318 provides eleven different Manufacturing Exemptions for items listed in the statute. The Property purchased and leased by ChampionX satisfies the requirements of *three* separate and independent exemptions. The Property's use in the manufacturing process was necessary and essential to:

1. comply with requirements related to public health, which satisfies Subsection (a)(5);

2. a pollution control process, which satisfies Subsection (a)(8); and

3. quality control testing, which satisfies Subsection (a)(10).

*See* Tex. Tax Code § 151.318(a)(5), (a)(8), (a)(10). And because the Property is exempt, the Related Services were also exempt under Texas Tax Code § 151.3111.

Appellants rest their appeal on other sections of the Tax Code contending that other provisions trump the three Manufacturing Exemptions that apply to ChampionX (Tex. Tax Code § 151.318(a)(5), (a)(8), and (a)(10)). To begin with, Appellants ask the Court to rule that an entirely ***different*** exemption for containers in Texas Tax Code § 151.322 prevails over and prevents application of the Manufacturing Exemptions. But Appellants' argument that the "Container Exemption" governs the items at issue here, to the exclusion of the Manufacturing Exemptions, must be rejected. Appellants' argument finds no support in the plain terms of the Tax Code, nor do the structure of the Code or the canons of statutory construction support Appellants' atextual construction.

The exemption for sales of containers under Section 151.322 is entirely distinct from the Manufacturing Exemptions under Section 151.318—the provisions address different subject matter and are motivated by separate legislative purposes; thus, the statutes are not *in pari materia*. Also, there is no irreconcilable conflict between the provisions, and, in any case, the Manufacturing Exemptions would take precedence because Section 151.318 is the more specific and more recently-enacted statute.

Next, and notably, Appellants' brief does not contest that ChampionX satisfies Manufacturing Exemptions 151.318(a)(5), (a)(8), or (a)(10). Indeed, Appellants' brief does not mention those exemptions at all. Instead, Appellants argue that ChampionX is not entitled to a different exemption that ChampionX does not even claim, Subsection (a)(1) for ingredients or component parts. Because ChampionX easily satisfies Subsections (a)(5), (a)(8), and (a)(10), and does not claim exemption (a)(1), the trial court's holding that ChampionX is entitled to Manufacturing Exemptions should be upheld.

Appellants then contend that two exclusions in Subsection 151.318(c) bar the Subsection (a)(5), (a)(8), and (a)(10) exemptions. But the two provisions Appellants rely upon, 151.318(c)(3) and 151.318(c)(4), do not apply here. These exclusions apply to equipment or supplies used in "distribution activities" and "transportation activities," and to equipment or supplies to the extent not otherwise exempt and used to "maintain or store" tangible personal property. The undisputed summary-judgment evidence establishes that the Property is used as packaging in the actual manufacturing of ChampionX's chemicals for ultimate sale to customers. The Property is used to hold the products at the completion of the manufacturing process and enable the chemicals to be transferred and used in compliance with applicable federal law, and in a manner that controls pollution, and permits quality control. The evidence does not support the conclusion that the

12

Property is used merely in distribution or transportation activities under (c)(3). Also, Section 151.318(c)(4) does not apply by its own terms because the Property is exempt under at least three different exemptions and is not used simply to maintain or store the chemicals.

In short, the Property is exempt from taxation under 151.318(a)(5), (a)(8), and (a)(10), and neither of the exclusions raised by Appellants changes that result. Nor does the exemption for sales of containers prevent ChampionX from claiming the separate and distinct Manufacturing Exemptions to which it is entitled. Finally, because the Property is exempt under the Manufacturing Exemptions, the Related Services performed on it are also exempt pursuant to Texas Tax Code § 151.3111. The parties agree that the tax treatment of the services depends on the exempt status of the Property. And Section 151.3111 does not require that the services be performed at the time the Property is being used for its exempt purpose.

Accordingly, ChampionX requests this Court to affirm the trial court's judgment that "Tex. Tax Code § 151.318 exempts the portafeed drums, tanks, and totes (the 'Property') at issue from Texas sales and use tax" and "[t]he exemption for services on exempted property under Tex. Tax Code § 151.3111 applies to the cleaning, delivery, and/or pickup services performed on the Property at issue." CR1 916.

13

## STANDARD OF REVIEW

Appellate courts apply *de novo* review to questions of law, including summary judgment and statutory construction. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003); *Cook v. Nissimov*, 580 S.W.3d 745, 751 (Tex. App.—Houston 2019). Summary judgment is appropriate if "(i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, … show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response." Tex. R. Civ. P. 166a(c); *see Jatex Oil & Gas Expl. L.P. v. Nadel & Gussman Permian, LLC*, 629 S.W.3d 397, 409 (Tex. App.—Eastland 2020, no pet.).

The Supreme Court of Texas has explained that "when construing any statute, ***including tax exemptions***, the truest manifestation of what lawmakers intended is what they enacted. We adhere to this maxim 'unless enforcing the plain language of the statute as written would produce absurd results.'" *Texas Student Hous. Auth. v. Brazos Cnty. Appraisal Dist*., 460 S.W.3d 137, 141 (Tex. 2015) (emphasis added). The concept that tax exemptions should be narrowly construed "does not mean disregarding the words used by the Legislature" and "cannot be

used as an excuse to stray from reasonableness." *Hegar v. El Paso Elec. Co.*, 629 S.W.3d 518, 528 (Tex. App.—Austin 2021) (affirming trial court's ruling that the taxpayer's property was exempt pursuant to the Manufacturing Exemption).

## ARGUMENTS

Texas imposes sales and use tax on each "sale" of a "taxable item" (*i.e.,* tangible personal property and taxable services) within the state. *See* Tex. Tax Code §§ 151.005, 151.051, 151.101. However, Texas Tax Code § 151.318 provides eleven exemptions from tax for items used in manufacturing. As detailed in Point II below, three of these exemptions apply to the Property at issue in this case: 151.318(a)(5), (a)(8), and (a)(10).

ChampionX was entitled to summary judgment if the Property satisfied even *one* of the three exemptions. The undisputed facts regarding the critical role ChampionX's porta-feed drums, tanks, and totes play throughout the manufacturing process, however, showed that the Property satisfied *all* three exemptions because the Property's use in manufacturing the chemicals was necessary and essential to: (1) a pollution control process; (2) a quality control process that tested the chemicals being sold; and (3) comply with DOT and UN requirements related to public health. *See infra* Part II.D.

Appellants, however, erroneously claim that an unrelated sales tax exemption under Texas Tax Code § 151.322—exempting sales of containers,

15

depending on whether they are "returnable" or "nonreturnable" and whether sold with or without contents—should be construed to prevent the Property from qualifying for the Manufacturing Exemptions. App. Br. 10, 13-14. Appellants address this issue first in their brief; thus, in accordance with Tex. R. App. P. 38.2, ChampionX responds to that argument first, demonstrating that Section 151.322 does not bar application of the Manufacturing Exemptions. As shown below, Appellants are mistaken that principles of statutory construction require Section 151.322 to take precedence over Section 151.318—and certainly nothing in the plain text supports Appellants' misreading of the statute.

## I. The Trial Court Properly Rejected Appellants' Argument that the Unrelated Exemption Under Section 151.322 Bars ChampionX's Property from Qualifying for the Manufacturing Exemptions in Texas Tax Code § 151.318

Appellants do not contend that the text of Texas Tax Code § 151.322 supports their position that this exemption somehow displaces the Manufacturing Exemptions to which ChampionX is entitled. Nor could they, since nothing in the plain text of the statute says anything like that. Instead, ignoring the plain text, Appellants resort to the statutory construction principle, often referred to as the "*in pari materia*" doctrine, which states that when two separate statutes share the same purpose and irreconcilably conflict, the more specific statute generally controls over the more general statute. App. Br. 13 (citing *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000)). Misapplying this interpretive rule,

16

Appellants assert that Section 151.322 is more specific and thus controls over Section 151.318. App. Br. 14.

Appellants' argument fails for the four reasons explained below.

## A. The Two Provisions Do Not Share the Same Purpose

*First*, Appellants fail to establish that the two provisions share the same purpose, as would be required for the exemption under Section 151.322 to prevail over and create an exception to the Manufacturing Exemptions under Section 151.318.

It is well-settled that the *in pari materia* doctrine, which has been codified in Texas Government Code § 311.026, applies only when statutes share a common purpose or objective. *Texas State Bd. of Chiropractic Examiners v. Abbott*, 391 S.W.3d 343, 348 (Tex. App.—Austin 2013) ("Because these statutes are not *in pari materia*, do not share a common purpose, and are not intended to be construed together, it follows that one provision could not be considered as controlling over the other or as creating an exception to it."). *See also Alejos v. State*, 555 S.W.2d 444, 450 (Tex. Crim. App. 1977) ("[T]he rule is not applicable to enactments that cover different situations and that were apparently not intended to be considered together." (citation omitted)).

Appellants make no attempt to identify a common purpose between Section 151.318 and Section 151.322. *See* App. Br. 13-17. Indeed, Appellants do not even

acknowledge this prerequisite. *See id.* This deficiency alone is reason enough for the Court to reject Appellants' attempt to fashion an exception to the Manufacturing Exemptions out of Section 151.322. *E.g., State v. Wiesman*, 269 S.W.3d 769, 776-77 (Tex. App.—Austin 2008) (declining to hold that one statute prevailed over another statute where the two provisions "d[id] not have the same purpose or objective" and "were intended to cover different situations and protect different interests"); *accord In re J.M.R.*, 149 S.W.3d 289, 292 (Tex. App.—Austin 2004); *State Bd. of Chiropractic Examiner*, 391 S.W.3d at 349.

As the Court explained in *State Board of Chiropractic Examiner*, "To determine whether two statutes share a common purpose, courts consider whether the two statutes were clearly written to achieve the same objective." 391 S.W.3d at 348-49. Section 151.318 and Section 151.322 are distinct provisions that the Legislature enacted to achieve different purposes. While each statute creates exemptions from sales and use tax, this is where the similarities end.

The purpose of the Section 151.318 Manufacturing Exemptions is "encourag[ing] economic development in this state." *Sharp v. Tyler Pipe Indus., Inc.*, 919 S.W.2d 157, 161 (Tex. App.—Austin 1996, writ denied). Because the Legislature determined that it was desirable to encourage manufacturing in Texas, it enacted the Manufacturing Exemptions to reduce the overall sales and use tax liability of manufacturers. This is why the Manufacturing Exemptions can extend

18

to property that is "used, or consumed by a manufacturer" even if the property is not ultimately sold to a customer at retail. *See* Tex. Tax Code § 151.318(a).

The exemption for sales of containers in Section 151.322, by contrast, does not serve the objective of promoting economic growth through manufacturing in Texas. Instead, Section 151.322's exemption for container sales is designed solely to place the tax burden on the ultimate consumer without duplication of tax liability across multiple parties. As the Third Court of Appeals has explained, the exemption in § 151.322 "is obviously designed to avoid imposition of multiple taxes on the value of returnable containers each time they are transferred from the seller of the goods contained therein to a buyer or back to the seller. This would constitute an unfair and discriminatory burden on sellers and consumers of goods which must be sold in returnable containers." *East Texas Oxygen Co. v. State*, 681 S.W.2d 741, 745 (Tex. App.—Austin 1984, no writ).

In sum, each statute operates independently to achieve different purposes— the first incentivizes development and the second seeks to avoid multiple taxation. The simple fact that ChampionX's transactions could potentially be covered by both Section 151.318 and Section 151.322 does not make the two statutes *in pari materia*. *See Weisman*, 269 S.W.3d at 777 ("Although the same conduct may sometimes violate both statutes, this does not mean that the statutes are *in pari materia*.").

Accordingly, the Court should reject Appellants' claim that § 151.322 prevails over § 151.318.

## B. Even Assuming the Two Provisions Share the Same Purpose, They Do Not Irreconcilably Conflict

*Second*, even assuming *arguendo* that the provisions have a common purpose, Appellants fail to identify an irreconcilable conflict.

As the Texas Government Code directs, "[i]f a general provision conflicts with a special or local provision, the provisions **shall be construed**, if possible, **so that effect is given to both**." Tex. Gov. Code § 311.026(a) (Appendix F) (emphasis added). Thus, even when two statutes have the same purpose, Texas courts will harmonize the two "whenever possible," making every effort to give effect to *both* provisions rather than allowing one to supplant the other. *Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 757 (Tex. 2017). Only in the limited instance of an "irreconcilable conflict" will one statute control over another. *See Texas Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC*, 324 S.W.3d 95, 107 (Tex. 2010) (declining to use one provision to prevail over another where the two provisions could be "easily harmonized").

The Comptroller has previously acknowledged the lack of conflict between these two statues. In Texas Policy Letter Ruling No. 200108400L (Aug. 6, 2001), the Comptroller found that the taxpayer, a manufacturer of cable products, could make tax-free purchases of returnable steel reels that the taxpayer used to ship its

20

products to customers. The taxpayer first stored its cable on the reels and then shipped the reels to customers. *Id.* The customers returned the reels to the taxpayer once all the cable had been removed. The Comptroller determined that the reusable reels qualified as wrapping, packing, and packaging supplies used to further the sale of the taxpayer's product and were, therefore, eligible for a manufacturing exemption found in Section 151.318:

> As a manufacturer of cable, CABLE COMPANY may make tax-free purchases of returnable steel cable reels that CABLE COMPANY uses to ship its product to its customers. The reels qualify as wrapping, packing, and packaging supplies that are used to further the sale of CABLE COMPANY'S product.

*Id.* The exemption for containers under Section 151.322 was apparently no obstacle to the Comptroller's decision in the policy letter. *Id.*[2]

## C. Even Assuming a Conflict, Section 151.318 Controls as the More Specific Provision

*Third,* even if an irreconcilable conflict existed between the two statutes, Section 151.318 should control over Section 151.322 because it is the more specific provision.

---

[2] On February 13, 2023, when this case was pending in the trial court, the Comptroller designated Texas Policy Letter 200108400L as "superseded" in the STAR database. The policy letter was not superseded by subsequent authority. Rather, the Comptroller alleges the letter was "superseded" because it was "contrary to the holding of *East Texas Oxygen Co.,*"—a decision that preceded the 2001 policy letter by more than 15 years. *East Texas Oxygen* is not contrary to Tax Policy Letter 200108400L and, as noted, did not even address the Manufacturing Exemption.

Section 151.318 is more specific because it is limited to a narrow class of taxpayers: manufacturers satisfying the definitions provided in the statute and Administrative Code. *See* Tex. Tax Code § 151.318(a), (d); 34 Tex. Admin. Code § 3.300(a)(2), (5), (8), (9), (10) (Appendix G). In addition, the Manufacturing Exemptions apply only to certain items used in the manufacturing activities enumerated in § 151.318(a)(1)-(11), such as compliance with public health laws, a pollution control process, or a quality control process. Section 151.322 on the other hand can only be viewed as the more general provision because it extends to all taxpayers who sell containers.

Therefore, even if the statutory construction rule that Appellants invoke were to apply, the Court should hold that the Manufacturing Exemptions in 151.318 govern as the more specific statute, both with respect to the class of eligible taxpayers and the types of activity that qualify for the exemption. *See* *Springer v. Johnson*, 280 S.W.3d 322, 329 (Tex. App.—Amarillo 2008, no pet.) ("[W]hen the law makes a general provision, apparently for all classes, and a special provision for a particular class, the general must yield to the special insofar as the particular class is concerned."); *Ramos v. State*, 928 S.W.2d 160, 161-62 (Tex. App.—Houston 1996, pet. ref'd).

### D. The Manufacturing Exemptions Under 151.318 Control as the Latest-Amended Provision

*Fourth,* even assuming an irreconcilable conflict and even assuming Texas Tax Code § 151.318 is the more general statute, Appellants' argument fails because Section 151.318 is the later enactment and the Legislature intended that it would prevail.

The Texas Government Code specifies that:

> If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, **unless the general provision is the later enactment and the manifest intent is that the general provision prevail**.

Tex. Gov. Code § 311.026(b) (emphasis added). Here, the Manufacturing Exemptions in Section 151.318 on which ChampionX relies have been newly enacted or amended since the latest legislative change to Section 151.322, which took place in 1991.[3]

In particular, in 1999, the Legislature added a global requirement that any property qualifying for § 151.318(a) must be "sold, leased, or rented to, or stored, used, or consumed by a manufacturer." Tex. Sess. Laws, Acts 1999, 76th Leg., ch. 1467, § 2.19, eff. Oct. 1, 1999. The same legislation amended the 151.318(a)(5)

---

[3] The current iteration of section 151.322 was originally effective in 1982, *see* Tex. Sess. Laws, Acts 1981, 67th Leg., p. 1566, ch. 389, § 1, eff. Jan. 1, 1982, and was last amended in 1991, *see* Tex. Sess. Laws, Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 14.10.

exemption regarding pollution control processes. *Id.* And this same 1999 legislation also expanded the Manufacturing Exemptions to quality control processes and public health requirements for the first time by adding § 151.318(a)(8) and (a)(10). Then, in 2001, the Legislature amended § 151.318(a)(8) again to add a requirement that the quality control process must "test[] [the] tangible personal property that is being manufactured, processed, or fabricated for ultimate sale." *See* Tex. Sess. Laws, Acts 2001, 77th Leg., ch. 1263, § 22, eff. Oct. 1, 2001.

It was the manifest intent of the Legislature that the exemption for containers not operate as an exception to the Manufacturing Exemptions. Never once during the numerous revisions to Section 151.318 did the Legislature express intent for Section 151.322 to preclude application of the Manufacturing Exemptions. *See In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013) ("Legislative intent is best revealed in legislative language … ."); *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008) (explaining that when the Legislature omits material from a statute, it does so intentionally and for a reason).

**E.** ***East Texas Oxygen* Does Not Address the Manufacturing Exemptions and Has No Application Here**

Appellants cite *East Texas Oxygen* to support their argument that Section 151.322 prevails over Section 151.318. *App. Br.* 16-17; CR1 496. However, that

case did not involve Section 151.318's Manufacturing Exemptions at all and provides no support for Appellants' position.

In *East Texas Oxygen*, a taxpayer purchased returnable metal cylinders that it filled with oxygen for sale to customers. 681 S.W.2d at 742. The taxpayer claimed a sales tax exemption based on the sale-for-resale exemption;[4] significantly, the taxpayer ***did not*** seek a Manufacturing Exemption. *See id.* at 744. The decision never specifies whether the taxpayer would have even qualified as a "manufacturer" of the oxygen. The Court in *East Texas Oxygen* found that the taxpayer's position would render the sale-for-resale exemption "meaningless" because every sale of returnable containers—whether or not sold with their contents as Section 151.322 requires—would qualify under the text of the sale-for-resale exemption. *Id.* at 745. Only after recognizing this irreconcilable conflict between the statutes did the Court rule that the provision specifically dealing with containers "must prevail over and constitute an *exception* to the general rule that '***sales for resale***' are exempt from the sales tax." *Id.* (emphasis added). At most, *East Texas Oxygen* stands for the narrow proposition that the exemption for sales of containers cannot be harmonized with and is narrower than the sale-for-resale

---

[4] The sale-for-resale exemption generally ensures that sales tax does not apply when a purchaser acquires taxable property for the purposes of reselling it. *See* Tex. Tax Code §§ 151.006, 151.302. The exemption places the tax burden on the ultimate consumer to avoid duplication of tax.

exemption. *See Combs v. Health Care Services Corp.*, No. 03–09–00617–CV, 2011 WL 1005419, at \*7 (Tex. App. Austin—Mar. 16, 2011, pet. granted), *aff'd in relevant part and rev'd in part on other grounds*, 401 S.W.3d 623 (Tex. 2013) (rejecting an overbroad reading of *East Texas Oxygen*; explaining that the decision only addressed "the particular transaction at issue" in that case).

Unlike the sale-for-resale exemption, Section 151.318's Manufacturing Exemptions do not render Section 151.322 "meaningless." For instance, to qualify for any of the Manufacturing Exemptions under 151.318(a), the taxpayer must of course be a "manufacturer." Thus, the exemption for containers cannot be rendered meaningless because manufacturers and non-manufacturers alike can claim exemption.

*East Texas Oxygen* does, however, provide some guidance to the Court. The decision expressly acknowledges that where, as here, two statutes serve different purposes, the Comptroller may not point to one statute in order to "exclude the transaction in question" from the clear ambit of the statute. *Id.* at 746 (citing *Schlusselberg v. Calvert*, 443 S.W.2d 695, 696 (Tex. 1969)). Thus, even *East Texas Oxygen* supports ChampionX's ability to claim the Manufacturing Exemptions.

For all these reasons, Section 151.322 does not bar application of the Manufacturing Exemptions in Section 151.318, and the trial court decision should be affirmed.

**II.    The Trial Court Was Correct in Ruling the Property at Issue Qualifies for, and Is Not Excluded from, the Manufacturing Exemptions in Texas Tax Code § 151.318**

The Final Judgment provides that ChampionX is entitled to refunds under Texas Tax Code § 151.318, meaning by necessity that ChampionX satisfied the elements of one or more Manufacturing Exemptions, and was not barred by the exclusions found in Subsection (c). On appeal, Appellants challenge this holding on two grounds. First, Appellants argue that ChampionX did not establish that it is entitled to exemption (a)(1). Next, Appellants argue that even if ChampionX is entitled to a manufacturing exemption, relief is barred by the exclusions under Subsections (c)(3) and (c)(4). As demonstrated below, Appellants are wrong on both accounts. First, ChampionX did not seek, and therefore the trial court did not conclude, that it is entitled to exemption (a)(1). Rather, ChampionX sought refunds under exemptions (a)(5), (a)(8) and/or (a)(10). *See infra*, pp. 30-31. These—(a)(5), (a)(8) and/or (a)(10)—are the exemptions supporting the judgment and the trial court's holding that ChampionX is entitled to refunds. Appellants failed, however, to address these exemptions in their brief, thereby waiving any such arguments

27

altogether. *See infra*, pp. 32-36. Second, Subsections (c)(3) and (c)(4) do not exclude the Property from the Subsection (a) exemptions. *See infra*, pp. 46-52.

## A.     The Manufacturing Exemptions

Section 151.318 is comprised of various subparts, two of which are relevant here. Subsection (a) lists the requirements that must be satisfied to claim a manufacturing exemption. Subpart (c) lists specific items that are excluded from the Manufacturing Exemptions.[5]

Subsection (a) starts with a threshold requirement that the Manufacturing Exemptions apply only to manufacturers. *See* Tex. Tax Code § 151.318(a) ("The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed ***by a manufacturer***:") (emphasis added). Subsection (a) then lists eleven exemptions for items (tangible personal property and services) used by a manufacturer during manufacturing that are exempt from tax. *See* Tex. Tax Code § 151.318(a)(1) – (a)(11). Thus, to meet the requirements of Subsection (a), ChampionX was required to establish—and did establish—that it is a manufacturer and that it satisfies one or more of the eleven exemptions.

---

[5] Sales and use tax exemptions are intended to exempt from taxation property or services that otherwise are subject to the imposition of tax. Exclusions to tax exemptions are exceptions to the exemptions; they function to remove or exclude particular property or services from the scope of the exemption, resulting in taxation of the property or services that fall within the scope of the exclusions.

Moving on to the specific exemptions claimed here, ChampionX claims three exemptions, Tex. Tax Code § 151.318(a)(5), (a)(8) and (a)(10):

Texas Tax Code - TAX § 151.318. Property Used in Manufacturing

(a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:

. . .

(5) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process;

. . .

(8) tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale;

. . .

(10) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health;

All three exemptions include a requirement that the item be "used or consumed in the actual manufacturing … of tangible personal property for ultimate sale." *Id*. Thus, a second threshold requirement for each of the exemptions ChampionX claims is that the item is used or consumed in the manufacturing process. Finally, each one of the three exemptions has an additional requirement

29

that ChampionX must fulfill—and has fulfilled. Exemption (a)(5) requires that the property be "necessary and essential to a pollution control process;" exemption (a)(8) requires that it be "necessary and essential to a quality control process;" and exemption (a)(10) requires that use of the property be "necessary and essential to comply with federal, state or local laws or rules that require that established requirements related to public health." *Id*.

This statutory text is "clear and unambiguous"; therefore, the Court must construe it "according to its plain meaning" and in a manner that is reasonable. *Gard v. Bandera Cnty. Appraisal Dist.*, 293 S.W.3d 613, 618 (Tex. App.—San Antonio 2009, no pet.); *see also supra*, pp. 14-15.

## B. Appellants Misconstrue the Manufacturing Exemptions Sought by ChampionX and Awarded by the Trial Court

In their brief, Appellants contend that two requirements must be met for the Property at issue to be exempt under Section 151.318. ChampionX agrees with the first recited requirement that the Property must be sold or leased to a manufacturer. App. Br. 18. But Appellants incorrectly contend that a second requirement exists— that the Property "must be used as an ingredient or component part of the tangible personal property [*i.e.*, chemicals] manufactured for ultimate sale." App. Br. 18 (citing Tex. Tax Code § 151.318(a)(1)). Appellants do not contest that ChampionX

satisfies the first requirement,[6] but they contend that ChampionX's refund claims "hinge" on the second requirement, found only in Subsection (a)(1)—which, they argue, ChampionX did not prove. App. Br. 17, 19.

The second requirement asserted by Appellants, however, does not apply here; it derives from a *different* Manufacturing Exemption, the one found in (a)(1).[7] ChampionX did not claim this exemption (a)(1) in its motion for summary judgment; rather, ChampionX sought judgment under Manufacturing Exemptions (a)(5), (a)(8), and (a)(10), which do not require the products to be ingredients or component parts.[8] Thus, any consideration by the Court of Subsection (a)(1) is unnecessary. Not being an exemption claimed by ChampionX in the summary judgment proceedings, and not being an exemption adjudicated by the trial court, that particular exemption is not properly on appeal.

---

[6] *See infra*, pp. 36-39.

[7] The threshold manufacturer requirement of Subsection(a) and the Subsection (a)(1) exemption together read:

> (a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer: (1) tangible personal property that will become *an ingredient or component part* of tangible personal property manufactured, processed, or fabricated for ultimate sale;

Tex. Tax Code § 151.318(a)(1) ((emphasis added).

[8] CR1 163-75, 516-17, 519-23.

**C. Appellants Have Waived the Right to Appeal ChampionX's Satisfaction of the Terms of Manufacturing Exemptions (a)(5), (a)(8), and (a)(10)**

Directing both their trial court and appellate briefing to exemption (a)(1), Appellants wholly omit any reference to or appeal of the application of the three exemptions actually sought: (a)(5), (a)(8), and (a)(10). Consequently, Appellants have waived any argument that ChampionX has not met the elements of these three exemptions.

**1. Appellants failed to preserve any Subsection (a)(5), (a)(8), or (a)(10) arguments in the trial court.**

In its summary judgment motion, ChampionX argued that the Property qualified for the Manufacturing Exemptions under Sections (a)(5), (a)(8), and (a)(10). CR1 163-75. Appellants' summary judgment briefing neglected to dispute any evidence or authority cited in ChampionX's motion showing that it is entitled to an exemption under these subsections. Rather than challenge that the Property qualifies for the three exemptions sought, Appellants bypassed these arguments completely, instead skipping to their argument that the Property is excluded under Texas Tax Code § 151.318(c). *See, e.g.,* CR1 494-95. *See also* CR1 843 (Appellants' Reply Brief) (admitting "Plaintiff may indeed be able to show that they are engaged in a manufacturing process that includes a pollution control (subsection (a)(5)) or a quality control (subsection (a)(8)), or are required to comply with federal, state, or local public health requirements (subsection

32

(a)(10)),” but then erroneously asserting that the exclusions in Subsection 151.318(c) “remove Plaintiff’s purchases out of the manufacturing exemption[s].”).

Appellants therefore failed to preserve in the trial court any argument respecting ChampionX’s satisfaction of the terms of the (a)(5), (a)(8), and (a)(10) exemptions. “[B]oth the reasons for the summary judgment and the objections to it must be in writing and before the trial judge at the hearing.” *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 677 (Tex. 1979); *see also Mitchell v. MAP Res., Inc.*, 649 S.W.3d 180, 196 (Tex. 2022) (holding that in an appeal from a summary judgment ruling, issues in front of the appellate court “must have been actually  presented to and considered by the trial court”); TEX. R. CIV. P. 166a(c) (“[I]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.”).

Indeed, any argument as to why exemptions (a)(5), (a)(8), and (a)(10) did *not* apply to the Property was never actually presented to the trial court in *any* of Appellants’ summary judgment briefing or at oral argument. The only subsection of Texas Tax Code § 151.318(a) that Appellants claimed ChampionX failed to satisfy was (a)(1)—a subsection on which ChampionX did not move for judgment. *See* CR1 494-95, 843.

Therefore, Appellants' briefing did not fairly advise ChampionX that they opposed summary judgment on the grounds that Subsections (a)(5), (a)(8), and (a)(10) did not apply to the Property. As a consequence, Appellants did not preserve any challenge to the application of (a)(5), (a)(8), and (a)(10) below and have waived any corresponding arguments on appeal.

**2. Appellants likewise waived any Subsection (a)(5), (a)(8), or (a)(10) arguments in this Court by failing to brief them on appeal.**

In addition to failing to preserve the issue in the trial court, Appellants failed to brief the applicability of (a)(5), (a)(8), and (a)(10) before this Court. Appellants' appellate briefing mirrors their summary judgment briefing below in that they, yet again, *never* argue that ChampionX failed to establish that the Property qualified for the three Manufacturing Exemptions. Instead, Appellants argue only that ChampionX is not entitled to an exemption under (a)(1) and that the exclusions in Section 151.318(c) apply. App. Br. 17-22.

Failure to brief these arguments has waived any corresponding challenges on appeal. *See Los Compadres Pescadores v. Valdez*, 622 S.W.3d 771, 780 (Tex. 2021) (holding that appellant waived argument by failing to include it in its appellate briefing); *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 452–53 (Tex. 1978) (holding that "grounds of error not asserted by points of error or argument in the court of civil appeals are waived"); *San Jacinto River Auth. v.*

*Duke*, 783 S.W.2d 209, 209–10 (Tex. 1990) (describing the rule that "grounds of error not asserted by points of error or argument in the court of appeals are waived" as "well-established"); *Delta Cnty. Appraisal Dist. v. PPF Gin & Warehouse, LLC*, 632 S.W.3d 637, 652 (Tex. App.—Texarkana 2021, pet. denied) (holding that appraisal district waived a point of error by failing to "make a clear and concise argument"); *see also Cunningham v. Waymire*, 612 S.W.3d 47, 67 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding that parties could not remedy briefing waiver by briefing an argument for the first time in a reply brief).

By neglecting to brief any arguments with respect to Manufacturing Exemptions (a)(5), (a)(8), and (a)(10), Appellants have also failed to comply with the longstanding rule that an appellant must challenge *all* possible grounds for summary judgment when the trial court's order does not specify the grounds for granting judgment. *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970) (affirming summary judgment when appellant failed to challenge all possible grounds the summary judgment order could have been based upon). Here, the trial court did not specify upon which of the three exemptions it based its judgment. Instead, the trial court's order simply states that ChampionX's motion was granted, CR1 864, and the final judgment gives Sections 151.318 and 151.3111 as the basis for granting the refund claims, CR1 916. Accordingly, on appeal, Appellants are required to challenge all possible grounds for summary

35

judgment by either "raising separate issues" or "'asserting a general issue that the trial court erred in granting summary judgment and within that issue providing argument negating all possible grounds upon which summary judgment could have been granted.'" *Rosetta Res. Operating, LP v. Martin,* 645 S.W.3d 212, 227 (Tex. 2022) (citation omitted). Appellants have done neither.

For these reasons, Appellants have waived any argument that ChampionX did not satisfy Subsections (a)(5), (a)(8), and (a)(10).

**D. The Court Should in any Event Affirm the Trial Court Holding that ChampionX Has Satisfied the Elements of the Manufacturing Exemptions (a)(5), (a)(8), and (a)(10)**

Because Appellants waived the right to appeal ChampionX's satisfaction of the requirements of Subsections (a)(5), (a)(8), and (a)(10), the Court should not review or address these issues. If it did, however, the result would be the same: summary judgment should be affirmed because ChampionX established its entitlement to these exemptions as a matter of law.

**1. The Property satisfies the threshold requirements for Subsections (a)(5), (a)(8), and (a)(10).**

Appellants concede that the Property was sold and leased to ChampionX, a manufacturer,[9] and that the Property was used in manufacturing tangible personal

---

[9] The statute does not define the term "manufacturer." But the corresponding regulation defines "manufacturer" as "[a] person who is engaged in manufacturing." 34 Tex. Admin. Code 3.300(a)(8).

36

property (*i.e.*, chemicals) for sale to customers. The Joint Stipulation of Facts establishes the following facts:

- "Plaintiff manufactures and sells various types of chemicals for the energy and water industries." CR1 216.

- "Plaintiff's chemical manufacturing process consists of charging raw materials in bulk tanks, blending, and adding a catalyst." CR1 218.

- "Plaintiff then tests the product to ensure it meets customer and industry specifications." *Id.*

- "Next, [Plaintiff] cools the product and transfers it from the reactor into a selected [drums, totes, or tanks] at the plant." *Id.*

- Plaintiff designed the Property "to hold the chemicals it manufactured." CR1 217.

- "Plaintiff delivers its chemicals in the [drums, totes, and tanks] to the customer." CR1 218.

- "Cleaned and repaired [drums, totes, and tanks] are transferred back to Plaintiff and inserted back into the manufacturing process." CR1 219.

*See also* CR1 205-09 (discussing the manufacturing process and demonstrating that the chemicals ChampionX produced had to be packaged in the Property to be sold and transferred to customers).

As Appellants themselves represented to the trial court, "there is no dispute that Plaintiff is engaged in manufacturing" and qualifies for Manufacturing Exemptions (a)(5), (a)(8), and (a)(10) in the first instance. CR1 843 (Appellants' Reply Brief). *See* 34 Tex. Admin. Code § 3.300(d)(15) (indicating exempt items

37

under Section 151.318 include containers and packaging that are used to further the sale of a product); 34 Tex. Admin. Code § 3.314(b)(1) (Appendix H) ("Sales or use tax is not due on containers or packaging supplies purchased by manufacturers for use as a part of the completion of the manufacturing process.… [T]he manufacturing process is [only] complete when the tangible personal property being produced has been packaged by the manufacturer as it will be sold[.]").[10] *See also* Tex. Pol'y Letter Ruling No. 200108400L (Aug. 6, 2001) (Appendix I) ("As a manufacturer of cable, CABLE COMPANY may make tax-free purchases of returnable steel cable reels that CABLE COMPANY uses to ship its product to its customers. The reels qualify as wrapping, packing, and packaging supplies that are used to further the sale of CABLE COMPANY'S product.")[11]; *accord* Tex. Pol'y Letter Ruling No. 9904382L (Apr. 7, 1999) (Appendix J).

Based on the foregoing, the Property is sold and leased to a manufacturer and is used in manufacturing chemicals for sale as required by Subsections (a)(5),

---

[10] Notably, section 3.314 contains definitions for the terms "containers," "nonreturnable containers," and "returnable containers." Yet, the regulation simply states that tax "is not due on **containers**"—without distinguishing between nonreturnable or returnable containers—purchased by manufacturers for use as part of completing the manufacturing process. 34 Tex. Admin. Code § 3.314(b)(1) (emphasis added).

[11] There are no consequential differences between the returnable reels in Letter 200108400L and the Property in this case. The Property is used to further the sale of product (chemicals) in the same way the reels in the letter were used to further the sale of product (cable).

(a)(8), and (a)(10) regardless of whether the Property was later returned to ChampionX to be reused in the manufacturing process.

> **2.    The Property satisfies the other requirements for Subsections (a)(5), (a)(8), and (a)(10).**
>
>> **a.    The Property is exempt under 151.318(a)(10) because its use was necessary and essential to comply with requirements related to public health.**

Addressing the subsections in reverse order, there is no genuine issue of fact that the Property is exempt from tax under (a)(10) because the use of it during manufacturing was "necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health." Tex. Tax Code § 151.318(a)(10). *See also* 34 Tex. Admin. Code § 3.300(d)(11).

Appellants admit that the Property ensures that the chemicals do not have a reaction "with the environment" and "meet government regulations and standards." CR1 197. The governmental regulations and standards that the Property meets include the DOT regulations in Title 49 of the Code of Federal Regulations that govern hazardous materials for all forms of transportation to, from, and within the United States. CR1 199. The DOT regulations cover, among other things, requirements for packaging standards and are based on the UN's Model Regulations regarding dangerous goods. CR1 199-00.

These DOT and UN regulations and standards are laws or rules that establish requirements related to public health. The Federal Hazardous Materials

Transportation law, 49 U.S.C. § 5101 *et seq.*, is the basic statute regulating the transportation of hazardous materials in the United States. Section 5101 states that the purpose of the law is to "protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5101. Section 5103 provides that the Secretary of Transportation shall issue regulations relating to the security of hazardous material in intrastate, interstate, and foreign commerce. 49 U.S.C. § 5103.

The hazardous materials regulations issued by the DOT are set forth in 49 C.F.R. parts 100-180. The DOT regulations define a hazardous material as "a substance or material that the Secretary of Transportation has determined is capable of posing an unreasonable risk to health, safety … and has been designated as hazardous." 49 C.F.R. § 171.8. The DOT regulations cover nine classes of hazardous materials, including: explosives, gases, flammables, oxidizers, organic peroxides, poisonous materials, radioactive materials, and corrosive materials. 49 C.F.R. § 173.2; *see also* 49 C.F.R. § 172.101. In addition, the regulations cover many areas such as material classification and labeling, packaging specifications, and operational rules that must be followed to ensure the safety of hazardous materials. The packaging requirements, which are based on the UN standards, are contained in 49 C.F.R. parts 173, 178, and 180.

Comptroller decisions and case law confirm that these DOT and UN regulations and standards "establish requirements related to public health." Tex. Tax Code § 151.318(a)(10). *See* Tex. Comptroller's Decision No. 40,875 (July 1, 2008) (Appendix K) (holding that (1) federal standards that prohibited the discharge into the environment of certain chemicals above specified quantities and required reporting of spills and leaks and (2) the Texas Hazardous Substances Spill and Prevention and Control Act that regulated discharges of hazardous substances were public health laws for purposes of Section 151.318(a)(10)). *See also United States v. Sellers*, 926 F.2d 410, 416 n.2 (5th Cir. 1991) (stating that the Resource Conservation and Recovery Act, which Congress enacted to regulate the treatment, storage, and disposal of hazardous wastes was a "regulatory statute intended to protect public health").

It is clear that use of the Property is necessary and essential to comply with the public health requirements set by the DOT and UN regulations and standards. CR1 207. At least 60% of the chemicals that ChampionX manufactures and transfers to customers contain one or more classes of hazardous materials regulated by the DOT; primarily, flammables, corrosives, and oxidizers. CR1 197-98. For the top ten chemical products manufactured by ChampionX that were packaged in the Property sold to customers in Texas during the Periods at Issue, safety data sheets show that nine of the ten products contained regulated materials. CR1 200.

41

The Property used to deliver ChampionX's products to customers was designed and tested to meet the DOT regulations and UN standards for hazardous materials to ensure the Property is safe for delivering the chemicals. CR1 201. ChampionX ensures that its Property larger than 119 gallons are compliant with the DOT's IBC or "bulk packaging" regulations under 49 C.F.R. parts 100-185. CR1 201. For this Property, ChampionX prepared 2.5 Year and 5 Year Recertification Guidelines to establish procedures necessary to comply with the DOT and UN regulations and standards. CR1 202-03; *see also* CR1 203 (attaching a copy of a sample Packaging Systems Inspection, Testing and Maintenance Record). For Property smaller than 119 gallons, ChampionX ensures that they comply with the DOT's "non-bulk packaging" or "drum" regulations under 49 C.F.R. parts 100-185. CR1 201.

Specification sheets for the Property state that they "meet[] United States Department of Transportation (DOT) Specification found in Code of Federal Regulations Section 49" and "also meet United Nations (UN) standards for Intermediate Bulk Containers (IBC's) contained in the Orange Book." CR1 201-02. The specification sheets explain that the Property:

> Eliminate[] chemical exposure hazards and help[] prevent injuries by not having to triple-rinse, cut, or crush drums for disposal.

> Contribute[] to a cleaner environment by helping to reduce drum disposal in landfills.

Reduce[] the chance for chemical spills (See SARA Title III regulations).

CR1 203.

In short, the chemicals, include hazardous materials. It was necessary and essential for ChampionX's products to be enclosed in a device such as the Property in order to comply with DOT regulations and UN standards designed to protect public health.

> **b.     The Property is independently exempt under 151.318(a)(8) because its use was necessary and essential to a quality control process.**

Because the Property was sold or leased to ChampionX, a manufacturer, and it was used in ChampionX's chemical manufacturing process, ChampionX needed only to show that use of the Property was "necessary and essential to a quality control process that tests tangible personal property that is being manufactured … for ultimate sale" to qualify for the exemption under Subsection (a)(8). Tex. Tax Code § 151.318(a)(8); 34 Tex. Admin. Code § 3.300(d)(2). The undisputed summary judgment record establishes that ChampionX made that showing.

ChampionX has developed specifications for the chemical products it manufactures. CR1 206. Also, ChampionX's chemicals must meet customer and industry specifications. *Id*. To ensure that these specifications are being achieved, ChampionX implemented procedures to test its chemicals. *Id.*

The initial stages of ChampionX's chemical manufacturing process involve blending and charging raw materials in reactors. CR1 205-06. ChampionX first tests its products while they are in the reactor. CR1 206. After the product is cooled and transferred from the reactor into selected Property, ChampionX performs additional testing on each batch of chemical products. *Id.* When a batch of produced chemicals is placed into the Property, ChampionX tests a sample of chemicals from the first and last vessel filled from the batch to check for contamination that may have entered the chemicals during the process of final packaging and confirm that the chemicals have maintained necessary specifications. *Id.*

Testing typically includes a visual inspection and a Fourier Transform Infrared Spectroscopy ("FTIR") test. CR1 207. If ChampionX's chemicals meet the set specifications, the Property is tagged and sealed. *Id.* Because quality control testing is performed after chemicals are filled into the Property, but before it is tagged and sealed, the Property is a necessary and essential part of ChampionX's overall quality control process and is, therefore, exempt. *See* 34 Tex. Admin. Code § 3.300(d)(9) (explaining that the Manufacturing Exemption extends to equipment necessary and essential to quality control testing that occurs before wrapping and packing); *see also* Tex. Comptroller's Decision No. 106,331 (Feb. 27, 2015) (Appendix L) (allowing the Manufacturing Exemption under Subsection (a)(8) for

44

equipment used to test a sample of tangible personal property intended for sale, even where "the quality-control testing will render the tested sample unfit for sale"); Texas Policy Letter Ruling No. 9911987L (Nov. 5, 1999) (Appendix M) (allowing the Manufacturing Exemption for a "sample pot" that "allow[ed] for in-process sampling of the product" and was used to "insure the overall quality of the product in the manufacturing process").

> c. **The Property is independently exempt under 151.318(a)(5) because its use was necessary and essential to a pollution control process.**

The Court should hold that the sale and lease of the Property are exempt under Subsection (a)(5) because use of the Property was "necessary and essential to a pollution control process." Tex. Tax Code § 151.318(a)(5); 34 Tex. Admin. Code § 3.300(d)(9).

For purposes of applying the Manufacturing Exemption to personal property related to a pollution control process, the Comptroller's guidance confirms that "[t]he statute does not require simultaneous use for processing [or manufacturing] and pollution control." Tex. Comptroller's Decision No. 115,803 (Jan 11, 2023) (Appendix N). Instead, the statute requires "that the tangible personal property be used for both purposes at some point." *Id.* Here, the Property was used at the completion of the manufacturing process. *See supra,* pp. 2, 4-5. Thereafter, it was used to prevent spills and chemical emissions for pollution control. CR1 203-04.

The undisputed evidence establishes that the Property "[r]educes the chance for chemical spills," and "[e]liminat[es] spills" thereby "avoid[ing] exposure to chemical emissions." *Id.* The Property also "eliminate[s] chemical exposure hazards" and contribute[s] to a cleaner environment by helping to reduce drum disposal in landfills." *Id.* Through eliminating chemical emissions and keeping chemicals, including some hazardous materials, out of landfills, the Property was necessary and essential to a pollution control process. *See* Tex. Comptroller's Decision No. 43,944 (Aug. 6, 2007) (Appendix O) (indicating the taxpayer's equipment that "remov[ed] potentially harmful emissions during the dry cement manufacturing process [wa]s necessary and essential to a pollution control process").

Because the Property is exempt under Subsections 151.318(a)(5), (a)(8), and (a)(10), the Court should affirm the trial court's judgment granting ChampionX's refund claim for the Property.

### E. Subsection (c) Does Not Exclude the Property from the Manufacturing Exemptions

In addition to arguing the Property is not exempt under 151.318(a)(1), Appellants erroneously contend that the Property is excluded from the Manufacturing Exemptions pursuant to Texas Tax Code § 151.318(c)(3) and (c)(4). App. Br. 20.

Neither of these exclusions applies as a matter of law.

46

### 1. The exclusion under Subsection (c)(3) does not apply.

Texas Tax Code § 151.318(c)(3) states that the manufacturing exemption "does not include … equipment or supplies used in … distribution activities … or transportation activities."

Texas Comptroller's Decision No. 24,833 (Apr. 10, 1990) (Appendix P) discussed at length the Manufacturing Exemptions and the exclusions in 151.318(c). As an initial matter, the Comptroller noted that "[f]rom 1963, virtually the inception of this state's sales and use taxes, tangible personal property used or consumed in an actual manufacturing or processing operation has been exempted from tax if necessary or essential to the operation, and provided the property used or consumed was not excluded[.]"

The Comptroller further explained that, with respect to the exclusion under (c)(3),[12] the Legislature (i) "essentially regurgitated" the basic requirements of the exemption that the property must be used or consumed in, and be necessary and essential to, actual manufacturing; and (ii) gave equipment or supplies used in distribution or transportation activities as examples of items not necessary and essential to actual manufacturing. *Id. See also* Tex. Comptroller's Decision No. 12,587 (June 28, 1982) (Appendix Q) (holding that "the test [for] whether a

---

[12] Subsection (c)(3) in the current version of the statute was (c)(4) in the version of the statute in effect at the time of the Comptroller's Decision.

particular item should be called … 'transportation equipment' should be determined by whether or not it can qualify under Section (a)[] as being used in the actual manufacturing"). Because the Property is used as packaging in the completion of the actual manufacturing of ChampionX's chemicals, *see supra* pp. 2, 4-5, it is not excluded under (c)(3).

Moreover, the Property is not equipment used in "distribution activities" or "transportation activities" within the meaning of (c)(3). The text of the exclusion and the Comptroller's own guidance interpreting it demonstrate that these terms are limited to equipment and supplies—such as pipes, cranes, hoists, and conveyor belts—that are used solely because they have mechanical properties that move product from place to place.

Texas Comptroller's Decision No. 24,833 (Apr. 10, 1990) provides that the exclusions "comprehend pipes and conveyor belts and any other property used as the means of moving, carrying, transporting, or transmitting something," with the "something" being the product being manufactured. *See also* 34 Tex. Admin. Code § 3.300(c)(5) (describing transportation equipment as "equipment that is used to move a product or raw material in connection with the manufacturing process, and specifically including all piping, conveyor systems, and related pumps (unless otherwise exempted), meters, valves, or rollers"); Tex. Comptroller's Decision No. 27,919 (Oct. 23, 1991) (Appendix R) (holding

overhead cranes, hoists, and wires that "move[d]" steel from step-to-step in the taxpayer's galvanizing process were excluded equipment used in a transportation activity).

In claiming that the exclusion under Subsection (c)(3) applies, Appellants rely solely on a flawed analogy that compares the Property to tanker trucks: "Similar to a tanker truck delivering gasoline to the storage tanks of a service station, Champion[X] used its Containers to distribute and transport chemicals to end-user customers." App. Br. 21. The use of this analogy admits that the exclusion under (c)(3) is limited to property that itself is used to mechanically move product. A tanker truck is not even close to "packaging" like that at issue here.

The on-point and more appropriate analogy remains the steel reels in Tax Policy Letter 200108400L (Aug. 6, 2001). The Property is used to deliver ChampionX's chemicals in the same way that reels in the policy letter were used to deliver the taxpayer's cable. As Appellants concede, the Property is used in the manufacturing of ChampionX's chemicals and is part of the physical properties of the product when transferred to customers. *See* App. Br. 3 (stating ChampionX uses the Property to "deliver[] its chemicals to its end-user customers" and that cleaned and repaired Property is "inserted back into Champion[X]'s chemical

49

production process to be reused for sending new batches of chemicals to additional end-user customers").

The scope of exclusion (c)(3) does not reach the Property in this case.

## 2. The exclusion under Subsection(c)(4) does not apply.

Texas Tax Code § 151.318(c)(4) states that the manufacturing exemption "does not include … machinery and equipment or supplies to the extent not otherwise exempted under this section used to maintain or store tangible personal property[.]"

As demonstrated above, the Property *is otherwise exempted* under Subsections (a)(5), (a)(8), and (a)(10). *See supra* Part II.D. Furthermore, the fact that the Property prevents the chemicals from having a reaction with the Property or with the environment and preserves the chemical composition of the product distinguishes it from ordinary supplies and equipment used solely to maintain and store a product. *See State v. B.F. Goodrich Co.*, 617 S.W.2d 835 (Tex. Civ. App. 1981), writ ref' n.r.e. (Nov. 25, 1981).

For example, in *B.F. Goodrich*, a rubber manufacturer used materials to wrap raw rubber before it was removed from the production line to prevent the rubber from becoming contaminated by foreign materials such as dust, dirt, paper, etc. *Id.* at 837. The manufacturer also used other packaging materials (*e.g.*, boxes and pallets) in the last stage of its manufacturing operation. *Id.* The Comptroller

argued that the wrapping and packaging materials were not necessary and essential to the manufacturing process and were excluded from the Manufacturing Exemption. The Court of Appeals rejected the Comptroller's contentions and affirmed the trial court's ruling that the wrapping and packing were exempt from taxation:

> We hold that the trial court properly applied th[e] statutory exemption. … The synthetic rubber would not be a usable product without the wrapping and packaging materials because of contamination, "cold flow," and the fact that the synthetic rubber would stick to other blocks of synthetic rubber.

*Id.* at 838. The same is true here, the Property is necessary and essential to make the chemicals transferrable and usable products.

Similarly, the fact that the Property may be "transferred to a warehouse" before being delivered to customers (App. Br. 22) does not mean it is excluded under Subsection (c)(4) as equipment used to "store" the chemicals. In 34 Tex. Admin. Code § 3.314(b)(1), the Comptroller acknowledged that "[s]ales or use tax is not due on containers or packaging supplies purchased by manufacturers for use as a part of the completion of the manufacturing process" and gave the following example:

> For example, toothpaste may be sold at retail in a tube enclosed in a box. Multiple units of the boxed toothpaste are placed in cardboard boxes by the manufacturer. A label is placed on the cardboard boxes identifying the product. The manufacturer then places these labelled boxes on a pallet and covers them with shrink-wrap for shipment, either to the manufacturer's distribution center, the manufacturer's

51

> warehouse, or to the manufacturer's customer. The toothpaste manufacturer may purchase the tubes, boxes, labels, pallets, and shrink-wrap tax free. Any additional packaging necessary to transfer the product from the manufacturer's distribution center, or from the manufacturer's warehouse to the manufacturer's customer would also be exempt from tax.

*Id.* (emphasis added). The Comptroller's example makes plain that simply because tangible personal property is placed in packaging that is transferred to a manufacturer's distribution center or warehouse before being transferred to customers does not exclude that packaging as equipment used to "store" tangible personal property. The exclusions under Subsection (c) must be construed strictly and in a way that would not swallow the Manufacturing Exemption. *See Allstate Ins. Co. v. Hegar*, 484 S.W.3d 611, 616 (Tex. App.—Austin 2016, pet. denied). Appellants' contention that transferring the Property to a warehouse excludes it from the exemption sweeps too broad.

## III. The Trial Court Properly Held the Related Services Performed on ChampionX's Property Are Exempt from Taxation Pursuant to Texas Tax Code § 151.3111

Because the Property is exempt under Section 151.318, the Related Services performed on the Property are exempt from taxation under Section 151.3111.

It is undisputed that ChampionX contracted with third-party service providers to pick up, clean, and deliver the Property after it was returned by customers. CR1 218-19 (Joint Stipulation). Once these services were completed, the Property was reinserted into ChampionX's manufacturing process and used to

52

deliver product to customers. CR1 219 (Joint Stipulation). Pursuant to Texas Tax Code § 151.3111(a), services performed on tangible personal property are not taxable if a sale or lease of the property would be exempted from tax at the time the service was performed due to the nature of the property.

Appellants first contend that the services performed on the Property are not exempt under Section 151.3111 because the Property itself never qualified for the Manufacturing Exemptions. App. Br. 22. For the reasons discussed at length above, the Property qualified for exemptions (a)(5), (a)(8), and (a)(10) because it was used in manufacturing and was necessary and essential to a pollution control process, to a quality control process, and to comply with public health requirements. *Supra*, Part II.D. As a result, the services performed on the Property were also tax-exempt.

In the alternative, Appellants contend that even if the Property qualified for the Manufacturing Exemptions, the Property lost its tax-exempt status once it was emptied. App. Br. 24. Consequently, Appellants claim the Related Services perform on the Property are not exempt under Section 151.3111, because the Property was not exempt "at the time" the services were performed on them. *Id*.

Appellants fail to cite any authority to support their apparent suggestion that exempt services under § 151.3111 must occur *during* one of the exempt uses of the Property. Indeed, Appellants' unsupported interpretation of § 151.3111 directly

53

contradicts the Comptroller's own previous decisions. Texas Comptroller's Decision No. 48,097 (Dec. 4, 2008) (Appendix S) established that cleaning services performed on vent hoods used in commercial kitchens were exempt from tax because the vent hoods themselves qualified for the Manufacturing Exemption under Section 151.318(a)(10) as tangible personal property necessary to comply with health codes during the manufacturing of food.

If Appellants' proposed interpretation prevailed, it would mean that the services performed on the vent hoods were not exempt because they were not being used for their exempt purpose at the time of service—*i.e.*, they were not being cleaned *while* food was being cooked below the hoods. But Decision No. 48,097 does not adopt this overly restrictive view. Just as the vent hoods were still tax-exempt at the time of the cleaning services even though not actively in use, the Property here does not lose its tax-exempt status just because it is not, at the time of the services, being used to hold chemicals.

Other Comptroller decisions have made clear that property remains tax-exempt for purposes of Section 151.3111 as long as it does not undergo a fundamental change in its nature, such as becoming "real property" rather than "tangible personal property." *See, e.g.*, Tex. Comptroller's Decision No. 102,273 (May 20, 2011) (Appendix T) (determining that furnaces for which the taxpayer was claiming an exemption pursuant to § 151.3111 were permanently attached to

real property, and as such did not qualify as exempt tangible personal property); Tex. Comptroller's Decision No. 106,795 (Jan. 24, 2017) (Appendix U) (stating that services performed on exempt manufacturing equipment become taxable if "the equipment at issue is installed to be permanently attached to real property"); Tex. Comptroller's Decision No. 48,097 (Dec. 4, 2008) (noting that the vent hoods at issue were not permanently affixed to real property). No permanent attachment or installation occurs here, where the Property merely cycle through the manufacturing and cleaning processes. The Property never loses its inherent status as exempt tangible personal property used by a manufacturer for purposes that satisfies the Manufacturing Exemptions.

For these reasons, the Court should hold that the services performed on the Property are exempt from sales and use tax under § 151.3111.

## **PRAYER**

For the foregoing reasons, Appellee ChampionX requests the Court affirm the trial court's judgment in favor of ChampionX.

Dated:  March 27, 2025

Respectfully submitted,

/s/Deborah S. Sloan
Deborah S. Sloan
State Bar No. 00786230
dsloan@jonesday.com
Jones Day
2727 N. Harwood Street, Suite 500
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

John M. Allan (*pro hac vice*)
jmallan@jonesday.com
Antoinette L. Ellison (*pro hac vice*)
aellison@jonesday.com
Jones Day
1221 Peachtree Street NE, Suite 400
Atlanta, Georgia 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330

*Counsel for Appellee*

# CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 12,328 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2025, a true and correct copy

of the foregoing was served on the following counsel of record via e-service:

Kelsey Hanson
Assistant Attorney General
State Bar No. 24096654
Tax Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
512-463-8897
512-478-4013 (fax)
kelsey.hanson@oag.texas.gov


*Attorneys for Appellants*


/s/ Deborah S. Sloan
Deborah S. Sloan

# INDEX OF APPENDICES

| Tab | Description |
| --- | --- |
| A | Order on Summary Judgment and Plea to the Jurisdiction (CR1 864) |
| B | Final Judgment (CR1 916-18) |
| C | Tex. Tax Code § 151.318 (Property Used in Manufacturing) |
| D | Tex. Tax Code § 151.3111 (Services on Certain Exempted Personal Property) |
| E | Tex. Tax Code § 151.322 (Containers) |
| F | Tex. Gov. Code § 311.026 (Special or Local Provision Prevails Over General) |
| G | 34 Tex. Admin. Code § 3.300 (Manufacturing; Custom Manufacturing; Fabricating; Processing) |
| H | 34 Tex. Admin. Code § 3.314 (Wrapping, Packing, Packaging Supplies, Containers, Labels, Tags, Export Packers, and Stevedoring Materials and Supplies) |
| I | Tex. Pol'y Letter Ruling No. 200108400L (Aug. 6, 2001) |
| J | Tex. Pol'y Letter Ruling No. 9904382L (Apr. 7, 1999) |
| K | Tex. Comptroller's Decision No. 40,875 (July 1, 2008) |
| L | Tex. Comptroller's Decision No. 106,331 (Feb. 27, 2015) |
| M | Tex. Policy Letter 9911987L (Nov. 5, 1999) |
| N | Tex. Comptroller's Decision No. 115,803 (Jan. 11, 2023) |
| O | Tex. Comptroller's Decision No. 43,944 (Aug. 6, 2007) |
| P | Tex. Comptroller's Decision No. 24,833 (Apr. 10, 1990) |
| Q | Tex. Comptroller's Decision No. 12,587 (June 30, 1982) |
| R | Tex. Comptroller's Decision No. 27,919 (Oct. 23, 1991) |
| S | Tex. Comptroller's Decision No. 48,097 (Dec. 4, 2008) |
| T | Tex. Comptroller's Decision No. 102,273 (May 20, 2011) |
| U | Tex. Comptroller's Decision No. 106,795 (Jan. 24, 2017) |

# APPENDIX A

**CAUSE NO. D-1-GN-20-000139**

| | | |
|---|---|---|
| CHAMPIONX, LLC, <br> PLAINTIFF, | § <br> § <br> § | IN THE DISTRICT COURT |
| v. | § <br> § | TRAVIS COUNTY, TEXAS |
| GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, and KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS <br> DEFENDANTS. | § <br> § <br> § <br> § <br> § | 419TH JUDICIAL DISTRICT |

## ORDER ON SUMMARY JUDGMENTS AND PLEA TO THE JURISDICTION

On December 19, 2023, this Court heard Defendants' Traditional and No Evidence Motion for Summary Judgment and Partial Plea to the Jurisdiction and Plaintiff's Motion for Partial Summary Judgment. The parties appeared by and through their respective counsel and announced ready. The Court determined that proper notice of said hearing was given.

Upon consideration of the pleadings, motions, responses, replies, argument of counsel, and the summary judgment evidence on file, this Court finds that:

(1) Defendants' Traditional and No Evidence Motion for Summary Judgment is DENIED;

(2) Plaintiff's Motion for Partial Summary Judgment is GRANTED; and,

(3) Defendants' Partial Plea to the Jurisdiction is GRANTED.

IT IS SO ORDERED.

Signed on this 20TH day of March 2024.

_____
MADELEINE CONNOR, DISTRICT JUDGE PRESIDING

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 11/22/2024 12:23:49

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

1 of 1

# APPENDIX B

CAUSE NO. D-1-GN-20-000139

| | | |
|---|---|---|
| CHAMPIONX, LLC, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| GLENN HEGAR, COMPTROLLER OF | § | |
| PUBLIC ACCOUNTS OF THE STATE OF | § | |
| TEXAS, AND KEN PAXTON, | § | |
| ATTORNEY GENERAL OF THE STATE | § | |
| OF TEXAS; | § | 419th JUDICIAL DISTRICT |
| | § | |
| Defendants. | § | |
| | § | |

## <u>FINAL JUDGMENT</u>

Having considered Plaintiff's Unopposed Amended Motion for Entry of Final Judgment, it is hereby ORDERED AND ADJUDGED that:

1. The exemption for property used in manufacturing under Tex. Tax Code § 151.318 exempts the portafeed drums, tanks, and totes (the "Property") at issue from Texas sales and use tax;

2. The exemption for services on exempted property under Tex. Tax Code § 151.3111 applies to the cleaning, delivery, and/or pickup services performed on the Property at issue;

3. The resulting refund amount due from the Comptroller to ChampionX, LLC ("ChampionX") (Taxpayer No. 13615204800) for the period of March 1, 2011 through February 28, 2014 is $219,609.20 of sales and use tax, plus statutory interest pursuant to Tex. Tax Code § 112.155;

4. The resulting refund amount due from the Comptroller to ChampionX (Taxpayer No. 13615204800) for the period of January 1, 2013 through December 31, 2015 is $1,032,948.67 of sales and use tax, plus statutory interest pursuant to Tex. Tax Code § 112.155;

FINAL JUDGMENT – PAGE 1

5.      The resulting refund amount due from the Comptroller to ChampionX (Taxpayer No. 13615204800 for the period of January 1, 2015 through September 30, 2017, is $1,424,794.60 of sales and use tax, plus statutory interest pursuant to Tex. Tax Code § 112.155;

6.      The resulting refund amount due from the Comptroller to ChampionX (Taxpayer No. 13615204800) for the period of December 1, 2016 through October 31, 2018, is $708,602.92 of sales and use tax, plus statutory interest pursuant to Tex. Tax Code § 112.155;

7.      The Court shall retain jurisdiction over the parties for the purposes of enforcing the terms and conditions of this Final Judgment.

8.      Each party shall bear its own costs and fees.

9.      This Final Judgment resolves all parties and all claims in the following cases:

| Case Number | Time Period |
|---|---|
| D-1-GN-20-000139 | March 1, 2011 through February 28, 2014 |
| D-1-GN-21-000699 | January 1, 2013 through December 31, 2015 |
| D-1-GN-22-003715 | January 1, 2015 through September 30, 2017 and December 1, 2016 through October 31, 2018 |

10.     This Final Judgment is final and appealable.

Signed on ___9|19___, 2024.

_____
DISTRICT JUDGE PRESIDING

FINAL JUDGMENT – PAGE 2

**APPROVED AS TO FORM AND SUBSTANCE:**

/s/Deborah S. Sloan
Deborah S. Sloan
State Bar No. 00786230
JONES DAY
2727 N. Harwood Street
Suite 500
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
dsloan@jonesday.com

John M. Allan
Antoinette L. Ellison
JONES DAY
1221 Peachtree Street NE
Suite 400
Atlanta, Georgia 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
jmallan@jonesday.com
aellison@jonesday.com
*Counsel for Plaintiff*

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 11/22/2024 12:23:52

VELVA L. PRICE
DISTRICT CLERK
By Deputy:

FINAL JUDGMENT – PAGE 3

# APPENDIX C

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
    Tax Code (Refs & Annos)
        Title 2. State Taxation (Refs & Annos)
            Subtitle E. Sales, Excise, and Use Taxes
                Chapter 151. Limited Sales, Excise, and Use Tax (Refs & Annos)
                    Subchapter H. Exemptions (Refs & Annos)

V.T.C.A., Tax Code § 151.318

§ 151.318. Property Used in Manufacturing

Currentness

(a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:

(1) tangible personal property that will become an ingredient or component part of tangible personal property manufactured, processed, or fabricated for ultimate sale;

(2) tangible personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to:

(A) the product being manufactured, processed, or fabricated for ultimate sale; or

(B) any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured, processed, or fabricated for ultimate sale;

(3) services performed directly on the product being manufactured prior to its distribution for sale and for the purpose of making the product more marketable;

(4) actuators, steam production equipment and its fuel, in-process flow through tanks, cooling towers, generators, heat exchangers, transformers and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the transformers, electronic control room equipment, computerized control units, pumps, compressors, and hydraulic units, that are used to power, supply, support, or control equipment that qualifies for exemption under Subdivision (2) or (5) or to generate electricity, chilled water, or steam for ultimate sale; transformers located at an electric generating facility that increase the voltage of electricity generated for ultimate sale, the electrical cable that carries the electricity from the electric generating equipment to the step-up transformers, and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the step-up transformers;

and transformers that decrease the voltage of electricity generated for ultimate sale and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the step-down transformers;

(5) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process;

(6) lubricants, chemicals, chemical compounds, gases, or liquids that are used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if their use or consumption is necessary and essential to prevent the decline, failure, lapse, or deterioration of equipment exempted by this section;

(7) gases used on the premises of a manufacturing plant to prevent contamination of raw material or product, or to prevent a fire, explosion, or other hazardous or environmentally damaging situation at any stage in the manufacturing process or in loading or storage of the product or raw material on premises;

(8) tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale;

(9) safety apparel or work clothing that is used during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if:

   (A) the manufacturing process would not be possible without the use of the apparel or clothing; and

   (B) the apparel or clothing is not resold to the employee;

(10) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health; and

(11) tangible personal property specifically installed to:

   (A) reduce water use and wastewater flow volumes from the manufacturing, processing, fabrication, or repair operation;

   (B) reuse and recycle wastewater streams generated within the manufacturing, processing, fabrication, or repair operation; or

   (C) treat wastewater from another industrial or municipal source for the purpose of replacing existing freshwater sources in the manufacturing, processing, fabrication, or repair operation.

(b) The exemption includes:

(1) chemicals, catalysts, and other materials that are used during a manufacturing, processing, or fabrication operation to produce or induce a chemical or physical change, to remove impurities, or to make the product more marketable;

(2) semiconductor fabrication cleanrooms and equipment; and

(3) pharmaceutical biotechnology cleanrooms and equipment that are installed as part of the construction of a new facility on which construction began after July 1, 2003.

(c) The exemption does not include:

(1) intraplant transportation equipment, including intraplant transportation equipment used to move a product or raw material in connection with the manufacturing process and specifically including all piping and conveyor systems, provided that the following remain eligible for the exemption:

(A) piping or conveyor systems that are a component part of a single item of manufacturing equipment or pollution control equipment eligible for the exemption under Subsection (a)(2), (a)(4), or (a)(5);

(B) piping through which the product or an intermediate or preliminary product that will become an ingredient or component part of the product is recycled or circulated in a loop between the single item of manufacturing equipment and the ancillary equipment that supports only that single item of manufacturing equipment if the single item of manufacturing equipment and the ancillary equipment operate together to perform a specific step in the manufacturing process; and

(C) piping through which the product or an intermediate or preliminary product that will become an ingredient or component part of the product is recycled back to another single item of manufacturing equipment and its ancillary equipment in the same manufacturing process;

(2) hand tools;

(3) maintenance supplies not otherwise exempted under this section, maintenance equipment, janitorial supplies or equipment, office equipment or supplies, equipment or supplies used in sales or distribution activities, research or development of new products, or transportation activities;

(4) machinery and equipment or supplies to the extent not otherwise exempted under this section used to maintain or store tangible personal property; or

(5) tangible personal property used in the transmission or distribution of electricity, including transformers, cable, switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units not otherwise exempted under this section, and lines, conduit, towers, and poles.

(d) In this section, "manufacturing" includes each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another.

(e) This section does not apply to any taxable item rented or leased for less than one year to a person engaged in manufacturing.

(f) For purposes of Subsection (c)(1), piping through which material is transported forward from one single item of manufacturing equipment and its ancillary support equipment to another single item of manufacturing equipment and its ancillary support equipment is not considered a component part of a single item of manufacturing equipment and is not exempt. An integrated group of manufacturing and processing machines and ancillary equipment that operate together to create or produce the product or an intermediate or preliminary product that will become an ingredient or component part of the product is not a single item of manufacturing equipment.

(g) Repealed by Acts 1999, 76th Leg., ch. 1467, § 4.01(3).

(h) to (m) Repealed by Acts 1997, 75th Leg., ch. 1390, § 3.

(n) A person engaged in overhauling, retrofitting, or repairing jet turbine aircraft engines and their component parts is entitled to an exemption from the tax imposed by this chapter for the purchase of machinery, equipment, or replacement parts or accessories with a useful life in excess of six months, or supplies, including aluminum oxide, nitric acid, and sodium cyanide, used in electrochemical plating or a similar process that are used or consumed in the overhauling, retrofitting, or repairing.

(o) The production of a publication for the dissemination of news of a general character and of a general interest that is printed on newsprint and distributed to the general public free of charge at a daily, weekly, or other short interval is considered "manufacturing" for purposes of this section.

(p) For the purposes of this section, the manufacturing of computer software begins with the design and writing of the code or program for the software and includes the testing or demonstration of the software.

(q) For purposes of Subsection (b), "semiconductor fabrication cleanrooms and equipment" means all tangible personal property, without regard to whether the property is affixed to or incorporated into realty, used in connection with the manufacturing, processing, or fabrication in a cleanroom environment of a semiconductor product, without regard to whether the property is actually contained in the cleanroom environment. The term includes integrated systems, fixtures, and piping, all property necessary or adapted to reduce contamination or to control airflow, temperature, humidity, chemical purity, or other environmental conditions or manufacturing tolerances, and production equipment and machinery. The term does not include the building or a permanent, nonremovable component of the building, that houses the cleanroom environment. The term includes moveable cleanroom partitions and cleanroom lighting. "Semiconductor fabrication cleanrooms and equipment" are not "intraplant transportation equipment" as that term is used in Subsection (c)(1).

(q-1) For purposes of Subsection (b), "pharmaceutical biotechnology cleanrooms and equipment" means all tangible personal property, without regard to whether the property is affixed to or incorporated into realty, used in connection with the

manufacturing, processing, or fabrication in a cleanroom environment of a pharmaceutical biotechnology product, without regard to whether the property is actually contained in the cleanroom environment. The term includes integrated systems, fixtures, and piping, all property necessary or adapted to reduce contamination or to control airflow, temperature, humidity, chemical purity, or other environmental conditions or manufacturing tolerances, and production equipment and machinery. The term does not include the building or a permanent, nonremovable component of the building that houses the cleanroom environment. The term includes moveable cleanroom partitions and cleanroom lighting. "Pharmaceutical biotechnology cleanrooms and equipment" are not "intraplant transportation equipment" as that term is used in Subsection (c)(1).

(r) A taxpayer claiming an exemption under this section has the burden of proof that the exemption is applicable and that no exclusion under Subsection (c) applies.

(s) The following do not apply to the semiconductor fabrication cleanrooms and equipment in Subsection (q) or the pharmaceutical biotechnology cleanrooms and equipment in Subsection (q-1):

(1) limitations in Subsection (a)(2) that refer to tangible personal property directly causing chemical and physical changes to the product being manufactured, processed, or fabricated for ultimate sale;

(2) Subsection (c)(1); and

(3) Subsection (c)(4).

(t) In addition to the other items exempted under this section, pre-press machinery, equipment, and supplies, including computers, cameras, photographic props, film, film developing chemicals, veloxes, plate-making machinery, plate metal, litho negatives, color separation negatives, proofs of color negatives, production art work, and typesetting or composition proofs, that are necessary and essential to and used in connection with the printing process are exempted from the tax imposed by this chapter if they are purchased by a person engaged in:

(1) printing or imprinting tangible personal property for sale; or

(2) producing a publication for the dissemination of news of a general character and of a general interest that is printed on newsprint and distributed to the general public free of charge at a daily, weekly, or other short interval.

**Credits**
Acts 1981, 67th Leg., p. 1564, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 7, §§ 13, 19, eff. Oct. 2, 1984; Acts 1987, 70th Leg., 2nd C.S., ch. 5, art. 1, pt. 4, § 26; Acts 1989, 71st Leg., ch. 154, § 1, eff. Aug. 28, 1989; Acts 1991, 72nd Leg., ch. 705, § 15, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 14.081(a); Acts 1993, 73rd Leg., ch. 404, § 1, eff. Oct. 1, 1993; Acts 1993, 73rd Leg., ch. 587, § 14, eff. Oct. 1, 1993; Acts 1995, 74th Leg., ch. 1000, § 17, eff. Oct. 1, 1995; Acts 1997, 75th Leg., ch. 1010, § 4.40, eff. July 1, 1997; Acts 1997, 75th Leg., ch. 1040, § 22, eff. Oct. 1, 1997; Acts 1997, 75th Leg., ch. 1390, §§ 1 to 3, eff. Oct. 1, 1997; Acts 1999, 76th Leg., ch. 62, § 19.01(91), eff. Sept. 1, 1999; Acts 1999, 76th Leg., ch. 1467, § 2.19, eff. Oct. 1, 1999; Acts 1999, 76th Leg., ch. 1467, § 4.01, eff. June 19, 1999; Acts 2001, 77th Leg., ch. 1263, § 22, eff. Oct. 1, 2001; Acts 2001, 77th Leg., ch. 1420, § 21.001(100), eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 1310, § 106, eff. June 20, 2003; Acts 2007, 80th Leg., ch. 1266, § 6(a), eff. July 1, 2007.

**Editors' Notes**

**REPEAL OF SUBSEC. (G)**

<Without reference to the amendment of subsec. (g) by Acts 1997, 75th Leg., ch. 1010, § 4.40, Acts 1997, 75th Leg., ch. 1390, § 3 repealed subsec. (g) effective Oct. 1, 1997.>

Notes of Decisions (35)

V. T. C. A., Tax Code § 151.318, TX TAX § 151.318
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated

   Tax Code (Refs & Annos)

      Title 2. State Taxation (Refs & Annos)

         Subtitle E. Sales, Excise, and Use Taxes

            Chapter 151. Limited Sales, Excise, and Use Tax (Refs & Annos)

               Subchapter H. Exemptions (Refs & Annos)

V.T.C.A., Tax Code § 151.3111

§ 151.3111. Services on Certain Exempted Personal Property

Currentness

(a) Subject to Section 151.1551, a service that is performed on tangible personal property that, if sold, leased, or rented, at the time of the performance of the service, would be exempted under this chapter because of the nature of the property, its use, or a combination of its nature and use, is exempted from this chapter.

(b) Subsection (a) does not apply to the performance of a service on:

   (1) tangible personal property that would be exempted solely because of the exempt status of the seller of the property;

   (2) tangible personal property that is exempted solely because of the application of Section 151.303, 151.304, or 151.306;

   (3) motor vehicles, trailers, or semitrailers as defined, taxed, or exempted by Chapter 152; or [1]

   (4) a taxable boat or motor as defined by Section 160.001. [1]

   (5) Deleted by Acts 1999, 76th Leg., ch. 631, § 13, eff. Oct. 1, 2001.

   (6) Tangible personal property exempt under Section 151.326.

(c) A taxable service performed on a motor vehicle, trailer, or semitrailer exempted under Section 152.086, 152.087, or 152.088 of this code is exempted from the taxes imposed by this chapter. A taxable service performed on a motor vehicle held for rental in the regular course of business, but not rented, or held for sale in the regular course of business is exempted from the taxes imposed by this chapter.

**Credits**

Added by Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 7, § 12, eff. Oct. 2, 1984. Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 7.03, eff. Oct. 1, 1991; Acts 1995, 74th Leg., ch. 1000, § 11, eff. Oct. 1, 1995; Acts 1999, 76th Leg., ch. 394, § 4, eff. June 3, 1999; Acts 1999, 76th Leg., ch. 631, § 13, eff. Oct. 1, 2001; Acts 2011, 82nd Leg., ch. 225 (H.B. 268), § 2, eff. Sept. 1, 2011.

---

**Footnotes**

[1]     Text as amended by Acts 1999, 76th Leg., ch. 631. Subdivision (4) should probably read "; or" in lieu of the period.

V. T. C. A., Tax Code § 151.3111, TX TAX § 151.3111
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX E

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle E. Sales, Excise, and Use Taxes
        Chapter 151. Limited Sales, Excise, and Use Tax (Refs & Annos)
          Subchapter H. Exemptions (Refs & Annos)

V.T.C.A., Tax Code § 151.322

§ 151.322. Containers

Currentness

(a) The following are exempted from the taxes imposed by this chapter:

(1) a container sold with its contents if the sales price of the contents is not taxed under this chapter;

(2) a nonreturnable container sold without contents to a person who fills the container and sells the contents and the container together; and

(3) a returnable container sold with its contents or resold for refilling.

(b) In this section:

(1) "Returnable container" means a container of a kind customarily returned for reuse by the buyer of the contents.

(2) "Nonreturnable container" means a container other than a returnable container.

(3) "Container" means glass, plastic, or metal bottles, cans, barrels, and cylinders, but does not include any item of a type described in Section 151.302(d).

**Credits**
Acts 1981, 67th Leg., p. 1566, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 14.10.

Notes of Decisions (9)

V. T. C. A., Tax Code § 151.322, TX TAX § 151.322

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX F

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 3. Legislative Branch (Refs & Annos)
      Subtitle B. Legislation
        Chapter 311. Code Construction Act (Refs & Annos)
          Subchapter C. Construction of Statutes (Refs & Annos)

V.T.C.A., Government Code § 311.026

§ 311.026. Special or Local Provision Prevails Over General

Currentness

(a) If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both.

(b) If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail.

**Credits**
Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.

Notes of Decisions (76)

**O'CONNOR'S ANNOTATIONS**
*State v. Allen*, 346 S.W.3d 713, 715-16 (Tex.App.--Austin 2011, pet. ref'd). "The doctrine [of in pari materia] is codified in the Code Construction Act [at §311.026]. [¶] We deem two criminal statutes to be in pari materia when one broadly defines an offense and the other more narrowly defines an offense, complete within itself, that proscribes conduct that meets every element of and would otherwise be punishable under the broader statute. Statutes that are in pari materia are construed together and, if possible, conflicts between them are harmonized. If conflicts between them cannot be harmonized--as when the narrower statute provides for a lesser punishment than the broader statute--a defendant has a due-process right to be prosecuted under the narrower statute in accordance with the presumed legislative intent that the more narrow statute apply. [¶] Courts consider several factors in determining whether two statutes are in pari materia. The most important factor is similarity of object or purpose, which we analyze by considering whether the statutes (1) are contained in the same legislative act; (2) require the same elements of proof; (3) involve different penalties; and (4) were clearly written to achieve the same objective. When an in-pari-materia assertion is made prior to trial and, accordingly, before an evidentiary record has been developed, a court may only conclude that two statutes are in pari materia if the charging instrument 'on its face' raises the in-pari-materia issue."

V. T. C. A., Government Code § 311.026, TX GOVT § 311.026

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX G

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Texas Administrative Code
Title 34. Public Finance
Part 1. Comptroller of Public Accounts
Chapter 3. Tax Administration
Subchapter O. State and Local Sales and Use Taxes

34 TAC § 3.300

§ 3.300. Manufacturing; Custom Manufacturing; Fabricating;
Processing (Tax Code, §§ 151.005, 151.007, 151.318, and 151.3181)

Currentness

(a) Definitions. The following words and terms, when used in this section, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Accessory--A machine fixture that causes the machinery to operate in a specialized way.

(2) Custom manufacturing--Producing tangible personal property to the special order of the customer, e.g., tailor-made clothing, custom-made draperies or slip-covers, or furniture made-to-order. Custom manufacturers are manufacturers for the purpose of this section.

(3) Display item--A manufactured item that is identical in size and function to other items held for sale which it represents and that is ultimately sold at retail. For example, manufacturer's apparel lines, furniture showroom pieces, light fixture displays.

(4) Equipment--Any apparatus, work clothing, device, or simple machines used directly in production.

(5) Fabrication--To make, build, create, produce, or assemble components of tangible personal property, or to make tangible personal property work in a new or different manner.

(6) Hand tool--An instrument that is to be used, managed, and powered by the hand (e.g., paint brush, trowel, hammer, screwdriver, files). Equipment that is controlled or operated by the hand, but is moved or powered by electricity, gas, steam, or other fuel, is not a hand tool (e.g., electric drill, chain saw, jack hammer).

(7) Machinery--All power-operated machines.

(8) Manufacturer--A person who is engaged in manufacturing. The definition includes processors, fabricators, submanufacturers, and custom manufacturers.

(9) Manufacturing--Each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property. The first production stage means the first act of production, and it shall not include those acts in preparation for production. For example, a lumber company that cuts trees or a manufacturer that gathers, arranges, or sorts raw materials or inventory is preparing for production. The first production stage for the manufacturing of software is the design and writing of the code or program, and manufacturing includes the testing or demonstration of the software. Manufacturing includes the repair or rebuilding of tangible personal property that the manufacturer owns for the purpose of being sold, but does not include the repair or rebuilding of property that belongs to another.

  (A) Completion of production means the tangible personal property has all the physical properties, including packaging, if any, that it has when transferred by the manufacturer to another. For example, a manufacturer of raw rubber has completed production when the raw rubber is ready to be transferred to a manufacturer of rubber goods.

  (B) Processing and fabrication are two activities that are performed during manufacturing. For example, the person who takes raw steel and makes pipe is engaged in fabrication. The workers who coat or thread the pipe are engaged in processing.

(10) Processing--The physical application of the materials and labor necessary to modify or to change the characteristics of tangible personal property. The repair of tangible personal property, belonging to another, by restoring it to its original condition is not considered processing of that property. The mere packing, unpacking, or shelving of a product to be sold will not be considered to be processing of that property. Processing does not include remodeling.

(11) Remodeling--To make tangible personal property belonging to another over again, in a similar but different way, or to change the style, shape, or form, without causing a loss of its identity, or without causing the property to work in a new or different manner.

(12) Replacement part--Any repair part attached to the machinery, equipment, or accessory.

(13) Sample--A scale model or representative piece of a manufactured product held for sale. For example, cloth swatches and wallpaper books.

(14) Semiconductor fabrication and pharmaceutical biotechnology cleanrooms and equipment--All tangible personal property, without regard to whether the property is affixed to or incorporated into realty, that is used in connection with the manufacturing, processing, or fabrication in a cleanroom environment of a semiconductor product or a pharmaceutical biotechnology product, without regard to whether the property is actually contained in the cleanroom environment. The term includes integrated systems, fixtures, and piping; moveable cleanroom partitions and cleanroom lighting; all property necessary or adapted to reduce contamination or to control airflow, temperature, humidity, chemical purity, or other environmental conditions or manufacturing tolerances; production equipment and machinery; all tangible personal property that moves the product or other materials that are necessary and essential to the process, including piping that is used to move gas, liquids, deionized water, and hazardous waste material; silicon wafer moving, handling, and tracking systems;

and electrical supply and control equipment, such as switches, wiring, and monitoring equipment that is incorporated into the realty. The term does not include the building or any permanent, nonremovable structural component part of the building, such as vibration-isolation platforms and vibration columns.

(15) Submanufacturer--A person who performs one or more of the manufacturing operations described in paragraph (9) of this subsection upon a product, or upon an intermediate or preliminary product, for a manufacturer.

(b) Manufacturer's responsibilities.

(1) Collection of tax. Persons who are engaged in the business of fabricating, manufacturing, processing, or custom manufacturing must collect sales tax on the total sales price of the manufactured item or accept a resale or exemption certificate in lieu of the tax. The sales price includes the cost of materials, labor or service costs, and all expenses that are connected with production. Persons who fabricate, custom manufacture, or process tangible personal property that the customer furnishes, either directly or indirectly, must collect tax on such fabricating, custom manufacturing, or processing charge. Manufacturers shall pay or accrue sales or use tax on all items used in the manufacturing process that do not qualify for exemption from tax. A manufacturer who purchases tangible personal property tax free by means of an exemption certificate or resale certificate and subsequently uses the item for a nonexempt purpose is responsible for tax as provided in subsection (k) of this section.

(2) Installed items. Generally, the charge for labor to install an item sold is taxable when the item sold is taxable. Persons who manufacture and install items that become improvements to residential realty or are incorporated into new real property structures are contractors and are subject to the provisions of § 3.291 of this title (relating to Contractors). Example: cabinetmakers who also affix the cabinets as a part of a new-construction contract. Persons who manufacture and install items that become improvements to existing nonresidential realty are subject to the provisions of § 3.357 of this title (relating to Nonresidential Real Property Repair, Remodeling, and Restoration; Real Property Maintenance). Persons who manufacture and install items as a part of a contract to repair tangible personal property are subject to the provisions of § 3.292 of this title (relating to Repair, Remodeling, Maintenance, and Restoration of Tangible Personal Property). Example: fabricating a propeller shaft for a customer as a part of an outboard motor repair. Persons who manufacture and install items that do not become improvements to realty or that are not part of a repair must collect sales tax on the total charge. Example: a retailer who makes and installs draperies for a home owner.

(3) Molds, dies, patterns. The manufacturer's purchase of molds, dies, patterns, jigs, tooling, photo engraving, and other manufacturing aids, and their raw materials or component parts, may qualify for exemption under subsection (d) of this section.

(A) Written agreement--sale. A separate charge by the manufacturer for the aid will be considered a sale of the aid to the customer only if a written agreement exists between parties that clearly makes the customer the owner of the aid. As owner of the aid, the customer will owe tax on the amount that the manufacturer charged, unless the customer is also manufacturing a product for sale.

(B) No written agreement--no sale. When no written agreement exists between the manufacturer and the customer, and the manufacturer separates the charge for the aid from the charge for the items produced by means of the aid, a sale will not be considered to have occurred. The combined charges constitute the sales price of the manufactured

item. (Charge for aid plus charge for items produced equals sales price of items.) The total charge shall be taxable or nontaxable depending on the taxability of the items produced.

(4) Samples. Since the sole use of such samples is to demonstrate not the sample but the other items that the sample represents, the purchase of the raw materials that are used to make the sample is subject to sales or use tax, regardless of the fact that the sample itself may be ultimately sold.

(c) Nonexempt manufacturing items. Certain items are specifically subject to tax:

(1) taxable items that are not otherwise exempted by this section;

(2) machinery, equipment, replacement parts, and accessories that are rented or leased for a term of less than one year;

(3) items that are merely useful or incidental to the operation, such as office machines, office supplies, transportation equipment, maintenance supplies, cleaning supplies, lubricants, and other items that are incidental to the manufacturing process and are not otherwise exempted by this section;

(4) hand tools;

(5) intraplant transportation equipment, unless exempted in subsections (d)(17) and (18) of this section, including equipment that is used to move a product or raw material in connection with the manufacturing process, and specifically including all piping, conveyor systems, and related pumps (unless otherwise exempted), meters, valves, or rollers. Intraplant transportation equipment is taxable even if manufacturing or processing activities (such as cooling, mixing, or pollution containment) occur during the transportation of product or component parts of the product;

(6) machinery and equipment or supplies that are not otherwise exempted in this section, but that are used to maintain or store tangible personal property (for example, refrigeration equipment that a restaurant uses);

(7) tangible personal property that is used in the transmission or distribution of electricity, including transformers, cable, switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are not otherwise exempted under this section, and lines, conduit, towers, and poles.

(d) The following items are exempted from the taxes imposed by Tax Code, Chapter 151, if purchased, leased, or rented by a manufacturer for storage, use, or consumption:

(1) tangible personal property that will become an ingredient or component part of tangible personal property that is manufactured, processed, or fabricated for ultimate sale;

(2) tangible personal property that is directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to:

(A) the product that is being manufactured, processed, or fabricated for ultimate sale; or

(B) any intermediate or preliminary product that will become an ingredient or component part of the product that is being manufactured, processed, or fabricated for ultimate sale.

(3) services that are performed directly on the product that is being manufactured prior to the product's distribution for sale, and for the purpose of making the product more marketable;

(4) actuators, steam production equipment (including water purification equipment such as demineralizers and reverse osmosis units) and its fuel, in-process flow through tanks, cooling towers, generators, heat exchangers, transformers and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the transformers, electronic control room equipment, computerized control units, pumps, compressors, hydraulic units, boilers (including economizers, superheaters, waterwalls, hoppers, feedwater heaters, condensers, pumps, air preheaters, draft fans, pulverizors, primary crushers, secondary crushers, oil or gas burning equipment that is related to the boilers), and related accessories that are used to power, supply, support, or control equipment that qualifies for exemption under paragraph (2) or (6) of this subsection or to generate electricity, chilled water, or steam for ultimate sale;

(5) transformers located at an electric generating facility that increase the voltage of electricity generated for ultimate sale, the electrical cable that carries the electricity from the electric generating equipment to the step-up transformers, and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, telemetry units, and related accessories that are associated with the step-up transformers; and transformers that decrease the voltage of electricity generated for ultimate sale and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, telemetry units, and related accessories that are associated with the step-down transformers;

(6) tangible personal property that is used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to a pollution control process;

(7) lubricants, chemicals, chemical compounds, gases, or liquids that are used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if their use or consumption is necessary and essential to prevent the decline, failure, lapse, or deterioration of equipment that is exempted by this section;

(8) gases that are used on the premises of a manufacturing plant to prevent contamination of raw material or product, or to prevent a fire, explosion, or other hazardous or environmentally damaging situation at any stage in the manufacturing process or in loading or storage of the product or raw material on premises;

(9) tangible personal property that is used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to a quality control process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale. For example, equipment that is used to test the product after the item is produced, but prior to wrapping and packaging. Equipment that is used to test raw materials prior to processing does not qualify for this exemption;

(10) safety apparel or work clothing that is used during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the manufacturing process would not be possible without the use of the apparel or clothing and the apparel or clothing is not resold to the employee. Examples are specialized clothing, safety goggles, gloves, ear plugs, or hairnets that the law requires employees to wear during processing, or static wrist guards that manufacturing personnel wear in a manufacturing process that must be free of static electricity. A regulation that requires employees to wear clean clothing is not sufficient to qualify uniforms for exemption;

(11) tangible personal property that is used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements for public health purposes. For example, disinfectants that are used in a meat packing operation to sanitize work areas are exempt. Tangible personal property that is required to be on site, but used only in emergency situations, is not considered consumed in the actual manufacturing process (for example, fire extinguishers, eye baths, and safety signs are not exempt under this provision);

(12) tangible personal property that is specifically installed to:

(A) reduce water use and wastewater flow volumes from the manufacturing, processing, fabrication, or repair operation;

(B) reuse and recycle wastewater streams that are generated within the manufacturing, processing, fabrication, or repair operation; or

(C) treat wastewater from another industrial or municipal source for the purpose of replacing existing freshwater sources in the manufacturing, processing, fabrication, or repair operation.

(13) gas and electricity when used directly in manufacturing. See § 3.295 of this title (relating to Natural Gas and Electricity).

(14) labor charges for repair, maintenance, remodeling, or restoration services to pollution control equipment or machinery that a law or regulation requires, and other tangible personal property that is exempt under this section.

(15) wrapping, packing, and packaging supplies that are used to further the sale of a product. See § 3.314 of this title (relating to Wrapping, Packing, Packaging Supplies, Containers, Labels, Tags, Export Packers, and Stevedoring Materials and Supplies).

(16) display items and the raw materials that are used to make display items, so long as the item is used only to demonstrate itself and the same or similar items prior to its sale to an ultimate consumer. The item may not be used for any purpose other than demonstration or display. Any other use by the manufacturer is taxable as a divergent use.

(17) piping or conveyor systems that are a component part of a single item of manufacturing equipment or pollution control equipment that is eligible for the exemption. For example, a printing press contains rollers and pipes to transport or feed paper or ink during the manufacturing process. The purchase of the press would continue to qualify for exemption, and rollers, pipe, or other press repair parts would remain as qualifying accessories or repair parts, even when purchased separately. An integrated group of manufacturing and processing machines and ancillary equipment that operate together to create or produce the product, or an intermediate or preliminary product that will become an ingredient or component part of the product, is not a single item of manufacturing equipment.

(18) piping through which the product, or an intermediate or preliminary product that will become an ingredient or component part of the product, is recycled or circulated in a loop between the single item of manufacturing equipment and the ancillary equipment that supports only that single item of manufacturing equipment, if the single item of manufacturing equipment and the ancillary equipment operate together to perform a specific step in the manufacturing process; and piping through which the product, or an intermediate or preliminary product that will become an ingredient or component part of the product, is recycled back to another single item of manufacturing equipment and its ancillary equipment in the same manufacturing process.

(e) Rented or leased taxable items. The exemptions provided in this section do not apply to any taxable item rented or leased before October 1, 1995, under an operating lease to a person engaged in manufacturing. Taxable items used in a manner exempted under this section and leased on or after October 1, 1995, for a term of one year or more qualify for exemption.

(f) Semiconductor fabrication and pharmaceutical biotechnology cleanrooms and equipment. Semiconductor fabrication and pharmaceutical biotechnology cleanrooms and equipment as defined in subsection (a)(14) of this section and associated materials and other items that are necessary and essential to maintain the cleanroom environment are exempt. Semiconductor fabrication and pharmaceutical biotechnology cleanrooms and equipment are not intraplant transportation equipment or used incidentally in a manufacturing process or fabrication operation as those terms are used in subsections (c)(3) and (c)(5) of this section. Regarding pharmaceutical biotechnology cleanrooms and equipment, the exemption applies only to pharmaceutical biotechnology cleanrooms and equipment that are installed as part of the construction of a new facility with a value of at least $150 million and on which construction began after July 1, 2003, and before August 31, 2004.

(g) Overhaul, retrofit, or repair of jet turbine engines. A person who is engaged in the overhaul, retrofit, or repair of jet turbine aircraft engines and their component parts may claim an exemption from tax on the purchase of machinery, equipment, or replacement parts or accessories with a useful life in excess of six months, or supplies, including aluminum oxide, nitric acid, and sodium cyanide, used in electrochemical plating or a similar process, that are used or consumed in the overhauling, retrofitting, or repairing of jet turbine aircraft engines or their component parts.

(h) Persons engaged in printing tangible personal property. A person who is engaged in printing or imprinting tangible personal property for sale or production of a publication for the dissemination of news of a general character and of a general interest that is printed on newsprint and distributed to the general public daily, weekly, or at some other short interval, free of charge, may purchase tax free, in addition to other items that are exempted under this section, the following items that are necessary and essential to and used in connection with the printing process: pre-press machinery, equipment, and supplies, including

computers, cameras, film, film developing chemicals, veloxes, plate-making machinery, plate metal, litho negatives, color separation negatives, proofs of color negatives, production art work, and typesetting or composition proofs.

(i) Separated and lump-sum contracts to improve realty. A contractor who incorporates into realty any equipment or materials that qualify for exemption under subsection (d) of this section may accept an exemption certificate in lieu of tax from the manufacturer for the separately stated exempt materials sold under a separated contract. Taxable materials, such as foundation materials and items that are noted under subsection (c) of this section must be separately stated from qualifying equipment, or a single charge for qualifying and nonqualifying materials will be presumed taxable. When nonresidential repair, remodeling, or restoration of realty is performed, qualifying equipment should be separately stated from both nonqualifying materials and taxable labor. A lump-sum charge to repair, remodel, or restore nonresidential realty is presumed taxable. The presumption may be overcome by the service provider at the time the transaction occurs by separately stating to the customer a reasonable charge for the taxable services. However, if the charge for the qualifying manufacturing equipment is not separately stated at the time of the transaction, the service provider or the purchaser may later establish for the comptroller, through documentary evidence, the percentage of the total charge that relates to exempt qualifying manufacturing equipment. Examples of acceptable documentation include purchase invoices, bid sheets, or schedules of values. See § 3.357 of this title (relating to Nonresidential Real Property Repair, Remodeling, and Restoration; Real Property Maintenance). A lump-sum charge to perform new construction as covered in § 3.291 of this title (relating to Contractors) is not taxable. The contractor is the consumer of all the goods that the contractor uses in the performance of a lump sum new construction contract, and neither the contractor nor the manufacturer may claim an exemption on otherwise qualifying manufacturing equipment.

(j) A taxpayer who claims an exemption under this section must prove that the exemption applies and that no exclusion under subsection (c) of this section applies.

(k) Divergent use.

(1) A manufacturer who issues a resale certificate to purchase tangible personal property tax free and subsequently uses the item for a nonexempt purpose must remit the tax to the comptroller based on the purchase price of the item or the fair market rental value of the item. See § 3.285 of this title (relating to Resale Certificate; Sales for Resale) and § 3.346 of this title (relating to Use Tax).

(2) A manufacturer who issues an exemption certificate to purchase tangible personal property tax free and subsequently uses the item for a nonexempt purpose is responsible for tax based on the divergent use. For divergent use that occurs prior to October 1, 2001, a manufacturer owes tax based on the purchase price or the fair market rental value of the equipment. See § 3.287(e) of this title (relating to Exemption Certificates). For divergent use that occurs after September 30, 2001, a manufacturer owes tax based on the guidelines that are provided in paragraph (3) of this subsection.

(3) A manufacturer must remit tax in the following manner on divergent use that occurs after September 30, 2001.

(A) No tax is due if the divergent use occurs in any month after the fourth anniversary of the equipment purchase date. Equipment that is purchased before October 1, 1997, is not subject to tax on divergent use that occurs after October 1, 2001.

(B) Except as provided by subparagraph (C) of this paragraph, a manufacturer owes tax on an item if the divergent use occurs in the month of, or during any month before, the fourth anniversary of the date of purchase. The amount of the tax that is due for the month in which the divergent use occurs is equal to 1/48 of the purchase price multiplied by the percentage of divergent use during that month multiplied by the applicable tax rate when the divergent use occurs.

(i) The 48-month period that is used in calculating divergent use begins when the equipment is purchased.

(ii) The amount of divergent use for a month can be measured either in hours or by applicable output as follows:

(I) the divergent use percentage for a month is computed by taking the total divergent use hours of operation of the equipment in a month and dividing that amount by the total hours of operation of the equipment during the same month; or

(II) the divergent use percentage for a month is computed by taking the total output of the equipment during the period of divergent use in a month and dividing that amount by the total output of that equipment during the same month.

(C) A manufacturer who uses equipment in a divergent manner in the month of, or during any month before, the fourth anniversary of the date of purchase owes no tax on that use if the divergent use percentage in that month is 5.0% or less.

(D) A manufacturer who purchases non-capitalized equipment repair parts or consumables for equipment that is routinely used in both exempt and nonexempt manners may elect to pay tax on the repair parts or consumables by applying the divergent use percentage of the equipment as provided by paragraph (2)(B) of this subsection for the month during which the manufacturer purchased the repair parts or consumable items.

(E) A manufacturer who purchases repair labor for equipment may owe tax if the manufacturer uses the qualifying exempt equipment for both exempt and nonexempt purposes. If the manufacturer was using qualifying equipment in an exempt manner at the time when the repair was needed, then no tax is due on the repair. If the manufacturer was using the qualifying equipment in a nonexempt manner when the repair was needed, then tax is due on the purchase price of the repair. If a manufacturer cannot determine whether the equipment was being used in an exempt or nonexempt manner at the time of the repair, then the manufacturer may pay tax on the purchase price of the repair multiplied by the divergent use percentage as provided by paragraph (2)(B) of this subsection for the month in which the purchase of the repair service was made.

(F) The use of "pharmaceutical biotechnology cleanrooms and equipment," as those terms are used in subsection (a)(14) of this section, to manufacture, process, or fabricate a pharmaceutical biotechnology product that is not sold is not a divergent use if the use occurs during the certification process by the United States Food and Drug Administration.

**Credits**
**Source:** The provisions of this § 3.300 adopted to be effective January 1, 1976; amended to be effective November 16, 1979, 4 TexReg 3985; amended to be effective December 3, 1984, 9 TexReg 5930; amended to be effective March 30, 1987, 12 TexReg 825; amended to be effective November 28, 1990, 15 TexReg 6600; amended to be effective February 5, 1992, 17 TexReg

473; amended to be effective April 3, 1996, 21 TexReg 2473; amended to be effective December 6, 1996, 21 TexReg 11501; amended to be effective July 10, 2001, 26 TexReg 5057; amended to be effective July 23, 2002, 27 TexReg 6537; amended to be effective October 12, 2004, 29 TexReg 9551.

Current through 49 Tex.Reg. No. 10736, dated December 27, 2024, as effective on or before January 3, 2025. Some sections may be more current. See credits for details.

34 TAC § 3.300, 34 TX ADC § 3.300

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX H

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Texas Administrative Code
  Title 34. Public Finance
    Part 1. Comptroller of Public Accounts
      Chapter 3. Tax Administration
        Subchapter O. State and Local Sales and Use Taxes

34 TAC § 3.314

§ 3.314. Wrapping, Packing, Packaging Supplies, Containers, Labels,
Tags, Export Packers, and Stevedoring Materials and Supplies

Currentness

(a) Definitions. The following words and terms, when used in this section, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Containers--Glass, plastic, or metal bottles, cans, barrels, and cylinders. The term does not include any item of a type that is enumerated in paragraph (4) of this subsection.

(2) Manufacturers--Those persons covered by the provisions of § 3.300 of this title (relating to Manufacturing; Custom Manufacturing; Fabricating; Processing).

(3) Nonreturnable container--A container other than a returnable container.

(4) Packaging supplies--All internal and external wrapping, packing, and packaging supplies including wrapping paper, wrapping twine, bags, boxes, cartons, crates, crating material, pallets, tape, rope, rubber bands, metal bands, labels, staples, glue, mailing tubes, excelsior, straw, cardboard fillers, separators, shredded paper, ice, dry ice, cotton batting, shirt boards, and hay lath.

(5) Returnable container--A container of a kind customarily returned for reuse by the buyer of the contents.

(b) Manufacturers.

(1) Sales or use tax is not due on containers or packaging supplies purchased by manufacturers for use as a part of the completion of the manufacturing process. For the purposes of this section, the manufacturing process is complete when the tangible personal property being produced has been packaged by the manufacturer as it will be sold. For example, toothpaste may be sold at retail in a tube enclosed in a box. Multiple units of the boxed toothpaste are placed in cardboard boxes by the manufacturer. A label is placed on the cardboard boxes identifying the product. The manufacturer then places these labelled boxes on a pallet and covers them with shrink-wrap for shipment, either to the manufacturer's distribution

center, the manufacturer's warehouse, or to the manufacturer's customer. The toothpaste manufacturer may purchase the tubes, boxes, labels, pallets, and shrink-wrap tax free. Any additional packaging necessary to transfer the product from the manufacturer's distribution center, or from the manufacturer's warehouse to the manufacturer's customer would also be exempt from tax.

(2) Sales tax is not due on internal or external wrapping, packing and packaging supplies sold to a person for the person's own use, stored for use, or used in wrapping, packing, or packaging newspapers as defined in § 3.299(a) of this title (relating to Newspapers, Magazines, Publishers, Exempt Writings), including those distributed free of charge to the general public.

(3) Sales tax is not due on nonreturnable containers, if the purchaser fills the container and sells the container with its contents. See subsection (g)(3) of this section regarding returnable containers.

(4) Sales or use tax is not due on ice used by manufacturers and processors inside or outside a package in order to shape, form, preserve, stabilize, or protect the contents of the manufactured product.

(c) Sale of packaging supplies to persons other than manufacturers. Sales or use tax is due on the sale of packaging supplies, including gift wrapping supplies, to persons who repack tangible personal property prior to sale, produce shippers who are not original producers, wholesalers, retailers, and service providers other than laundry and dry cleaners for use in delivering, expediting, or furthering in any way:

(1) the performance of a taxable or nontaxable service;

(2) the rental of tangible personal property; or

(3) the sale of tangible personal property.

(d) Gift wrapping supplies. Sales tax is due on the purchase price of gift wrapping supplies used by persons providing gift wrapping services.

(1) Tax must be paid on the purchase price of gift wrapping by the person who provides the service whether or not the item being gift wrapped was sold by the person providing the service.

(2) Tax must be collected on a charge for gift wrapping if the person who provides the gift wrapping service sold the item that is being wrapped and does not provide the service on a stand-alone basis.

(e) Combination businesses. A business that primarily manufactures tangible personal property for sale may also purchase tangible personal property for resale that was manufactured by another entity. If the business is primarily a manufacturer, all packaging supplies may be purchased tax free even though a portion of the packaging supplies are used in repackaging a product. For example:

(1) fast-food restaurants are considered to be primarily processors of tangible personal property for sale. The restaurant may also sell tangible personal property without further processing, such as soft drinks, doughnuts, or candy. The fast-food restaurant may purchase all packaging supplies tax free even though a portion of the packaging supplies are used in packaging or serving a nonprocessed product;

(2) a grocery store purchases tangible personal property for resale, but also processes food and food products. A grocery store's meat department or snack bar may be processing as well as re-packaging food and food products. If the packaging supplies used by the departments that process are clearly distinguishable from those packaging supplies used in the nonprocessing department, the processing department's packaging supplies may be purchased tax free.

(f) Purchases for resale. A person who purchases packaging supplies for resale "as is," not as part of a packaged product, may purchase the packaging supplies tax free by issuing a resale certificate in lieu of paying tax.

(g) Containers. Sales or use tax is not due on:

(1) containers when sold with the contents, if sales or use tax is not due on the sales price of the contents;

(2) nonreturnable containers when sold without the contents to persons who place the contents in the container and sell the contents together with the container. Throwaway glass bottles are examples of nonreturnable containers;

(3) returnable containers when sold with the contents in connection with the retail sale of the contents or when resold for refilling. An example is a person who sells oxygen with an oxygen cylinder. The oxygen seller must pay sales or use tax on the oxygen cylinder at the time of purchase. If the oxygen purchaser returns the cylinder to be refilled, then no tax is due on the cylinder in that transaction.

(h) Labels and tags. Sales or use tax is due on labels and tags unless they are used as discussed in subsection (b) or are purchased by the type of persons who are described in subsection (k) of this section.

(i) Export packers.

(1) An export packer is a person who packages property to be exported outside the territorial limits of the United States.

(2) Crating and packaging supplies as listed in subsection (a)(4) of this section, when purchased by an export packer to export personal property, are exempt under Tax Code, § 151.307, whether used to package the export packer's property, that of vendors shipping such property to their foreign customers, or that of purchasers who contract and pay for such services.

(3) An export packer may give exemption certificates to suppliers on material purchases but must maintain records showing which materials were used for the exempt purpose of exporting tangible personal property.

(4) The export packer need not obtain a sales or use tax permit if all crating and packing supplies are purchased for exporting tangible personal property.

(j) Stevedoring services. Materials and supplies are exempt when purchased by a person providing stevedoring services for a ship or vessel operating exclusively in foreign or interstate coastal commerce if the materials and supplies are loaded aboard the ship or vessel and are not removed before the departure of the ship or vessel.

(k) Laundry and dry cleaners. Sales tax is not due on hangers, safety pins, pins, inventory tags, staples, boxes, paper wrappers, and plastic bags that are purchased by a person who performs laundry or dry cleaning services, if the items are used to wrap, pack, or package an item that the person has pressed and dry cleaned or laundered in the regular course of business. See § 3.310 of this title (Relating to Laundry, Cleaning, and Garment Services).

**Credits**

**Source:** The provisions of this § 3.314 adopted to be effective July 23, 1992, 17 TexReg 4958; amended to be effective May 3, 1996, 21 TexReg 3550; amended to be effective December 6, 1996, 21 TexReg 11504; amended to be effective March 3, 2002, 27 TexReg 1334.

Current through 49 Tex.Reg. No. 10736, dated December 27, 2024, as effective on or before January 3, 2025. Some sections may be more current. See credits for details.

34 TAC § 3.314, 34 TX ADC § 3.314

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX I

200108400L [Tax Type: Sales] [Document Type: Letter/Memo] [Status: Superseded with Summary]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 200108400L

**STAR Superseded Information**
**Supersede type:** complete
**Document superseded on** :  02/13/2023
**Issue(s) that caused the document to be superseded** : returnable steel reels
**Reason(s):** This document is contrary to the holding of East Texas Oxygen Co., Vs. The State Of Texas, STAR document 8410C0607A01

August 6, 2001

\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*

Dear \*\*\*\*\*\*\*\*\*\*\*\*\*\*:

Thank you for your inquiry requesting a written ruling on returnable steel reels purchased by a manufacturer.

\*\*\*\*\*\*\*\*\*\*\*\*\* ("CABLE COMPANY") is a manufacturer of cable products. When CABLE COMPANY ships the cable to its customers, the cable is sometimes shipped to them on steel reels that CABLE COMPANY plans to receive back from its customers once they have removed all the cable. CABLE COMPANY stores your cable product in inventory on these steel reels prior to shipment. Depending upon the amount of cable ordered, the cable could be shipped on the stored reel or a smaller one.

We discussed returnable milk trip cases in our conversation of July 27 and stated that the trip cases are exempted as wrapping and packaging when purchased by a manufacturer.

You asked if the steel reels that CABLE COMPANY first stores its product on and

then ship to its customers, with the idea that CABLE COMPANY will get them back empty (returnable steel reels), be exempt from both Texas sales and use tax when purchased?

Response:  As a manufacturer of cable, CABLE COMPANY may make tax-free purchases of returnable steel cable reels that CABLE COMPANY uses to ship its product to its customers.  The reels qualify as wrapping, packing, and packaging supplies that are used to further the sale of CABLE COMPANY'S product. See Rule 3.300 (d)(14). Steel reels used solely for storage of finished product and that are not used to ship product to customers do not qualify for exemption. On a similar issue, the Administrative Law Judge, in Hearing 22,668 (1989), addresses the exemption for returnable hardwood pallets purchased by a manufacturer.

This opinion is based on the facts presented.  Other facts though similar may provide a different result.

I hope this information answers your questions.  If you need additional information, you may e-mail our tax help section at .
 You may also call me toll-free at 1-800-531-5441, extension 3-4502.  The direct line is 512/463-4502.  You may also write to Tax Policy Division, Comptroller of Public Accounts.

Sincerely,


Gilbert Zamora
Tax Policy Division

---

ACCESSION NUMBER: 200108400L
SUPERSEDED: Y
DOCUMENT TYPE: L
DATE: 2001-08-06
TAX TYPE: SALES

# APPENDIX J

9904382L [Tax Type: Sales] [Document Type: Letter/Memo]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 9904382L

April 7, 1999

\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*

Dear \*\*\*\*\*\*\*\*\*\*:

This is to clarify my December 14, 1998 response to you regarding packaging supplies and processing.  My responses to question 2 and 4 are restated below with the clarification added (last paragraph added to my response to question 2 and first sentence of question 4 clarified and last paragraph added).

These packaging products are used in the following departments in a retail grocery store:

2. Cheese Department - this department cuts and repackages large wheels of cheese, and prepares cheese, olive and various other spreads and dips.

Response:  This department is considered repackaging the cheese rather than processing the cheese, therefore the packaging supplies used for this purpose are taxable.  The mixing of ingredients to prepare spreads and dips qualifies as processing and packaging for those products qualify for exemption.  Subsection (e) (2) of Rule 3.314 provides in part:

(e) Combination businesses.  A business that primarily manufactures tangible personal property for sale may also purchase tangible personal property for resale that was manufactured by another entity.  If the business is primarily a manufacturer, all packaging supplies may be purchased tax free even though a portion of the packaging supplies are used in repackaging a product.  For example:

 (1) ...

(2) a grocery store purchases tangible personal property for resale, but also processes food and food products.  A grocery store's meat department or snack bar may be processing as well as re-packaging food and food products.  If the

packaging supplies used by the departments that process are clearly distinguishable from those packaging supplies used in the nonprocessing department, the processing department's packaging supplies may be purchased tax free.

Slicing or grating of cheese is considered processing.  Packaging supplies (containers, bags, labels, etc.) used to package cheese sliced or grated by Taxpayer qualify for exemption as wrapping and packaging supplies.

4.  Bulk Department - this department includes over a hundred products such as rice, flour, nuts, grains, cereals and herbs. Without a package to put these in, such as a plastic bag, the customer would not be able to take the product off the store premises.

Additionally, the auditor has indicated that containers are taxable if used in non-processing departments. It appears to me that containers are exempt by statute as long as the ingredients within the containers are also not taxable, such as raw peanut butter or maple syrup. Could you please confirm that as well?

Response:  You are correct, with respect to the "sale" of containers with exempt products.  Texas Tax Code  151.322 (a)(1) exempts a container sold with its contents if the sales price of the contents is not taxed under this chapter.  "Containers" that qualify include glass, plastic, or metal bottles, cans, barrels, and cylinders, but does not include any item of a type described in Section 151.302(d).  Also, plastic bags do not qualify as containers.

Subsection (b)(1) of Rule 3.314 - concerning wrapping and packaging supplies, exempts from sales tax containers or packaging supplies purchased by "manufacturers" for use as a part of the completion of the manufacturing process.  Therefore, Taxpayer can purchase tax free containers or packaging supplies used in the Bulk Department used to package bulk items processed by Taxpayer or the customer (i.e., grinding of coffee beans).  Containers and bags used to package or bag bulk items not processed by Taxpayer, or the customer, are not exempted.

This opinion is based on the facts presented.  Other facts though similar may provide a different result.   I hope this information answers your questions.

If you need additional information, please call me toll-free at 1-800-531-5441, extension 3-4502.  The direct line is 512/463-4502.  You may also write to Tax Policy Division, Comptroller of Public Accounts. You may also e-mail our tax help section at: Sincerely,


Gilbert Zamora
Tax Policy Division

 cc:  Ping Hu, Auditor -Audit
*************
*************
*************




December 14, 1998

***********
***********

\*\*\*\*\*\*\*\*\*\*

Dear Ms. \*\*\*\*\*\*\*\*\*\*\*\*\*\*:

This is in response to your request for a ruling on certain packaging products used by COMPANY A in their stores. You are currently under audit and have been advised by our auditor, Ping Hu, to request a taxability determination on certain packaging products.

Packaging supplies for these departments are separately invoiced, and therefore clearly distinguishable from packaging supplies purchased for other non-processing department in the store.

You asked for a ruling on the taxability of each of the department's bag and packaging purchases as well as on the container question. If you have any questions or need additional information, please feel free to contact me at the number listed below.

These packaging products are used in the following departments in a retail grocery store:

1. Produce Department- in addition to simply placing produce on a shelf for customer purchase fruits and vegetables are washed, sliced and packaged for sale.

Response:  Packaging for fruits and vegetables that are sliced and packaged for sale will qualify for exemption.  Packaging for fruits and vegetables that are merely washed and then packaged does not qualify for exemption.

2. Cheese Department - this department cuts and repackages large wheels of cheese, and prepares cheese, olive and various other spreads and dips.

Response:  This department is considered repackaging the cheese rather than processing the cheese, therefore the packaging supplies used for this purpose are taxable.  The mixing of ingredients to prepare spreads and dips qualifies as processing and packaging for those products qualify for exemption. Subsection (e) (2) of Rule 3.314 provides in part:

(e) Combination businesses.  A business that primarily manufactures tangible personal property for sale may also purchase tangible personal property for resale that was manufactured by another entity.  If the business is primarily a manufacturer, all packaging supplies may be purchased tax free even though a portion of the packaging supplies are used in repackaging a product.  For example:

(1) ...

(2) a grocery store purchases tangible personal property for resale, but also processes food and food products.  A grocery store's meat department or snack bar may be processing as well as re-packaging food and food products.  If the packaging supplies used by the departments that process are clearly distinguishable from those packaging supplies used in the nonprocessing department, the processing department's packaging supplies may be purchased tax free.

3.  Bakery Department - in addition to selling baked goods from an off-site bakehouse and other outside vendors, the stores have on-site ovens where they bake cookies, breads and other pastries.

Response: The bags, cake boxes, cake domes, etc., used in the bakery department to package the off-site and on-site baked cookies, breads and pastries will qualify for exemption.  Packaging materials used for outside vendor-baked items are taxable.

4.  Bulk Department - this department includes over a hundred products such as rice, flour, nuts, grains, cereals and herbs. Without a package to put these in, such as a plastic bag, the customer would not be able to take the product off the store premises.

Additionally, the auditor has indicated that containers are taxable if used in non-processing departments. It appears to me that containers are exempt by statute as long as the ingredients within the containers are also not taxable, such as raw peanut butter or maple syrup. Could you please confirm that as well?

Response:  You are correct.  Texas Tax Code 151.322 (a)(1) exempts a container sold with its contents if the sales price of the contents is not taxed under this chapter.  "Containers" that qualify include glass, plastic, or metal bottles, cans, barrels, and cylinders, but does not include any item of a type described in Section 151.302(d).  Also, plastic bags do not qualify as containers.

This opinion is based on the facts presented.  Other facts though similar may provide a different result.   I hope this information answers your questions.

If you need additional information, please call me toll-free at 1-800-531-5441, extension 3-4502.  The direct line is 512/463-4502.  You may also write to Tax Policy Division, Comptroller of Public Accounts. You may also e-mail our tax help section at: Sincerely,


Gilbert Zamora
Tax Policy Division

---

ACCESSION NUMBER: 9904382L
SUPERSEDED: N
DOCUMENT TYPE: L
DATE: 1999-04-07
TAX TYPE: SALES

# APPENDIX K

200807235H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 200807235H

*ALERT: Section 151.318 was amended to allow 100% exemption on manufacturing machinery and equipment (excluding hand tools) without respect to useful life effective 1-1-95.*

SOAH DOCKET NO. 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.26
CPA HEARING NO. 40,875

RE: **************
TAXPAYER NO.: **************
AUDIT OFFICE:
AUDIT PERIOD: January 1, 1994 THROUGH December 31, 1997

Limited Sales, Excise, And Use Tax/RDT

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS

TREVOR MOORE
Representing Tax Division

*************
Representing Petitioner

COMPTROLLER'S DECISION

************** (Petitioner) was audited for sales and use tax compliance by the
(Comptroller) and assessed a deficiency.

Petitioner requested a redetermination hearing contending that credits should be allowed for sales tax paid on material purchases that were exempt because used in manufacturing. In this Proposal for Decision, the Administrative Law Judge (ALJ) recommends that the requested credits should be allowed.

## I. PROCEDURAL HISTORY, NOTICE & JURISDICTION

The case was submitted for decision based on the written submissions of the parties. Petitioner was represented by **************. The Comptroller was represented by Trevor Moore. The record closed on March 14, 2008.

There are no contested issues of notice or jurisdiction, and those matters are set out in the Findings of Fact and Conclusions of Law without further discussion here.

## II. REASONS FOR DECISION

A. Background, Evidence Submitted, and Issues Presented

Petitioner was audited for the period January 1, 1994, through December 31, 1997, and assessed a tax deficiency. On redetermination, Petitioner contends that credits should be allowed for sales tax it paid on its purchases of epoxy materials as exempt materials used in manufacturing to comply with laws or regulations for public health or pollution control purposes. Petitioner refines and produces copper, copper telluride, and specialty metal products for ultimate sale at its facility in CITY, Texas. An electrolytic process is used to separate pure copper from other metals in copper anodes. Petitioner states that the refining process takes place in a large tank house that contains electrolyte-filled refining cells on a main floor. The main floor rests on a concrete containment area that underlies the entire tank house. Chemical resistant epoxy materials are used to coat the concrete to prevent spilled or leaked electrolyte, which contains arsenic and selenium, from corroding the containment area and leaching into the soil. The epoxy materials, because they do not react with the sulfuric acid in the electrolyte mixture, also allow Petitioner's personnel to collect the spilled electrolyte and recycle it into the process.

The invoices that Petitioner submitted are dated from April 1994 through August 1997 and describe purchases of bags, drums and other containers of epoxy and materials used to mix and create the epoxy coatings. The materials were shipped by common carrier. The invoices do not state any labor or installation charges. Petitioner states that the epoxy materials were applied by its own personnel or by third parties hired by Petitioner.

According to an affidavit from Petitioner's Environmental Services Manager, INDIVIDUAL A, the electrolytic solution is used in copper refining and typically contains sulfuric acid, copper, arsenic, nickle, iron, and selenium. At any given time, there are approximately one million gallons of electrolytic solution circulating in the refinery tanks, cells, pumps, hoses, pipes, valves, fittings, and heat exchangers. Any electrolytic solution that is spilled or

leaked is collected in a concrete containment area beneath the main floor of the refinery.

INDIVIDUAL A states the U.S. Environmental Protection Agency considers arsenic and selenium to be hazardous substances and imposes reporting requirements on facilities that release more than a designated reportable quantity of a hazardous substance to the environment in a 24-hour period. To prevent releases of the electrolyte into the environment, Petitioner purchased and applied chemical epoxy coating to the containment area. The epoxy is made of materials that do not react with the electrolyte solution so that leaks and spills pool on the surface of the epoxy. Petitioner's personnel assigned to the containment area collect the electrolytes from the epoxy surface and recycle it back into the refining process.

Staff takes the position that exemption must be denied because: (1) the epoxy coating was permanently installed to the floor of Petitioner's facility, thus becoming an improvement to real property, which cannot qualify for the manufacturing exemption; and (2) in the alternative, exemption must be denied because the epoxy coating was not used in actual manufacturing.

B. Agreed Deletions

In its Response to Petitioner's Brief of March 7, 2008, Staff recommends that the audit be amended as set forth in a schedule of agreed transactions.

C. Analysis and Recommendation

Petitioner claims exemption for epoxy materials purchased during 1994 through August 1997 on the grounds that they were used in or during manufacturing to comply with laws or regulations for public health or pollution control purposes. Consideration of Petitioner's claim must begin with a correct identification of the relevant tax exemptions as stated in the statutes and rules in effect during those years. Petitioner proposes former Tax Code Section 151.318(g) as a starting point. That subsection, as relevant to Petitioner's contention, provided a phased-in exemption for machinery, equipment, and replacement parts or accessories with a useful life in excess of six months if the equipment is used or consumed in or during the actual manufacturing, processing, fabrication, or repair of tangible personal property for ultimate sale, and the use or consumption of the property was necessary or essential to a pollution control process. TEX. TAX CODE ANN. SECTION 151.318(g), repealed effective October 1, 1999. That exemption, in effect when the epoxy was purchased, was limited to machinery and equipment and their replacement parts or accessories. Machinery is defined as power-operated machines, and equipment is defined as any apparatus, work clothing, device, or simple machines used directly in production. 34 TEX. ADMIN. CODE SECTION 3.300(a)(4) and (7). Since the epoxy coatings are not machinery or equipment, former Tax Code Section 151.318(g) is not accepted as a basis for exemption in this case.

Petitioner next cites the Comptroller's administrative rule that exempted necessary and essential materials, other than machinery and equipment, used in manufacturing to satisfy or comply with requirements of law or regulations for

public health or pollution control purposes. 34 TEX. ADMIN. CODE SECTION 3.300(d)(3)(B), effective June 21, 1989. That rule provision was adopted in response to Southwestern Electric Power Co v. Bullock, Cause No. 429,161 (Dist. Ct. Of Travis County, 200th Judicial Dist. Of Texas, August 1, 1988), in which a taxpayer claimed the manufacturing exemption for crushed limestone that was mixed with water and sprayed on smokestacks of the taxpayer's power plants to clean emissions from the plant. The Comptroller argued that the limestone was used after manufacturing had occurred, rather than during the manufacturing process. After the district court ruled in favor of the taxpayer, the Comptroller changed the tax policy to conform to that decision, and effective June 21, 1989, amended Rule 3.300 to exempt necessary and essential materials used in manufacturing to comply with requirements of law or regulations for public health or pollution control purposes. See STAR Accession No. 8810L0897E08 (October 3, 1988).

The new rule provision was found invalid as contrary to the tax statutes in Comptroller's Decision No. 27,971 (1992). Although that decision is shown as superseded for unspecified reasons on the Comptroller's data base, the holding of Comptroller's Decision No. 27,971 was reaffirmed and followed in Comptroller's Decision Nos. 34,023 (1996) and 38,348 (2002), decisions that have not been superseded. However, the Comptroller reissued Rule 3.300(d)(3)(B) on February 5, 1992, and on December 6, 1996. Moreover, other Comptroller decisions recognize that the rule provision regarding materials used to comply with public health or pollution control regulations was valid and in effect for periods prior to October 1, 1997. As discussed in Comptroller's Decision No. 40,286 (2006), the Comptroller regarded the 1997 amendments to Tax Code Section 151.318 as having in effect abrogated the exemption provided by Rule 3.300(d)(3)(B). Subsequently, the Legislature amended Tax Code Section 151.318, effective October 1, 1999, to add Subsections(a)(5) and (a)(10), exempting tangible personal property used or consumed in actual manufacturing if the use or consumption is necessary and essential to pollution control process or to comply with laws or regulations related to public health. The 1999 amendments were intended as a clarification of existing law. Accordingly, the Comptroller regards the 1999 amendments relating to pollution control and public health to have reinstated at least in some manner the exemption that was previously available under Rule 3.300(d)(3). See also Comptroller's Decision No. 42,324 (2005), and STAR Accession No. 200106319L (June 8, 2001).

Therefore, during the periods at issue, the relevant exemption for materials used in manufacturing to pollution control or to comply with public health requirements are those found in former Rule 3.300(d)(3)(B). Staff contends that the epoxy purchases do not qualify for exemption under that provision for two reasons. Staff first contends that the epoxy does not qualify as materials used in manufacturing because the epoxy was permanently installed to the floor of Petitioner's plant, thus becoming improvements to plant real property. However, the invoices and other evidence show that Petitioner purchased the epoxy coating in containers shipped by common carrier. The undisputed affidavit testimony of Petitioner's Environmental Services Manager is that the epoxy coating was then applied to the concrete containment barriers by Petitioner's

employees. Staff cites Comptroller's Decision No. 27,683 (1991) for the proposition that applying epoxy to an existing building results in an improvement to real property. That decision dealt with a lump-sum charge by a contractor for epoxy coating. Equipment or materials that qualify for the manufacturing exemption that are sold as part of a lump-sum charge to repair or remodel nonresidential realty are presumed taxable, but an exemption certificate may be accepted if the exempt materials are separately stated. 34 TEX. ADMIN. CODE SECTION 3.300(i); see also STAR Accession No. 200305919L (May 29, 2003, partially superseded for unrelated reasons). In this case, the charges for the epoxy materials were separately stated on the invoices, and they qualify as materials under former Rule 3.300(d)(3)(B).

Secondly, Staff contends that even if the epoxy purchases are considered as materials they do not qualify for exemption because the materials were not used or consumed in or during actual manufacturing as required by Tax Code Section 151.318(a)(2) as in effect when the purchases were made. Staff cites Comptroller's Decision No. 30,606 (1996), in which a taxpayer claimed exemption for liquid emulsified asphalt sprayed on roads at its cement plant to control dust as required by the Texas Air Control Board. Exemption was denied under Tax Code Section 151.318(a)(2) because the asphalt was not used or consumed during the actual manufacturing of cement. There was no discussion of Rule 3.300(d)(3)(B). Although not articulated in the decision, exemption apparently could have been denied on the grounds that the dust control was incident to transportation activities rather than manufacturing. Staff further asserts that the epoxy in this case was not used in actual manufacturing because "it makes no change to the product." The requirement that tangible personal property used in manufacturing must directly make or cause a chemical or physical change to the product being manufactured was added to Tax Code Section 151.318(a)(2) effective October 1, 1997. Before that date, the statute only specified tangible personal property used or consumed in or during actual manufacturing that is necessary or essential to the manufacturing operation. The statute was construed to exempt tangible personal property that was an indispensable or integral part of the production of tangible personal property for ultimate sale during actual manufacturing, which begins at the first stage of production of tangible personal property and ends at the completion of tangible personal property; the statute did not require direct contact with the finished product. Sharp v. Tyler Pipe Indus. Inc., 919 S.W. 2d 157 (Tex. App. –Austin, 1996, writ denied); see also Comptroller's Decision No. 40,286 (2006). The undisputed evidence is that the epoxy materials in this case were used after copper production had commenced and before it was completed. The Rule 3.300(d)(3)(B) exemption only specifies that materials be used "in manufacturing" to comply with law or regulations for public health or pollution control purposes. Staff also relies on Comptroller's Decision No. 34,023, a decision that denies the validity of Rule 3.300(d)(3)(B). That decision is not considered a correct statement of Comptroller policy for the periods at issue for the reasons already discussed.

The reasons articulated by Staff are therefore not accepted as valid grounds for denying exemption in this case. That does not necessarily result in

exemption because Petitioner bears the burden of proof to establish all elements of exemption by clear and convincing evidence. 34 TEX. ADMIN. CODE SECTION 1.40(2)(A). There must be proof that the epoxy materials were necessary and essential to satisfy or comply with requirements of law or regulations for public health or pollution control purposes. Petitioner cites federal regulations that list arsenic and selenium and selenium compounds as hazardous substances. 40 CFR Section 302.4. Federal water pollution and control standards prohibits the discharge into the environment of arsenic and selenium above specified quantities and require reporting of spills and leaks. 33 U.S.C. Section 1311 and 42 U.S.C. Section 9601. Such discharges of hazardous substances are also regulated under the Texas Hazardous Substances Spill and Prevention and Control Act. TEX. WATER CODE ANN. Section 26.261 et seq. These provisions establish that the arsenic and selenium in the electrolyte solution are hazardous substances that are subject to federal and state regulation. Petitioner's undisputed evidence is that the epoxy coating applied to the containment area was necessary to prevent chemicals in the electrolyte solution from corroding the concrete containment barrier and leaking or being released into the environment. Petitioner also states the epoxy coating allows leaks and spills to pool on the containment surface so that the electrolyte solution can be collected and returned to the refining process, a function that does not contradict and is consistent with the use of the materials to prevent the release of hazardous substances. The evidence establishes that the epoxy coating was used in manufacturing to comply with public health or pollution control regulations, and it is recommended that the exemption be allowed.

III. FINDINGS OF FACT

1. ************** (Petitioner) was audited for sales and use tax compliance by the  (Comptroller) for the period January
1, 1994, through December 31, 1997 and assessed a tax deficiency. Petitioner requested redetermination.

2. The case was referred to the State Office of Administrative Hearings for hearing on written submission.

3. A Notice of Hearing dated December 5, 2007, contained a statement of the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

4. Petitioner requested a credit against the audit liability for sales paid on its purchases of epoxy materials as exempt materials used in manufacturing to comply with laws or regulations for public health or pollution control purposes

5. Petitioner purchased materials used to mix and create epoxy coatings during April 1994 through August 1997. The charges for materials were separately stated and did not include any labor or installation charges.

6. The epoxy materials were used to coat containment barriers at Petitioner's copper refining plant to prevent hazardous chemicals from an electrolytic

process to corrode the concrete barriers and to leak or be released into the environment.

7. The epoxy materials were used in and during the manufacture of copper products for ultimate sale.

8. The use of the epoxy materials was necessary and essential to satisfy or comply with requirements of law or regulations for public health or pollution control purposes.

IV. CONCLUSIONS OF LAW

1. The  has jurisdiction over this matter pursuant to TEX. TAX CODE ANN. ch. 111.

2. The State Office of Administrative Hearings has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law, pursuant to TEX. GOV'T CODE ANN. ch. 2003.

3. Petitioner was timely and properly notified of the hearing as required by TEX. GOV'T CODE ANN. Section 2001.051 and 2001.052.

4. Petitioner met its burden of proof under 34 TEX. ADMIN. CODE SECTION 1.40(2)(A) to establish by clear and convincing evidence that the epoxy materials were necessary and essential to satisfy or comply with requirements of law or regulations for public health or pollution control purposes pursuant to former 34 TEX. ADMIN. CODE SECTION 3.300(d)(3)(B).

5. Based on the foregoing Findings of Fact and Conclusions of Law, credits or refunds should be allowed for sales tax paid on purchase of the epoxy materials and as stated by Staff.

Hearing No. 40,875

ORDER OF THE COMPTROLLER

On March 19, 2008, the State Office of Administrative Hearings' (SOAH) Administrative Law Judge, Alvin Stoll, issued a Proposal for Decision in the above referenced matter. The parties were given fifteen days from the date of the Decision to file exceptions with SOAH. No exceptions were filed, and the Comptroller has determined that the Administrative Law Judge's Proposal for Decision should be adopted as written.

The above decision resulting in a credit to Taxpayer as set out in "Attachment A," which is incorporated by reference, is approved and adopted in all respects. This decision becomes final twenty days after the date Petitioner receives notice of this decision. If either party desires a rehearing, that party must file a Motion for Rehearing, which must state the grounds for rehearing, no later than twenty days after the date Petitioner receives notice of this decision. Notice of this decision is presumed to occur on the third day after the date of this decision.

Signed on this 1st day of July 2008.

SUSAN COMBS

by: Martin A. Hubert
Deputy Comptroller

---

ACCESSION NUMBER: 200807235H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2008-07-01
TAX TYPE: SALES

# APPENDIX L

201502052H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

# 201502052H

SOAH DOCKET NO. 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.26
CPA HEARING NO. 106,331

RE: *************
TAXPAYER NO.: *************
AUDIT OFFICE: *************
AUDIT PERIOD: January 1, 2005 THROUGH August 31, 2008

Sales And Use Tax/RDT

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

GLENN HEGAR

ROBERT SCOTT
Representing Tax Division

*************
Representing Petitioner

COMPTROLLER'S DECISION

The Tax Division (Staff) of the
(Comptroller) audited ************* (Petitioner) for compliance with sales and use tax laws and made an assessment. Petitioner requested redetermination contending that the audit erroneously schedules certain exempt asset and expense purchases for tax. Alternatively, Petitioner contends the disputed purchases should be deleted from the audit based on the Comptroller's detrimental reliance policies. Lastly, Petitioner contends the penalty assessment should be waived. Staff agreed to delete certain duplicate entries but otherwise disagrees with each of Petitioner's contentions and argues that the assessment should be affirmed. In the Amended Proposal for Decision (PFD), the Administrative Law Judge (ALJ) recommends that Petitioner's exemption

claims be granted. However, the ALJ finds that Petitioner failed to demonstrate that penalty waiver is warranted in this matter, and therefore that contention should be denied.

## I. PROCEDURAL HISTORY, NOTICE, AND JURISDICTION

Staff referred the contested case to the State Office of Administrative Hearings and, on August 20, 2013, issued a Notice of Hearing to Petitioner. ALJ Victor John Simonds convened a hearing on the merits on October 21, 2013. Petitioner was represented by *************, Attorney at Law. Staff was represented by Assistant General Counsel Robert Scott. At the conclusion of the hearing, Staff asked that the record be left open to allow for the submission of written closing arguments. The ALJ granted Staff's unopposed request and left the record open until December 12, 2013. Staff timely filed exceptions, and Petitioner submitted its response. The Amended PFD represents the ALJ's recommendation and ruling on the exceptions. There are no issues of notice or jurisdiction, therefore those matters are set out in the Findings of Fact and Conclusions of Law without further discussion.

## II. REASONS FOR DECISION

### A. Evidence

Staff presented the testimony of Herman Blake (the auditor that completed the audit at issue), and submitted the following exhibits:

1. Sixty-day notification letter for the audit at issue;
2. Texas Notification of Audit Results for the audit at issue;
3. Penalty and interest waiver worksheet for the audit at issue;
4. Audit report for the audit at issue;
5. Audit plan for the audit at issue;
6. Schedule of agreed and disputed transactions (referred to as a AP 124 schedule);
7. Various audit documentation regarding audit of ************* (COMPANY A);
8. Audit schedules of audit of COMPANY A;
9. Audit documentation relating to the results of audit of COMPANY A;
10. Documentation related to the hearing request for audit of COMPANY A;
11. Documentation related hearing results of COMPANY A audit;
12. Hearing decision related to audit of COMPANY A;
13. Texas Tax Code SECTION 151.317 and 151.318 (Vernon's 1992);
14. Acts of 1999, Leg. R.S., H.B. 3211, ch. 1467, SECTION 2.18, 2.19, and 4.01 – 4.13, Tex. Gen. Laws 4996, 5017-21, 5036-38; and
15. Internet website printout from *************.

Petitioner did not object to the admission of Staff's evidentiary submissions, but noted that Exhibit No. 15 was a website printout from a global company based in England, I.E., it was not Petitioner's website. Each of Staff's exhibits was admitted to the record.

Petitioner presented the testimony of INDIVIDUAL A (Petitioner's vice president and general manager), INDIVIDUAL B (Petitioner's director of contracts), and INDIVIDUAL C (Petitioner's facilities manager). Petitioner also presented the testimony of INDIVIDUAL D, an engineer who performed various predominant-use utility studies at Petitioner's facilities. Petitioner submitted the following exhibits:

1. Comptroller's Decision No. 32,859 (1998);
2. Purchase and Sale Agreement;
3. Predominant-use utility studies;

4. Affidavit of INDIVIDUAL E, a contracts manager for Petitioner;

5. Statement of INDIVIDUAL G, a development engineer for Petitioner; and

6. Pages from Petitioner's pleadings identifying disputed items.

Petitioner's Exhibit Nos. 1 and 2 were admitted without objection. Staff objected to Petitioner's Exhibit No. 3, arguing that the predominant-use studies had no relevance to the contested case hearing because they were completed in 2012, I.E., after the audit period. The ALJ overruled the objection based on his conclusion that the studies had at least some tendency to prove factual matters at issue. SEE Tex. R. Evid. 401 and 402. Staff also objected to Petitioner's Exhibit Nos. 4 and 5, arguing that they should not be admitted because they were conclusory and the individuals were not available to testify. The ALJ also overruled those objections. Nevertheless, at the conclusion of the hearing the ALJ determined that the documents should be excluded from the record because Petitioner's witnesses had testified on each of the matters set forth within the exhibits. Thus, Exhibit Nos. 4 and 5 (which constitute hearsay evidence) were not necessary to ascertain facts at issue in the matter. SEE Tex. R. Evid. 802, and Tex. Gov't Code SECTION 2001.081.

B. Staff Agreed Adjustments

Staff agreed to delete duplicate entries scheduled in Exam 500. The specific adjustments are identified within Staff's Exhibit No. 6.

C. Facts Established by the Evidence and Issues Presented

************* (COMPANY B) was audited by the Comptroller's Audit Division for compliance with sales and use tax laws in the period August 1, 1989, through February 28, 1993. During the audit period, COMPANY B tested products for lubricant manufacturers at its CITY J facilities. Specifically, COMPANY B tested products to see if they met industry standards. Under normal conditions, the lubricants could not be marketed by the manufacturers unless they had been subjected to tests such as those being performed by COMPANY B. The auditor determined that COMPANY B erroneously failed to pay tax on its electricity and natural gas purchases. Therefore, the Comptroller issued COMPANY B a Texas Notification of Audit Results assessing tax, penalty, and interest. The company requested redetermination contending that the purchases were exempt from sales and use tax as tangible personal property that was used or consumed in manufacturing or processing. COMPANY B provided predominant-use studies that had been prepared by COMPANY D. INDIVIDUAL D concluded that COMPANY B's electricity and natural gas purchases were exempt, based on Texas Tax Code SECTION 151.318 and 151.317, because the taxpayer was engaged in quality-control testing of automotive lubricants. During the audit period, the cited exemptions did not specifically refer to quality-control testing, however the Comptroller's published interpretation of those statutes was that all quality-control testing done prior to delivery of the product to the end customer was included in the exemptions. SEE Comptroller's Decision Nos. 21,157 and 21,169 (1989). The Comptroller affirmed that the testing COMPANY B was doing would be exempt if it were performed by a manufacturer because it was performed prior to the completion of the manufacturing process. The Comptroller also determined that the manufacturer was entitled to subcontract out a part of the manufacturing process, such as quality-control testing. Because COMPANY B was a subcontractor performing a manufacturing process on beha lf of the manufacturers, the COMPANY B exemption claim was granted. SEE Comptroller's Decision No. 32,859 (1998).

Subsequently, the Comptroller's Audit Division audited a company known as COMPANY A. As the audit documentation notes, COMPANY A provided lab testing and inspection services. It had locations in CITY A, CITY B, CITY C, CITY D, CITY

E, CITY G, and CITY H. [ENDNOTE: (1)] COMPANY A did not have any facilities in CITY J, and did not perform quality-control testing on automotive lubricants. The COMPANY A audit covered the period June 1, 2000, through September 30, 2003. The auditor determined that COMPANY A erroneously failed to pay sales tax on its purchases of electricity. The Comptroller issued a Texas Notification of Audit Results to COMPANY A assessing tax, penalty, and interest. Prior to the completion of the audit, the COMPANY A representatives agreed that they should have been paying tax on their electricity purchases. Nevertheless, they requested redetermination. During the pendency of the COMPANY A redetermination hearing the company was purchased by Petitioner. Staff filed a motion to dismiss the hearing when Petitioner failed to respond to the Position Letter. The motion was granted and the resulting Comptroller's Decision became final on December 17, 2007.

On October 26, 2005, Petitioner also acquired COMPANY B, and approximately three years later the Audit Division initiated a follow-up audit of Petitioner, which is the subject of this hearing. The audit documentation states that Petitioner had 14 facilities located around the state. Prior to initiating audit fieldwork the auditor reviewed Comptroller records and noted the previous COMPANY A audit. He also determined that Petitioner had submitted nine of its sales tax returns late. The auditor did an internet search and located a website for Intertek, a global company based in London, England. [ENDNOTE: (2)] The website stated that the company was a risk management company that evaluated product design and performance, and studied customer behavior. The auditor did not realize that Intertek and Petitioner are two distinct companies that do not perform the same types of tests. The auditor met with Petitioner's representatives but he did not tour the CITY J automotive facilities. Mr. Blake agreed that Petitioner did not market, distribute, or package its customer's products for sale, [ENDNOTE: (3)] but concluded that the lubricant testing was being performed prior to production and therefore determined that the testing was a research and development process, not manufacturing. [ENDNOTE: (4)] He testified that Petitioner's customers were sending "samples to test, not the actual manufactured product. It seems like research and development. Also it is obvious that [Petitioner] is not a manufacturer and does not process the [tangible personal property] that is supplied by their customers." [ENDNOTE: (5)] The auditor determined that Petitioner erroneously failed to pay tax on its purchase of various taxable items, e.g., testing equipment, electricity, and natural gas. The purchases that were scheduled for tax covered a number of Petitioner's facilities, including its two CITY J locations (at LOCATION A and LOCATION B).

After completing the audit fieldwork, the auditor held an exit conference with Petitioner's representatives. Petitioner disagreed with the assessments related to the CITY J facilities, and provided the auditor with a copy of Comptroller's Decision No. 32,859 (I.E., the COMPANY B hearing). [ENDNOTE: (6)] The auditor noted that the decision had been partially superseded in 2009, and therefore did not accept it as controlling authority. On December 13, 2010, Staff issued a Texas Notification of Audit Results to Petitioner assessing tax in the amount of $*************, a 10% late penalty, and interest accrued to the account as of the statement date. The overall audit error was 68.69%, and Staff declined to waive penalties because the "prior audit provided coverage in the area of adjustment." [ENDNOTE: (7)] Petitioner requested redetermination.

At the hearing on the merits, INDIVIDUAL A (Petitioner's vice president and general manager) testified that he has been at the CITY J automotive testing facility for 32 years. INDIVIDUAL A stated that, though ownership of the automotive facilities had changed over the years, the operational functions had remained essentially unchanged. Specifically, they test products for lubricant manufacturers to verify that the products meet quality standards set by various

trade groups. INDIVIDUAL A explained that Petitioner's customers (E.G., COMPANY C, COMPANY E, COMPANY G) are required to register the products they manufacture with the American Chemistry Council (ACC). Once a manufacturer secures a license it cannot change the product in any substantial way. [ENDNOTE: (8)]

Additionally, before the licensed product can be sold to end-users (I.E., oil marketers), the manufacturers must complete certain product testing to secure product certifications authorized by groups such as the American Petroleum Institute (API) and the American Society for Testing and Materials (ASTM). [ENDNOTE: (9)] INDIVIDUAL A stated that the testing is not a research and development function. Rather, it is the final step before the manufacturers can package and sell their products. [ENDNOTE: (10)] INDIVIDUAL A testified that the manufacturers have to do these types of tests repeatedly at the insistence of the manufacturer's customers (the ultimate end-users) and because the end-users have different base stocks. For example, COMPANY G knows the chemical composition of the various additives it manufactures, but each of its customer's base stock is different. COMPANY G must confirm that adding its product to its customer's base stock creates a product that meets the quality standards set by various industry groups. [ENDNOTE: (11)] According to INDIVIDUAL A, COMPANY G might do some of the quality-control testing on its own. However, because Petitioner's CITY J facilities have test stands and protocols that have been certified by the various industry groups, COMPANY G comes to Petitioner to conduct the testing. [ENDNOTE: (12)] He testified that Petitioner is able to perform the testing more efficiently and hence more economically. Petitioner's customers provide samples of the products they hope to market in quantities as small as a quart or as much as several gallons. [ENDNOTE: (13)] The lubricants Petitioner tests at its CITY J facilities include transmission and differential fluids, and engine oils. Some of the tests require the product sample to undergo 500 hours of engine testing. [ENDNOTE: (14)] In some cases, the samples will be shipped back to the manufacturers, but after undergoing the quality-control testing, the samples generally cannot be sold to an end-user. According to INDIVIDUAL A, it is theoreti
cally possible for a manufacturer to sell its additives without performing the quality-control testing, however the oil-marketer end-users will not buy a manufacturer's products if they do not carry the various trade group certifications and seals. [ENDNOTE: (15)]

The testing completed at Petitioner's CITY J automotive facilities is different from the testing that is done at Petitioner's other facilities. [ENDNOTE: (16)] But INDIVIDUAL C and INDIVIDUAL D both agreed that the testing performed at the CITY J automotive facilities during the instant audit period is the same quality-control testing that COMPANY B did in the period at issue in Comptroller's Decision No. 32,859. The only substantive change that occurred in the intervening years is that Petitioner added certain automotive emissions testing at its LOCATION B in the third quarter of 2008. [ENDNOTE: (17)] The predominant-use studies in evidence were completed by INDIVIDUAL D and issued in December 2012. They were based on 12 previous consecutive months of usage, and examined each of the meters at the two CITY J facilities. The energy usage at each of the meters at issue was predominantly for Petitioner's quality-control testing. The percentage of usage for quality-control used at each meter was as follows: meter 106, 96.02%; meter 108, 82.7%; meter 100, 97.74%; meter 109, 99.8%; meter 103, 89.85%; meter 185, 100%; and meter 798, 82.7%. The first five meters were at the LOCATION A, and the last two were at the LOCATION B. Based on his 24 years of experience in the energy sector and on his comparison of the 1992 and the 2012 studies, INDIVIDUAL D stated that the predominant use never changed more than a few points during the intervening years, except that the LOCATION B added emissions testing that was transformed from lubricant testing. [ENDNOTE: (18)] Petitioner's company representative

certified the studies represented a true and correct account of utility use, and that the hours of use allocated to energy using items was correct.

D. ALJ's Analysis and Recommendation

1. The Statutes

In the COMPANY B audit period (I.E., August 1, 1989, through February 28, 1993), the manufacturing exemption made no express reference to quality-control testing. As it then existed, Texas Tax Code SECTION 151.318(a)(2) exempted "tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication, or fabrication operation." SEE Comptroller's Decision No. 32,859 (1998). "Manufacturing" was defined to include "each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another." Id. Additionally, Texas Tax Code SECTION 151.317 provided, in relevant part, that electricity and natural gas, when "use[d] by a person engaged in processing tangible personal property for sale as tangible personal property" was exempt. Tex. Tax Code Ann. SECTION 151.317(c)(2)(A)(i) (Vernon's 1992).

In 1999, the Texas Legislature amended the manufacturing exemption. Among other things, the Legislature added language to specifically exempt "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process." Acts of 1999, 76th Leg., R.S., H.B. 3211, ch. 1467, SECTION 2.19. Tex. Gen. Laws 4996, 5018. The legislation also amended the Tax Code to provide that the sale of electricity and natural gas is exempted when it is sold for "use in powering equipment exempt under Section 151.318 by a person processing tangible personal property for sale as tangible personal property, …" Acts of 1999, 76th Leg., R.S., H.B. 3211, ch. 1467, SECTION 2.18. Tex. Gen. Laws 4996, 5017. The exemption for electricity and natural gas applied only if the products were: "sold to the person using the gas or electricity in an exempt manner. For purposes of [the exemption] the use of gas or electricity in an exempt manner by an independent contractor engaged by the purchaser of the gas or electricity to perform one or more of the exempt activities … is considered use by the purchaser of the gas or electricity." Id. The Legislature added that the identified changes were a clarification of existing law and did not imply that existing law may be construed as inconsistent with the law as amended. Id. at SECTION 4.08.

In 2001, the Legislature amended the manufacturing exemption again. Effective October 1, 2001, Texas Tax Code SECTION 151.318(a)(8) provided an exemption for "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process THAT TESTS TANGIBLE PERSONAL PROPERTY THAT IS BEING MANUFACTURED, PROCESSED, OR FABRICATED FOR ULTIMATE SALE." Acts of 2001, 77th Leg., R.S., S.B. 1125, ch. 1263, SECTION 22. Tex. Gen. Laws 3001, 3008 (emphasis in original). As it did in 1999, the Legislature stated that the amendment was a clarification of existing law and did not imply that existing law may be construed as inconsistent with the law as amended. Id. at SECTION 85.

2. Quality-Control Testing

Petitioner contends its CITY J facilities are performing quality-control testing as a subcontractor to lubricant manufacturers. It therefore argues that its purchase of certain testing equipment for those facilities is exempt. Staff agrees that Petitioner's CITY J facilities perform testing on automotive lubricant samples, and that Petitioner's operations may be substantially the same as those described in Comptroller's Decision No. 32,859. [ENDNOTE: (19)] However, according to Staff, the law has changed and Petitioner is not entitled to the manufacturing exemption. Petitioner is required to demonstrate audit error, and because it attempts to do so by claiming exemptions its evidence must be clear and convincing. SEE 34 Tex. Admin. Code SECTION 1.40(2)(A).

The evidence demonstrates that, in the period 1989 through 1993, COMPANY B performed quality-control testing of automotive lubricant samples provided by its manufacturer customers. They did not market, package, or sell any of the products it tested. The Comptroller concluded that COMPANY B's testing was performed prior to the completion of the manufacturing process, and that COMPANY B was performing a manufacturing process as a subcontractor to manufacturers. The Comptroller concluded that the exemption applied to the disputed COMPANY B purchases. SEE Comptroller's Decision No. 32,859.

On November 2, 2009, Comptroller's Decision No. 32,859 was partially superseded based on Comptroller's Decision Nos. 44,843 (2005) and 44,627 (2005). The issue that prompted the action was: "manufacturing exemption for wrapping and packaging for third parties and/or those having limited control over process." Petitioner argues that superseding the decision (even partially) was erroneous and pointed out in its pleadings that Comptroller's Decision No. 49,528 (2009) specifically cited the earlier decision as being consistent with the quality-control testing manufacturing exemption. On October 23, 2012 (after Petitioner pointed out the apparent conflict) Comptroller's Decision No. 49,528 was superseded as well. According to statements on both of the superseded decisions, the agency's current policy is represented by State Tax Automated Research (STAR) Document No. 200710043L (October 15, 2007).

Comptroller's Decision No. 44,843 involved a taxpayer that was the sales subsidiary to a parent-company manufacturer. After the manufacturing process was completed the parent company transferred the product (tiles) to its sales subsidiary for marketing and distribution. The taxpayer claimed its purchases of wrapping and packaging were exempt under the manufacturing exemption. SEE 34 Tex. Tax Code SECTION 151.318(d). More specifically, it argued that it was completing the manufacturing process when it performed the function of wrapping and packaging the tiles. The argument was based on published policy statements (such as Comptroller's Decision No. 32,859) that had determined that no difference exists whether manufacturing activities are carried out by the manufacturer's employees or its subcontractors. The Comptroller rejected the taxpayer's argument and held that prior decisions "cannot be construed in any way to stand for the proposition that a person who does not engage in any manufacturing can become a manufacturer." Therefore, the Comptroller concluded that the sales subsidiary could not claim the manufacturing exemption. The subsidiary did not engage in any manufacturing when it repackaged the tiles its parent company had manufactured.

The second decision cited as a basis for partially superseding Comptroller's Decision No. 32,859 also involved a sales subsidiary to a tile manufacturer. Comptroller's Decision No. 44,627 (2005) denied the claimed exemption because the taxpayer did not establish that it was a manufacturer or that it performed any part of the manufacturing process.

The final document referenced by the statement partially superseding

Comptroller's Decision No. 32,859 is STAR Document No. 200710043L. The policy letter sets forth facts that relate to a company that designs and licenses products to be manufactured. The Tax Policy Division letter states that the designer company had control over the specifications, designs, and patterns of items manufactured by a second company, but that the designer company was not entitled to the manufacturing exemption because it was not acting as a manufacturer. Moreover, it was seeking to exempt bags that the products were placed into at retail stores. Therefore, the exemption that the designer company was seeking was not contingent upon whether or not the designer company was considered a manufacturer. The manufacturing process had been completed at the point the products were placed into the bags the designer company sought to exempt.

The tax policy letter and Comptroller's Decision Nos. 44,843 and 44,627 each include clear statements of facts, and conclusions of law. However, it is not at all clear how the policies set forth in those documents establish a basis for superseding the COMPANY B decision. Neither the letter, nor the administrative hearings decisions states that Comptroller's Decision No. 32,859 should be superseded. More importantly, none of the referenced policy statements contradict the findings and conclusions of the COMPANY B case. For example, Comptroller's Decision No. 44,843 sought to distinguish the facts that were presented in the COMPANY B matter. The taxpayer in that case was a third-party taxpayer that was neither a manufacturer, nor a subcontractor performing part of the manufacturing process. As relevant for issues presented in the instant matter, Comptroller's Decision No. 44,843 stands for the proposition that a taxpayer that does not engage in any manufacturing activity cannot claim a manufacturing exemption. It does not in any way stand for the proposition that a subcontractor that is performing a manufacturing activity on behalf of a manufacturer cannot claim a manufacturing exemption. The taxpayer in Comptroller's Decision No. 44,627 failed to provide sufficient evidence to demonstrate that it was performing any manufacturing. Thus, Comptroller's Decision No. 44,627 is also distinguishable from the COMPANY B case, because its holding was based on the fact that the subsidiary in that matter failed to demonstrate that it was a manufacturer or performed any stage of the manufacturing process. STAR Document No. 200710043L is similar. It affirms that a taxpayer that is neither a manufacturer, nor a subcontractor to a manufacturer may not claim the manufacturing exemption. Moreover, when the manufacturing process is complete the exemption ends as well. Those fact patterns did not exist in the COMPANY B case. Comptroller's Decision No. 32,859 involved a taxpayer that was a subcontractor to a manufacturer that was per forming quality-control testing that was part of the manufacturing process of the automobile lubricants.

An agency is entitled to modify its interpretation of a statute, even if the Legislature has not amended or modified the statute, as long as the new interpretation does not contradict either statutory language or a formally promulgated rule. SEE GROCERS SUPPLY CO. V. SHARP, 978 S.W.2d 638 (Tex. App.—Austin 1998, pet. denied). However, if Comptroller's Decision No. 32,859 was partially superseded based on Comptroller's Decision Nos. 44,843 and 44,627, then the superseding act appears to have been in error. Moreover, even if the decision was properly superseded (for some other reason), the outcome of the current dispute is the same.

Numerous current published policy statements affirm that some portions of manufacturing may be carried out by subcontractors or other third parties. SEE, E.G., Comptroller's Decision No. 103,642 (2011), which was published after the Tax Policy Division superseded the COMPANY B decision. SEE ALSO STAR Document No. 200012945L (December 19, 2000), which provides that manufacturers may subcontract the wrapping and packaging function to a subcontractor. The

Comptroller's policy is long-standing; a subcontractor that is performing the last stage of manufacturing is entitled to claim the manufacturing exemption for tangible personal property purchases that are used or consumed in performing manufacturing processes. SEE STAR Document No. 201001557L (January 8, 2010), published after the COMPANY B decision was partially superseded.

Turning to the current matter, there is no dispute that Petitioner's customers (E.G., COMPANY G) are manufacturers producing automobile lubricants. The relevant statutes and current Comptroller policies establish that the manufacturers are entitled to claim the quality-control manufacturing exemption when they purchase tangible personal property that will be used or consumed to perform quality-control testing. Established Comptroller policy also states that the manufacturing exemption extends to subcontractors, such as Petitioner, that purchase tangible personal property that is used or consumed performing a manufacturing process.

Nevertheless, Staff contends Petitioner is not entitled to the exemption. It asserts that the Petitioner's testing occurs prior to manufacturing, or (alternatively) after the manufacturing has already been completed. Both assertions are contrary to Petitioner's clear and convincing evidence. INDIVIDUAL A's testimony was particularly detailed and established that the auditor erred when he concluded that Petitioner's testing constituted research and development. INDIVIDUAL A credibly explained that the lubricant manufacturers are required to get a license from the ACC for their various chemical formulations prior to having the quality-control testing done, and that the product cannot be changed in any substantial way after having been licensed. Additionally, he testified that the end-users (I.E., oil distributors) require lubricant manufacturers to obtain the trade association certifications and approvals from groups such as API prior to marketing their products. Moreover, INDIVIDUAL A, INDIVIDUAL C, and INDIVIDUAL D testified that the operation of the automotive facilities during the audit period is essentially the same as it was when COMPANY B owned the facilities. There was no suggestion or argument in Comptroller's Decision No. 32,859 that COMPANY B was doing research and development, or that its testing was done after the manufacturing process. Therefore, the ALJ finds that Petitioner's evidence clearly and convincingly establishes that Petitioner was acting as a subcontractor to lubricant manufacturers when it performed quality-control testing that was necessary and essential to, and part of, the manufacturing process of the lubricants being manufactured.

The question that remains is whether a manufacturer is entitled to claim the quality-control manufacturing exemption when it purchases tangible personal property that will be used or consumed to perform quality-control testing of samples that will not be sold. Petitioner contends current published policy statements demonstrate the answer to that question is yes. It cites to Comptroller's Decision No. 102,916 (2010), which involved a taxpayer that operated a steel manufacturing facility. The taxpayer in that case claimed the quality-control testing exemption for manufacturers when it purchased certain computer monitors. Its quality-control testing involved removing samples of molten steel to test for impurities, and the taxpayer expended a great deal of energy keeping the steel in a molten state so that operators could make adjustments to the process as quickly as possible. In that case, Staff conceded that computers and monitors located in testing labs were exempt, but took issue with equipment located outside the labs. The Comptroller ultimately declined the taxpayer's exemption claim for the equipment located outside the labs because the evidence did not establish how those monitors were used. The salient point for purposes of the instant matter is that Comptroller's Decision No. 102,916 affirms that a manufacturer may claim an exemption for tangible personal property used or consumed during the actual manufacturing of tangible

personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality-control process that tests a sample of tangible personal property that is intended for ultimate sale.

Staff argues Petitioner's exemption claim should be rejected because its facts are distinguishable. Staff points out that, unlike the taxpayer in the 2010 case, Petitioner's test results are not communicated to its customers in real-time. Staff is correct, but the point is immaterial. Neither the statutes, nor relevant Comptroller policies suggest that communication of quality-control test results must be instantaneous or in real-time. The critical fact that must be established is that the testing and communication of the results is part of the manufacturing process. Petitioner's evidence establishes that fact in the instant matter. It is also worth noting that though COMPANY B performed its testing on samples that were not ultimately sold to an end-user, the Comptroller agreed that the manufacturing exemption applied in that case.

However, it does not appear that the Comptroller has addressed the issue of whether a manufacturer must sell the samples that are subjected to quality-control testing to an end-user recently. According to Staff, the Legislature's 2001 amendments narrowed the quality-control exemption such that a taxpayer in Petitioner's position cannot claim the exemption because the samples it tested were not sold to an end-user. But Staff did not provide any testimony or published statements of Comptroller policy to establish that its argument was consistent with agency policy. Petitioner contends that, if the Comptroller were to adopt Staff's interpretation, then manufacturers of milk, soda, medicines, and other such products would not be entitled to the manufacturing exemption for quality-control testing, which Petitioner argues would be absurd. Moreover, Petitioner argues that Staff ignores specific legislative language stating that the amendments were intended to be clarifications of existing law, not a narrowing of the exemption.

The cardinal rule of statutory interpretation is to give effect to legislative intent. SEE FLEMING FOODS OF TEX., INC. V. RYLANDER, 6 S.W.3d 278 (Tex. 1999). The statutory notes associated with the Legislature's 2001 amendment to the quality-control manufacturing exemption state that the additional language was intended to be a non-substantive clarification of existing law, and the ALJ finds nothing in the amended language that would support Staff's contention that, in fact, the Legislature intended to narrow the exemption.

Effective October 1, 2001, the statute provided an exemption for "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale." Tex. Tax Code SECTION 151.318(a)(8). Staff is correct when it states in its post-hearing brief that a taxpayer claiming this exemption must be the purchaser of the taxable item for which the exemption is claimed. Staff is also correct when it states that the claimant must use the equipment in an exempt manner. But Petitioner meets both of those requirements. Moreover, those requirements were not imposed by the 2001 amendment to Texas Tax Code SECTION 151.318(a)(8). The manufacturing exemption has always required as much. It would be odd indeed for a taxpayer to claim an exemption from tax on equipment that it had not purchased, and the ALJ is unaware of any instance in which a taxpayer was allowed to claim the manufacturing exemption on equipment that was used in a nonexempt manner.

Staff is also correct that the Legislature's statutory clarification provisions require that the law for the audit period be construed consistent with the amended text. But the amended text did not impose any new requirements. Thus,

there is no inconsistency between the 2001 statutory text and that which existed in 1999. Moreover, even when it added subsection (a)(8) in 1999, the Legislature was merely clarifying the quality-control testing exemption and codifying the principles established by published Comptroller policies, such as Comptroller's Decision No. 32,859. Staff's argument that the 2001 amendment narrowed the exemption should be rejected as contrary to specifically stated legislative intent. If the Legislature had intended to narrow the exemption as Staff suggests, it would not have stated that the additional language was merely a clarification of existing law. There is simply no indication that the Legislature intended to deny the exemption to manufacturers performing quality-control testing on samples that would not be sold. The more reasonable interpretation of the exemption is that an exemption applies to purchases of tangible personal property used or consumed during the manufacturing of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to a quality-control process that tests tangible personal property that is being manufactured for ultimate sale, with the understanding that a manufacturer is not precluded from claiming the exemption if its quality-control testing is performed on a sample of the product that is intended for ultimate sale and the quality-control testing will render the tested sample unfit for sale. Based on that interpretation and the ALJ's previous findings and conclusions, Petitioner's claim to the exemption provided by Texas Tax Code SECTION 151.318(a)(8) should be granted.

3. Natural Gas and Electricity

Petitioner also contends the auditor erred when he scheduled purchases of electricity and natural gas that were used at the CITY J automotive facilities. Natural gas and electricity are exempted from tax when they are sold for use in powering exempt manufacturing equipment. Tex. Tax Code SECTION 151.317(a)(2). Natural gas and electricity are also exempt if used in lighting, cooling, and heating in the manufacturing area during the actual manufacturing or processing of tangible personal property for sale (other than preparation or storage of prepared food). Tex. Tax Code SECTION 151.317(a)(3). To qualify for the exemptions, the gas or electricity must be sold to a person using the gas or electricity in an exempt manner. Tex. Tax Code SECTION 151.317(d). The use of gas or electricity in an exempt manner by an independent contractor engaged by the purchaser of the gas or electricity to perform one or more of the exempt activities is considered use by the purchaser. Id. Gas or electricity used during a regular monthly billing period for exempt and nonexempt purposes under a single meter is totally exempt or taxable based on the predominant use of the gas or electricity measured by that meter. Tex. Tax Code SECTION 151.317(e).

COMPANY B's evidence in Comptroller's Decision No. 32,859 included several predominant-use utility studies that had been completed by INDIVIDUAL D. In that hearing, Staff did not argue that the studies were unacceptable. Instead, it argued that COMPANY B's activities were not exempt. The same is true of the instant matter. Additionally, Staff argues that Petitioner's 2012 studies are irrelevant because they cover a 12-month period that was four years after the end of the audit period. Staff's argument should be rejected. The ALJ overruled Staff's relevancy objection at the hearing. Moreover, the Comptroller has affirmed that the statute and administrative rule both contemplate both retroactive and projected predominant-use studies. SEE STAR Document No. 200802045L (February 4, 2008), which cites to 34 Tex. Admin. Code SECTION 3.295(f)(1) and (4). In fact, when Staff raised the same relevancy objection in a previous redetermination hearing, the Comptroller rejected the argument. In that 1992 case, the ALJ wrote:

[M]ost of the predominant use studies we see are post-audit studies, and that does not disqualify them, per se. If it did, the requirement for utility

studies would be meaningless. Nevertheless, [Staff's] position is basically sound in cases where there has been a marked change in the use or type of equipment measured. There is no indication that such a change occurred during the audit period, here. The burden of proof is on the Petitioner to show error in the audit. Had the Petitioner's post-audit study indicated a marked change, the burden would have been on the Petitioner to rehabilitate its self-impeached study. However, no such self-impeachment appears here on the study's face. Accordingly, more than general allegations by [Staff] are required, in order to add to the Petitioner's burden of going forward. But, specifically identified, significant, changes will. Comptroller's Decision No. 27,652 (1992).

INDIVIDUAL A, INDIVIDUAL C, and INDIVIDUAL D testified that, though there had been equipment upgrades between 1992 and 2012, there had been no change in the operation of the facilities, except that in the third quarter of 2008 part of the LOCATION B facility was updated to add certain automobile emissions testing. That change does not create a bar to the claimed exemption. INDIVIDUAL D testified that he compared the 1992 study and the changes in electricity and gas usage in the years between the studies. His expert opinion was that, except for the meters associated with the LOCATION B location, the predominant-use percentage points never changed more than a few percentage points. His 2012 studies show that Petitioner's predominant-use of gas and electricity was for exempt manufacturing activities. In fact, the lowest percentage of exempt use was 82.7%. The ALJ finds that the evidence demonstrates that Petitioner's purchases of natural gas and electricity for the CITY J automotive facilities were exempt, and therefore recommends that those purchases be deleted from the audit.

4. Detrimental Reliance

Petitioner alternatively argues that it is entitled to relief based on the Comptroller's detrimental reliance policies. Given the ALJ's exemption recommendations, this contention is moot. Nevertheless, the ALJ finds that a brief discussion of the matter is warranted.

In limited instances, the Comptroller grants relief if a taxpayer can establish that it relied on erroneous advice from a Comptroller employee. The taxpayer must establish the following four elements: (1) proof of the advice (both as to the substance thereof and its direct communication to the taxpayer), meaning that it usually must be in writing; (2) that advice was followed; (3) the taxpayer gave sufficient information to have resulted in correct advice and did not misrepresent information or deliberately withhold or conceal relevant information, and (4) harm would result unless the Comptroller adheres to the advice. SEE Comptroller's Decision No. 101,806 (2010). Petitioner contends it claimed the manufacturing exemptions at issue based on the conclusions of Comptroller's Decision No. 32,859, and it provided the auditor with a copy of the decision at the audit exit conference explaining that they had relied on the decision's result. Staff nevertheless argues that relief is not warranted.

Staff argues that Petitioner had constructive and actual knowledge of changes to the manufacturing exemption statute. But, as the ALJ has explained, those changes were clarifications of existing law, not a narrowing of the exemption. Staff also argues that relief is not warranted because Petitioner had knowledge of the COMPANY A audit, which assessed tax on transactions similar to those at issue in this matter. But the evidence demonstrates that Petitioner's automotive facilities were not a part of that audit, and that the facilities that were included performed an entirely different type of testing. Thus, Staff's argument should be rejected. Therefore, to the extent Petitioner is not entitled to the manufacturing exemptions it claimed in the audit period, the ALJ recommends that the Comptroller extend relief under the agency's

detrimental reliance policies.

5. Penalty Waiver

Lastly, Petitioner contends the penalty assessment should be waived. Late penalties are automatically imposed on delinquent sales taxes. Tex. Tax Code SECTION 111.061 and 151.703. The Comptroller has the discretionary authority to waive penalties if a taxpayer has exercised reasonable diligence to comply with tax laws. Tex. Tax Code SECTION 111.103. The taxpayer has the burden to establish its reasonable diligence by a preponderance of the evidence. SEE 34 Tex. Admin. Code SECTION 1.40(2)(B). In making the reasonable diligence determination the Comptroller reviews audit error rate, the taxpayer's audit history, the tax issues involved, changes in Comptroller policy during the exam period, the size and sophistication of the taxpayer, whether tax was collected and not remitted, whether returns were timely filed, the completeness of the records, delinquencies in other taxes, and whether there was reliance on advice provided by the Comptroller's office that caused imposition of penalty. 34 Tex. Admin. Code SECTION 3.5(c). SEE ALSO Comptroller's Decision No. 101,976 (2010).

Staff declined to waive penalty because the auditor determined that the errors identified in the instant audit were present in the prior audit of COMPANY A. Additionally, Petitioner filed nine returns late, and the initial calculation of overall error was 68.69%. The evidence has demonstrated that the COMPANY A audit did not include the automotive facilities, and if the ALJ's recommendations regarding Petitioner's exemption claims are accepted, then the overall error rate will undoubtedly go down. Irrespective, the audit encompasses more than just the CITY J locations. Petitioner failed to establish what the revised error rate would be or to otherwise demonstrate that it acted with reasonable diligence in complying with tax laws at each of its facilities. Therefore, the ALJ finds that penalty waiver is not warranted in this matter.

III. FINDINGS OF FACT

1. ************* (COMPANY B) was audited by the Audit Division of the Tax Division (Staff) of the  (Comptroller) for
compliance with sales and use tax laws in the period August 1, 1989 through February 28, 1993.

2. During the audit period, COMPANY B tested products for lubricant manufacturers at its CITY J facilities. Specifically, COMPANY B tested products to see if they met industry standards. Under normal conditions, the lubricants could not be marketed by the manufacturers unless they had been subjected to tests such as those being performed by COMPANY B.

3. After the auditor determined that COMPANY B erroneously failed to pay tax on its electricity and natural gas purchases, the Comptroller issued COMPANY B a Texas Notice of Audit Results assessing tax, penalty, and interest.

4. COMPANY B requested redetermination contending its electricity and natural gas purchases were exempt from sales and use tax as tangible personal property that was used or consumed in manufacturing or processing.

5. COMPANY B provided predominant-use studies that had been prepared by COMPANY D.

6. INDIVIDUAL D concluded that COMPANY B's electricity and natural gas purchases were exempt, based on Texas Tax Code SECTION 151.318 and 151.317, because the taxpayer was engaged in quality-control testing of automotive lubricants.

7. During the COMPANY B audit period the cited exemptions did not specifically refer to quality-control testing, however the Comptroller's published interpretation of those statutes was that they included all quality-control testing done prior to delivery of the product to the end customer.

8. COMPANY B's evidence in Comptroller's Decision No. 32,859 included several predominant-use utility studies that had been completed by INDIVIDUAL D. In that hearing, Staff did not argue that the studies were unacceptable.

9. On November 2, 2009, Comptroller's Decision No. 32,859 was partially superseded. The issue that prompted the action was: "manufacturing exemption for wrapping and packaging for third parties and/or those having limited control over process." According to the superseding statement, the action was taken based on Comptroller's Decision Nos. 44,843 (2005) and 44,627 (2005). The statement further provided that State Tax Automated Research (STAR) Document No. 200710043L (October 15, 2007) represented current policy.

10. The Comptroller's Audit Division also audited a company known as COMPANY A.

11. As the audit documentation notes, COMPANY A provided lab testing and inspection services. It had locations in CITY A, CITY B, CITY C, CITY D, CITY E, CITY G, and CITY H.

12. COMPANY A did not have any facilities in CITY J.

13. The COMPANY A audit covered the period June 1, 2000, through September 30, 2003.

14. The auditor determined that COMPANY A erroneously failed to pay sales tax on its purchases of electricity.

15. The Comptroller issued a Texas Notification of Audit Results to COMPANY A assessing tax, a late penalty, and interest.

16. Prior to the completion of the audit, the COMPANY A representatives agreed that they should have been paying tax on their electricity purchases. Nevertheless, they requested redetermination.

17. During the pendency of the COMPANY A redetermination hearing, the company was purchased by Intertek, USA, Inc. (Petitioner).

18. Staff filed a motion to dismiss the COMPANY A hearing when Petitioner failed to respond to the Position Letter. Staff's motion was granted and the resulting Comptroller's Decision became final on December 17, 2007.

19. On October 26, 2005, Petitioner also acquired COMPANY B. In August 2008, the Audit Division initiated a follow-up audit of Petitioner, which is the subject of this hearing.

20. The audit documentation states that Petitioner had 14 facilities located around the state.

21. Prior to initiating audit fieldwork, the auditor reviewed Comptroller records and noted the previous COMPANY A audit. He also determined that Petitioner had submitted 9 of its sales tax returns late.

22. The auditor did an internet search and located a website for Intertek, a global company based in London, England. The website stated that the company

was a risk management company that evaluated product design and performance, and studied customer behaviour (the English spelling of the word). The auditor did not realize that there was a distinction between Petitioner and ************; the two companies do not do the same types of testing.

23. The auditor met with Petitioner's representatives but he did not tour Petitioner's CITY J automotive facilities. He agreed that Petitioner did not market, distribute, or package its customer's products for sale, but concluded that the lubricant testing was being performed prior to production and therefore determined that the testing was more a research and development function than it was a manufacturing process.

24. The auditor determined that Petitioner erroneously failed to pay tax on its purchase of various taxable items, e.g., testing equipment, electricity, and natural gas. The purchases that were scheduled for tax covered a number of Petitioner's facilities, including its two CITY J locations (at LOCATION A and LOCATION B).

25. After completing the audit fieldwork, the auditor held an exit conference with Petitioner's representatives.

26. Petitioner disagreed with the assessments related to the CITY J facilities, and provided the auditor with a copy of Comptroller's Hearing No. 32,859 (I.E., the COMPANY B hearing).

27. The auditor noted that Comptroller's Hearing No. 32,859 was partially superseded in 2009, and determined Petitioner was not entitled to the same exemptions. He testified that he reached that conclusion because Petitioner's customers were sending "samples to test, not the actual manufactured product. It seems like research and development. Also it is obvious that [Petitioner] is not a manufacturer and does not process the [tangible personal property] that is supplied by their customers."

28. On December 13, 2010, Staff issued Petitioner a Texas Notification of Audit Results to Petitioner assessing tax in the amount of $************, a 10% late penalty, and interest accrued to the account as of the statement date.

29. The overall audit error was 68.69%, and Staff declined to waive penalties because the "prior audit provided coverage in the area of adjustment."

30. Petitioner requested redetermination.

31. INDIVIDUAL A is Petitioner's vice president and general manager, and he has been at the CITY J automotive testing facility for 32 years.

32. Though ownership of the CITY J automotive facilities had changed over the years, the operational functions have remained essentially unchanged. Specifically, Petitioner tests products for lubricant manufacturers to verify that the products meet standards set by various trade groups.

33. Petitioner's customers (e.g., COMPANY C, COMPANY E, COMPANY G) are required to register the products they manufacture with the American Chemistry Council (ACC). Once the manufacturer secures a license for the product it cannot change the product in any substantial way.

34. Before the licensed product can be sold to end-users (I.E., oil marketers), the manufacturers must complete certain product testing to secure product certifications authorized by groups such as the American Petroleum Institute (API) and the American Society for Testing and Materials (ASTM).

35. The testing Petitioner performs at its CITY J facilities is not research and development. Rather, it is the final step in the manufacturing process before the manufacturers can package and sell their products.

36. Lubricant manufacturers have to do these types of tests repeatedly at the insistence of the manufacturer's customers (the ultimate end-users) and because the end-users have different base stocks.

37. Because Petitioner's CITY J facilities have test stands and protocols that have been certified by various industry groups, the manufacturers come to Petitioner to conduct the testing. Petitioner is able to perform the testing more efficiently and hence more economically.

38. Petitioner's customers provide samples of the products they intend to market to Petitioner for quality-control testing.

39. The samples can be as small as a quart or as much as several gallons.

40. The lubricants Petitioner tests at its CITY J facilities include transmission and differential fluids, and engine oils. Some of the tests require the product sample to undergo 500 hours of engine testing.

41. In some cases, the samples will be shipped back to the manufacturers, but after undergoing the quality-control testing, the samples generally cannot be sold to an end-user.

42. It is theoretically possible for a manufacturer to sell its additives without performing the quality-control testing, however the end-users (I.E., oil marketers) will not buy a manufacturer's products if they do not carry the various trade group certifications and seals.

43. The testing conducted at Petitioner's CITY J automotive facilities is different from the testing that is done at Petitioner's other facilities.

44. The testing performed at the CITY J automotive facilities during the instant audit period is substantially the same testing COMPANY B did in the period at issue in Comptroller's Hearing No. 32,859. The only substantive change is that Petitioner added certain automotive emissions testing at its LOCATION B location in the third quarter of 2008.

45. The predominant-use studies in evidence were completed by INDIVIDUAL D and issued in December 2012. They were based on 12 previous consecutive months of usage, and examined each of the meters at the two CITY J facilities.

46. The percentage of usage for quality-control used at each meter was as follows: meter 106, 96.02%; meter 108, 82.7%; meter 100, 97.74%; meter 109, 99.8%; meter 103, 89.85%; meter 185, 100%; and meter 798, 82.7%. The first five meters were at the LOCATION A, and the last two were at the LOCATION B location.

47. The predominant use percentage points at Petitioner's CITY J facilities never changed more than a few points in the years from 1992 through 2012.

48. Petitioner's company representative certified the studies represented a true and correct account of utility use, and that the hours of use allocated to energy using items was correct.

49. Staff agrees that Petitioner's CITY J facilities perform testing on

automotive lubricant samples, and that Petitioner's operations may be substantially the same as those described in Comptroller's Decision No. 32,859.

50. Staff referred the case to the State Office of Administrative Hearings (SOAH).

51. On August 20, 2013, Staff issued a Notice of Hearing to Petitioner. The notice contained the date, time, and location of the hearing; a statement of the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

52. On October 21, 2013, the Administrative Law Judge (ALJ) convened a hearing on the merits.

53. On December 12, 2013, the ALJ closed the contested case record.

54. There is no dispute that Petitioner's customers are manufacturers producing automobile lubricants.

55. Staff declined to waive penalty in the instant matter because the auditor determined that the errors identified in the instant audit were present in the prior audit of COMPANY A. Additionally, Petitioner filed nine returns late, and the initial calculation of overall error was 68.69%.

56. The COMPANY A audit did not include the CITY J automotive facilities, and if the ALJ's recommendations regarding Petitioner's exemption claims are accepted, then the overall error rate will undoubtedly decrease. Irrespective, the audit encompasses more than just the CITY J locations.

IV. CONCLUSIONS OF LAW

1. The Comptroller has jurisdiction over this matter pursuant to Texas Tax Code ch. 111.

2. SOAH has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law pursuant to Texas Government Code ch. 2003.

3. Staff provided proper and timely notice of the hearing pursuant to Texas Government Code ch. 2001.

4. In the period from August 1, 1989, through February 28, 1993, the Texas Tax Code made no express reference to exempt quality-control testing for manufacturers. As it then existed, Texas Tax Code SECTION 151.318(a)(2) exempted "tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication, or fabrication operation." SEE Comptroller's Decision No. 32,859 (1998).

5. In the period from August 1, 1989, through February 28, 1993, "manufacturing" was defined to include "each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another." Id.

6. In the period from August 1, 1989, through February 28, 1993, Texas Tax Code SECTION 151.317 provided, in relevant part, that electricity and natural gas, when "use[d] by a person engaged in processing tangible personal property for sale as tangible personal property" was exempt. Tex. Tax Code Ann. SECTION 151.317(c)(2)(A)(i) (Vernon's 1992).

7. In 1999, the Texas Legislature amended the manufacturing exemption. Among other things, the Legislature added language to specifically exempt "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process." Acts of 1999, 76th Leg., R.S., H.B. 3211, ch. 1467, SECTION 2.19. Tex. Gen. Laws 4996, 5018.

8. The legislation also amended the Tax Code to provide that the sale of electricity and natural gas is exempted when it is sold for "use in powering equipment exempt under Section 151.318 by a person processing tangible personal property for sale as tangible personal property, ..." Acts of 1999, 76th Leg., R.S., H.B. 3211, ch. 1467, SECTION 2.18. Tex. Gen. Laws 4996, 5017.

9. The exemption for electricity and natural gas applies only if the products are "sold to the person using the gas or electricity in an exempt manner. For purposes of [the exemption] the use of gas or electricity in an exempt manner by an independent contractor engaged by the purchaser of the gas or electricity to perform one or more of the exempt activities ... is considered use by the purchaser of the gas or electricity." Id.

10. In 1999, the Legislature provided that each change in laws identified by Conclusions of Law Nos. 7, 8, and 9 was a clarification of existing law and did not imply that existing law may be construed as inconsistent with the law as amended. Id. at SECTION 4.08.

11. In 2001, the Legislature amended the quality-control manufacturing exemption language. Effective October 1, 2001, the statute provided an exemption for "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process THAT TESTS TANGIBLE PERSONAL PROPERTY THAT IS BEING MANUFACTURED, PROCESSED, OR FABRICATED FOR ULTIMATE SALE." Acts of 2001, 77th Leg., R.S., S.B. 1125, ch. 1263, SECTION 22. Tex. Gen. Laws 3001, 3008 (emphasis in original).

12. As it did in 1999, the Legislature specified that the change identified by Conclusion of Law No. 11 was a clarification of existing law and did not imply that existing law may be construed as inconsistent with the law as amended. Id. at SECTION 85.

13. Petitioner is required to demonstrate audit error, and because it attempts to do so by claiming exemptions its evidence must be clear and convincing. SEE 34 Tex. Admin. Code SECTION 1.40(2)(A).

14. Comptroller's Decision No. 32,859 (1998) affirmed that the testing COMPANY B was doing would be exempt if performed by the manufacturer because it was performed prior to the completion of the manufacturing process, and held that the manufacturer was entitled to subcontract out a part of the manufacturing process, such as quality-control testing. Because COMPANY B was a subcontractor performing a manufacturing process on behalf of the manufacturers, the manufacturing exemption extended to the COMPANY B testing.

15. Comptroller's Decision No. 44,843 held that prior decisions "cannot be construed in any way to stand for the proposition that a person who does not engage in any manufacturing can become a manufacturer." The Comptroller held that the sales subsidiary could not claim the manufacturing exemption because it did not engage in any manufacturing when it repackaged the tiles its parent-company had manufactured.

16. STAR Document No. 200710043L represents current agency policy. The policy letter relates to a company that designs and licenses products to be manufactured. The Tax Policy Division states that the designer company had control over the specifications, designs, and patterns of items manufactured by a second subsidiary company, but that the designer company was not entitled to the manufacturing exemption. The designer company was not acting as a manufacturer. Moreover, it was seeking to exempt bags that the products were placed into at retail stores. Therefore, the exemption that the designer company was seeking was not contingent upon whether or not the designer company was considered a manufacturer. The bag purchases it sou ght to exempt were for placing products into after the manufacturing process had been completed.

17. The policies and conclusions set forth within Comptroller's Decision Nos. 44,843 (2005) and 44,627 (2005), and STAR Document No. 200710043L do not contradict the findings and conclusions of Comptroller's Decision No. 32,859 (1998).

18. As relevant for the instant hearing, Comptroller's Decision No. 44,843 stands for the proposition that a taxpayer that does not engage in any manufacturing activity cannot claim a manufacturing exemption.

19. Comptroller's Decision No. 44,843 does not stand for the proposition that a subcontractor that is performing a manufacturing activity on behalf of a manufacturer cannot claim a manufacturing exemption.

20. Comptroller's Decision No. 44,627 denied application of the claimed manufacturing exemption based on the fact that the subsidiary in that matter failed to demonstrate that it was a manufacturer or performed any stage of the manufacturing process.

21 An agency is entitled to modify its interpretation of a statute, even if the Legislature has not amended or modified the statute, as long as the new interpretation does not contradict either statutory language or a formally promulgated rule. SEE GROCERS SUPPLY CO. V. SHARP, 978 S.W.2d 638 (Tex. App.—Austin 1998, pet. denied).

22. If Comptroller's Decision No. 32,859 was superseded based on Comptroller's Decision Nos. 44,843 and 44,627, then the superseding act was in error.

23. Numerous current published policy statements affirm that some portions of manufacturing may be carried out by subcontractors or other third parties. SEE, E.G., Comptroller's Decision No. 103,642 (2011), which was published after the Tax Policy Division superseded the COMPANY B decision. SEE ALSO STAR Document No. 200012945L (December 19, 2000), which provides that manufacturers may subcontract the wrapping and packaging function to a subcontractor.

24. The Comptroller has long held that a subcontractor that is performing the last stage of manufacturing is entitled to claim the manufacturing exemption for tangible personal property purchases that are used or consumed in performing manufacturing processes. The distinction being made in Comptroller's Decision Nos. 44,843 and 44,627 is that a third-party taxpayer that is not a manufacturer or a subcontractor performing part of the manufacturing process is

not entitled to the exemption because such a taxpayer is not a manufacturer and it is not performing part of the manufacturing process. That is also the conclusion the tax policy analyst reached in STAR Document No. 200710043L. See also STAR Document No. 201001557L (January 8, 2010).

25. The relevant statutes and current Comptroller policies establish that manufacturers (such as Petitioner's customers) are entitled to claim the quality-control exemption when they purchase tangible personal property that will be used or consumed to perform quality-control testing.

26. Established Comptroller policy also establishes that the manufacturing exemption extends to subcontractors, such as Petitioner, that purchase tangible personal property that is used or consumed performing a manufacturing process.

27. Petitioner's evidence clearly and convincingly establishes that Petitioner was acting as a subcontractor to lubricant manufacturers when it performed quality-control testing that was necessary and essential to, and part of, the manufacturing process of the lubricants being manufactured.

28. Comptroller's Decision No. 102,916 affirms that a manufacturer may claim an exemption for tangible personal property used or consumed during the actual manufacturing of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality-control process that tests a sample of tangible personal property that is intended for ultimate sale.

29. Neither the relevant statutes, nor relevant Comptroller policies suggest that communication of quality-control test results must be instantaneous or in real time.

30. Petitioner's evidence establishes that the testing conducted at its CITY J facilities, and the communication of the test results is part of the manufacturing process.

31. The cardinal rule of statutory interpretation is to give effect to legislative intent. SEE FLEMING FOODS OF TEX., INC. V. RYLANDER, 6 S.W.3d 278 (Tex. 1999).

32. Effective October 1, 2001, Texas Tax Code SECTION 151.318(a)(8) provides an exemption for "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale."

33. There is no inconsistency between the 2001 statutory text of Texas Tax Code SECTION 151.318(a)(8) and that which existed in 1999. Moreover, even when the Legislature added subsection (a)(8) in 1999, it was merely clarifying the manufacturing exemption and codifying the principles established by published Comptroller policies, such as Comptroller's Decision No. 32,859.

34. The 2001 amendment to Texas Tax Code SECTION 151.318(a)(8) did not narrow the exemption. Staff's argument to the contrary is contrary to specifically stated legislative intent. The more reasonable interpretation of the exemption is that an exemption applies to purchases of tangible personal property used or consumed during the manufacturing of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to a quality-control process that tests tangible personal property that is being manufactured for ultimate sale, with the understanding that a manufacturer is

not precluded from claiming the exemption if its quality-control testing is performed on a sample of the product for ultimate sale and the quality-control testing will render the sample unfit for sale.

35. Petitioner's claim to the exemption provided by Texas Tax Code SECTION 151.318(a)(8) should be granted for equipment it purchased during the audit period for its CITY J facilities.

36. Natural gas and electricity are exempted from tax when they are sold for use in powering exempt manufacturing equipment. Tex. Tax Code SECTION 151.317(a)(2).

37. Natural gas and electricity are also exempt if used for lighting, cooling, and heating in the manufacturing area during the actual manufacturing or processing of tangible personal property for sale (other than preparation or storage of prepared food). Tex. Tax Code SECTION 151.317(a)(3).

38. To qualify for the exemptions, the gas or electricity must be sold to the person using the gas or electricity in an exempt manner. Tex. Tax Code SECTION 151.317(d).

39. The use of gas or electricity in an exempt manner by an independent contractor engaged by the purchaser of the gas or electricity to perform one or more of the exempt activities is considered use by the purchaser. Id.

40. Gas or electricity used during a regular monthly billing period for exempt and nonexempt purposes under a single meter is totally exempt or taxable based on the predominant use of the gas or electricity measured by that meter. Tex. Tax Code SECTION 151.317(e).

41. The Comptroller has affirmed that the relevant statutes and administrative rules contemplate both retroactive and projected predominant-use studies. SEE STAR Document No. 200802045L (February 4, 2008), which cites to 34 Tex. Admin. Code SECTION 3.295(f)(1) and (4). SEE ALSO Comptroller's Decision No. 27,652 (1992).

42. Petitioner's evidence clearly and convincingly demonstrates that its purchases of natural gas and electricity for the CITY J automotive facilities were exempt during the January 1, 2005, through August 31, 2008 audit period, and therefore those purchases should be deleted from the audit.

43. In limited instances, the Comptroller grants relief if a taxpayer can establish that it relied on erroneous advice from a Comptroller employee. The taxpayer must establish the following four elements: (1) proof of the advice (both as to the substance thereof and its direct communication to the taxpayer), meaning that it usually must be in writing; (2) that advice was followed; (3) the taxpayer gave sufficient information to have resulted in correct advice and did not misrepresent information or deliberately withhold or conceal relevant information, and (4) harm would result unless the Comptroller adheres to the advice. SEE Comptroller's Decision No. 101,806 (2010).

44. To the extent Petitioner is not entitled to the exemptions it has claimed in this contested case hearing, the Comptroller should extend relief under the agency's detrimental reliance policies.

45. Late penalties are automatically imposed on delinquent sales taxes. Tex. Tax Code SECTION 111.061 and 151.703.

46. The Comptroller has the discretionary authority to waive penalties if a

taxpayer has exercised reasonable diligence to comply with tax laws. Tex. Tax Code SECTION 111.103.

47. The taxpayer has the burden to establish its reasonable diligence by a preponderance of the evidence. SEE 34 Tex. Admin. Code SECTION 1.40(2)(B).

48. In making the reasonable diligence determination the Comptroller reviews audit error rate, the taxpayer's audit history, the tax issues involved, changes in Comptroller policy during the exam period, the size and sophistication of the taxpayer, whether tax was collected and not remitted, whether returns were timely filed, the completeness of the records, delinquencies in other taxes, and whether there was reliance on advice provided by the Comptroller's office that caused imposition of penalty. 34 Tex. Admin. Code SECTION 3.5(c). SEE ALSO Comptroller's Decision No. 101,976 (2010).

49. Petitioner failed to establish what the revised error rate would be or to otherwise demonstrate that it acted with reasonable diligence in complying with tax laws at each of its facilities.

50. Penalty waiver is not warranted in this matter.

51. The assessment at issue should be adjusted as agreed by Staff. Additionally, Petitioner's claim to the exemption provided by Texas Tax Code SECTION 151.318(a)(8) should be granted; and Petitioner's claim to the exemptions provided by Texas Tax Code SECTION 151.317(a)(2) and (3) should be granted. In all other respects, the assessment should be affirmed.

Hearing No. 106,331


ORDER OF THE COMPTROLLER

On December 20, 2013, the State Office of Administrative Hearings' Administrative Law Judge (ALJ), Victor John Simonds, issued a Proposal for Decision in the above-referenced matter to which the Tax Division filed Exceptions on January 6, 2014. Petitioner filed a Reply on January 9, 2014. An Amended Proposal for Decision was issued on January 13, 2014. The Comptroller has considered the Exceptions, the Reply, and the ALJ's recommendation letter and determined that the ALJ's Amended Proposal for Decision, except for minor changes to correct typographical or clerical errors, should be adopted without change and this Decision represents the ruling thereon.

The above Decision resulting in Petitioner's liability as set out in Attachment A, which is incorporated by reference, is approved and adopted in all respects. The Decision becomes final twenty days after the date of notice of this decision, and the total sum of the tax, penalty, and interest amounts is due and payable within twenty days thereafter. If such sum is not paid within such time, an additional penalty of ten percent of the taxes due will accrue, and interest will continue to accrue. If either party desires a rehearing, that party must file a motion for rehearing, which must state the grounds for rehearing, no later than twenty days after the date of notice of this Decision. Notice of this Decision is presumed to occur on the third day after the date of this Decision.

Signed on this 27th day of February 2015.


GLENN HEGAR

by: Mike Reissig
Deputy Comptroller

ENDNOTE(S)
(1) SEE Staff's Exhibit No. 7.

(2) SEE Staff's Exhibit No. 15.

(3) Id. at 35:25.

(4) Id.at 23:00.

(5) Id.

(6) Id. at 39:30. SEE ALSO Staff's Exhibit No. 5, page 23, entry for September 16, 2010.

(7) The audit error calculation is based on the formula: assessed tax ÷ (assessed tax + reported tax) = overall audit error percentage.

(8) Oral Hearing Testimony at 59:00.

(9) Id.

(10) Id.

(11) Id. at 1:15:00.

(12) Id.

(13) Id. at 1:07:00.

(14) Id. at 1:13:00.

(15) Id. at 1:00:35 and 1:04:20.

(16) Id. at 1:21:15.

(17) Id. at 2:01:30.

(18) Petitioner's Exhibit No. 3.

(19) SEE Staff's Post-Hearing Reply at 1.

ACCESSION NUMBER: 201502052H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2015-02-27
TAX TYPE: SALES

# APPENDIX M

9911987L [Tax Type: Sales] [Document Type: Letter/Memo] [Status: Partially Superseded with Summary]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

# 9911987L

STAR SUPERSEDED INFORMATION
Supersede type - partial
Document superseded on - 07/16/2012
Issue(s) that caused the document to be superseded - exhaust oil drum as pollution control equipment (Phase 1, Part 3)
Reason(s): Administrative Hearing Decision 103,141 (STAR 201206519H) expressly superseded this document on the basis that the oil drum at issue was not used or consumed IN the actual manufacturing of tangible personal property for ultimate sale.

November 5, 1999

**************
**************
**************
**************

Dear **************:

On February 3, 1998, we responded to your questions concerning the sales tax exemptions available for manufacturers. Since then, the Texas Legislature has clarified those exemptions.

Our letter dated February 3, 1998, discussed changes made to Section 151.318 of the Texas Tax Code by House Bill 1855 that went into effect October 1, 1997. House Bill 3211, which passed in the most recent legislative session, clarified the exemptions provided for manufacturers. I have reprinted the original letter in its entirety and signified changes in our previous letter with the notation "Corrected Response."

This response is based upon the facts appearing in your letter of November 21, 1997 and clarifications appearing in your letter of January 26, 1998.

Facts:  Your client, COMPANY A, operates a large integrated manufacturing complex.  The process consists of six major phases; Phase I- introduction and blending of additives and catalysts, Phase II- process reactor is converted to polypropylene powder, Phase III- a process extruder turns the powder into pellets, Phase IV- the pellets are blended and cleaned, Phase V- the pellets are transported through a pipe, cooled, and further cleaned, Phase VI- the pellets are loaded on rail cars for delivery to customers.  You have identified the separate pieces of equipment that make up Phases I through IV and are asking if each identified piece of equipment would qualify for exemption pursuant to Texas Tax Code Section 151.318(a)(4), as amended by H.B. 1855..  I presume that you are in agreement that all items used in Process V and VI are taxable to your client.

Response:  As you are aware, House Bill 1855, effective October 1, 1997, limits the exemption for tangible personal property used in the manufacturing process to property used directly in the process and that makes or causes a chemical or physical change in the product being manufactured for sale or in an intermediate or preliminary product that becomes a part of the product manufactured for sale.  Exemptions are not granted to equipment solely because it is necessary and essential and used during the manufacturing process.

The amendment specifically excludes from the exemption intraplant transportation equipment (including pipes or conveyors), used to move a product or raw material in connection with the manufacturing process (unless the pipe is a component part of a single piece of exempt manufacturing or pollution control equipment ), and equipment or supplies used to maintain or store tangible personal property.

The bill (HB-1855) also specifically exempts actuators, steam production equipment and its fuel, in-process flow-through tanks, cooling towers, generators, heat exchangers, electronic control-room equipment, computerized-control units, compressors, and hydraulic units that are used to power, supply, support, or control exempt equipment that manufactures a product for sale or that generates electricity, chilled water, or steam for sale. Also exempted are machinery, equipment, and replacement parts or accessories used or consumed in manufacturing a product for sale if their use is necessary and essential to a pollution-control process. (NOTE: House Bill 3211, which passed in the most recent legislative session, amended this section to include transformers and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interrupters, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the transformers, and pumps to this list of exempt items.)

The amendment clarifies that a taxpayer claiming the manufacturing exemption must prove that the purchase qualifies for exemption and that items purchased are not specifically excluded from exemption.

The taxability of each piece of equipment used during each processing phase is described below.

Phase I

All of the following equipment is found in the first stage of the manufacturing process. The raw materials and additives are stored outside of this process in drums and other storage devices and introduced to the manufacturing process in this phase. None of this equipment serves as pre-manufacturing storage devices.

1. Peroxide Feed Tank--This tank feeds and meters (measures) a specially treated peroxide solution into the blending drum that coalesces with the catalysts and raw materials that serve as the basis for the final product. The feed tank injects materials necessary and essential to the process into the blending drum. The tank maintains the peroxide and meters it into the manufacturing process.

Response. The metering of catalysts and materials into the blending process is a manufacturing process and the peroxide feed tank will qualify for the exemption.

2. Teal Metering Drums-- These drums are equipped to meter the amounts of teal (a raw material) that are fed into the blending drum along with the other specifically measured amounts of raw materials. Without specific amounts of this raw material in the solution, the integrity of the product would be compromised. The metering drums make possible the production of a stable pellet mix and are necessary and essential to the process.

Response. The metering of catalysts and materials into the blending process is a manufacturing process and the teal metering drums qualify for the exemption.

3. Exhaust Oil Drum- This is a drum that collects the accumulation of oil-based waste materials after they are filtered out of the various components fed into the blending drum. The drums serve as pollution control equipment as they gather the hazardous industrial byproducts of the process as required by law. The industrial waste is removed from this waste collection drum and disposed of in accordance with the law. This drum is pollution control equipment.

Response. These drums are considered storage devices and are taxable per 151.318(c)(5) of the Texas Tax Code.

Corrected Response. House Bill 3211 amended Section 151.318(a)(5) of the Texas Tax Code. This section exempts tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process. The exhaust oil drum qualifies for the exemption under this section.

4. Oil Storage Drum- This is not truly a storage area per se but a chamber in the process where oil necessary to the manufacturing process is heated and injected with nitrogen to purify it before it enters into the process. The

product cannot be manufactured without the oil prepared in this area. This oil is not an equipment lubricant but rather a component raw material.

Response. This vessel is used directly in making a chemical or physical change in a component part of the product for sale and the oil storage drums qualify for the exemption.

5. Catalyst Drum Scale - This functions like the teal metering drum above. Specific amounts of the various catalysts are measured for injection into the blending drum. Without the precise amount of catalysts primed for entry there will not be a reaction that results in the proper powder mix.

Response. The metering of catalysts and materials into the blending process is a manufacturing process and the catalyst drum scales qualify for exemption.

6. Catalyst Drum Vibrator- This device is an accessory to the manufacturing process as it assists with the flow of catalyst out of the drums and into the process. It ensures that the catalyst flows at the speed required by the process for optimal integration into the base product that will be further transformed in successive phases. In addition, this device agitates the catalyst to prepare it before it mixes with other component materials in the process. The catalyst is stored in drums before it is introduced into the manufacturing process. These drums are placed in the catalyst drum vibrator which performs the above process.

Response.  Agitating a component part of an item for sale to prepare it for mixture is exempt manufacturing use and the catalyst drum vibrator qualifies for exemption.

Phase II.

1.  Pellet Water Sump Tank- This tank is a part of the cooling unit. Water is cooled in this area and impurities are separated out and removed from the cooling water. The removal of the impurities is a physical change that must be effected to maintain the overall cooling system. The water is actually cooled in the cooling tower. This tank is part of the overall cooling, process and also functions as pollution control equipment by removing the industrial waste generated through the cooling process from the water.

Response. Cooling towers used in manufacturing are specifically exempt by statute. If this is a component part of a single piece of qualifying equipment (a cooling tower), it will qualify.

2.  HP Blow Down Vessel- This device functions if an upset in the process occurs. It separates production material into gas and liquid and feeds that into the flare for burn off. This is essential for safe plant operations and pollution control. It is part of the flare system. Without the flare system the plant could not function safely. Additionally, if there were an upset in the system and the chemicals were introduced into the atmosphere without this equipment in place they would be a hazard to the environment.

Response. The flare system qualifies as exempt pollution control equipment if necessary for that purpose. [There is no exemption for equipment used for "safe plant operations."] " (NOTE: The preceding sentence is being deleted because some exempt items may be considered for use in "safe plant operations" as a result of amendments made to Section 151.318 by House Bill 3211.)

3. Chilled Water Drum- This drum is part of the overall cooling process. As water leaves the cooling equipment it passes through the drum before entering the process. The drum acts as both a surge control device (preventing process overflow) and backup source of cooling water if the system were to fail. The cooling system is a closed loop system. Without this vessel the plant could not operate safely. It is necessary and essential to continuous and safe plant operations. This is an in-process flow through tank for the cooling process.

Response. In-process flow through tanks are specifically exempted by statute. See Section 151.318 (a)(4) of the Texas Tax Code.

4. Steam Condensate Drum- The drum acts as a collection unit for condensation and water within the steam system. The condensation and water is collected and returned to the boiler from this drum. The steam is used in the actual manufacturing process and is necessary and essential. The steam system is a closed loop process. This is an in-process flow through tank for the steam process. You state that the drum is within the steam system.

Response. Steam production equipment and in process flow-through tanks are specifically exempt by statute. This equipment appears to be a component part of a single piece of qualifying equipment (steam production). See Section 151.318 (a)(4) of the Texas Tax Code.

5. Chilled Water Surge Drum- This water surge drum maintains the overall pressure of the chilled water system that is required to maintain the production process at optimal levels. This is an in-process flow through tank for the cooling process.

Response. Cooling towers and in process flow-through tanks are specifically exempt by statute. This equipment appears to be a component part of a single piece of qualifying equipment (cooling tower). See Section 151.318 (a)(4) of the Texas Tax Code.

6. Air Receiver Vessel - This vessel receives air from the compressor before entering into the process. The vessel helps to maintain the overall pressure within the manufacturing process. This is a continuous flow process that allows for five minutes of extra air if the process were to shutdown (safety requirement). This is an in-process flow through tank for the compressed air system.

Response. Compressors and in process flow-through tanks are specifically exempt by statute. See Section 151.318 (a)(4) of the Texas Tax Code.

7. R-201 Sample Pot- This sample pot is an accessory to the reactor. It allows for in-process sampling of the product. The product is pulled out of the

reactor and into the sample pot where it is heated to separate the propylene from the polypropylene solution. This sample process is repeated once or twice every 12 hours to monitor the overall quality of the product so that changes to the process can be made if a problem with the process is occurring. This does not cause a physical change in the product. It serves only to insure the overall quality of the product in the manufacturing process.

Corrected Response. House Bill 3211 amended Section 151.318 of the Texas Tax Code by adding subsection (a)(8) to the statute. This section exempts tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process..

8. Reactor Jacket Water Additive Pot- Your request of January 26, 1998 concluded that this item was taxable and no longer at issue.

9. D-301/F-301 Sample Pots- Similar in nature to sample pot in #7 except that nitrogen is used instead of heat to separate the materials. It serves only to insure the overall quality of the product in the manufacturing process.

Corrected Response. Same as sample pot in Response 7 above.

Phase III.

These are all in-process flow through tanks.

1. Powder Surge Bin Outlet Rotary Feeders--Surge bin that meters process materials before they enter into another stage in the manufacturing process. This bin is also required for safety reasons if there is an upset in the process.

2. Powder Silo--Process chemicals flow through this surge vessel continuously. The purpose of the vessel is to act as a "bubble in the process" in case there is a problem in production, the process chemicals have somewhere to go. The process could not operate safely without this surge vessel.

3. Powder Feed (Surge Bin) Silo--Powder feeds into this bin from one process and is metered or fed into the extruder process from this bin. The process is one continuous process from the raw materials to the pelletizer process.

4. Pellet Surge Hoppers--This hopper is similar to #2 above except it is in the pelletizer process. It acts as a "bubble in the process" to contain pellets if there is a problem in the process. The process could not operate safely without this surge hopper. The hoppers are not just a link from parts of the process but they actively determine the flow of the process.

Response. This equipment qualifies for exemption as in process flow-through tanks.

Phase IV.

1.  Feeding Hoppers--These are components or accessories of the pellet blending silos (see phase IV diagram). Pellets move into the feeding hoppers from the process and are metered into the pellet blending silos where they are blended into a homogeneous batch.

Response.  These are exempt as a component part of exempt manufacturing equipment. See pellet blending silo below.

2.  Pellet Blending Silo--Pellets are made in homogeneous batches. However, because the raw materials may be slightly different in quality or grade in a particular batch, it is necessary to mix the pellets so the overall blend is homogeneous before the pellets can be transferred to packaging or the rail car area. Additionally, the pellet blending silos also remove any residual process powder and impurities from the pellets. For further explanation, see Facts Section Phase IV.

Response.  This silo is used for mixing raw materials and not used for storage. It will qualify for exemption.

3.  Pellet Blending Blower Pack--Pushes pellets from the bottom of the blending silo to the top of the silos to aid in the overall mixing process.

Response. This equipment mixes raw materials and qualifies for exemption.

4.  Eltriator Blower Pack/Filters--Components of process that cleans fines (small product dust) from the final product. This equipment does not cause a physical change in the product. It simply removes the product powder from the pellets and then filters the powder from the air before it enters the atmosphere. It serves as pollution control equipment in this capacity.

Corrected Response.  House Bill 3211 amended Section 151.318 of the Texas Tax Code by adding subsection (a)(8) to the statute. This section exempts tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process.

Based on this new information, you may want to review your client's equipment purchases since October 1, 1997 as your client may have paid tax in error on some equipment. Your client may use a copy of this letter (along with the appropriate documentation) to request a refund of any taxes paid in error. The enclosed refund information packet includes forms and instructions on how to receive a sales tax refund. I have also enclosed a blank exemption certificate for your convenience.

This opinion is based on the facts presented.  If there are additional or different facts, the opinion may change.

If you have any questions regarding the manufacturing exemptions, you may call Kevin Koller toll free at 1-800-531-5441, ext. 5-0613. You may also write to

Tax Policy Division, Comptroller of Public Accounts.

Sincerely,

Lindey Osborne
Tax Administration Division

---

ACCESSION NUMBER: 9911987L
SUPERSEDED: P
DOCUMENT TYPE: L
DATE: 1999-11-05
TAX TYPE: SALES

# APPENDIX N

202301025H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 202301025H

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,803**
RE:  CLAIMANT A
TAXPAYER NO:  **************
AUDIT OFFICE:  **************
AUDIT PERIOD:  March 1, 2012 THROUGH February 29, 2016

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,804**
RE:  CLAIMANT B
TAXPAYER NO:  **************
AUDIT OFFICE:  **************
AUDIT PERIOD:  October 1, 2013 THROUGH December 31, 2016

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,805**
RE:  CLAIMANT C
TAXPAYER NO:  **************
AUDIT OFFICE:  **************
AUDIT PERIOD:  March 1, 2012 THROUGH June 30, 2013

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,806**
RE:  CLAIMANT C
TAXPAYER NO:  **************
AUDIT OFFICE:  **************
AUDIT PERIOD:  July 1, 2013 THROUGH March 31, 2016

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,807**
RE:  CLAIMANT B

TAXPAYER NO:   **************
AUDIT OFFICE:    *************
AUDIT PERIOD:   March 1, 2012 THROUGH September 30, 2013

Sales And Use Tax/RFD

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

GLENN HEGAR
Texas Comptroller of Public Accounts

SARAH BERRY
Representing Respondent

**************

Representing Claimant

## COMPTROLLER'S DECISION

**This decision is considered final on February 6, 2023, unless a motion for rehearing is timely filed; this date of finality is calculated based on the Administrative Procedure Act (APA). [1] The failure to timely file a motion for rehearing may result in adverse legal consequences.**

Administrative Law Judge (ALJ) Keneshia Washington of the State Office of Administrative Hearings (SOAH) issued a Proposal for Decision (PFD) that includes Findings of Fact and Conclusions of Law.  SOAH served the PFD on each party and each party was given an opportunity to file exceptions and replies with SOAH in accordance with SOAH's rules of procedure.  The ALJ recommended that the Comptroller adopt the PFD as written.

After review and consideration, IT IS ORDERED that the PFD is adopted as changed. [2]

The results from this Decision are Attachments A.  The ALJ's letter to the Comptroller is Attachment B.  The PFD as changed is Attachment C.  Attachments A, B, and C are incorporated by reference.

Attachments A reflect a credit owed to Claimant in Hearing No. 115,803 and zero amounts due in Hearing Nos. 115,804-807.

The credit will be processed after the date the comptroller's decision is final. The parties may waive the right to file a motion for rehearing to expedite the processing of the credit. A waiver of rehearing or motion for rehearing may be filed as described above.

SIGNED on this 11th day of January 2023

GLENN HEGAR
Comptroller of Public Accounts

By: Lisa Craven
Deputy Comptroller

Attachments A, Texas Notifications of Hearing Results
Attachment B, ALJ's letter to the Comptroller

Attachment C, Proposal for Decision as changed

**ATTACHMENT B**

State Office of Administrative Hearings
Kristofer S. Monson
Chief Administrative Law Judge

September 26, 2022

The Honorable Glenn Hegar
Comptroller of Public Accounts
LBJ Building
111 E. 17th Street, 1st Floor
Austin, TX 78701

SOAH Docket Nos. 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.26; 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.26; 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.26; 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.26; 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.26; TCPA Hearing Nos. 115,803; 115,804; 115,805; 115,806;115,807; CLAIMANT A (Taxpayer No. **************), CLAIMANT B (Taxpayer No. **************), CLAIMANT C (Taxpayer No. **************) v. Texas Comptroller of Public Accounts

Dear Comptroller Hegar:

The undersigned Administrative Law Judge (ALJ) issued a Proposal for Decision (PFD) in this matter on August 17, 2022. Please be advised that Claimants filed exceptions to the Proposal for Decision (PFD) in this matter on August 31, 2022. Staff filed a reply to Claimant's exceptions on September 12, 2022, marking the close of the exceptions and reply period. Claimants filed a reply to Staff's reply on September 15, 2022, that will not be considered because it was filed after the close of the exceptions and reply period.

In its exceptions, Claimants argue that page 21 and Conclusion of Law 40 regarding divergent use should reference Texas Tax Code Section 151.3181(c) rather than Section 151.155, and Staff agrees. The ALJ agrees with this exception from the parties and has amended the PFD regarding the statutory cites in connection with divergent use from Section 151.155 to 151.3181(c).

Furthermore, Claimants' exceptions reassert arguments made in the hearing, such as accounting for divergent use; interpretation and application of the statute and Comptroller Rules regarding the manufacturing exemption; tanks as real property versus tangible personal property; as well as receipt dates and validity of Vendor Assignment of Right to Refund Forms (VARF). Claimants' exceptions also include assertions regarding the parties' burden of proof that are not supported by the applicable Rules or the relevant facts. Claimant requests various changes to the analysis, findings of fact, and conclusions of law based on its assertions.

Having reviewed the filings of the parties, the ALJ finds no errors in the findings of fact or conclusions of law except for the citation to Texas Tax Code Section 151.3181(c) rather than Section 151.155. This change does not constitute a substantive amendment that would afford the parties an opportunity to file exceptions. I recommend

that the amended PFD be adopted as written. Because SOAH has concluded its involvement in the matter, the case is being remanded to the Texas Comptroller of Public Accounts. *See* Tex. Gov't Code § 2003.051(a).

Sincerely,

Keneshia Washington
Presiding Administrative Law Judge

**ATTACHMENT C**

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,803**
**CLAIMANT A**
**TAXPAYER NO: **************

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,804**
**CLAIMANT B**
**TAXPAYER NO: **************

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,805**
**CLAIMANT C**
**TAXPAYER NO: **************

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,806**
**CLAIMANT C**
**TAXPAYER NO: **************

**SOAH DOCKET NO. 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.26**
**CPA HEARING NO. 115,807**
**CLAIMANT B**
**TAXPAYER NO: **************

**v.**

**TEXAS COMPTROLLER OF PUBLIC ACCOUNTS**

**BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS**

**Amended Proposal for Decision**

CLAIMANT A, CLAIMANT B, and CLAIMANT C (collectively, Claimants) filed claims for sales and use tax refunds. The Tax Division (Staff) of the Texas Comptroller of Public Accounts (Comptroller) denied the refund claims in full. Claimants requested refund hearings to contest the refund denials, claiming that they were owed refunds of sales tax paid for purchases of equipment, services, and chemicals that qualify for the manufacturing

exemption or the sale-for-resale exemption. Staff contends Claimants failed to prove that they are owed any refund amounts beyond the transactions that are agreed. In this Proposal for Decision (PFD), the Administrative Law Judge (ALJ) recommends that the refund denials be affirmed except as agreed by Staff.

## I. NOTICE, JURISDICTION, AND PROCEDURAL HISTORY

Staff referred the contested cases to the State Office of Administrative Hearings (SOAH) and, on October 1, 2021, issued Claimants Notices of Hearing. On November 1, 2021, ALJ Keneshia Washington issued Order No. 1, which joined the cases for the purpose of issuing a single PFD and set out pre-hearing requirements. On May 12 and 13, 2022, the ALJ convened a videoconference hearing on the merits. The record closed June 6, 2022. Claimants were represented by INDIVIDUAL A, COMPANY A. Sarah Berry represented Staff.

There are no issues of notice or jurisdiction; therefore, those matters are set out in the Findings of Fact and Conclusions of Law without further discussion here.

## II. REASONS FOR DECISION

### A. Evidence Presented

Staff called auditor Paul Weaver to testify and submitted the following exhibits for each hearing:

1. 60-Day Letter;

2. Refund Denial Letter;

3. Refund Audit Plan;

4. Refund Claim; and

5. Contested Items Spreadsheet.

Staff also submitted exhibits specific to particular hearings, as follows:

SOAH Docket No. 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.26:

6. Emails from Auditor to Claimant;

7. Assignment of Right to Refund Spreadsheet;

8. Assignment or Right to Refund Forms;

9. Notice of Demand; and

10. Updated Contested Items Spreadsheet.

SOAH Docket No.: 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.26:

6. Emails from Auditor to Claimant; and

7. Notice of Demand.

SOAH Docket No.: 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.26:

6. Assignment of Right to Refund Spreadsheet;

7. Assignment of Right to Refund Forms; and

8. Notice of Demand.

SOAH Docket No.: 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.26:

> 6. Emails from Auditor to Claimant; and

> 7. Notice of Demand.

SOAH Docket No.: 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.26:

> 6. Emails from Auditor to Claimant;

> 7. Assignment of Right to Refund Spreadsheet;

> 8. Assignment of Right to Refund Forms; and

> 9. Notice of Demand.

Staff's exhibits were admitted into the record without objection.

INDIVIDUAL B, vice president of operations for CLAIMANTS B & C, and INDIVIDUAL C, senior tax accountant with INDIVIDUAL C, testified on behalf of Claimants. Claimants submitted the following exhibits for each case: [3]

> 1. Spreadsheets Reflecting Items Claimed for Exemption;

> 2. Tank Schematics;

> 3. Drone Pictures;

> 4. CLAIMANTS  B & C 10Ks; and

> 5. Claimants' Reply to Notice of Demand.

Staff objected to Claimants' Exhibits 1 – 4, arguing they were provided after the Notice of Demand deadline. In refund cases such as these, Staff may issue a Notice of Demand that all evidence to support the claim for refund must be produced before the expiration of a specified date in the notice. Tex. Tax Code § 111.105(e). The specified date may not be earlier than 180 days after the date the refund is claimed and not less than 60 days from the date of the notice. *Id* .; 34 Tex. Admin. Code § 1.12(c). The deadline to respond to the Notice of Demand may be extended by the Tax Hearings Attorney. 34 Tex. Admin. Code § 1.12(c). A taxpayer who fails to produce the requested documents by the specified date may not introduce in evidence any of the documents that were not timely produced. *Id* . Neither the ALJ nor the Comptroller may consider evidence produced after the specified date. Tex. Tax Code § 111.105(e).

For each case, Staff issued a Notice of Demand to Claimants on  February 26, 2019. Claimants were to provide "all documentary and other evidence that would support facts or contentions regarding any claim of refund or credit raised in this hearing" by May 2, 2019. Staff extended the deadline to August 15, 2019, and Claimants responded on August 14, 2019.

Claimants' Exhibit 5 includes all documents timely filed in response to the Notice of Demand. Claimants argued that their Exhibits 1 – 4 should not be excluded from the contested case record because 34 Texas Administrative Code § 1.12(c) illegally expands the statutory restriction in Texas Tax Code § 111.105(e). The ALJ disagrees. It is well established that the Comptroller and SOAH do not have jurisdiction to consider and rule on the validity of an administrative rule. *See* Comptroller's Decision Nos. 112,735, 112,736 (2017). Claimants also argue the Notice of Demand letters fail to meet basic due process notice requirements because they lack specificity in the documents requested from Claimants. However, neither the statute nor the Comptroller rule contains language requirements for the Notice of Demand letters. Moreover, the language in the letters mirrors the language in

Texas Tax Code § 111.105(e) authorizing the Comptroller to issue the letters and 34 Texas Administrative Code § 1.12(c) regarding administration of the statute. The Notice of Demand letters effectively convey the substance of Staff's requests and the applicable deadlines so that Claimants had proper notice. Hence, Claimants' contention that the letters failed due process requirements should be denied.

Claimants argue that they provided the contents of Exhibit 4 prior to the deadline in the demand letter because the documents are publicly available records that the auditor could have reviewed prior to the deadline. However, record evidence does not establish that Claimants made the documents available to the auditor prior to the deadline, that the auditor reviewed them prior to the deadline, or that Claimants identified them as documents that Claimants assert would support their refund claims prior to the Notice of Demand deadline.

Based on record evidence, Claimants did not provide the contents of Exhibits 1 – 4 to Staff as evidence that would support their contentions prior to the Notice of Demand deadline. Staff's objections are sustained. Therefore, the documents included in Claimants' Exhibits 1 – 4 are excluded from the contested case record and the ALJ gave them no weight in the instant refund hearing. Claimants' Exhibit 5 is admitted to the record.

## B. Agreed Adjustments

Staff agreed to refund amounts shown in Exhibit 10 for SOAH Docket No. 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.26.

## C. Facts Established and Issues Presented

The combined group that includes Claimants (CLAIMANTS B & C) treats and disposes of water and sells the recovered oil. During the refund period, Claimants did not sell the water that it treated. Claimants obtain wastewater from primary energy or exploration and production companies and then process that water to produce sellable oil. Claimants dispose of the wastewater in company-owned saltwater waste disposal wells (SWDs). CLAIMANTS B & C had over 50 facilities by the end of the refund period. All of the facilities have essentially the same layout and structure. Each facility has a small office site; however, all facilities are fully automated using a process logic control (PLC) system that Claimants operate remotely from CLAIMANTS B & C headquarters in CITY, STATE to remotely adjust flows, tank levels, and implement programming at local facilities. The facilities operate 24/7 except for maintenance shutdowns.

Claimants receive a mix of water, oil, and solids. The solids separate in the sand tanks, the water separates in the gun barrel tanks, the water is injected into a SWD, and the extracted oil is sold. The raw wastewater arrives at Claimants' facility via truck or pipe. The wastewater passes through an intake manifold. Claimants take water samples near the manifold to adjust chemical dosing rates. Then, the water goes into the sand tank where most of the solids fall out. The mix of water and oil passes to the gun barrel tank where the water is separated from the oil. The mix is agitated using various pieces of equipment to facilitate separation of the water from the oil. Remaining solids also separate and accumulate at the bottom of the tank.

The separated oil is skimmed off the top of the gun barrel tank. The oil first enters a production tank where it is tested and chemicals, such as emulsion breakers and acids, are added to separate more oil. Sometimes the tank is heated to cause additional separation. The mix of oil and water is referred to as "slop oil." Claimants inject chemicals and test the slop oil throughout the process to determine the percentage of water or solids opposed to the oil. Once they achieve the desired specifications, the oil is transferred to an oil tank referred to as a sell tank. The sellable oil is referred to as "skim oil." The remaining slop oil is transferred to a slop tank and possibly offered for sale. Steel oil tanks are used interchangeably for production, storage of slop oil, and storage of skim oil.

The water passes from the gun barrel tank to water tanks. The last two water tanks are referred to as "suction tanks." The water is filtered again when it passes through the suction manifold to remove as many solids as

possible. Claimants inject downhole chemicals, e.g., scale inhibitors and friction reducers to help remove solids. Then the charge pump passes the water to the injection pump where it is injected downhole into a SWD.

There are straps on the piping of the intake manifold and the suction manifold where chemicals are injected. Chemicals are also injected into the tanks at all stages of the process. Demulsifiers are active separators that separate oil and water. This chemical group includes emulsifiers, demulsifiers, emulsion, and emulsion breakers. Claimants also use degreasers to polish the oil, i.e., separate impurities, and for well maintenance.

Solids control chemicals separate solids from the oil and water mix and from the treated water before it is injected downhole. These chemicals make the oil more marketable and include acid surfactants, iron sulfide, scavengers, iron sulfide dissolver, iron control, solids control, citric acid, muriatic acid, and scale inhibitors. Acid surfactants are used at all places of the process and in well construction. They aid in pH control, iron control, solids control, drilling mud, drilling fluids, well preventive maintenance, and well construction. As part of maintenance for the facilities, Claimants use acid surfactants for separation of iron in the sand tank and for "acid jobs" where they wash the inside of the wellbore, the injection tubing, and injection pumps. Scale inhibitors are used in the sand tanks, connecting pipes, and pumping equipment to prevent iron build-up. Iron sulfide scavengers facilitate separation of solids and are used at the intake manifold and the suction manifold.

Corrosion prevention chemicals extend the life of the tanks, the internals of the tanks, pipes that connect the tanks, impellers in the pumps, and the injection tubing. This group of chemicals includes corrosion inhibitors, wetting agents, friction reducers, surfactants, acids, and bases. Wetting agents are used to reduce tension and friction loss, creating ~~creates~~ viscosity on the internal parts. Because they facilitate the movement of water from arrival to downhole injection as well as the movement of oil between tanks, the wetting agents are used in all tanks.

Claimants also use biofoulants and antifoulants that prevent bacterial growth on the internal parts of the equipment and within the interface of the oil and water, which makes the oil more marketable. Claimants use well- completion chemicals and well-maintenance chemicals to prevent the decline, failure, lapse, or deterioration of the SWDs. These chemicals aid well construction and include packer fluid, potassium chloride, sodium carbonate, sodium hydroxide, and sodium hydrochloride. Chemicals are critical for the injection of the water into the well because they facilitate the final stage of filtration so that little to no solids enter the pumping equipment or the wellbore.

During the refund period, Claimants purchased services and equipment for updates and upgrades to their facilities. Purchased equipment included tanks, tools, chemicals, and electricity for the PLC as well as general office areas. Services included labor for construction site setup, electrical work, general plumbing, and roustabout services performed by a general technician in the oil field with a wide range of capabilities. General labor purchased for the facilities include moving tools, loading tanks, and helping the crew build catwalks for inspection at the top of the tank. Claimants also purchased lighting equipment and associated labor for the night crews.

Claimant A was not permitted to collect sales and use tax from March 1, 2012, through February 29, 2016. Claimant B  was not permitted to collect sales and use tax from March 1, 2012, through September 30, 2013, but was permitted from October 1, 2013, through December 31, 2016. Claimant C was not permitted to collect sales and use tax from March 1, 2012, through June 30, 2013, but was permitted from July 1, 2013, through March 31, 2016.

In August 2016, Claimants filed sales and use tax refund claims for the period of March 1, 2012, through February 29, 2016, and Staff conducted a refund audit to verify the claims. Claimants provided Vendor Assignment of Right to Refund Forms (VARF), refund schedules, and corresponding invoices. However, VARFs were not provided for all purchases by other entities. Because Claimants were not permitted for all periods

within the claim period, the auditor could not perform a tax account reconciliation. The invoices provided showed purchases of pumps, piping, other equipment and repairs to real property or tangible personal property. The invoices also show rentals of generators, mobile offices and port-a-johns. INDIVIDUAL B testified, and the invoices provided show, that Claimants purchased 1000-barrel tanks, 750-barrel tanks, and 400-barrel tanks.

On October 31, 2017, Staff notified Claimants that their refund claims were denied in full. Claimants each timely requested a refund hearing and provided additional documentation for review. Staff did not agree to any refund amounts based on the documentation provided. Claimants excluded purchases of port-a-johns as well as purchases from COMPANY B in SOAH Docket No. 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.26 and COMPANY C in SOAH Docket Nos. 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.26 and -0224.26. Claimants contend that the remainder of the purchases are eligible for one or multiple manufacturing exemptions or the sale for resale exemption. Staff disagreed, contending that Claimants' purchases were used completely after the manufacturing process was complete or for manufacturing and unaccounted-for divergent use. Staff also contends that Claimants failed to establish the applicability of the sale for resale exemption and that multiple VARFs are deficient and do not support the claims. Staff further contends that some transactions are barred by the statute of limitations. Hence, Staff referred the matters to SOAH. While at SOAH, Staff agreed to refund amounts shown in its updated contested items spreadsheet in Staff's Exhibit 10 to SOAH Docket No. 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.26 but contends that no additional refund amounts are warranted.

## D.  ALJ's Analysis and Recommendation

If the Comptroller finds that an amount of tax, penalty, or interest has been unlawfully or erroneously collected, the Comptroller shall credit or refund the amount. Tex. Tax Code § 111.104(a). When a taxpayer requests a refund, it must establish by a preponderance of evidence that taxes were erroneously collected or paid. *See, e.g.* , 34 Tex. Admin. Code § 1.26(e); Comptroller's Decision No. 109,787 (2015). If a claimant relies on an exemption to establish the error, then it must provide clear and convincing evidence. 34 Tex. Admin. Code § 1.26(c); Comptroller's Decision No. 100,477 (2012). Furthermore, exemptions from taxation are subject to strict construction since they are the antithesis of equality and uniformity and because they place a greater burden on other taxpaying businesses and individuals. *See Bullock v. National BancShares Corp.* , 584 S.W.2d 268 (Tex. 1979). An exemption cannot be raised by implication, but must affirmatively appear, and all doubts are resolved in favor of the taxing authority and against a claimant. *See, e.g.,* Comptroller's Decision Nos. 41,522, 44,260 (2010).

Sellers of taxable items and purchasers who store, use, or consume taxable items in this state shall keep books, papers, and records in the form the Comptroller requires. Tex. Tax Code § 151.025(a); 34 Tex. Admin. Code § 3.281(a)(1). For example, records must reflect total purchases of taxable items and must substantiate any claimed deductions or exclusions authorized by law. Tex. Tax Code § 151.025(a)(3); 34 Tex. Admin. Code § 3.281(b). Claimant must produce contemporaneous records and supporting documentation appropriate to the tax or fee for the transactions in question to substantiate and enable verification of the taxpayer's claim related to the amount of tax, penalty, or interest to be assessed, collected, or refunded. 34 Tex. Admin. Code § 1.26(a); *see also* Tex. Tax Code § 111.0041. Pursuant to 34 Texas Administrative Code § 3.325(a)(4)(C), a person requesting a refund from the Comptroller is required to include information about each transaction upon which a refund is requested such as: (i) the purchaser or seller's name as appropriate; (ii) invoice number, if applicable; (iii) d ate of transaction; (iv) description of the item(s) purchased or sold; (v) specific reason for the refund, such as applicable statutory authority; (vi) purchase or sale amount subject to refund; (viii) identification of all local jurisdictions to which tax remitted; and (ix) if requesting a refund for taxes paid in error to a permitted seller, the seller's name, address and sales tax permit number or information that allows the Comptroller to identify the seller's sales tax permit number. Such documentation may include invoices, vouchers, checks, shipping records, contracts, or other equivalent records. Tex. Tax Code § 111.0041(c); 34 Tex. Admin. Code § 3.325(a)(4)(E).

A taxpayer is generally required to support its contentions by source records. Comptroller's Decision No. 112,607 (2019). Factual assertions in pleadings are not evidence. *See, e.g.* , Comptroller's Decision No. 111,587 (2015). Bare assertions are not a substitute for evidence and are insufficient to establish audit error. Comptroller's Decision No. 115,999 (2020), citing to *Baker v. Bullock* , 529 S.W.2d 279 (Tex. Civ. App.— Austin 1975, writ ref'd n.r.e.); *see also* Comptroller's Decision No. 107,916 (2013). The Comptroller has held that summary documents that are created by the taxpayer and submitted without underlying support are tantamount to bare assertions; i.e., they are not considered evidence. *See, e.g.* , Comptroller's Decision Nos. 115,535 (2020), 102,488 (2010). Furthermore, the long-standing law in Texas presumes that the party in possession of evidence peculiarly within its control has the burden of producing that evidence. *See Watson v. Brazos Elec. Power Corp., Inc.* , 918 S.W.2d 639, 643 (Tex. App.—Waco 1996, writ denied) (failure to produce evidence within a party's control raises the presumption that if produced it would operate against him, and every intendment will be in favor of the opposite party); *Brewer v. Dowling* , 862 S.W.2d 156, 159 (Tex. App.—Fort Worth 1993, writ denied); *H. E. Butt Grocery Co. v. Bruner* , 530 S.W.2d 340, 343 (Tex. Civ. App.—Waco 1975, writ dism'd).

Texas imposes a tax on each sale of a taxable item in this state. Tex. Tax Code § 151.051. The term "taxable item" includes tangible personal property and taxable services. *Id* . § 151.010. Unless an exemption applies, all sales of tangible personal property in this state are taxable. *See* <u>Tex. Tax Code § 151.051;</u> Comptroller's Decision No. 116,506 (2020). Taxable services are specifically enumerated in Texas Tax Code § 151.0101(a) and include: repair, remodeling, maintenance, and restoration of tangible personal property; real property services; and real property repair and remodeling. Tex. Tax Code § 151.0101(a)(5), (11), (13).

### 1. Manufacturing Exemption

The Tax Code provides an exemption for tangible personal property that will be sold, leased, or rented to, or stored, used, or consumed by a manufacturer if the tangible personal property is directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale and the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to the product being manufactured, processed, or fabricated for ultimate sale. *Id* . §  151.318(a) (2)(A). The exemption also includes any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured, processed, or fabricated for ultimate sale. *Id* . § 151.318(a)(2)(B).

The Tax Code also provides an exemption for tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process; to a quality control process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale; or to comply with federal, state, or local laws or rules that establish requirements related to public health. *Id* . § 151.318(a)(5), (8), (10).

Processing is an activity performed during manufacturing. 34 Tex. Admin. Code § 3.300(a)(9)(B). Specifically, processing is the physical application of the materials and labor necessary to modify or to change the characteristics of tangible personal property. *Id* . § 3.300(a)(10). Manufacturing ends with the completion of tangible personal property. *Id* . § 3.300(a)(9). Completion of production means the tangible personal property has all the physical properties, including packaging, if any, that it has when transferred by the manufacturer to another. *Id* . § 3.300(a)(9)(A).

The statute exempts in-process flow through tanks, electronic control room equipment, computerized control units, pumps, compressors, and hydraulic units, that are used to power, supply, support, or control equipment that qualifies for exemption under Texas Tax Code § 151.318(a)(2) or (5) or to

generate electricity. Tex. Tax Code § 151.318(a)(4). Furthermore, the exemption covers lubricants, chemicals, chemical compounds, gases, or liquids that are used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if their use or consumption is necessary and essential to prevent the decline, failure, lapse, or deterioration of equipment exempted by this section. *Id* . § 151.318(a)(6). The exemption includes chemicals, catalysts, and other materials that are used during a manufacturing, processing, or fabrication operation to produce or induce a chemical or physical change, to remove impurities, or to make the product more marketable. *Id* . § 151.318(b)(1).

Also included in the exemption is tangible personal property specifically installed to reduce water use and wastewater flow volumes from the manufacturing, processing, fabrication, or repair operation; reuse and recycle wastewater streams generated within the manufacturing, processing, fabrication, or repair operation; or treat wastewater from another industrial or municipal source for the purpose of replacing existing freshwater sources in the manufacturing, processing, fabrication, or repair operation. *Id* . § 151.318(a)(11).

Also exempt are services performed directly on the product being manufactured prior to its distribution for sale and for the purpose of making the product more marketable. *Id* . § 151.318(a)(3). But for exceptions that do not apply to the instant matter, the exemption covers the purchase of a service that is performed on tangible personal property that would be exempted because of the nature of the property, its use, or combination of its nature and use, is also exempt. *Id* . § 151.3111.

The processing activity that Claimants conducted during the claim period was the extraction and polishing of oil for ultimate sale. Claimants have removed as much oil as possible from the wastewater and removed as many solids as possible before the wastewater is injected into an SWD. Claimants highlight that construction and use of the SWDs are carried out in a manner to prevent environmental pollution and regulated by the Texas Railroad Commission. Claimants contend that the SWDs are necessary and essential to the processing of oil for ultimate sale, rendering the SWDs used during the actual processing of the oil and the services performed on the SWDs eligible for the manufacturing exemption.

Claimants contend that even if the SWDs are not deemed to have been used during the actual processing of the oil, the SWDs are eligible for the manufacturing exemption because they are necessary and essential to a pollution control process and compliance with government law. Staff contends that eligibility for  the manufacturing exemption under Texas Tax Code § 151.318(a)(5) or (10) requires that two conditions be met: 1) the tangible personal property must be used or consumed in ~~during~~ the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, and 2) use or consumption of the property must be necessary and essential to a pollution control process or to comply with federal, state, or local laws or rules that establish requirements related to public health. Claimants contend that only the second factor must be present. Claimants reason that requiring the presence of both factors is illogical and impossible because equipment cannot be simultaneously used for processing and disposal of waste to prevent pollution. However, Claimants' contention mischaracterizes the statutory requirements. The statute does not require simultaneous use for processing and pollution control. However, the statute requires that the tangible personal property be used for both purposes at some point. The oil is being processed for ultimate sale. Any oil that will be sold has been extracted from the wastewater before the wastewater is injected into the SWD. Moreover, during the claim period, Claimants did not sell the wastewater. Hence, at no point are the SWDs involved in the actual processing of the oil for ultimate sale.

Furthermore, Claimants contend that the SWD is involved in the actual processing of the oil because the processing cannot proceed but for the use of SWDs. The Comptroller considered facts almost identical to Claimants' as well as the same arguments that Claimants present in Comptroller Decision No. 46,299 (2009). There, the Comptroller held that the equipment used to construct the SWDs at issue and the chemicals used on them were not eligible for the manufacturing exemption because the SWDs were used solely after the manufacturing of the oil and gas had been completed. The Comptroller rejected the taxpayer's argument that the SWDs were like gas flares and vent hoods deemed to be exempt pollution control equipment per Comptroller policy because both the flare system and the vent hood were used as part of the actual manufacturing process while the SWDs were not.

Claimants argue that the present case is different from the facts in Comptroller Decision No. 46,299. Specifically, Claimants argue that because the facilities operate 24/7, injection of the water into an SWD is happening while oil is being separated from water in a different part of the facility so that use of the SWD happens during processing of the oil. However, the assertion that these factors render the SWDs eligible for the manufacturing exemption ignores the statutory requirement that the SWD be used as part of the manufacturing process, namely to separate oil from water. Because Claimants' SWDs are not used to process their oil, neither the SWDs nor chemicals used or services performed on the SWDs are eligible for the manufacturing exemption.

Though the SWDs are used to store water, and Claimants treat the water prior to injecting the water into the SWDs, Claimants have not established by clear and convincing evidence that the SWDs facilitate water reduction; the wastewater flows of their oil processing, water reuse, water recycling; or the replacement of existing freshwater sources in their operations as required by Texas Tax Code § 151.318(a)(11).

At the hearing Claimants confirmed that they removed some purchases from their refund request, including purchases from COMPANY C. To the extent that any purchases of lightning control and static protection equipment remain, Claimants have not established by clear and convincing evidence that the equipment was used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale or otherwise eligible for the manufacturing exemption.

## 2. Divergent Use

Staff acknowledges that some of Claimants' purchases are eligible for the manufacturing exemption because they are used solely for the purpose of separating oil from water and other impurities, e.g., some of Claimants' gun barrel tanks. However, if a manufacturer uses exempt property for a nonexempt purpose (i.e., a purpose other than the purpose that qualified the property for exemption under Tex. Tax Code § 151.318 manufacturing or fabricating tangible personal property), the property is subject to tax for the divergent use. Tex. Tax Code § 151.3181. Tax is due for the period of time the property is used in a nonexempt (divergent) manner or on the full purchase price of the property. 34 Tex. Admin. Code § 3.300(k). "Divergent use" means the use of property in a manner or for a purpose other than the manner or purpose that qualified the purchase for exemption. Tex. Tax Code § 151.3181(a)(1).

Moreover, machinery and equipment or supplies to the extent not otherwise tax-exempted under Texas Tax Code § 151.318 used to maintain or store tangible personal property are not exempt from tax. Tex. Tax Code § 151.318(c)(4). Except for factors that do not apply here taxable, intraplant transportation equipment includes equipment that is used to move a product or raw material in connection with the manufacturing process, and specifically including all piping, conveyor systems, and related pumps (unless otherwise exempted), meters, valves, or rollers. 34 Tex. Admin. Code § 3.300(c)(5); *see also* Tex. Tax Code § 151.318(c)(1). Intraplant transportation equipment is taxable even if manufacturing or

processing activities (such as cooling, mixing, or pollution containment) occur during the transportation of product or component parts of the product. 34 Tex. Admin. Code § 3.300(c)(5).

Claimants contend that because their facilities operate 24/7 and are used solely to process oil, divergent use does not apply. However, as discussed above, parts of the overall process carried out at Claimants' facilities do not involve the separation of oil from water and impurities and do not constitute processing under 34 Texas Administrative Code § 3.300. Therefore, they are not part of the manufacturing process. For instance, Claimants use steel tanks interchangeably for production and storage of slop oil and skim oil. The tanks are not tax exempt while used as storage. Claimants have not accounted for the divergent use of the tanks or accessories. Moreover, some chemicals, such as acid surfactants and wetting agents, are used in all tanks during oil and water separation as well as prior to and after oil processing. Solids control chemicals are used to make the oil more marketable but are also used to treat water immediately before it is injected into the SWDs. Corrosion-prevention chemicals extend the life of the tanks and are also used in pipes that connect the tanks to facilitate intraplant transportation as well as injection tubing after the oil processing is complete. Claimants have not accounted for the divergent use in activities outside of the manufacturing process. Therefore, Claimants' contention regarding the application of the manufacturing exemption should be denied.

Based on invoices provided and record evidence, Claimants made purchases of roustabout services, equipment-cleaning services, as well as structural and equipment upgrades at their facilities that constitute taxable services under Texas Tax Code § 151.0101(a)(5), (11), and (13). Claimants contend, and INDIVIDUAL B testified, that the services were performed on their facilities where oil is being processed. However, neither the invoices nor any other records show that the services were performed solely on equipment eligible for the manufacturing exemption or that the services are otherwise exempt. Claimants cannot satisfy their burden of proof with uncorroborated testimony on the ultimate issue to be proven. *See* Tex. Tax Code § 151.025; 34 Tex. Admin. Code § 3.281(b); *see also, e.g.* , Comptroller's Decision Nos. 115,398 (2020), 114,570 (2019), 109,188 (2017), and 104,278 (2012). Claimants' contention that remaining purchases of services are nontaxable or tax exempt should be denied.

Furthermore, INDIVIDUAL B testified, and the invoices provided show, that Claimants purchased 1000-barrel tanks, 750-barrel tanks, and 400-barrel tanks. Tanks with a capacity over 500 barrels are considered real property. *See* 34 Tex. Admin. Code § 3.324(e)(2). Per Texas Tax Code § 151.318, the manufacturing exemption applies to purchases of services and tangible personal property, not real property. Therefore, regardless of how they are used, tanks exceeding a capacity of over 500 barrels, as well as chemicals used and services performed on them, are not eligible for the manufacturing exemption.

### 3. Sale for Resale

The sale for resale of a taxable item is exempted from sales tax. Tex. Tax Code § 151.302(a). A sale for resale is the sale of a taxable item to a purchaser who acquires the taxable item for the purpose of reselling it as a taxable item in the United States or Mexico in the normal course of business in the form or condition in which it is acquired; or as an attachment to or as an integral part of another taxable item. 34 Tex. Admin. Code § 3.285(b)(1)(A). Since certain chemicals are oil soluble and remain in the product flow after injection, the well operator may purchase those chemicals separately from the service provider and issue a resale certificate in lieu of tax on the charge for the chemicals. 34 Tex. Admin. Code § 3.324(h)(1). The injection of chemicals to stimulate production or remove impurities from the product being removed such as acid, emulsifiers, or nitrogen is a nontaxable service. *Id* . § 3.324(h)(2). The service company is the consumer of all chemicals pumped down hole and must pay tax at the time

of purchase. *Id* . Claimants contend that demulsifiers, emulsion breakers, and other chemicals that bind to oil are exempt under the resale exemption because some portion of the chemicals remain with the oil and are resold to the ultimate purchaser. Claimants argue that any material that is ultimately transferred to the purchaser is eligible for the sale-for-resale exemption. Claimants did not establish by clear and convincing evidence which specific chemicals remain with the oil and in what proportions. Hence, Claimants failed to demonstrate they acquired the chemicals for the purpose of reselling them and failed to show which, if any, chemicals were resold. Claimants failed to show by clear and convincing evidence that any of the requested refund amounts represent purchases eligible for the sale-for-resale exemption. Therefore, the refund claims should remain denied.

## 4. Sales Tax Reconciliation

A permitted purchaser may amend a return for the period in which an overpayment was made, file a refund claim with the Comptroller according to the requirements of 34 Texas Administrative Code § 3.325(a)(4), or take a credit on a future sales and use tax return filed by the purchaser for taxes paid in error to a permitted seller. 34 Tex. Admin. Code § 3.325(a)(3)(A). The permitted purchaser must have been permitted at the time the tax paid in error was due and payable in order to claim a refund directly from the Comptroller, amend a return for the period in which an overpayment was made, or to take a credit on a future sales and use tax return. *Id* .

A person who requests a refund from the Comptroller must submit supporting documentation to verify any refund claimed or credit taken, such as copies of invoices, cancelled checks, and executed contracts. *Id.* § 3.325(a)(4)(E). The Comptroller's refund sales tax verification procedures direct the auditor to verify that tax was paid or accrued by reviewing cancelled checks, the claimant's accounts payable register, and accrual accounts. *See, e.g.* , Comptroller's Decision Nos. 111,334, 111,335 (2017), 100,786, 100,788, 100,789 (2013). In addition, Claimants must perform a sales tax reconciliation to show that they had not previously claimed a credit for any of the amounts for which they seek a refund. *See id* .

When Claimants B and C were permitted to collect and remit sales and use tax by the Comptroller, they were required to provide a tax reconciliation for the periods covering October 1, 2013, through December 31, 2016, and July 1, 2013, through March 31, 2016, respectively, to establish that they had not previously claimed a credit for any of the amounts for which they seek a refund. They failed to do so.

Claimants argue that they had no detailed, transactional-level sales tax general ledger information, or any other sales tax information because they do not collect any sales tax. Claimants further argue that because of the low amount of use tax they accrue, it would not have been logical for them to take a credit. Claimants assert that their sales and use tax returns for the permitted periods show that there was no or minimal sales tax remitted for them to take a credit against. Claimants also highlight that their use tax accruals during the permitted periods are significantly smaller than the refund claim. However, bare assertions are insufficient for Claimants to meet their evidentiary burden. In the absence of a sales tax reconciliation or source records establishing that Claimants did not previously claim a credit for requested tax refund amounts while they were permitted, Claimants' corresponding refund claims should be denied except as agreed by Staff.

## 5. Vendor Assignment of Right to Refund Forms (VARF)

A tax refund claim may be filed with the Comptroller only by the person who directly paid the tax to this state or by the person's attorney, assignee, or other successor. Tex. Tax Code § 111.104(b). A person who does not have a sales and use tax permit and who has paid tax in error to a permitted seller may request a

refund only from the permitted seller to whom the tax was paid. 34 Tex. Admin. Code § 3.325(a)(1). A permitted seller may assign its right to refund to the purchaser, who may then request a refund directly from the Comptroller that must meet the requirements listed in 34 Texas Administrative Code § 3.325(a)(4). *See id* . § 3.325(a)(1), (3)(A).

A refund claim must be submitted within the applicable limitations period. *Id.* § 3.325(a)(4)(D). A claim for refund must be made within four years from the date on which the tax was due and payable as provided by Texas Tax Code § 151.401. *Id* . § 3.325(b)(1). If the claim is being filed by a non-permitted person who is an assignee of a refund that may be owed, the person must include a VARF with the refund claim to toll the statute of limitations. *Id* . § 3.325(b)(10)(A)(iii).

Before the expiration of the statute of limitations, the Comptroller and a taxpayer may agree in writing to extend the limitation period in accordance with Tax Code § 111.203. *Id* . § 3.325(b)(4). Any refund request pertaining to periods for which limitations have been extended must be made prior to the expiration date of the agreement. *Id* . Failure to file a claim within the limitations prescribed by this section constitutes a waiver of any demand against the state on account of the overpayment. *Id* . § 3.325(b)(6). The postmark date or its equivalent on a refund request determines when a refund is claimed. *Id* . § 3.325(d)(1).

All Claimants had periods where they were not permitted during the refund claim period. Moreover, all claimed amounts are based on purchases for which Claimants contend they paid tax to permitted vendors rather than directly to the Comptroller. Claimants provided VARFs with their refund claims submitted in August 2016 and during Staff's verification of the claims. On August 3, 2017, Staff agreed to extend the time that Claimants had to provide additional documentation, including VARFs, to August 16, 2017. On August 18, 2017, Staff agreed to another extension of approximately two weeks. On August 31, 2017, Staff sent Claimants email correspondence confirming that its review had been completed based on the documentation provided and that the claims would be denied in full. Claimants acknowledge that they have not provided VARFs from vendors covering all transactions for non-permitted periods. Claimants argue that the fact that they have provided VARFs from most of the vendors in the transactions at issue is sufficient to meet the requirements under 34 Texas Administrative Code § 3.325(b)(10)(A)(iii). However, that argument is directly contradicted by the language of the rule. For transactions where Claimants did not provide a VARF, the statute of limitations was not tolled, and those claims should be denied.

The auditor testified that, for the VARFs provided after the refund claim, he received multiple copies of some VARFs and noted the earliest date that he received them on the VARF. He explained that, for the VARFs that were not provided to him directly because the claims were with the Comptroller's Administrative Hearings Section, he did not notate the date received. Four years from the last date of the non-permitted periods for Claimant C was June 30, 2017. Therefore, any VARF provided after the agreed extension date of August 31, 2017, was after the limitations period. Therefore, the limitations period was not tolled, and the claims for purchases from those vendors must be denied.

Claimants argue that the auditor's notation process does not reliably indicate when the Comptroller received the VARF. Claimants argue that a more accurate indicator would be emails from Claimants' file transfer system showing when Claimants uploaded the documents. Claimants contend that those emails are Comptroller documents and that Staff's failure to provide them supports a negative inference contrary to Staff's position that the VARFs were provided after the agreed deadline to provide the VARFs to Staff. Claimants further argue that it is appropriate to assume that the VARFs were filed with the Comptroller shortly after the dates they were signed. However, the auditor's testimony, supported by the VARFs provided, establishes a prima facie case to support Staff's position regarding when the

VARFs were provided and that the dates were after the extended date agreed to by Staff. Claimants' contentions are not supported by source records to show different receipt dates by Staff. Claimants' inferences and assertions are insufficient to meet their evidentiary burden or support a grant of Claimants' refund claims.

For Claimants A and B, four years from the last date of the of the non-permitted periods was February 29, 2020, and September 30, 2017, respectively. The VARFs provided for those Claimants were denied for being provided after the statute of limitations and/or deficient. Some deficiencies include that the assignor vendor was not permitted to collect and remit or did not collect and remit sales and use tax to the Comptroller at the time of the purchases at issue. Another is that the assignee on the VARF is not either of the Claimants at issue and the corresponding invoices do not identify either Claimant. Moreover, the auditor found that some VARFs showed the wrong taxpayer number or did not show the execution date. Claimants contend that the deficiencies on the VARFs are clerical in nature and not enough to invalidate the contractual intent by the parties on the VARFs to assign the sellers' rights of refunds to Claimants. INDIVIDUAL B testified that Claimants' parent company acquired the companies indicated on the VARFs and invoices that are not Claimants; however, the testimony without corroborating evidence is insufficient to validate the VARFs. The totality of the deficiencies is sufficient to negate any assumed contractual intent. Given the insufficiency of the VARFs or the date that they were provided, the corresponding refund claims should be denied.

Furthermore, Claimants argue that VARFs are not required by statute and that the Comptroller's requirements for VARFs under 34 Texas Administrative Code § 3.325 are in violation of the statutory scheme and a violation of Claimants' due process rights. The ALJ disagrees. The Comptroller's administrative rules are presumed valid, and the Comptroller's authority in this area is limited only by the requirement that an adopted rule cannot conflict with the laws of this state or the Constitution of the United States. *See Lewis v. Jacksonville Bldg. & Loan Ass'n* , 540 S.W.2d 307 (Tex. 1976). The ALJ finds no such conflict in this case. Once in effect, administrative rules have the force and effect of legislation. *Id* . The agency is required to follow the unambiguous language of its own rules. *See Zimmer US, Inc. v. Combs* , 368 S.W.3d 579 (Tex. App.—Austin 2012, no pet.); *see also Tex. Indus. Energy Consumers v. Centerpoint Energy Houston Elec.* , 324 S.W.3d 95 (Tex. 2010).

Based on the foregoing, the ALJ recommends that the denial of the refund claims be upheld except as agreed to by Staff.

## III. FINDINGS OF FACT

1. During the periods at issue, CLAIMANT A, CLAIMANT B, and CLAIMANT C (collectively, Claimants), provided water solutions services in the crude oil and natural gas industry.

2. The combined group that includes Claimants (CLAIMANTS B & C) treats and disposes of water and sells the recovered oil.

3. During the claim period, Claimants did not sell the water that it treated.

4. Claimants obtain wastewater from primary energy or exploration and production companies and then process that water to produce sellable oil. Claimants dispose of the wastewater in company-owned saltwater waste disposal wells (SWDs).

5. CLAIMANTS B & C had over 50 facilities by the end of the refund period. All of the facilities have essentially the same layout and structure. Each facility has a small office site. Each facility is fully automated using a process logic control (PLC) system that Claimants operate remotely from CLAIMANT B &

C headquarters in CITY, STATE to remotely adjust flows, tank levels, and implement programming at local facilities. The facilities operate 24/7 except for maintenance shutdowns.

6. The raw wastewater arrives at Claimants' facility via truck or pipe. The wastewater passes through the intake manifold. Claimants take water samples near the manifold to adjust chemical dosing rates. Then the water goes into the sand tank where most of the solids fall out.

7. The mix of water and oil passes to the gun barrel tank where the water is separated from the oil. The mix is agitated using various pieces of equipment to facilitate separation of the water from the oil. Remaining solids also separate and accumulate at the bottom of the tank.

8. The separated oil is skimmed off the top of the gun barrel tank. The oil first enters a production tank where it is tested and chemicals, such as emulsion breakers and acids, are added to separate more oil. Sometimes the tank is heated to cause additional separation.

9. The mix of oil and water is referred to as "slop oil." Claimants inject chemicals and test the slop oil throughout the process to determine the percentage of water or solids opposed to the oil. Once they achieve the desired specifications, the oil is transferred to an oil tank referred to as a sell tank. The sellable oil is referred to as "skim oil." The remaining slop oil is transferred to a slop tank and possibly offered for sale.

10. Steel oil tanks are used interchangeably for production, storage of slop oil, and storage of skim oil.

11. The water passes from the gun barrel tank to water tanks. The last two water tanks are referred to as "suction tanks." The water is filtered again when it passes through the suction manifold to remove as many solids as possible. Claimants inject downhole chemicals, e.g., scale inhibitors and friction reducers, to help remove solids. Then the charge pump passes the water to the injection pump where it is injected downhole into a SWD.

12. There are straps on the piping of the intake manifold and the suction manifold where chemicals are injected. Chemicals are also injected into the tanks at all stages of the process. Demulsifiers are active separators that separate oil and water. This chemical group includes emulsifiers, demulsifiers, emulsion, and emulsion breakers. Claimants also use degreasers to polish the oil, i.e., separate impurities, and for well maintenance.

13. Solids control chemicals separate solids from the oil and water mix and from the treated water before it is injected downhole. These chemicals make the oil more marketable and include acid surfactants, iron sulfide, scavengers, iron sulfide dissolver, iron control, solids control, citric acid, muriatic acid, and scale inhibitors.

14. Acid surfactants are used at all places of the process and in well construction. They aid in pH control, iron control, solids control, drilling mud, drilling fluids, well preventive maintenance, and well construction. As part of maintenance for the facilities, Claimants use acid surfactants for separation of iron in the sand tank and for "acid jobs" where they wash the inside of the wellbore, the injection tubing, and the injection pumps.

15. Scale inhibitors are used in the sand tanks, connecting pipes, and pumping equipment to prevent iron build up.

16. Iron sulfide scavengers facilitate separation of solids and are used at the intake manifold and the suction manifold.

17. Corrosion prevention chemicals extend the life of the tanks, the internal parts of the tanks, pipes that connect the tanks, impellers in the pumps, and the injection tubing. This group of chemicals includes corrosion inhibitors, wetting agents, friction reducers, surfactants, acids, and bases. Wetting agents are used to reduce tension and friction loss. It creates viscosity on the internal parts. Because they facilitate the movement of

water from arrival to downhole injection as well as the movement of oil between tanks, the wetting agents are used in all tanks.

18. Claimants use biofoulants and antifoulants that prevent bacterial growth on the internals of the equipment and within the interface of the oil and water. Bacterial prevention makes the oil more marketable. Claimants use well completion chemicals and well maintenance chemicals to prevent the decline, failure, lapse, or deterioration of the SWDs. These chemicals aid well construction and include packer fluid, potassium chloride, sodium carbonate, sodium hydroxide, and sodium hydrochloride.

19. Chemicals are critical for the injection of the water into the well, into the lower formation, because they facilitate the final stage of filtration so that little to no solids enter the pumping equipment or the wellbore.

20. During the refund claim period, Claimants purchased services and equipment for updates and upgrades to their facilities.

21. Purchased equipment included tanks, tools, chemicals, and electricity for the PLC as well as general office areas.

22. Purchased services included labor for construction site setup, electrical work, general plumbing, and roustabout services performed by a general technician in the oil field with a wide range of capabilities. General labor purchased for the facilities include moving tools, loading tanks, and helping the crew build catwalks for inspection at the top of the tank. Claimants also purchased lighting equipment and associated labor for the night crews.

23. Claimant A was not permitted to collect sales and use tax from March 1, 2012, through February 29, 2016.

24. Claimant B was not permitted to collect sales and use tax from March 1, 2012, through September 30, 2013, but was permitted from October 1, 2013, through December 31, 2016.

25. Claimant C was not permitted to collect sales and use tax from March 1, 2012, through June 30, 2013, but was permitted from July 1, 2013, through March 31, 2016.

26. In August 2016, Claimants filed sales and use tax refund claims for the period of March 1, 2012, through February 29, 2016, and the Tax Division (Staff) of the Texas Comptroller of Public Accounts (Comptroller) conducted a refund audit to verify the claims.

27. Claimants provided Vendor Assignment of Right to Refund Forms (VARF), refund schedules, and corresponding invoices. VARFs were not provided for all purchases by other entities.

28. For the VARFs provided after the refund claim, the auditor received multiple copies of some VARFs and noted the earliest date that he received them on the VARF. For the VARFs that were not provided to him directly because the claims were with the Comptroller's Administrative Hearings Section, he did not notate the date received.

29. Some deficiencies with the VARFs include that the assignor vendor was not permitted to collect and remit or did not collect and remit sales and use tax to the Comptroller at the time of the purchases at issue.

30. Another VARF deficiency is that the assignee on the VARF is not either of the Claimants at issue and the corresponding invoices do not identify either of the Claimants.

31. Some VARFs showed the wrong taxpayer number or did not show the execution date.

32. On August 3, 2017, Staff agreed to extend the time that Claimants had to provide additional documentation, including VARFs, to August 16, 2017.

33. On August 18, 2017, Staff agreed to another extension of approximately two weeks.

34. On August 31, 2017, Staff sent Claimants email correspondence confirming that review had been completed based on the documentation provided and that the claims would be denied in full.

35. Claimants acknowledge that they have not provided VARFs from vendors covering all transactions for non-permitted periods.

36. Because Claimants were not permitted for all periods within the claim period, the auditor could not perform a tax account reconciliation.

37. The invoices provided showed purchases of pumps, piping, other equipment and repairs to real property or tangible personal property. The invoices also show rentals of generators, mobile offices, and port-a-johns.

38. INDIVIDUAL B testified, and the invoices provided show, that Claimants purchased 1000-barrel tanks, 750-barrel tanks, and 400-barrel tanks.

39. On October 31, 2017, Staff notified Claimants via official letter that their refund claims were denied in full.

40. Claimants timely requested a refund hearing and provided additional documentation for review.

41. Claimants excluded purchases of port-a-johns as well as purchases from COMPANY B in SOAH Docket No. 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.26 and COMPANY C in SOAH Docket Nos. 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.26 and 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.26.

42. Staff agreed to refund amounts shown in its updated contested items spreadsheet in Staff's Exhibit 10 to SOAH Docket No. 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.26.

43. Staff referred the contested cases to the State Office of Administrative Hearings (SOAH) and, on October 1, 2021, issued Notices of Hearing to Claimant. Each notice contained a statement of the date, time, and location of the hearing, the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the factual matters asserted, or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency.

44. On November 1, 2021, the Administrative Law Judge issued Order No. 1, combining the contested cases for purposes of issuing a single Proposal for Decision and including the requirements for the oral hearing by videoconference.

45. The joined hearing convened on May 12 and 13, 2022.

46. The contested case record closed on June 6, 2022.

## IV. CONCLUSIONS OF LAW

1. The Comptroller has jurisdiction over these matters. *See* Tex. Tax Code ch. 111.

2. SOAH has jurisdiction over matters related to the hearing, including the authority to issue a proposal for decision with findings of fact and conclusions of law. *See* Tex. Gov't Code ch. 2003.

3. Staff provided a proper and timely notice of hearing. *See* Tex. Gov't Code ch. 2001; Tex. Tax Code § 111.105.

4. During the administrative hearing process, a person claiming a refund under Section 111.104 must submit documentation to enable the comptroller to verify the claim for refund. The comptroller may issue a notice of

demand that all evidence to support the claim for refund must be produced before the expiration of a specified date in the notice. The specified date in the notice may not be earlier than 180 days after the date the refund is claimed. The comptroller may not consider evidence produced after the specified date in the notice in an administrative hearing. Tex. Tax Code § 111.105(e).

5. Pursuant to Tax Code, §111.105(e), the Tax Hearings Attorney may issue with the Position Letter a written notice of demand that all documentary evidence to support facts or contentions related to a taxpayer's claim for refund be produced before the expiration of a specified date in the notice. The specified date may not be less than 180 days from the date of the original refund claim, and not less than 60 days from the date of the notice. The deadline to respond to the notice of demand may be extended by the Tax Hearings Attorney. A taxpayer who fails to produce the requested documents by the specified date may not introduce in evidence any of the documents that were not timely produced. The assigned ALJ cannot consider in SOAH proceedings documents that were not timely produced. 34 Tex. Tax Code § 1.12(c).

6. If the Comptroller finds that an amount of tax, penalty, or interest has been unlawfully or erroneously collected, the Comptroller shall credit or refund the amount. Tex. Tax Code § 111.104(a).

7. When a taxpayer requests a refund, it must establish by a preponderance of evidence that taxes were erroneously collected or paid. *See, e.g.* , 34 Tex. Admin. Code § 1.26(e); Comptroller's Decision No. 109,787 (2015).

8. If a claimant relies on an exemption to establish the error, then it must provide clear and convincing evidence. 34 Tex. Admin. Code § 1.26(c); Comptroller's Decision No. 100,477 (2012).

9. Exemptions from taxation are subject to strict construction since they are the antithesis of equality and uniformity and because they place a greater burden on other taxpaying businesses and individuals. *See Bullock v. National BancShares Corp.* , 584 S.W.2d 268 (Tex. 1979).

10. An exemption cannot be raised by implication, but must affirmatively appear, and all doubts are resolved in favor of the taxing authority and against a claimant. *See, e.g.* , Comptroller's Decision Nos. 41,522, 44,260 (2010).

11. Sellers of taxable items and purchasers who store, use, or consume taxable items in this state shall keep books, papers, and records in the form the Comptroller requires. Tex. Tax Code § 151.025(a); 34 Tex. Admin. Code § 3.281(a)(1).

12. Records must reflect total purchases of taxable items and must substantiate any claimed deductions or exclusions authorized by law. Tex. Tax Code § 151.025(a)(3); 34 Tex. Admin. Code § 3.281(b).

13. Claimants must produce contemporaneous records and supporting documentation appropriate to the tax or fee for the transactions in question to substantiate and enable verification of the taxpayer's claim related to the amount of tax, penalty, or interest to be assessed, collected, or refunded. 34 Tex. Admin. Code § 1.26(a); *see also* Tex. Tax Code § 111.0041.

14. Pursuant to 34 Texas Administrative Code § 3.325(a)(4)(C), a person requesting a refund from the Comptroller is required to include information about each transaction upon which a refund is requested such as: (i) the purchaser or seller's name as appropriate; (ii) invoice number, if applicable; (iii) date of transaction; (iv) description of the item(s) purchased or sold; (v) specific reason for the refund, such as applicable statutory authority; (vi) purchase or sale amount subject to refund; (viii) identification of all local jurisdictions to which tax remitted; and (ix) if requesting a refund for taxes paid in error to a permitted seller, the seller's name, address and sales tax permit number or information that allows the comptroller to identify the seller's sales tax

permit number. Such documentation may include invoices, vouchers, checks, shipping records, contracts, or other equivalent records. Tex. Tax Code § 111.0041(c); 34 Tex. Admin. Code § 3.325(a)(4)(E).

15. A taxpayer is generally required to support its contentions by source records. Comptroller's Decision No. 112,607 (2019).

16. Factual assertions in pleadings are not evidence. *See, e.g.* , Comptroller's Decision No. 111,587 (2015).

17. Bare assertions are not a substitute for evidence and are insufficient to establish audit error. Comptroller's Decision No. 115,999 (2020), *citing Baker v. Bullock* , 529 S.W.2d 279 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.); *see also* Comptroller's Decision No. 107,916 (2013).

18. The Comptroller has held that summary documents that are created by the taxpayer and submitted without underlying support are tantamount to bare assertions; i.e., they are not considered evidence. *See, e.g.* , Comptroller's Decision Nos. 115,535 (2020), 102,488 (2010).

19. Claimants cannot satisfy their burden of proof with uncorroborated testimony on the ultimate issue to be proven. *See* Tex. Tax Code § 151.025; 34 Tex. Admin. Code § 3.281(b); *see also, e.g.* , Comptroller's Decision Nos. 115, 398 (2020), 114,570 (2019), 109,188 (2017), 104,278 (2012).

20. The long-standing law in Texas presumes that the party in possession of evidence peculiarly within its control has the burden of producing that evidence. *See Watson v. Brazos Elec. Power Corp., Inc.* , 918 S.W.2d 639, 643 (Tex. App.—Waco 1996, writ denied) (failure to produce evidence within a party's control raises the presumption that if produced it would operate against him, and every intendment will be in favor of the opposite party); *Brewer v. Dowling* , 862 S.W.2d 156, 159 (Tex. App.—Fort Worth 1993, writ denied); *H. E. Butt Grocery Co. v. Bruner* , 530 S.W.2d 340, 343 (Tex. Civ. App.—Waco 1975, writ dism'd).

21. Texas imposes a tax on each sale of a taxable item in this state. Tex. Tax Code § 151.051.

22. The term "taxable item" includes tangible personal property and taxable services. Tex. Tax Code § 151.010.

23. Unless an exemption applies, all sales of tangible personal property in this state are taxable. *See* Tex. Tax Code § 151.051 ; Comptroller's Decision No. 116,506 (2020).

24. Taxable services are specifically enumerated in Texas Tax Code § 151.0101(a) and include: repair, remodeling, maintenance, and restoration of tangible personal property; real property services; and real property repair and remodeling. Tex. Tax Code § 151.0101(a)(5), (11), (13).

25. The Tax Code provides an exemption for tangible personal property that will be sold, leased, or rented to, or stored, used, or consumed by a manufacturer if the tangible personal property is directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale and the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to the product being manufactured, processed, or fabricated for ultimate sale. Tex. Tax Code § 151.318(a)(2)(A).

26. The exemption includes any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured, processed, or fabricated for ultimate sale. Tex. Tax Code § 151.318(a)(2)(B).

27. The Tax Code provides an exemption for tangible personal property used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process; to a quality control

process that tests tangible personal property that is being manufactured, processed, or fabricated for ultimate sale; or to comply with federal, state, or local laws or rules that establish requirements related to public health. Tex. Tax Code § 151.318(a)(5), (8), (10).

28. Processing is an activity performed during manufacturing. 34 Tex. Admin. Code § 3.300(a)(9)(B).

29. Processing is the physical application of the materials and labor necessary to modify or to change the characteristics of tangible personal property. 34 Tex. Admin. Code § 3.300(a)(10).

30. Manufacturing ends with the completion of tangible personal property. 34 Tex. Admin. Code § 3.300(a)(9).

31. Completion of production means the tangible personal property has all the physical properties, including packaging, if any, that it has when transferred by the manufacturer to another. 34 Tex. Admin. Code § 3.300(a)(9)(A).

32. The statute exempts in-process flow through tanks, electronic control room equipment, computerized control units, pumps, compressors, and hydraulic units, that are used to power, supply, support, or control equipment that qualifies for exemption under Texas Tax Code § 151.318(a)(2) or (5) or to generate electricity. Tex. Tax Code § 151.318(a)(4).

33. The exemption covers lubricants, chemicals, chemical compounds, gases, or liquids that are used or consumed during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if their use or consumption is necessary and essential to prevent the decline, failure, lapse, or deterioration of equipment exempted by this section. Tex. Tax Code § 151.318(a)(6).

34. The exemption includes chemicals, catalysts, and other materials that are used during a manufacturing, processing, or fabrication operation to produce or induce a chemical or physical change, to remove impurities, or to make the product more marketable. Tex. Tax Code § 151.318(b)(1).

35. Tangible personal property specifically installed to reduce water use and wastewater flow volumes from the manufacturing, processing, fabrication, or repair operation; reuse and recycle wastewater streams generated within the manufacturing, processing, fabrication, or repair operation; or treat wastewater from another industrial or municipal source for the purpose of replacing existing freshwater sources in the manufacturing, processing, fabrication, or repair operation is exempt. Tex. Tax Code § 151.318(a)(11).

36. Services performed directly on the product being manufactured prior to its distribution for sale and for the purpose of making the product more marketable are exempt. Tex. Tax Code § 151.318(a)(3).

37. But for exceptions that do not apply to the instant matter, the exemption covers the purchase of a service that is performed on tangible personal property that would be exempted because of the nature of the property, its use, or combination of its nature and use. Tex. Tax Code § 151.3111.

38. Neither the SWDs nor chemicals used or services performed on the SWDs are eligible for the manufacturing exemption.

39. Claimants have not established by clear and convincing evidence that the SWDs facilitate water reduction, the wastewater flows of their oil processing, water reuse, water recycling, or the replacement of existing freshwater sources in their operations as required by Texas Tax Code § 151.318(a)(11).

40. If a manufacturer uses exempt property for a nonexempt purpose (i.e., a purpose other than the purpose that qualified the property for exemption under Tex. Tax Code § 151.318 manufacturing or fabricating tangible personal property ), the property is subject to tax for the divergent use. Tex. Tax Code § 151.3181.

41. Tax is due for the period of time the property is used in a nonexempt (divergent) manner or on the full purchase price of the property. 34 Tex. Admin. Code § 3.300(k).

42. "Divergent use" means the use of property in a manner or for a purpose other than the manner or purpose that qualified the purchase for exemption. Tex. Tax Code § 151.3181(a)(1).

43. Machinery and equipment or supplies, to the extent not otherwise tax exempted under Texas Tax Code § 151.318, used to maintain or store tangible personal property are not exempt from tax. Tex. Tax Code § 151.318(c)(4).

44. Except for factors that do not apply here, taxable intraplant transportation equipment includes equipment that is used to move a product or raw material in connection with the manufacturing process, and specifically including all piping, conveyor systems, and related pumps (unless otherwise exempted), meters, valves, or rollers. 34 Tex. Admin. Code § 3.300(c)(5); *see also* Tex. Tax Code § 151.318(c)(1).

45. Intraplant transportation equipment is taxable even if manufacturing or processing activities (such as cooling, mixing, or pollution containment) occur during the transportation of product or component parts of the product. 34 Tex. Admin. Code § 3.300(c)(5).

46. Claimants have not accounted for the divergent use of the items purchased in the remaining contested transactions.

47. Claimants' contention that remaining purchases of services are nontaxable or tax exempt should be denied.

48. Tanks with a capacity over 500 barrels are considered real property. *See* 34 Tex. Admin. Code § 3.324(e)(2).

49. The manufacturing exemption applies to purchases of services and tangible personal property, not real property. Tex. Tax Code § 151.318.

50. The sale for resale of a taxable item is exempted from sales tax. Tex. Tax Code § 151.302(a).

51. A sale for resale is the sale of a taxable item to a purchaser who acquires the taxable item for the purpose of reselling it as a taxable item in the United States or Mexico in the normal course of business in the form or condition in which it is acquired; or as an attachment to or as an integral part of another taxable item. 34 Tex. Admin. Code § 3.285(b)(1)(A).

52. Since certain chemicals are oil soluble and remain in the product flow after injection, the well operator may purchase those chemicals separately from the service provider and issue a resale certificate in lieu of tax on the charge for the chemicals. 34 Tex. Admin. Code§ 3.324(h)(1).

53. The injection of chemicals to stimulate production or remove impurities from the product being removed such as acid, emulsifiers, or nitrogen is a nontaxable service. The service company is the consumer of all chemicals pumped down hole and must pay tax at the time of purchase. 34 Tex. Admin. Code § 3.324(h)(2).

54. Claimants did not establish by clear and convincing evidence which specific chemicals remain with the oil and in what proportions.

55. Claimants failed to demonstrate they acquired the chemicals for the purpose of reselling them and failed to show which, if any, chemicals were resold.

56. Claimants failed to show by clear and convincing evidence that any of the requested refund amounts represent purchases eligible for the sale for resale exemption.

57. A permitted purchaser may amend a return for the period in which an overpayment was made, file a refund claim with the comptroller according to the requirements of 34 Texas Administrative Code § 3.325(a)(4), or take a credit on a future sales and use tax return filed by the purchaser for taxes paid in error to a permitted seller. The permitted purchaser must have been permitted at the time the tax paid in error was due and payable in order to claim a refund directly from the comptroller, amend a return for the period in which an overpayment was made, or to take a credit on a future sales and use tax return. 34 Tex. Admin. Code § 3.325(a)(3)(A).

58. A person who requests a refund from the comptroller must submit supporting documentation to verify any refund claimed or credit taken, such as copies of invoices, cancelled checks, and executed contracts. 34 Tex. Admin. Code § 3.325(a)(4)(E).

59. The Comptroller's refund sales tax verification procedures direct the auditor to verify that tax was paid or accrued by reviewing cancelled checks, the claimant's accounts payable register, and accrual accounts. *See, e.g.* , Comptroller's Decision Nos. 111,334, 111,335 (2017), 100,786, 100,788, 100,789 (2013).

60. Claimants must perform a sales tax reconciliation to show that they had not previously claimed a credit for any of the amounts for which they seek a refund. *See* Comptroller's Decision Nos. 111,334, 111,335 (2017), 100,786, 100,788, 100,789 (2013).

61. In the absence of a sales tax reconciliation or source records establishing that Claimants did not previously claim a credit for requested tax refund amounts while they were permitted, Claimants' corresponding refund claims should be denied except as agreed by Staff.

62. A tax refund claim may be filed with the comptroller only by the person who directly paid the tax to this state or by the person's attorney, assignee, or other successor. Tex. Tax Code § 111.104(b).

63. A person who does not have a sales and use tax permit and who has paid tax in error to a permitted seller may request a refund only from the permitted seller to whom the tax was paid. 34 Tex. Admin. Code § 3.325(a)(1).

64. A permitted seller may assign its right to refund to the purchaser, who may then request a refund directly from the comptroller that must meet the requirements listed in 34 Texas Administrative Code § 3.325(a)(4). *See* 34 Tex. Admin. Code § 3.325(a)(1), (3)(A).

65. A refund claim must be submitted within the applicable limitations period. 34 Texas Administrative Code § 3.325(a)(4)(D).

66. A claim for refund must be made within four years from the date on which the tax was due and payable as provided by Tex. Tax Code §151.401. 34 Tex. Admin. Code § 3.325(b)(1).

67. If the claim is being filed by a non-permitted person who is an assignee of a refund that may be owed, the person must include a VARF with the refund claim to toll the statute of limitations. 34 Tex. Admin. Code § 3.325(b)(10)(A)(iii).

68. Before the expiration of the statute of limitations, the comptroller and a taxpayer may agree in writing to extend the limitation period in accordance with Tax Code, §111.203. 34 Tex. Admin. Code § 3.325(b)(4).

69. Any refund request pertaining to periods for which limitations have been extended must be made prior to the expiration date of the agreement. 34 Tex. Admin. Code § 3.325(b)(4).

70. Failure to file a claim within the limitations prescribed by this section constitutes a waiver of any demand against the state on account of the overpayment. 34 Tex. Admin. Code § 3.325(b)(6).

71. The postmark date or its equivalent on a refund request determines when a refund is claimed. 34 Tex. Admin. Code § 3.325(d)(1).

72. The Comptroller's administrative rules are presumed valid, and the Comptroller's authority in this area is limited only by the requirement that an adopted rule cannot conflict with the laws of this state or the Constitution of the United States. Once in effect, administrative rules have the force and effect of legislation. *See Lewis v. Jacksonville Bldg. & Loan Ass'n* , 540 S.W.2d 307 (Tex. 1976).

73. The agency is required to follow the unambiguous language of its own rules. *See Zimmer US, Inc. v. Combs* , 368 S.W.3d 579 (Tex. App.—Austin 2012, no pet.); *see also, Tex. Indus. Energy Consumers v. Centerpoint Energy Houston Elec.* , 324 S.W.3d 95 (Tex. 2010).

74. Claimants have not established by clear and convincing evidence that an exemption from tax supports additional refund amounts.

75. Claimants have not met their burden to establish by a preponderance of the evidence that Staff's partial denial of their refund claims was erroneous.

76. The ALJ recommends that the denial of the refund claims be upheld except as agreed to by Staff.

**SIGNED September 26, 2022.**

**KENESHIA WASHINGTON**
**ADMINISTRATIVE LAW JUDGE**
**STATE OFFICE OF ADMINISTRATIVE HEARINGS**

**ENDNOTES:**

[1] The date calculated is 25 days after this decision is signed. *See* APA, Tex. Gov't Code § 2001.146(a) ; S.B. 1095 , Acts 2017, 85th Leg.   For additional guidance, refer to the Frequently Asked Questions Related to Motions for Rehearing, found here: http://comptroller.texas.gov/taxes/publications/96-1789.pdf

[2] *See* Tex. Gov't Code § 2003.101(e) and (f).

[3] Claimants numbered their exhibits using A – E. The ALJ renumbered the exhibits for ease of reference.

ACCESSION NUMBER: 202301025H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2023-01-11
TAX TYPE: SALES

# APPENDIX O

200708967H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 200708967H

HEARING NO.  43,944

RE: **************
TAXPAYER NO.: **************
AUDIT OFFICE: **************
AUDIT PERIOD: NOVEMBER 1, 1997 THROUGH JULY 31, 2001

SALES AND USE TAX/RFD

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

ANNE K. PEREZ
Administrative Law Judge

JOHN D. BOSTICK
Representing Tax Division

**************
Representing Claimant

COMPTROLLER'S DECISION

PRELIMINARY DISCUSSION:

At Claimant's request, this decision is based upon the written submissions of the parties.

The Administrative Law Judge took official notice of all records of the Comptroller's office that pertain to the Claimant and the issues involved in the case.  Unless otherwise indicated, all Section references are to Title 2, Texas Tax Code Ann. (Vernon 2002).  References to Rules are to sections of Title 34, Texas Administrative Code.

No exceptions were filed to the Second Amended Proposed Comptroller's Decision that was issued for this hearing on November 1, 2006.

CLAIMANT'S CONTENTIONS:

1. Claimant contends that its bucket elevators and air slides are exempt because they are components of a single item of manufacturing equipment.

2. Claimant contends that repair and replacement parts for its slewing stacker and reclaimer are exempt because those machines perform a mixing or blending function that is an intermediate step of an integrated manufacturing process.

3. Claimant contends that conveyors in its dust control system are exempt because they are components of an integrated pollution control system.

FINDINGS OF FACT:

1. **************, Claimant, is a manufacturer of Portland cement with a quarry and manufacturing facility located in **************, Texas.

2. Claimant requested a refund of Texas sales and use taxes paid between November 1, 1997 and July 31, 2001 ("Refund Period").  The Comptroller granted part of the refund claim but denied the remaining portion.  Claimant requested a hearing on the partial refund denial, resulting in this proceeding.

3. During the Refund Period, Claimant purchased and paid Texas sales tax on the following items: bucket elevators, air slides, conveyors for its dust control system, and repair and replacement parts for its slewing stacker and its reclaimer.

4. Claimant's manufacturing process for cement consists of the following steps: (a) shale (pre-sorted by quality and content) is crushed, (b) various shales are measured and sorted into piles by the slewing stacker, and then deposited on conveyors by the reclaimer, (c) other materials such as limestone, iron ore, and sand are blended with the shale at the Blending Silo, (d) the material [ENDNOTE: (1)] that is not properly blended is re-circulated back to the beginning of the Blending Silo by way of air slides and bucket elevators, while acceptable material is transported to the preheater tower, (e) the materials enter a high-temperature kiln, passing through several temperature zones that chemically alter the particles into pellets ("clinker"), (f) the material is transported by air slides to the clinker cooler, (g) air slides and bucket elevators move the material through the Finish Mill, where it is ground by steel balls to a fine powder, (g) the powder is transported via air slides and bucket elevators to the Classifier, (i) the Classifier separates out properly-ground particles from those of improper size or consistency, (j) the Classifier recirculates too-large particles back to the beginning of the Finish Mill by way of air slides and bucket elevators, while acceptable material is dropped through a sieve and transported on conveyors to cement storage, and (k) dry cement meeting product specifications is stored, packaged, and shipped to Claimant's customers, who mix it with water to form concrete.

5. Prior to crushing, shale is segregated by quality and content in a storage area at Claimant's facility, since the chemical content of dry cement must be formulated in accordance with the customer's desired use (e.g, highway construction, building construction).  The shale is crushed twice, and then moved to an enclosed area where the slewing stacker piles crushed shale in exact proportions according to size, color, consistency, and chemical content. The reclaimer, which is computer-programmed with a "recipe," selects an exact mixture of the shale from the various piles and deposits it on a conveyor for

further processing.

6. The crushing of the shale causes a physical change to the shale and is the beginning of Claimant's manufacturing process.  But neither the slewing stacker nor the reclaimer causes a physical or chemical change to the shale.  The slewing stacker moves crushed shale with different chemical and physical properties into separate piles, according to specific proportions.  The reclaimer, assisted by a computer program, selects an exact mixture of shale from those piles and deposits it on conveyors.  The slewing stacker and the reclaimer both measure and "dispense" the desired "recipe" of shale, but they do not mix or blend the shale.

7. Air slides and bucket elevators are used to transport the material between different pieces of machinery or equipment in the cement manufacturing process.  An air slide is a down-ward flowing, enclosed tube through which raw material flows at various points in the manufacturing process, aided by gravity and air supplies in the tube.  The air flow also prevents product build-up in the slide.  Raw particles are discharged from air slides onto a bucket elevator, an enclosed space that conveys the material from lower to higher elevations.  Air slides and bucket elevators are the functional equivalent of conveyors or piping.

8. Air slides move the raw materials through the Finish Mill onto a bucket elevator.  Once the material is ground to the proper size and consistency in the Finish Mill, it is deposited from the bucket elevator onto air slides that move it to the Classifier.  The Classifier separates out properly-ground particles from those of improper size or consistency; acceptable material is dropped through a sieve and moved to cement storage via conveyors, while too-large particles are repeatedly recirculated back to the beginning of the Finish Mill through air slides and bucket elevators.  The material is typically recycled two or three times through the Finish Mill before it meets product specifications.  The Finish Mill makes or causes a chemical or physical change to the material and is exempt equipment.

9. The Classifier does not make or cause a physical or chemical change to the particles emerging from the Finish Mill.  The sole purpose of the Classifier is to separate out particles that have been reduced to the proper size and consistency from particles that require further grinding.

10. Improperly blended product is also recycled back through the Blending Silo.  Again, the slewing stacker moves shale of different chemical and physical properties into piles.  The reclaimer picks up shale from the various piles according to the appropriate "recipe" and deposits the shale on to a conveyor, which transports it to the Blending Silo.  It is here that the shale is blended with materials such as limestone, iron ore, and sand.  The material ("raw meal") is then directed to another piece of equipment, the "Pfister Feeder." [ENDNOTE: (2)]

11.  The Pfister Feeder does not make or cause a chemical or physical change to the raw meal; rather, its sole purpose is to weigh and measure the material exiting the Blending Silo, which permits a plant operator to determine whether the material is of the proper consistency or rate to enter the preheater tower/kiln.  Improperly blended material is re-circulated back to the beginning of the Blending Silo via air slides and bucket elevators, while acceptable material is transported to the preheater tower/kiln.

12. Claimant employs a dust control system, comprised of a bag filtering system that removes hot gases and dust out of the kiln.  Air slides transport the dust and gases onto conveyors that move them to the baghouse.  Once the gases are

removed in the baghouse other conveyors transport the dust away from the area.

13. The bag house is pollution control equipment.  Its removal of potentially harmful emissions during the dry cement manufacturing process is necessary and essential to a pollution control process.

14. Photographs marked "Air Slides Convyr/Baghouse" included in Claimant's submission dated June 10, 2004, reflect that the conveyors are attached to the Baghouse, but they do not establish that the conveyors are a component part of the Baghouse.  A photograph of the Baghouse included in Claimant's exceptions reinforces this conclusion.

15. The photographs included in Claimant's submission dated June 10, 2004, as well as those presented on exceptions, depict conveyors, bucket elevators, and air slides between and/or attached to discrete pieces of equipment.  The photographs do not reflect that certain machines are so closely connected that they form a single item of manufacturing equipment.

DISCUSSION AND CONCLUSIONS OF LAW:

Claimant's contentions should be granted in part and denied in part.

The manufacturing exemption that controls this case is found in Chapter 151 of the Tax Code.  Section 151.318(a)(2) exempts from tax tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of a product for ultimate sale, if the tangible personal property is necessary and essential to that operation.  Effective October 1, 1997 (and applicable to Claimant's Refund Period) the exemption requires that the tangible personal property directly make or cause a chemical or physical change to the product being manufactured or to a component part thereof.  See Section 151.318(a)(2)(A) and (B).

Several other amendments to Section 151.318 are also relevant.  As of October 1, 1997, the exemption includes tangible personal property used in actual manufacturing if it is necessary and essential to a pollution control process.  See Section 151.318(a)(5).  However, effective the same date the Legislature broadened the exclusion for intraplant transportation equipment, specifically providing that the manufacturing exemption does not include "intraplant transportation equipment, including intraplant transportation equipment used to move a product or raw material in connection with the manufacturing process and specifically including all piping and conveyor systems …".  See Section 151.318(c)(1).  The following items were not subject to the exclusion and remain exempt: "piping or conveyor systems that are a component part of a single item of manufacturing equipment or pollution control equipment eligible for exemption under Section 151.318(a)(2), (a)(4), or (a)(5)."  (Emphasis supplied).  The 1997 amendments also clarified that a taxpayer has the burden to prove the applicability of the manufacturing exemption and that no exclusion applies.  See Section 151.318(r).  Subsection (r) is in keeping with the established principles that statutory exemptions are strictly construed against the taxpayer, that exemptions cannot be raised by implication, and that all doubts regarding an exemption's applicability will be resolved in favor of the taxing authority.  See North Alamo Water Supply Corp. v. Willacy County Appraisal Dist., 804 S. W. 2d 894, 899 (Tex. 1991); Bullock v. National Bancshares Corp., 584 S.W.2d 268, 272 (Tex. 1979); Rule 1.40(2)(A).

Also pertinent are subsequent amendments to Section 151.318 that became effective on October 1, 1999.  The substance of subsection 151.318(c)(1) remained the same but was renumbered as (c)(1)(A).  The Legislature added

subsections (c)(1)(B) and (C), which clarify when piping in a manufacturing process will be exempt.  Section 151.318(c)(1)(B) exempts "piping through which the product or ... preliminary product that will become ... part of the product is recycled or circulated in a loop between the single item of manufacturing equipment and the ancillary equipment [that supports it] if the ... manufacturing equipment and the ancillary equipment operate together to perform a specific step in the manufacturing process ...". (Emphasis supplied).  And Section 151.318(c)(1)(C) exempts "piping through which the product or ... preliminary product that will become ... part of the product is recycled back to another single item of manufacturing equipment and its ancillary equipment in the same manufacturing process ...".  (Emphasis supplied).  And finally, the Legislature in subsection (f) clarified under what circumstances piping will be considered a component part of a "single item of manufacturing equipment," thus determining when the exemption applies.  Section 151.318(f) is set forth below in its entirety:

Section 151.318.  Property Used in Manufacturing

(f)For purposes of Subsection (c)(1), piping through which material is transported forward from one single item of manufacturing equipment and its ancillary support equipment to another single item of manufacturing equipment and its ancillary support equipment is not considered a component part of a single item of manufacturing equipment.  An integrated group of manufacturing and processing machines and ancillary equipment that operate together to create or produce the product or an intermediate or preliminary product that will become an ingredient or component part of the product is not a single item of manufacturing equipment.

Claimant's manufacturing process was originally envisioned as consisting of discrete pieces of manufacturing machinery, with air slides, conveyors, and bucket elevators positioned between them for the purpose of transporting product from one separate machine to another.  Thus, Claimant's manufacturing equipment was concluded to be "an integrated group of manufacturing and processing machines and ancillary equipment that operate together to produce" dry cement, in accordance with Section 151.318(f).  All of Claimant's air slides and bucket elevators (which are enclosed, akin to piping, and are functionally equivalent to conveyors) were considered subject to the intraplant transportation exclusion.

On exceptions, Claimant furnished additional photographic evidence and the affidavit testimony of ************** (CB), the Maintenance Manager at Claimant's ************** plant.  The Tax Division did not object to the introduction of this evidence or to its substance.  With respect to the disputed bucket elevators and air slides at the Finish Mill, Claimant's evidence establishes that (a) the Classifier is a separate piece of equipment from the Finish Mill, (b) the Classifier itself does not cause a physical or chemical change to the product, (c) the Classifier's sole function is to determine whether particles coming out of the Finish Mill are properly ground up, and (d) with respect to improperly sized particles, the Classifier recycles them back to the beginning of the Finish Mill through air slides and bucket elevators, while it directs acceptable material on through the production process.  Based on this evidence, Claimant argued that the Classifier was ancillary equipment that supported only the Finish Mill and that, together, the Classifier and the Finish Mill performed a single step in Claimant's manufacturing process, that of properly sizing the particles.  Accordingly, Claimant asserted that the air slides and bucket elevators between the Classifier and the Finish Mill were exempt under Section 151.318(c)(1)(B). [ENDNOTE: (3)]

While piping and conveyors utilized in a manufacturing process are generally considered non-exempt intraplant transportation equipment, Section 151.318(c)(1)(B) exempts piping if it is used to recycle or circulate the product (or an ingredient thereof) in a loop between a single item of manufacturing equipment and the ancillary equipment that supports it if the manufacturing equipment and the ancillary equipment "operate together to perform a specific step in the manufacturing process…."  It is concluded, however, that Section 151.318(c)(1)(B) does not apply to the air slides and bucket elevators between the Classifier and the Finish Mill.  Simply put, those pieces of equipment perform different functions that are not "a specific step in the manufacturing process."  The Classifier "sorts" properly-sized particles from improperly-sized particles and routes the latter back to the Finish Mill; the Classifier does not change the size or consistency of the material.  In contrast, the Finish Mill grinds raw material to a different size and consistency, which is a separate, discrete function in the manufacturing process.

Claimant's argument concerning the Blending Silo (exempt manufacturing equipment) and the Pfister Feeder is similar and is rejected for the same reasons.   Claimant asserted on exceptions that the Pfister Feeder is an ancillary piece of equipment that supports a single item of manufacturing equipment, the Blending Silo, and that, together, the equipment performs a specific step in the manufacturing process: the proper blending of shale, limestone, sand, etc.  Accordingly, Claimant urges that the air slides and bucket elevators between the Pfister Feeder and the Blending Silo are exempt under Section 151.318(c)(1)(B).

The evidence presented on exceptions establishes how "raw meal" exiting the Blending Silo is directed to the Pfister Feeder, which weighs and measures the material; the resulting information allows a plant operator to determine whether the raw meal is of the proper consistency or rate to enter the preheater tower/kiln.  Improperly blended material is re-circulated back to the beginning of the Blending Silo via air slides and bucket elevators, while acceptable material is transported to the preheater tower/kiln.

Again, the evidence suggests that the Pfister Feeder and the Blending Silo perform different functions that are not "a specific step in the manufacturing process."  The Pfister Feeder simply weighs and measures the material and based on that information, the operator determines whether further blending is needed.  The Blending Silo performs a different step entirely: the actual blending of raw materials.

That said, the Classifier itself appears to qualify under Section 151.318(a)(8), which exempts from tax "tangible personal property used … during actual manufacturing [of the product] for ultimate sale if the use … of the property is necessary and essential to a quality control process that tests [the product being manufactured for sale].  The Classifier sorts out material of sufficient quality (particle size and consistency) and directs it onward through the production process, while it recycles improperly ground-up particles back to the Finish Mill for further processing.  The Classifier is necessary and essential to a quality control process and consequently, the air slides and bucket elevators that move the materials from the Classifier back to the Finish Mill qualify under Section 151.318(c)(1)(C) (exempting "piping through which the product or…preliminary product that will become…part of the product is recycled back to another single item of manufacturing equipment and its ancillary equipment in the same manufacturing process….")

The Pfister Feeder (like the Classifier) would also qualify for exemption under Section 151.318(a)(8).  The sole purpose of the Pfister Feeder is to weigh and

measure the material exiting the Blending Silo.  The plant operator relies on this information to make a quality control decision, namely, whether the material is of the proper consistency or rate to enter the preheater tower/kiln, or whether it needs to be recirculated back through Blending Silo.  The Pfister Feeder is used during actual manufacturing, and it is necessary and essential to a quality control process that tests the product held for ultimate sale.  Thus, the air slides and elevators that loop back from the Pfister Feeder to the Blending Silo are exempt under Section 151.318(c)(1)(C).

With respect to the slewing stacker and reclaimer, Claimant argues that their repair and replacement parts are exempt because those machines perform a mixing or blending function that is an intermediate step of an integrated manufacturing process.  According to Claimant, State Tax Automated Research (STAR) Accession No. 200203869L (2002) indicates the Comptroller views "mixing" as an exempt function.

STAR Accession No. 200203869L considered whether various types of restaurant equipment qualify as exempt food processing equipment.  The taxability letter provides that processing equipment and machinery used to cook, mix, chop, or blend food products held for ultimate sale are exempt from sales tax.  Claimant's use of a slewing stacker and reclaimer in its manufacturing process is distinguishable from the use of restaurant equipment.  The slewing stacker merely piles pre-sorted shale in exact proportions according to size, color, consistency, and chemical content.  The computer-operated reclaimer then selects an exact mixture of the shale from the various piles and deposits it on a conveyor for further processing.  Unlike a dough mixer that kneads the dough prior to baking, a slewing stacker and reclaimer simply "dispense" the raw materials according to a pre-ordained "recipe."  The slewing stacker and reclaimer do not "directly make or cause a physical or chemical change" to the product ultimately sold (dry cement) or to a component part thereof, as required by Section 151.318(a)(2).  Since they are not exempt manufacturing equipment, their repair and replacement parts are taxable.

Again, the manufacturing exemption was significantly narrowed, effective October 1, 1997.  After that date tangible personal property is not exempt under Section 151.318(a)(2) unless it directly makes or causes a chemical or physical change to the product being manufactured or to a component part thereof.  See Section 151.318(a)(2)(A) and (B).  Prior to October 1, 1997, Section 151.318(a)(2) required only that the tangible personal property be used or consumed in or during actual manufacturing of a product held for ultimate sale, and that the tangible personal property be necessary and essential to the manufacturing operation.  Comptroller policy regarding sorting activities should be reviewed in light of this statutory change.

Policy letters issued in 1995 and 1996 that consider whether sorting, washing, and shaking procedures are exempt under Section 151.318 focus on the beginning of the manufacturing process as the determining benchmark.  That is, if the sorting activity occurs after commencement of the manufacturing process the sorting equipment is considered exempt as "tangible personal property … used in or during actual manufacturing …" that is necessary and essential thereto.  Thus, STAR Accession No. 9508L1364G13 (1995) states that vibrating shaker screens used to separate the material being processed in an aggregate materials manufacturing plant are exempt if used in the line of operations after physical or chemical changes (crushing) occur, but the screens are taxable if used in preparation for the manufacturing process, i.e., prior to physical or chemical changes.  STAR Accession No. 9512228L (1995) considered a similar or identical manufacturing process and concluded that (a) screening equipment is exempt if used to screen materials after crushing has commenced, (b) shaker screens are taxable when used to remove dirt and gravel prior to grinding, but are exempt

when used to remove contaminants after grinding, and (c) sand screws that wash and/or sort aggregate materials are taxable if used before grinding commences, but are exempt when used afterwards.  The same policy was applied to replacement parts for this equipment.  See, STAR Accession No. 9603229L (1996).

Comptroller policy was in accordance with Section 151.318(a)(2) up until October 1, 1997, because the statute did not limit the manufacturing exemption to tangible personal property that directly makes or causes a chemical or physical change to the product being manufactured.  Subsequent to that date, it appears that the Comptroller considers shaking, washing, and sorting procedures to be exempt only if they make a chemical or physical change in the product held for ultimate sale.  For example, STAR Accession No. 9912917L (1999) concludes that the following equipment used at a sand and rock manufacturing facility is exempt because it makes a chemical or physical change to the manufactured product: (a) shakers/shaker screens that loosen clay from rock and size the rock product, thus determining to which crusher the rock will next be moved, (b) "Log Washers" that soften the clay by grinding the rocks upon themselves, and (c) sand screws that filter out the remaining clay sediment from the rock product that is ultimately held for sale.  In contrast, the sorting activities performed by Claimant's slewing stacker and reclaimer do not cause a physical or chemical change to the shale so they are not exempt equipment and their repair and replacement parts are taxable.

Claimant's final contention concerns the conveyors utilized in its dust control system, which transport the dust and gases to and away from the baghouse.  Claimant asserts that the conveyors are exempt because they are components of an integrated pollution control system.

Section 151.318(a)(5) exempts from tax tangible personal property used in actual manufacturing of tangible personal property for ultimate sale if its use is necessary and essential to a pollution control process.  Claimant's baghouse is exempt under this provision because its removal of potentially harmful emissions during the dry cement manufacturing process is necessary and essential to a pollution control process.  But again, piping and conveyors are intraplant transportation equipment specifically excluded from the exemption unless they are "a component part of a single item manufacturing equipment or pollution control equipment eligible for exemption under Subsection 151.318(a)(2), (a)(4), or (a)(5)."  See Section 151.318(c)(1)(A).  Rule 3.300(d)(17), which contains the Comptroller's interpretation of Section 151.318(c)(1)(A), offers the following example of piping or conveyor systems that are part of a "single item of manufacturing equipment" eligible for exemption: a printing press that contains rollers and pipes to transport or feed paper or ink during the manufacturing process.  In addition, Rule 3.300(d)(5) provides that intraplant transportation equipment, including piping and conveyors, is "taxable even if manufacturing or processing activities (such as cooling, mixing, or pollution containment) occur during the transportation of product or component parts of the product."  The photographs of record indicate that the disputed conveyors are attached to, but not part of, the qualifying pollution control equipment.  The conveyors' purpose is to contain and transport the dust and gases to and away from baghouse, but they do not appear to be a component part of thereof.

RECOMMENDATION:

Based on the foregoing findings of fact, conclusions of law, and discussion, Claimant's refund request should be granted as recommended herein but otherwise denied.

ANNE K. PEREZ
Administrative Law Judge


HEARING NO. 43, 944

ORDER OF THE COMPTROLLER

The above decision is approved and adopted in all respects.  This decision becomes final twenty days after the date Claimant receives notice of this decision.  If either party desires a rehearing, that party must file a Motion for Rehearing, which must state the grounds for rehearing, no later than twenty days after the date Claimant receives notice of this decision.  Notice of this decision is presumed to occur on the third day after the date of this decision.

Signed on this 6th day of August 2007.


SUSAN COMBS


ENDNOTES:

(1) At different points in the production process, the raw materials are called "clinker" or "raw meal."  The material eventually becomes cement, the product held for ultimate sale.

(2) Also known as the "Kiln Feed Rotor Weighfeeder."

(3) Claimant's argument on exceptions is different from its original argument: that the bucket elevators and air slides were exempt as components of a single item of manufacturing equipment.

ACCESSION NUMBER: 200708967H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2007-08-06
TAX TYPE: SALES

# APPENDIX P

9004H0999A01 [Tax Type: Sales] [Document Type: Hearing] [Status: Superseded with Summary]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 9004H0999A01

*ALERT: An exemption for certain depreciable property used in "qualified research", as added to Section 151.3182 by the 83rd (2013) Legislative Session (H.B.800), may be available.  See Rule 3.340 for additional details.*

**STAR Superseded Information**
**Supersede type:** complete
**Document superseded on** :  10/24/2022
**Issue(s) that caused the document to be superseded** : piping considered interplant transportation equipment
**Reason(s)** This Hearing was expressly overturned by Hearing 31,842.

HEARING NO. 24,833

IN RE: **************
TAXPAYER NO.: *************
AUDIT OFFICE: *************
AUDIT PERIOD: 1/1/85-6/30/88

SALES & USE TAX

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

FRED CONDER
Administrative Law Judge

ALVIN STOLL
Representing Tax Division

**************

Representing Taxpayer

COMPTROLLER'S DECISION

CONTENTION OF TAXPAYER

Taxpayer contends that certain pipe on which it paid sales or use tax, is exempted from tax by virtue of TEX. TAX CODE ANN. section 151.318(2) (Vernon Supp. 1989), and taxpayer seeks a refund in the approximate sum of $**************.

Testifying on behalf of taxpayer was **************, its supervisor of the Production Department and an employee of taxpayer for 37 years. No witnesses were presented on behalf of the tax division. **************, an employee of taxpayer, was either presented by taxpayer primarily in order to permit questioning by the tax division or was called by the tax division as an adverse witness.

Taxpayer submitted proposed findings of fact. The facts as set out below constitute the administrative law judge's ruling thereon.

FINDINGS OF FACT

1. Taxpayer is a Delaware corporation with its principal place of business in CITY A, Connecticut.

2. Taxpayer is in the sulphur mining and production business. Sulphur is a nonmetallic element originally found near volcanic outcroppings and called "brimstone." Elemental sulphur occurs in many localities, either free or combined; that is, it sometimes occurs as chemically pure crystals, but it is more frequently mixed with gypsum and limestone. Deposits of sulphur occur in porous formations overlying certain salt domes at depths ranging from 300 to 2,500 feet below the surface. The sulphur formation (or layer) varies from as little as 30' to as much as 360', and the percentage of sulphur in said formation (or layer) will range generally from as little as 5% to as much as 35%.

3. The method taxpayer used to obtain the sulphur was similar to one devised by Herman Frasch in 1891 and perfected commercially in 1903. The method used by taxpayer, to produce-and-prepare (as specifically described below) sulphur for sale to customers, is a modification of the original method but is still called the Frasch method.

4. The Frasch method used by taxpayer consisted of pumping superheated water through tubing into the formation, thus melting the sulphur within the formation and underground, and then injecting air down a pipe to raise the melted (or liquid) sulphur to the surface. At that point, the sulphur was ready for sale to customers.

5. The superheated water (heated to over 300o F.) was pumped underground via wells drilled into sulphur formations. Each well had the same underground equipment, consisting of a nest of four pipes set one inside the other and reaching from the surface into the sulphur deposits. The nest of pipes included

an outer ten-inch or eight-inch pipe, a six-inch pipe, a three-inch pipe, and a one-inch pipe in the center.

6. The water was pumped down the annular space between the six-inch and three-inch pipes and discharged into the formation through perforations in the pipe. The entire region through which this water circulated was raised to a temperature above the melting point of sulphur.

7. Melted sulphur is heavier than water; thus it drained downward, formed a pool around the foot of the well, and, after entering through the lower perforations, rose in the three-inch pipe.

8. Compressed air was injected down the central one-inch pipe and caused the liquid sulphur to be raised to the surface. This liquid sulphur was placed in large holding tanks, and weighed. From these holding tanks it was pumped into customers' receptacles of one kind or another, or into large vats and allowed to solidify awaiting customers' orders; but if the latter, it was remelted because taxpayer marketed all their sulphur in liquid form.

9. Sulphur mixed with gypsum and limestone (fact 2.) must be separated from the other minerals to be useful. The Frasch method performs this separation underground, per the foregoing facts.

10. It is physically possible for sulphur to be extracted and produced by traditional mining methods; however, if the sulphur were removed in its natural state, it would be necessary to separate the sulphur from other components of the formation above-ground. This would be a more expensive and less efficient method for recovering or producing sulphur than the Frasch method.

11. The pipes (act 5.) serve different but somewhat overlapping functions. The ten-inch (or eight-inch) outer pipe acts as a protective casing. the six-inch pipe has the super-heated water pumped down it (between it and the three-inch pipe) and this water is forced out through holes at the bottom into the sulphur-bearing formation, and this allows the melting to occur. Thus the six-inch pipe permits hot water to go from above ground into the formation. The one-inch pipe has compressed air put down it to push the liquid sulphur, that has bled at the bottom of the well, to the surface. The liquid sulphur and air are forced up the three-inch pipe (between it and the one-inch pipe). Thus the three-inch and one-inch pipes permit the liquid sulphur to be brought to the surface.

12. Sulphur wells do not generally operate longer than six months, though some wells do last longer, and one went for three years. When a well is "killed", it is possible to pull about 300' of the casing (by shooting with dynamite) and to pull all of the one-inch pipe (though none of it is reusable); it is also possible to pull most or all of the three-inch and six-inch pipes, with about 75% of the three-inch reusable and 75-100% of the six-inch reusable.

DISCUSSION AND CONCLUSIONS OF LAW:

Taxpayer says: the Frasch method it used in sulphur production (facts 3. - 9.) is correctly characterized as manufacturing or processing tangible personal

property for sale; that various pipe or tubing was used or consumed in that operation and was necessary or essential thereto; the pipe (or certain of it) had a useful life when new of six months or less; and thus taxes paid on such pipe were paid in error and should be refunded. TEX. TAX CODE ANN. Section 151.318 (Vernon 1982 and Vernon Supp. 1990).

The parties had agreed that the administrative law judge should initially determine only the issue of whether the "Frasch method" constituted "manufacturing, processing, or fabricating tangible personal property for ultimate sale" so as to make the provisions of 151.318, supra, applicable. Both apparently felt the only other criterion for exemption, or obstacle to exemption, was taxpayer's proving that the pipe or some specific part thereof had a useful life when new of six months or less, and this matter would be deferred. Taxpayer did not oppose this approach (which might entail a second hearing) because it permitted taxpayer to leave certain witnesses at home and not be out that trouble and expense in the event taxpayer were to lose on the initial issue. However, a Proposed Decision issued in which, though the melting of sulphur was found to be the processing of tangible personal property for sale, the pipe was concluded to be subject to tax as serving a transportation function and not used in an actual processing operation.

The statute reads, in pertinent part:

(a) The following items are exempted from the taxes imposed by this chapter:

* * *

(2) tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation; . . .

* * *

(b) The exemption includes chemicals, catalysts, and other materials that are used during a manufacturing, processing, or fabrication operation to produce or induce a chemical or physical change, to remove impurities, or to make the product more marketable.

(c) The exemption does not include:

(1) machinery, equipment, or replacement parts or their accessories having a useful life when new in excess of six month;

(2) intraplant transportation equipment, ... or other machinery, equipment, materials, or supplies that are used incidentally in a manufacturing, processing, or fabrication operation;

(3) hand tools; or

(4) ... equipment or supplies used in sales or distribution activities. . . or transportation activities; or other tangible personal property not used in an actual manufacturing, processing, or fabrication operation.

\* \* \*

TEX. TAX CODE ANN. Section 151.318.

From 1963, virtually the inception of this state's sales and use taxes, tangible personal property used or consumed in an actual manufacturing or processing operation has been exempted from tax if necessary or essential to the operation, and provided the property used or consumed was not excluded by subparts (i) - (iv), now (1) - (4) above.

Analysis and consideration of the provision leads to the conclusion that the Legislature in 1963, in a statute it has not substantively changed, exempted from tax two basic categories of tangible personal property, "(a)" [now (1)] those items that became ingredients or component parts of other tangible personal property manufactured, processed, or fabricated for ultimate sale and "(b)" [now (2)] those items used or consumed in actual manufacturing, processing, or fabricating operations provided they were necessary or essential to the actual operations. However, it specifically excluded from the second category four types of tangible personal property, two of which might otherwise have qualified for exemption within the very terms of (b) - now (2) --and two of which were not intended to qualify within its terms. In (b)(i) and (b)(iii), which became (c) (2) and (c)(3) as the result of recodification, the Legislature carved from the exemption items that might otherwise have qualified for exemption as having been used in an actual manufacturing, processing, or fabricating operation and as having been necessary or essential to the operation, whereas in (b)(ii) and (b)(iv), (c)(2) and (c)(4) with recodification, the Legislature specifically excluded by clarification and example items that would probably not have been exempted by a clear (and strict) reading of (b). The Legislature gave taxpayers, tax administrators, and the courts specific guidance in understanding what it meant by use in actual manufacturing or processing operations and also by being necessary or essential to the actual operation. In (ii), or (c) (2), it excluded from the exemption any items not necessary or essential to the actual manufacturing, that is, used in a manner incidental to the manufacturing, processing, or fabricating operation, and gave as specific examples "intraplant transportation equipment, and maintenance an janitorial equipment and supplies." In (iv), or (c)4), it excluded from exemption any items "not used in an actual manufactur ing, processing, or fabrication operation," which is just a restatement of the basic exemption, (a)(2) -- but again the Legislature gave specific examples, saying, "office equipment or supplies, equipment or supplies used in sales or distribution activities, [equipment or supplies used in] research or development of new products, or [equipment or supplies used in] transportation activities."

In sum: subprovisions (c)(1) and (c)(3) specifically withdrew from the exemption items that might otherwise be covered by the exemption for property used in actual processing operations and necessary or essential thereto; whereas subprovisions (2) and (4) essentially regurgitated the two requirements (used in actual, and necessary or essential), but specifically listed examples of items not covered. It is clear that the exemption does not reach intraplant

transportation items or other property used in or during an actual manufacturing, processing, or fabricating operation but incidental to the operation. It is also clear the exemption does not cover property used by those performing manufacturing, processing, and fabricating operations but used by them in activities other than the actual manufacturing, processing, and fabricating operations, giving as examples property used in office work, in sales and distribution, in research and development, and in transportation. The Legislature used "intraplant transportation equipment" as a specific example of property used in or during actual manufacturing, processing, and fabricating operations but not necessary or essential to those operations (instead, "incidental" to those operations); and it used equipment and supplies used in "transportation activities" (apparently meaning all transportation that was not intraplant) as a specific example of property used "by" manufacturers, processors, and fabricators but "not used in an actual manufacturing, processing or fabrication operation." The foregoing exposition of this exemption is essentially to be found in Comptroller's Decision Nos. 12,587 (1982), 11,614 (1981), and 10,447 (1980), but it seems to get overlooked.

Neither intraplant transportation equipment nor equipment and supplies used in transportation activities are limited to wheeled or non-stationary vehicles, the terms comprehend pipes and conveyor belts and any other property used as the means of moving, carrying, transporting or transmitting something - there is surely no question but that a pipeline can be a transporter or carrier the same as a truck or a forklift. See No. 12,587, supra.

Because "processing" is defined as "the physical application of the materials and labor necessary to modify or to change the characteristics of tangible personal property," it is concluded that processing took place when the sulphur was changed into liquid form within the formation. 34 TAC 3.300 (a)(10). And because the sulphur was then pumped to the surface and placed in storage tanks from which it was withdrawn and sold in liquid form, it is concluded that this was "the actual... processing...of tangible personal property for ultimate sale" as required by the statute. See (a)(2), page 4.

It should perhaps be noted here that the primary arguments put forth by the tax division were 1) that this whole process had to be viewed as a mining process as contrasted with a manufacturing process, and 2) that the Legislature's adoption in 1967 of a specific exemption for pipe used in off-shore operations could only be read as meaning the Legislature did not view the Frasch method as a manufacturing or processing operation, because if it did, the 1967 provision would be superfluous. The first argument cannot be accepted because the law does not require a determination of mining process versus manufacturing process, but requires a determination of the manufacturing, processing, or fabricating (per se) of property to be sold and a determination of those items used or consumed in the actual manufacturing, processing, or fabricating operation and necessary or essential thereto. See, e.g., Comptroller's Decision Nos. 23,055 (1988), 13,811 (1986), 1,665 (1968), and 4,349 (1967). Furthermore, these decisions were consistent with key written pronouncements by this agency in 1965, 1976, and 1983. As for the second, and rather esoteric argument, the very reason this pipe is not exempt under Section 151.318 -- equipment used for

transportation -- is the reason the Legislature had to provide a special and specific exemption for such pipe used "off-shore." Its adoption was not meaningless or superfluous.

It matters not that the tax division failed to urge that this pipe was intraplant transportation equipment or property used in transportation activities, because the burden was upon taxpayer to bring its purchases of pipe within an exemption, for all sale/purchase transactions are presumed subject to tax. TEX. TAX CODE ANN. Sections 151.051, 151.054, 151.101-151.105, and American Biomedical Corp. v. bullock, 551 S.W.2d 177 (Tex. Civ. App - Austin 1977. writ ref'd n.r.e.). Taxpayer needed to bring the pipe purchases within the claimed exemption. Furthermore, exemption statutes are to be strictly and narrowly construed. Id., and Bullock v. National Bancshares Corp., 584 S.W.2d 268 (Tex. 1979).

Having satisfied the trier of fact and law that processing of sulphur occurred within the formation, taxpayer had to persuade him that these various pipes were used in or during the actual processing operation and were necessary or essential thereto. Based on the facts, particularly 4. -8., and the law, the administrative law judge concludes that these pipes were not used in the actual processing operation. The exemption provision itself gives as a specific example of property not used in an actual processing operation equipment or supplies used in transportation activities, (c)(4), supra, and as a specific example of property the Legislature did not consider as necessary or essential to a processing operation, but incidental thereto, intraplant transportation equipment,(c)(2), supra. Sure the pipes, or any transportation equipment may be necessary or essential to manufacturing, processing, or fabricating operations in a "but for" sense -- for that matter, even office machines and supplies, maintenance equipment and supplies, and property used in sales and distribution activities may be necessary in the sense that "but for" them the manufacturing or processing operation could not continue, see Comptroller's Decision No. 12,587 (1982) at page 3 --but the Legislature specifically named such items as property not actually used in such an operation or not necessary or essential to the operation itself.

Taxpayer filed what it called a Motion for Rehearing, but it later indicated that it was not seeking the "second" hearing on useful life nor requesting that the record be reopened, that it only wanted a decision based upon the facts shown and upon the legal authorities and arguments presented (including those presented in the motion), i.e., the motion should be treated as exceptions to the proposed decision. In the exceptions, taxpayer cites State v. B.F. Goodrich Co., 617 S.W.2d 835 (Tex. Civ. App.-Eastland 1981, writ ref'd n.r.e.), and also cites nine Comptroller's Decisions as supporting its asserted errors in the proposed decision, to wit, Comptroller's Decision Nos. 23,434, (1989), 21,010 (1988), 16,385 (1985), 14,187 (1984), 11,712 (1981), 10,447 (1980), 9,433 (1979), 9,102 (1979), and 7,563 (1976). But the B.F. Goodrich case dealt with an exemption for property described by both the trial court and the Eastland court as "wrapping and packaging materials." Yet Goodrich was not claiming exemption as wrapping and packaging materials under art. 20.04(E)(2), now section 151.321. The appellate court decided the case on the facts, 26 of which

it repeated in its opinion, stating that inasmuch as the Attorney General challenged none of the facts, they were conclusive and binding on the parties and the court. Based on the facts, the Eastland court reached a correct result, hence the "n.r.e." -- but the case is not authority for taxpayer's contention that these pipes are exempted from tax because we have a completely different type of property and a distinguishable fact situation --not only that, but one where the type property in our case is as clearly taxed as the "wrapping and packaging materials" of B.F. Goodrich were exempted. As to the nine previous decisions of the Comptroller, the administrative law judge read each and does not find that any one of them dictates a different result.

Also, in exceptions, the refund claimant says, the 3" and 6" pipes were used directly in the "production process," apparently meaning "processing operation," and that the casing was necessary or essential thereto, and cites two Comptroller's Decisions which it alleges allowed the "manufacturing" exemption for items use "in a less direct manner" -- 14,187 (1984) and 9,102 (1979). Neither decision lends much, if any, support to taxpayer, and certainly neither requires that this decision as proposed be reversed, or that, if not, the earlier two decisions be overruled.

Finally in exceptions, while agreeing that exemptions are to be strictly construed, taxpayer pointed out that the construction of tax exemptions must be reasonable, citing City of Abilene v. State, 113 S.W.2d 631 (Tex. Civ. App. --Eastland 1937, writ dism'd). This 1937, writ-dismissed case was cited in Comptroller's Decision No. 1,447 (1980) for that cogent and simplistic proposition, but what the court actually wrote was, "It is not believed that the rule of strict construction would require the adoption of the least reasonable of two possible constructions, and particularly [not] if that one be less effective to accomplish the manifest purpose of the exemption." Id., 635. The administrative law judge is of the opinion that he has strictly and reasonably construed the exemption and has followed legislative intent; and of the opinion that if the exemption is to be more broadly or liberally construed, a court of this state needs to be the one to do so.

The administrative law judge concludes that taxpayer correctly paid tax on its purchases of pipe, that the pipe in question was not exempted from tax.

RESULT:

Based on the stated findings of fact (essentially as proposed by taxpayer), the stated conclusions of law, and the reasoning set forth, taxpayer is not entitled to a refund with respect to taxes paid on pipe.

Originally proposed the 1st day of December, 1989.

SIGNED this the 9th day of April, 1990.

FRED CONDER
Administrative Law Judge

ORDER OF THE COMPTROLLER

The foregoing decision of the administrative law judge is approved and adopted in all respects. This decision becomes final twenty (20) days from the date of this Order.

If a rehearing is desired, a Motion for Rehearing must be filed with the clerk of the administrative law judges twenty (20) days from the date of this Order, and must state the grounds  upon which the motion is based.

SIGNED this the 10th day of April 1990.

BOB BULLOCK
Comptroller of Public Accounts
of the State of Texas

ACCESSION NUMBER: 9004H0999A01
SUPERSEDED: Y
DOCUMENT TYPE: H
DATE: 1990-04-10
TAX TYPE: SALES

# APPENDIX Q

8206H0452A01 [Tax Type: Sales] [Document Type: Hearing] [Status: Partially Superseded no Summary]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 8206H0452A01

HEARING NO. 12,587

IN RE: **********
TAXPAYER NO. **********
FIELD OFFICE: **********
AUDIT PERIOD: JULY 1, 1976 THROUGH June 30, 1980

SALES TAX

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

ROGER EASTERDAY
Administrative Law Judge

MARTIN CHERRY
Representing Tax Division

**********
Representing Petitioner

COMPTROLLER'S DECISION

PETITIONER'S FIRST CONTENTION

Petitioner contends that the purchase of certain steel conveyor rolls located in its electric-weld pipe mills which are used to move the pipe from process to process within those buildings may, depending upon their useful life, be exempt from the sales or use tax under the manufacturing exemption, formerly TEX. TAX. -GEN. ANN. art. 20.04(E)(1) (Vernon 1969), now TEX. TAX CODE ANN. Sec. 151.318.

SALES TAX DIVISION'S RESPONSE

The Division contends the conveyor rolls are "intraplant transportation equipment per Sec. 151.318(c)(2) and are not exempt even if their useful life

is less than six months.

FINDINGS OF FACT

(1) Petitioner was the subject of a state sales and tax audit covering the period July 1, 1976 through June 30, 1980. During this audit period Petitioner purchased certain steel conveyor rolls for use in its Texas plant. Petitioner did not accrue sales or use tax on these purchases. The audit assessed tax on them.

(2) The eighteen inch conveyor rolls in question are placed in a stationary position in a continuous line between processes in the electric-weld pipe mills. The conveyor rolls rotate in place along their axis, powered by motor. When the steel is placed on the rotating conveyor rolls, it is moved from process to process within the mills. The pipe that the conveyor rolls move is often very hot and very heavy. For instance, in the manufacturing process, it is necessary to heat the pipe in furnaces to temperatures over 2000 degrees F. to relieve stress caused by cold forming and welding. The conveyor rolls move the pipe to and from, and through these furnaces. And, in the quench and temper process, the pipe is heated by induction to temperatures over 2000 degrees F. and then quenched in cold water to produce higher strength. The conveyor rolls move the pipe to,  from, and through this process. Some joints of pipe weigh over eighty pounds per foot, and at times there is a load of over eight hundred pounds per square inch on the conveyor rolls and bearings. There is substantial friction between the pipe and the rolls.

(3) Petitioner keeps records on the number of conveyor rolls purchased, and by comparing this figure with the number of rolls in use it is possible to establish the average useful life of a roll. For this audit period, the average useful life was more than six months using this method of calculation.

CONCLUSION OF LAW

The manufacturing exemption from sales and use tax is currently embodied in TEX. TAX CODE ANN. Sec. 151.318, which states:

(a) The following items are exempted from the taxes imposed by this chapter:

(1) tangible personal property that will become an ingredient or component part of tangible personal property manufactured, processed, or fabricated for ultimate sale; and

(2) tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation.

(b) The exemption includes chemicals, catalysts, and other materials that are used during a manufacturing, processing, or fabrication operation to produce or induce a chemical or physical change, to remove impurities, or to make the produce more marketable.

(c) The exemption does not include:

(1) machinery, equipment, or replacement parts or their accessories having a useful life when new or excess six months;

(2) intraplant transportation equipment, maintenance or janitorial supplies or equipment, or other machinery, equipment, materials, or supplies that are used

incidentally in a manufacturing, processing, or fabrication operation;

(3) hand tools; or

(4) office equipment or supplies, equipment or supplies used in sales or distribution activities, research or development of new products, or transportation activities, or other tangible personal property not used in an actual manufacturing, processing, or fabrication operation.

(d) In this section, "manufacturing" includes each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another.

Petitioner concedes that the conveyor rolls purchased and used during this audit period do not qualify for the manufacturing exemption. However, Petitioner and the Division disagree on the reason the conveyor rolls do not qualify.

The Division asserts that the conveyor rolls are disqualified by their very nature under the exclusions contained in Sections (c)(2) and (c)(4); that is, the conveyor rolls are, per Sec. (c)(2), "intraplant transportation equipment...or machinery...used incidentally in a manufacturing, processing, or fabrication operation," and, per Sec. (c)(4), "equipment...used in...transportation activities, or other tangible personal property not used in an actual manufacturing, processing, or fabrication operation." Thus, under the Division's view, the useful life of the conveyor rolls is not the reason for the rolls not being exempt. Instead, the conveyor rolls would always be taxable, regardless of useful life, because they are "intraplant transportation equipment."

Petitioner, on the other hand, contends that the transportation equipment to which the statute refers is "mobile equipment such as trucks, railroad cars, forklifts, front end loaders, and other wheeled vehicles." (Petitioner's Reply, February 18, 1982). Petitioner asserts that its conveyor rolls if they had a useful life of less than six months, would be exempt per Sec. 151.318(a)(2) as "tangible personal property used or consumed during the actual manufacturing, processing, or fabrication [and] necessary and essential to the manufacturing, processing, or fabrication operation." The only reason the conveyor rolls are not exempt during this audit period, says Petitioner, is that they fall under the specific exclusion in Sec. (c)(1) for "equipment...having a useful life when new in excess of six months." Petitioner wishes to preserve the right to claim the exemption for conveyor rolls purchased in the future that might last less than six months.

The exclusions in Section C are divided into two classes. The first class consists of items that would be exempt under Section (a)(2) as used or consumed in the actual manufacturing and necessary or essential thereto. Both "equipment...having a useful life when new in excess of six months" (Sec. (c)(1)) and "hand  tools" (Sec. (c)(3)) fall into this class. The second class consists of those items which, in any event, would not qualify for exemption under Section (a)(2). This class would, at the least include "maintenance or janitorial supplies" (Sec. (c)(2)), "office equipment and supplies", and "equipment or supplies used in sales or distribution activities, [or] research or development of new products" (Sec. (c)(4)). None of these items can be considered used or consumed in the actual manufacturing, processing, or fabrication (though the items might be considered "necessary or essential" to the manufacturing venture in a "but for..." sense; that is, but for the office

equipment and supplies, or the maintenance supplies, the manufacturing venture could not long exist.)

All the items specifically enumerated in Sec. (c)(2), including intraplant transportation equipment, are part of the last enumeration: "...or other machinery, equipment, materials or supplies that are used incidentally in a manufacturing, processing, or fabrication operation". (emphasis added) Similarly, the items specifically enumerated, including "transportation equipment", in Sec. (c)(4) are part of the last group in that section:

"...or other tangible personal property not used in an actual manufacturing, processing, or fabrication operation."

Thus, the test is whether a particular item should be called "intraplant transportation equipment" or "transportation equipment" should be determined by whether or not it can qualify under Section (a)(2) as being used in the actual manufacturing, processing, or fabrication, or whether it falls in the realm of being used incidentally (Sec. (c)(2)), or not being used in the actual manufacturing, processing or fabrication (Sec. (c)(4)).

In the instant case, it is clear that the primary purpose served by the conveyor rolls is to move the steel from process to process within the plant. The conveyor rolls perform no manufacturing or processing themselves on the steel. Thus, while necessary to the production of the steel product in a "but for" sense, they must be classified as "intraplant transportation equipment" or "transportation equipment", not used for the "actual manufacturing", but used only incidentally thereto. The term "intraplant transportation equipment" is not limited to wheeled, non-stationary vehicles as Petitioner suggests. While capable of carrying extremely heavy or very high temperature steel products, and necessary and essential to the production, the conveyor rolls are still "intraplant transportation equipment", specifically disqualified from exemption by Sec. 151.318(c)(2) and (4). Their useful life is not relevant to the disqualification from exemption.

PETITIONER'S SECOND CONTENTION

Petitioner contends that certain payments made to third parties involving tires, starters, and generators are nontaxable charges for repairs on those items, and not the taxable purchase of a rebuilt item.

FINDINGS OF FACT

(1) Petitioner sends out defective starters and generators to a MR. SMITH. MR. SMITH is in the business of rebuilding or repairing defective starters and generators.

(2) According to the Division's factual assertions in its pleadings, which have not been challenged by Petitioner, MR. SMITH makes no effort to segregate and identify which particular generations and starters come from any particular customer. He repairs/rebuilds other similar starters and generators for customers other than Petitioner.

(3) With regard to tires which are sent out to be recapped, Petitioner states that its materials and supplies warehouse still records the serial number of those tires it sends out (unlike starters and generators). petitioner has not specifically asserted that the serial numbers of the tires it receives back are matched against the serial numbers of those it sent out. The Division asserts that in each instance where it was shown that the same item was received back, it agreed that the transaction was a repair.

(4) The auditor assessed tax on the lump-sum charges made by MR. SMITH to Petitioner and on tires where Petitioner's records did not establish that it was receiving back the same item it sent.

CONCLUSION OF LAW

A "sale" subject to sales or use tax is defined to occur when there is a transfer of possession of tangible personal property for a consideration. Sec. 151.005(1). MR. SMITH transferred possession of a rebuilt starter or generator and was paid a consideration. It is presumed that this "sale" transaction is subject to tax. Sec. 151.054. Thus, it is Petitioner's burden to overcome the taxable presumption.

Petitioner asserts that the transactions are "repairs", the lump-sum payment for which is specifically excepted from the sales tax by Sec. 151.056. Instead, a lump-sum repairman pays tax on his repair supplies when he buys them, and collects no tax from his customers on his lump-sum repair charge.

The case of Calvert v. Engineers & Fabricators, Inc., 440 S.W.2d 320 (Tex. Civ. App.-Austin 1969, writ ref'd n.r.e.) stands for the proposition that, to be a repair, the customer must receive back the same item it submitted to be repaired. If a different, rebuilt item is received back by the customer, the charge is deemed to be a sale of a rebuilt item, with the customer's non-serviceable item treated as a trade-in toward the sales price of the rebuilt item. Sec. 151.007(c)(6).

In that instant case, Petitioner has failed to factually prove that it received back the same items (starters, generators, tires) that it sent out, and has, therefore, failed to overcome the presumption of taxability.

PETITIONER'S THIRD CONTENTION

Petitioner contends that the purchases of certain core arbors, core barrels, and flasks are exempted from tax by the manufacturing exemption.

FINDINGS OF FACT

(1) During the audit period, Petitioner made purchases of certain core arbors, core barrels, and flasks, which are items used to hold together a sand mold in which molten pig iron is poured to create an ingot mold. The ingot mold, in turn, is used to form molten steel into an ingot of steel, which is further reshaped and processed in the course of manufacturing pipe for sale.

(2) The core arbor, core barrel, and flask have useful lives of less than six months.

(3) The audit assessed tax on the purchase of these items.

CONCLUSION OF LAW

During the audit period, the relevant portion of the manufacturing exemption contained in TEX. TAX-GEN. ANN. art 20.04(E)(1)(b) (Vernon 1969) read as follows:

(1) Tangible Personal Property Used in Manufacturing. There are exempted from the taxes imposed by this Chapter the receipts from the sale, lease or rental of, and the storage, use or other consumption in this State of:

(a) tangible personal property which will enter into and become an ingredient or component part of tangible personal property manufactured, processed or fabricated for ultimate sale at retail within or without this State; and

(b) tangible personal property used or consumed in or during any phase of such actual manufacturing, processing or fabricating operation, provided that the use or consumption of such tangible personal property is necessary or essential to the performance of such operations.

The statute has since been recodified in Sec. 151.318(1)(2) to read:

(a) The following items are exempted from the taxes imposed by this chapter:

(2) tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation.

Reading art. 20.04(E)(1)(b), Petitioner contends that its materials used to make the sand molds are "used or consumed in or during any phase of such actual manufacturing..." The "such actual manufacturing" being referred to in paragraph (b) has to be the manufacturing referred to in paragraph (a) of Art. 20.04(E)(1)(a): "...tangible personal property manufactured, processed or fabricated for ultimate sale at retail with or without this State." This construction for article 20.04(E)(1)(b) is the same as is explicitly stated in its successor, Sec. 151.318(a)(2). Petitioner also contends that the core arbors, core barrels and flask are "necessary or essential to the performance of such operations."

Exemptions from tax, being the antithesis of equality, are strictly construed against the taxpayer. American Biomedical Corp. v. Bullock, 551 S.W.2d 177 (Tex. Civ. App.-Austin 1977 writ ref'd n.r.e.) To be exempt, the transaction must clearly fit the exemption, construed in a reasonable, unstrained way.

The core arbors, core barrels and flasks in question are not used to manufacture, process or fabricate an item of tangible personal property "...for ultimate sale at retail...". Instead, they are used to make a sand mold, which is in turn used to make a pig iron ingot mold. Only the pig iron ingot mold is USED IN THE "actual" manufacture of the steel pipe. The core arbors, core barrels and flasks are two degrees removed from the "actual" manufacture, though they are admittedly necessary and essential to the manufacture of a piece of equipment (the pig iron ingot mold) which is used in the actual manufacture of an item "for ultimate sale at retail." Thus, it must be concluded that the core arbors, core barrels and flasks do not qualify for the manufacturing exemption.

PETITIONER'S FOURTH CONTENTION

Petitioner requests waiver of penalty and interest.

FINDINGS OF FACT

(1) An audit was performed on Petitioner, a direct pay permit holder, for the period July 1, 1976 through June 30, 1980. The audit assessed additional tax of $**********, plus the statutory 10% penalty as well as accrued interest to the date of billing. Interest has continued to accrue at the statutory rate (now 10%). Petitioner timely requested redetermination of the audit liability.

(2) This audit represents Petitioner's third formal contact with the

Comptroller's office. The first was R.G. Head's visit in 1966 (see Petitioner's Second Contention, Comptroller's Decision No. 10,447 (1979)). The second was a full-blown audit covering the period July 1, 1972 through September 30, 1976. The original assessment in that audit was $********** additional tax, plus penalty and interest. After the redetermination process (see Comptroller's Decision No. 10,447(1979)), the liability will be about $**********, about 21% of the original assessment. The penalty and part of the interest was waived in that audit.

(3) The additional tax assessed in this audit represents about 2.8% of the total amount remitted by Petitioner during the audit period.

(4) The original liability in this audit breaks down as follows:

(1) Failure to accrue use tax on expense and rental items $**********

(2) Failure to accrue use tax on fixed asset purchases $**********

TOTAL $**********

The hearings attorney has previously agreed to reductions of about $********** of tax off the original assessment. The remainder of the items in issue (contentions one, two and three herein) are not large compared to the rest of the liability. As to the non-contested bulk of the liability, Petitioner states: "None of the issues in this audit (other than **********) were the same as the previous audit. The additional tax is primarily on items which we have historically exempted but in a more thorough audit (six months vs. three months) were found by the auditor to be taxable."

(5) Petitioner is a large, sophisticated corporate taxpayer with both in-house and external tax advisors of high caliber.

CONCLUSION OF LAW

TEX. TAX CODE ANN. Sec. 111.103(a) states that the Comptroller may waive penalty or interest upon a finding that the taxpayer has "exercised reasonable diligence to comply with the provisions of the title."

Both the ten percent penalty and interest are imposed automatically by statute when delinquent tax is found. See Sec. 151.703(a), (c), Sec. 151.512 and Sec. 111.060. If a taxpayer is found to be intentionally evading tax, an additional twenty-five percent penalty for intentional evasion exists implies that the test for the automatic ten percent penalty (Sec. 151.703(a)) is ordinary negligence. Since it is imposed automatically, the presumption is that if the payment is late, or delinquent, the taxpayer has been negligent. It is the taxpayer's burden to show he has exercised reasonable diligence and has not been negligent.

The Comptroller's power is a discretionary one. The legal test of the Comptroller's judgment in the exercise of his discretionary power is whether or not it was exercised arbitrarily or capriciously. Thus, while each taxpayer and his situation are examined on a case-by-case basis, the Comptroller has attempted to apply a relatively uniform standard.

In deciding if a taxpayer's penalty should be waived, two (related) areas, among others, are focused upon: (1) what conduct could have been expected of the particular taxpayer and (2) what was the degree of murkiness of the taxation question(s). With respect to the issue of what conduct could have been expected of the particular taxpayer, the factors considered, among others, are

the number, degree, and subject matter of prior contacts with the Comptroller's office, such as prior audits, and the tax sophistication or tax "awareness" of the taxpayer. With respect to the second area, the Comptroller looks to the difficulty of the tax question(s) that has caused the majority of the taxpayer's liability, whether the law was clear, or whether the Comptroller's had a clear rule on the subject if the law is unclear.

In the instant case, Petitioner is a sophisticated, tax-aware taxpayer and has previously been audited. Thus, the highest degree of tax compliance conduct could be expected of Petitioner. Petitioner has obliquely suggested that the major part of its liability is related to erroneous exemption decisions on transactions that were later found by the auditor to be taxable, but has not set forth the particulars of these transactions. Since it has not chosen to contest the legality of the assessment of the majority of this audit liability, it must be assumed that the taxable nature of the transactions is (and was) clear at the time they were made.

It is concluded that Petitioner has not shown how it exercised reasonable diligence in the remittance of tax during the audit period. The purpose of a penalty is to encourage remittance of tax in the reporting period it is due or have a good reason for not remitting the tax, such as a bona fide, reasonable belief that an exemption applies. Otherwise, the non remitting taxpayer is no worse off than his similarly situated brethren who fully pays on time. Indeed, if penalty did not exist, two substantial incentives to pay on time would exist: (1) the possibility of not being audited at all with escape of all liability and (2) the traditionally lower interest rates of the state on delinquent tax versus the private credit market interest rate. That is not to say that those considerations ran through this taxpayer's corporate mind; merely that there is a substantial public policy served by imposing a 10% penalty automatically and placing the burden on the taxpayer to show reasonable diligence.

Interest is a time charge on the use of money. By not remitting the tax when due, irregardless of the reasons why, Petitioner has had the use of the money. Nevertheless, as a spur to prompt administrative action, the Comptroller waives interest for the period of unreasonable tardiness on the agency's part during the redetermination process. The Division has agreed to waive interest on that basis for the periods October 17, 1981 through January 19, 1982.

EXCEPTIONS

Petitioner filed Exceptions to the Proposed Decision with respect to the penalty issue. Petitioner points out that (1) a complete audit process was not complete on the 1972 through 1976 audit until late 1980, near the end of this audit period and therefore it would have held no reason to believe its procedures were inadequate; (2) in the five month sample of expense items, the error rate was .5276%; (3) in the detail of capital asset purchases, the number of additional taxable items found was 2.2% of the total number purchased; (4) the additional tax found due was 2.8% of the amount of tax reported; (5) other than the ********** issue, none of the issues are the same as those in the previous audit.

The fact an audit liability is small compared to the total amount remitted does not, of itself, establish reasonable diligence. Petitioner's 2.8% monetary error rate is not particularly good compared to other taxpayers of comparable size and sophistication who have undergone previous audits.

The fact that the redetermination procedure on the previous audit was not substantially complete until well into this audit period is not particularly

relevant. There are two points to be made about previous audits. First, they give specific guidance as to the taxable or nontaxable nature of particular transactions. With respect to those specific transactions challenged in the redetermination procedure, the policy of the Comptroller is that a taxpayer has been put on notice of the Comptroller's position on a specific transaction when the audit deficiency notice issued. The obligation to pay tax on identical transactions occurring during a new audit period while redetermination, or litigation, is occurring is not suspended just because of the pending redetermination or litigation of the issue. See arts. 1.05(3) & 1.07; Comptroller's Decision No. 12,443 (1982). Second, an audit can generally be said to make a taxpayer "tax aware": whatever consideration the Comptroller gives to taxpayers who are innocently blissfully ignorant (in a general sense) of their tax responsibility is erased once an audit has  been performed on them.

In Petitioner's case, while the ********** rentals were the only common issue being challenged, most of those that are in issue here are within the ambit of the manufacturing exemption. Essentially, items that are bought must be considered subject to tax unless a taxpayer reasonably believes at the time that a specific exemption applies. By issuance of the previous deficiency, Petitioner was put on notice that the Comptroller was reading the manufacturing exemption strictly, as required by law (even though some items were ultimately found to qualify for exemption during the redetermination process). The fact that the conveyors rolls (First Contention) would not be exempt in any event under Petitioner's legal theory because they did not last six months, indicates that no such exemption decision was being made at the time of purchase. It is thus unnecessary to decide  how meritorious Petitioner's losing legal theory is. Reasonable diligence has to be judged on what the taxpayer did at the time the purchase (or sale) was made, not on the merits of a legal defense asserted to defend an assessment. Only if that meritorious (but losing) legal reasoning were occurring at the time of the purchase (or sale) might it be considered an element of reasonable diligence. That was not the case here.

The Administrative Law Judge is thus not persuaded by Petitioner's exceptions.

RECOMMENDATION

It is recommended that the audit be amended to conform to the deletions agreed to by the Division in the Position Letter of January 18, 1982, including the ********** issue. Penalty should be upheld and interest partially waived as set forth above.

SIGNED this the 28th day of June, 1982.


ROGER EASTERDAY
Administrative Law Judge


ORDER OF THE COMPTROLLER

The above decision of the administrative law judge is approved and adopted in all respects. This decision becomes final on the 15th day of July, 1982, and the total sum of the tax, penalty and interest amounts above is due and payable within twenty (20) days thereafter. If such sum is not paid within such time, an additional penalty of ten percent of the taxes due will accrue, interest will continue to accrue at ten percent per annum, and the bonding of security provisions of TEX. TAX CODE ANN. Sections 151.251 - 151.262 (1981 Tex. Sess. Law Serv., ch 389, Sec. 1, at 1490 [Vernon 1981]) will apply.

If a rehearing is desired, a Motion for Rehearing must be filed with the clerk of the administrative law judges on or before the date this decision becomes final, and must state the grounds upon which the motion is based. (See Rule .029, Rules of Practice and Procedure, or 34 TAX Sec. 1.29).

This decision is issued in accordance with the provisions of the Limited Sales, Excise and Use Tax statutes, TEX. TAX CODE ANN. ch. 151 (Vernon 1982).

RENDERED and ISSUED on this the 30th day of June, 1982.


BOB BULLOCK
Comptroller of Public Accounts
of the State of Texas

ACCESSION NUMBER: 8206H0452A01
SUPERSEDED: P
DOCUMENT TYPE: H
DATE: 1982-06-30
TAX TYPE: SALES

# APPENDIX R

9110H1138G03 [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 9110H1138G03

HEARING NO. 27,919

IN RE: **************

TAXPAYER NO.: **************
AUDIT OFFICE: **************
AUDIT PERIOD: February 1, 1987
through September 30, 1990

SALES TAX

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

JOHN R. NEEL
CHIEF ADMINISTRATIVE LAW JUDGE

LEE R. JOHNSON
REPRESENTING TAX DIVISION

*************
REPRESENTING TAXPAYER

COMPTROLLER'S DECISION

PRELIMINARY COMMENTS:

Petitioner, **************, waived its right to an oral hearing and requested that the case be decided based upon the written submissions of the parties. The Administrative Law Judge (ALJ) hereby takes official notice of all records of the Comptroller's office which pertain to the Petitioner and the issues involved in this case.  On July 8, 1991, the Tax Division filed proposed findings of fact and conclusions of law.  This Proposed Comptroller's Decision represents the ALJ's ruling thereon.

All Section references herein are to Title 2, Texas Tax Code Annotated.

PETITIONER'S CONTENTIONS:

1. The overhead cranes and hoists used in its galvanizing business are processing equipment, not intraplant transportation equipment, and since the utility study performed demonstrated that the majority of electricity purchased and used by the Petitioner was used to operate the cranes and hoists, its purchases of electricity should not have been scheduled as taxable by the auditor.

2. Its purchases of wire used to fasten material to the cranes and hoists to enable movement of the material through the galvanizing process should not have been scheduled as taxable by the auditor.

FINDINGS OF FACT:

1. Petitioner was audited for compliance with the provisions of the Limited Sales, Excise and Use Tax Act for the period February 1, 1987 through September 30, 1990.

2. The auditor scheduled purchases for which tax was not paid or accrued, and on March 7, 1991, a Texas Notice of Tax due totaling $*************** in State and local taxes, penalty, and interest was communicated to the Petitioner.

3. Petitioner timely filed its Petition for Redetermination and Statement of Grounds

4. Petitioner is in the business of galvanizing steel for its customers.

5. Petitioner uses overhead cranes and hoists in its galvanizing operation. Specifically, steel is unloaded in its plant using overhead cranes.  The material is then assembled to be processed in an acid bath and then proceeds to a kettle of molten zinc to be galvanized.  From the kettle, the steel is then moved to the shipping area for shipment to Petitioner's customers. All of these steps are performed by using overhead cranes and hoists.

6. An electric utility study performed for Petitioner demonstrated that the majority of electricity purchased and used by Petitioner is used to operate the overhead cranes and hoists.

7. Petitioner uses wire to fasten the material to the overhead cranes and hoists so that the material can be moved through the galvanizing process described in Finding of Fact No. 5.  Upon completion of the galvanizing process, the wire is cut loose from the galvanized material and discarded.

8. Petitioner's cranes and  hoists are used to move the steel from step-to-step in the galvanizing process.  They do not cause a chemical or physical change, remove impurities, or make the steel more marketable.  The cranes and hoists do not become an ingredient or component part and are not used or consumed in the actual galvanizing process.  The cranes and hoists are, therefore, intraplant transportation equipment, not processing equipment.

9. The wire is used in conjunction with the cranes and hoists to move the steel thorough the galvanizing process and is, therefore, a supply item used in a transportation activity.

CONCLUSIONS OF LAW AND DISCUSSION:

For the reasons to be subsequently discussed, Petitioner's contentions must be denied.

Section 151.318(a)(2) exempts from sales and use taxes"... tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation.." (emphasis added). Section 151.317(a) exempts from sales and use taxes "...electricity ... except when sold for commercial use." (emphasis added).  Subsection (c), in pertinent part, defines commercial use to mean "...use by a person engaged in selling warehousing, or distributing a commodity... but does not include use by a person engaged in processing tangible personal property for sale as tangible personal property..."  Based upon these provisions, and the "predominant use" provision of Comptroller's Rule 3.295, Petitioner argues that its purchases of electricity and wire are not taxable and should not have been scheduled by the auditor.

While neither the Tax Division nor the ALJ disagrees with Petitioner that the overhead cranes, hoists, and wire in issue are very important, if not "necessary and essential," in its galvanizing operation, Petitioner fails to recognize (or accept) the exclusions from the basic exemption provided by Section 151.318(a).  Section 151.318(c) provides as follows:

"(c) The exemption does not include:...

 (2) intraplant transportation equipment...

 (3) ...supplies used in  ... transportation activities..." (emphasis added)

There is no doubt in this case that the overhead cranes, hoists and wire are used in order to move the steel from step-to-step in the galvanizing process. The cranes and hoists are, therefore, intraplant transportation equipment and the wire is a supply item used in a transportation activity. (See Finding of Fact Nos. 5, 7, 8, and 9, and Comptroller's Decision No. 24,833 (1990)).  None of them are processing equipment and, thus, the exemptions from tax provided by Sections 151.317 and 151.318 are not available to Petitioner. (Also see Comptroller's Rule 3.300).

RECOMMENDATION:

Based on the findings of fact, conclusions of law, and discussion contained herein, the ALJ recommends that the Petitioner's contentions be denied, and that the audit be considered final, without amendment.

SIGNED this the 31st day of July, 1991.


JOHN R. NEEL
Chief Administrative Law Judge



HEARING NO.: 27,919


ORDER OF THE COMPTROLLER

The above decision of the Administrative Law Judge, is approved and adopted in all respects.  This decision becomes final twenty (20) days from the date of this Order.

If a rehearing is desired, a Motion for Rehearing must be filed with the clerk of the Administrative Law Judges twenty (20) days from the date of the Order, and must state the grounds upon which the motion is based.

RENDERED and ISSUED this 23rd day of October, 1991.


JOHN SHARP
Comptroller of Public Accounts
of the State of Texas

ACCESSION NUMBER: 9110H1138G03
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 1991-10-23
TAX TYPE: SALES

# APPENDIX S

200812326H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 200812326H

SOAH DOCKET NO. 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.26
CPA HEARING NO. 48,097

RE: **************
TAXPAYER NO.: **************
AUDIT OFFICE: **************
AUDIT PERIOD: April 1, 2002 THROUGH June 30, 2005

Limited Sales & Use Tax/RDT

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS


KARI HONEA
Representing Tax Division

**************
Representing Petitioner


COMPTROLLER'S DECISION

************** (Petitioner) requested a redetermination of the sales tax
assessed against it by the  (TCPA), and
requested a hearing on that request. The Staff of the TCPA (Staff) responded
that the assessment should not be adjusted. After considering the evidence and
argument presented at hearing, the Administrative Law Judge (ALJ) recommends
that the assessment be adjusted.

I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

There are no contested issues of notice, jurisdiction, or venue in this
proceeding. Therefore, these matters are addressed in the findings of fact and

conclusions of law without further discussion here.

On March 30, 2006, the TCPA issued to Petitioner a Notification of Audit Results. On April 24, 2006, Petitioner requested a redetermination of the assessment. Petitioner raised two alternative contentions, and a third contention.

On March 9, 2007, Staff issued a Notice of Hearing referring this case to the State Office of Administrative Hearings (SOAH) for an oral hearing on April 30, 2007. The hearing convened April 30, 2007, before ALJ Roy G. Scudday in the William P. Clements Building, 300 West 15th Street, Fourth Floor, Austin, Texas. Staff was represented by Victor John Simonds, Assistant General Counsel. Respondent was represented by **************, tax consultant. The record was closed at the conclusion of the hearing that day.

II. REASONS FOR DECISION

A. Contentions

1. Petitioner contends that the cleaning services on the vent hoods were not subject to tax because they were scheduled and periodic maintenance on real property.

2. Alternatively, Petitioner contends that the cleaning services on the vent hoods were not subject to tax because they were services performed on tangible personal property that was necessary and essential for public health or pollution control.

3. Petitioner contends that it detrimentally relied on publications of the TCPA.

B. Legal Standards

Texas Tax Code Ann (Code) Section 151.051 imposes a state sales tax on the sale of a taxable item in this state. Code Section 151.010 includes taxable services in the definition of "taxable item." Code Section 151.0101(5) includes "the repair, remodeling, maintenance and restoration of tangible personal property" as a taxable service, and subsection (11) includes "real property services" as "taxable services." Code Section 151.3111 exempts from sales tax taxable services performed on tangible personal property that is exempt from sales tax. Code Section 151.318(a)(5) exempts tangible personal property "used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption is necessary and essential to a pollution control process." Code Section 151.318(a)(10) exempts tangible personal property "used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health."

C. Evidence

Staff presented the testimony of one witness, David Gonzalez, an employee of the TCPA who is a supervisor of contract audits; and submitted four exhibits. Respondent submitted three exhibits.

1. Facts Established by Documentary Evidence

Petitioner operates a restaurant in CITY A. Petitioner was audited for sales tax compliance for the period of April 1, 2002, through June 30, 2005. The TCPA

issued a Notification of Audit Results on March 30, 2006, in the amount of $**************, including tax and interest. During the audit period, Petitioner purchased cleaning services for the vent hoods that cover its grills, and paid tax on those services. On May 31, 2005, Petitioner deducted the tax paid on those purchases from the sales tax it owed for that report period. Exam 1, the only exam in the audit, solely consists of the taxes deducted by Petitioner that it paid on the cleaning services.

During the audit, Petitioner asserted that the vent hoods were real property. At a Dispute Resolution Conference held November 29, 2005, both parties agreed that the vent hoods were real property. However, pictures of the hoods introduced as Petitioner's Exhibit 1 indicate that the vent hoods are actually trade fixtures that are not permanently affixed to the building and could easily be removed.

2. Mr. Gonzalez' Testimony

Mr. Gonzalez toured Petitioner's restaurant. He observed that the vent hoods were above, but not attached to, the grills. He agreed that the purpose of the vent hoods was to filter smoke and grease from the operation of the grills. He also agreed that the vent hoods could possibly be considered to be trade fixtures that could be removed from the building.

D. Analysis

Petitioner's first contention is predicated on the argument that the vent hoods are real property. However, as discussed above, the vent hoods are not permanently affixed to the building and could easily be removed. As a result, the vent hoods are tangible personal property as opposed to real property. Accordingly, Petitioner's first contention is moot.

In regard to Petitioner's second contention, Petitioner asserts that the vent hoods are exempt tangible personal property pursuant to Code Section 151.318(a)(5) and (10), because they are necessary and essential for pollution control, and their use is required by state and local health regulations. Staff responds that, in order for the vent hoods to be exempt tangible personal property, they must either be component parts of the cooking equipment, or must cause a chemical or physical change to the product being manufactured, i.e., the food being cooked. Staff relies on State Tax Automated Research System (STAR) Accession No. 9905450L [ENDNOTE: (1)] in support of this position. That Taxability Letter states that if the vent hoods are separate from the cooking equipment, that is, not component parts of the cooking equipment, then they are not exempt because they do not cause a chemical or physical change, and are not considered to be pollution control equipment because they are not shown to be required by either the EPA or the TNRCC, now the TCEQ. The policy letter does not address the exemption to comply with public health requirements.

Pursuant to 25 Texas Administrative Code (TAC) Section 229.167(h), the Texas Department of State Health Services (DSHS) requires food establishments to provide mechanical ventilation "if necessary to keep rooms free of excessive heat, steam, condensation, vapors, obnoxious odors, smoke, and fumes." Sec. 20-21.25(b)(g) of the CITY A Food Ordinance provides that all cooking equipment in restaurants "shall be provided with a ventilation hood."

Staff argues that the vent hoods in question do not qualify for the exemption because they are not components of the manufacturing equipment, do not cause an actual physical or chemical change to the food being manufactured, and have not been shown to be pollution control equipment. However, none of these is a requirement for the exemption under Code Section 151.318(a)(10). There is no

language in subsection (a)(10) that requires the vent hoods to be a component part of the grills if they are exempt as separate equipment. In addition, unlike subsection (a)(2) [ENDNOTE: (2)] the language of subsection (a)(10) does not include the phrase "and directly makes or causes a chemical or physical change."

Comptroller's Decision No. 40,286 (2006) included a discussion of subsection (a)(10) as follows:

"Section 151.318(a)(10) does not exclude machinery and equipment from the exemption and applies to all tangible personal property that meets the statutory requirements. For the most part, the language of Section 151.318(a)(10) parallels the language of Section 151.318(a)(2), as it existed prior to the 1997 amendment. Thus, the critical requirement that the item must be used or consumed in the actual manufacturing of tangible personal property for ultimate sale remains unchanged, and the construction of Section 151.318(a)(2), articulated by the court of appeals in Tyler Pipe, provides guidance in ascertaining the Legislature's intent behind Section 151.318(a)(10). To be eligible for the claimed exemption, Claimant must demonstrate by clear and convincing evidence that the contested items are indispensable and integral to the compliance of the federal, state, or local law established for public health during the actual manufacturing of food for ultimate sale. "

STAR Accession No. 9911843L states that vent hoods qualify for the exemption under Code Section 151.318(a)(10) if they are necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health. STAR Accession No. 200204008L states that a vent hood covering food-processing equipment, such as a grill or fryer, qualifies for the exemption under that subsection.

Based on the above-cited policy letters and Comptroller's Decision, if the vent hood is used in the actual manufacturing of the food for ultimate sale, which it is, and is indispensable and integral to comply with federal or local laws, which it is inasmuch as the health codes specifically require mechanical ventilation or ventilation hoods, then it qualifies for the exemption. And, accordingly, the cleaning services for the vent hoods are exempt pursuant to Code Section 151.3111(a).

Based on the above-discussion, Petitioner's third contention is moot.

III. CONCLUSION

Because the vent hoods are tangible personal property that is used in the actual manufacturing of the food and are indispensable and integral to compliance with the state and local health codes, they are exempt from sales tax pursuant to Code Section 151.318(a)(10). As a result, cleaning of the vent hoods is an exempt taxable service pursuant to Code Section 151.3111(a). Accordingly, Exam 1 should be deleted from the audit and the liability reduced to zero.

IV. FINDINGS OF FACT

1. ************** (Petitioner) operated a restaurant in CITY A, Texas.

2. Petitioner was audited for sales tax compliance for the period of April 1, 2002, through June 30, 2005.

3. On March 30, 2006, the  (TCPA) issued

Petitioner a Notification of Audit Results, in the amount of $**************, including tax and interest.

4. On March 7, 2007, the TCPA issued a Notice of Hearing scheduling the hearing before the State Office of Administrative Hearings (SOAH) on April 30, 2007. All parties appeared and participated.

5. The notice of hearing contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

6. During the audit period, Petitioner purchased cleaning services for the vent hoods in its restaurant, on which purchases it paid sales tax.

7. On May 31, 2005, Petitioner deducted from its sales tax report the taxes it paid on the vent hood cleaning services.

8. The deduction of those taxes were the only items scheduled in Petitioner's audit, and the sole basis of the audit liability.

9. The vent hoods were trade fixtures and tangible personal property, not improvements to realty.

10. The vent hoods were located above, but not attached to, the grills used to cook food in the restaurant.

11. There is no evidence in the record that vent hoods are pollution control equipment required by either the EPA or the TCEQ.

12. Mechanical ventilation is required by state public health regulations for food establishments when necessary to keep rooms free of excessive heat, steam, condensation, vapors, obnoxious odors, smoke, and fumes.

13. Ventilation hoods are required by CITY A public health regulations for cooking equipment in restaurants.

V. CONCLUSIONS OF LAW

1. The Comptroller of Public Accounts of the State of Texas has jurisdiction of this matter under Tex. Tax Code Ann. chs. 111, 151 and 171.

2. The State Office of Administrative Hearings has jurisdiction over all matters relating to conducting a hearing in this proceeding, including the preparation of a proposal for decision with findings of fact and conclusions of law, pursuant to Tex. Gov't Code Ann. Section 2003.

3. Petitioner received proper and timely notice of the proceedings and hearing, pursuant to Tex. Gov't Code Ann. Section 2001.051 and 2001.052.

4. Petitioner showed by clear and convincing evidence that the vent hoods were tangible personal property used in the actual manufacturing of food for ultimate sale, and that their use was indispensable and integral to compliance with state and local requirements related to public health.

5. Petitioner showed by clear and convincing evidence that the cleaning services were performed on tangible personal property that was exempt from

sales tax.

6. Based on the foregoing Findings of Fact and Conclusions of Law, Petitioner's liability should be reduced to zero.


Hearing No. 48,097

ORDER OF THE COMPTROLLER

On May 7, 2007 the State Office of Administrative Hearings' (SOAH) Administrative Law Judge, Roy G. Scudday, issued a Proposal for Decision in the above referenced matter. The parties were given fifteen days from the date of the Decision to file exceptions with SOAH. No exceptions were filed, and the Comptroller has determined that the Administrative Law Judge's Proposal for Decision should be adopted as written.

The above decision resulting in Taxpayer's liability as set out in "Attachment A," which is incorporated by reference, is approved and adopted in all respects. This decision becomes final twenty days after the date Petitioner receives notice of this decision. If either party desires a rehearing, that party must file a Motion for Rehearing, which must state the grounds for rehearing, no later than twenty days after the date Petitioner receives notice of this decision. Notice of this decision is presumed to occur on the third day after the date of this decision.

Signed on this 4th day of December 2008.


SUSAN COMBS


by: Martin A. Hubert
Deputy Comptroller


ENDNOTE(S):

(1)  (TCPA) State Tax Automated Research System (STAR) HomePage. 30 March 2007 http://cpastar2.cpa.state.tx.us/index.html.

(2) Code Section 151.318(a)(2) provides:

a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:. . . (2) tangible personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to: (A) the product being manufactured, processed, or fabricated for ultimate sale."

ACCESSION NUMBER: 200812326H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2008-12-04

TAX TYPE: SALES

# APPENDIX T

201105246H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

# 201105246H

SOAH DOCKET NO. 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.27
CPA HEARING NO. 102,273

RE: *************
TAXPAYER NO.: *************
AUDIT OFFICE: *************
AUDIT PERIOD: April 1, 2003 THROUGH December 31, 2006

Direct Payment Sales Tax/RDT

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS

TREVOR MOORE
Representing Tax Division

*************
Representing Petitioner

COMPTROLLER'S DECISION

The Comptroller of Public Accounts (Comptroller) audited *************
(Petitioner) for sales and use tax compliance and issued an assessment to
Petitioner. Petitioner requested redetermination. Comptroller Staff (Staff)
agreed to amend the assessment, but a number of contentions remain in dispute.
In his Proposal for Decision, the Administrative Law Judge (ALJ) recommends
that the audit assessment should be affirmed subject to the adjustments agreed
to by Staff.

## I. PROCEDURAL HISTORY, NOTICE & JURISDICTION

On June 22, 2010, Staff referred the case to the State Office of Administrative Hearings for an oral hearing. The ALJ subsequently granted a motion converting the oral hearing to a hearing based on the parties' written submissions. Staff was represented by Assistant General Counsel Trevor Moore. Petitioner was represented by ************* of the tax consulting firm of COMPANY A. The record closed on November 1, 2010.

There are no issues of notice or jurisdiction in this proceeding. Therefore, those matters are set out in the Findings of Fact and Conclusions of Law without further discussion here.

## II. REASONS FOR DECISION

### A. Evidence Submitted

Staff submitted the following exhibits: 60-day letter, the audit plan, the audit report, the penalty and interest waiver worksheet, and the Texas Notification of Audit Results. Staff also submitted the administrative record consisting of the pleadings filed by the parties while this matter was pending before the Comptroller and the exhibits attached thereto. Petitioner submitted the following exhibits: Exhibit A: a schedule of agreed transactions; Exhibit B: schedule of disputed transactions under Contention No. 1 and supporting documentation; Exhibit C: supporting documentation regarding respirators and associated filter cartridges; Exhibit D: timeline of services on roaster furnaces; Exhibit E: invoices and purchase orders regarding removal of existing cable and installation of new cable; Exhibit F: the COMPANY B purchase order and invoice for electrode equipment; Exhibit G: Inet brochure regarding gas detection and monitoring services provided by COMPANY C; and Exhibit H: Affidavit of INDIVIDUAL, process engineering manager for Petitioner's CITY, Texas, plant. The evidence submitted by both parties is admitted into the record without objection.

### B. Agreed Deletions

Staff has agreed to numerous adjustments to the audit assessment. The agreed adjustments are set out in Staff's Supplement to the Response to the Reply to the Position Letter.

### C. Background

Petitioner operates a facility in CITY, Texas, that processes spent nickel/molybdenum and cobalt/molybdenum catalysts into various grades of molybdenum oxide, vanadium oxide, fused alumina, and nickel/cobalt alloys. First, Petitioner blends and mixes the used catalysts. The mixture is then heated in a roaster furnace to remove unwanted compounds. Next, the materials are ground into a fine powder and leached to remove the alumina concentrate, which is placed in hoppers. The remaining slurry consists of vanadium and molybdenum.

The alumina concentrate with nickel and cobalt is screened, dried, and smelted in the electric arc furnace.  The electric arc furnace uses an electrode and anodes to produce high-voltage current, which creates a tremendous heat source. Inside the furnace, the alumina concentrate is melted and separated into calcium aluminate (I.E., SLAG) and a nickel/cobalt alloy.

The vanadium and molybdenum slurry is filtered to separate the vanadium from the molybdenum. The vanadium is melted by a fusion furnace, then cooled and flaked. The molybdenum is further filtered to remove the molybdenum cake, which is placed into a rotary kiln that removes moisture and impurities. All of the materials produced at Petitioner's CITY plant are either sold to customers or further processed at other facilities operated by Petitioner.

D. Issues Presented

The Comptroller audited Petitioner for sales and use tax compliance for the period April 1, 2003, through December 31, 2006, and issued a Texas Notification of Audit Results dated September 5, 2008, assessing a deficiency consisting of tax, the standard 10% penalty, and interest accrued through the date of notification. Petitioner timely requested a redetermination hearing. The issues in contention have been reduced to the following:

1. Items purchased with company-issued American Express credit cards should be deleted from the audit because the transactions are coded to accounts that the auditor has already agreed are for the purchase of equipment exempt under TEX. TAX CODE ANN. Section 151.318(a).

2. Petitioner purchased respirators and filter cartridges that are exempt under TEX. TAX CODE ANN. Section 151.318(a)(9) and 34 TEX. ADMIN. CODE Section 3.300(d)(10) because they are used to protect employees from respiratory hazards.

3. Petitioner hired vendors to perform repair services on the electric arc furnaces and the fusion furnaces used at the CITY plant. The labor charges are exempt because they were performed on tangible personal property exempt under TEX. TAX CODE ANN. Section 151.3111.

4. Since the roaster furnaces have been determined to be real property improvements, the services performed on these furnaces constitute exempt scheduled and periodic maintenance.

5. The auditor erred in scheduling transactions that constitute nontaxable new construction.  These services include the replacement of a pad-mounted transformer and the related installation and connection of electrical cables, the removal of existing cable and installation of new cable connections to a control room, and pulling new wire to a building.

6. The rental of electrode equipment from COMPANY B was for the performance of nontaxable consultation services.

7. Petitioner purchased nontaxable gas detection and monitoring services that included the incidental use of gas monitoring and detection equipment.

Alternatively, if it is determined that the transactions consist of the rental of tangible personal property, the rental is exempt under TEX. TAX CODE ANN. Section 151.318(a)(10).

E. ALJ's Analysis and Recommendation

Contention No. 1: Purchase of Exempt Manufacturing Equipment

Petitioner claims that the purchases are exempt under TEX. TAX CODE ANN. Section 151.318(a). Because it claims an exemption, Petitioner must show that it is entitled to the exemption by clear and convincing evidence under 34 TEX. ADMIN. CODE Section 1.40(2)(A). The only grounds Petitioner has advanced in support of its contention is the statement that the auditor has previously agreed to delete similar transactions coded to the same account numbers within Petitioner's accounting system. Petitioner has not provided any other evidence in support of this contention. The ALJ finds that Petitioner has failed to meet its burden of showing by clear and convincing evidence that it is entitled to the exemption, and therefore cannot recommend any further adjustments.

Contention No. 2: Respirators and Assorted Filter Cartridges

Tax Code Section 151.318(a)(9) exempts from tax safety apparel or work clothing that is used or consumed by a manufacturer, which is used during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if: (A) the manufacturing process would not be possible without the use of the apparel or clothing; and (B) the apparel or clothing is not resold to the employee. The implementing Comptroller regulations list the following as examples of exempt safety apparel:

Examples are specialized clothing, safety goggles, gloves, ear plugs, or hairnets that the law requires employees to wear during processing, or static wrist guards that manufacturing personnel wear in a manufacturing process that must be free of static electricity.

34 TEX. ADMIN. CODE Section 3.300(d)(10).

INDIVIDUAL, in his affidavit, states that Petitioner purchases respirators, cartridges, and disposable dust masks for use by employees at four locations: at the electric arc furnace, the catalyst storage buildings, inside the catalyst feed pad, and inside the metal production building. INDIVIDUAL further states that the respirators and masks must be worn to prevent the inhalation of harmful metal particulates, which could cause severe respiratory problems. INDIVIDUAL, however, does not state that the respirators, filter cartridges, and disposable dust masks are actually used during a manufacturing process. The Comptroller has held that a taxpayer claiming this exemption must show that the items are used during the processing operation. SEE COMPTROLLER'S DECISION NO. 103,101 (2010). Absent such a showing, Petitioner is not entitled to the exemption.

Contention No. 3: Services Related to Exempt Manufacturing Equipment

Petitioner contends that the labor charges for the services performed on two of the types of furnaces used at the CITY plant (the electric arc furnaces and the fusion furnaces) are exempt because the furnaces retained their identity as exempt tangible personal property that qualifies for the manufacturing exemption. Therefore, according to Petitioner these services performed on the furnaces were exempt under TEX. TAX CODE ANN. Section 151.3111.

Under Tax Code Section 151.3111, the maintenance or repair services are exempt only if the furnaces retain their status as tangible personal property at the time the services are performed.  Such services would be taxable as the repair, restoration, remodeling, or modification of nonresidential real property if the furnaces were permanently attached to the real property. SEE TEX. TAX CODE ANN. Section 151.0047(a) and 151.0101(a)(13).

The criteria for determining whether personal property has been annexed to real property are well known and frequently cited. SEE COMPTROLLER'S DECISION NO. 43,982 (2006). HUTCHINS V. MASTERSON & STREET, 46 Tex. 551 (1877) sets out the following three-part test to assist in making the determination of whether tangible personal property had been incorporated into the realty in such a manner so as to lose its original identity of being tangible personal property:

1. Has there been a real or constructive annexation of the article in question to the realty?

2. Was there a fitness or adaptation of such article to the uses or purposes of the realty with which it is connected?

3. Was it the intention of the parties that the chattel become a permanent accession to the freehold?

This three-factor test has been endorsed in numerous cases, including LOGAN V. MULLIS, 686 S.W.2d 605 (Tex. 1985), and applied in virtually every Comptroller's Decision involving a contention similar to Petitioner's. SEE COMPTROLLER'S DECISION NO. 43,732 (2004). HUTCHINS also instructs that the third factor, relating to the question of intention, is the preeminent consideration, with the first and second factors being evidence of intention.

The evidence offered by Petitioner regarding the furnaces' status as tangible personal property consists almost exclusively of INDIVIDUAL'S affidavit. The fusion furnaces are used by Petitioner to process vanadium pentoxide dust. The fusion furnaces melt the vanadium pentoxide dust into a liquid by heating it to approximately 1,300 degrees Fahrenheit. The molten vanadium pentoxide is then poured onto a flaking wheel where it is cooled and transformed into metal flakes. According to INDIVIDUAL, who as the process engineering manager of the plant is familiar with the plant's operations, the fusion furnaces measure approximately eight feet in length, four feet in width, and four feet in height. They rest in cradles above the plant floor. Although there are five fusion furnaces at the plant, only three are in operation at any given time. The three offline furnaces undergo repairs and sit in inventory until such time as the furnaces are traded out. Every three to six months, two of the offline furnaces are taken out of inventory, moved into the cradles, and placed into

production. The repaired furnaces are placed into inventory once they are returned from the vendor.

The frequency with which the fusion furnaces are moved in and out of production suggests that they were not intended to become a permanent accession to the realty. However, given the burden of proof Petitioner bears, I.E., clear and convincing evidence, this is not sufficient to establish that the furnace retained its character as tangible personal property. For example, INDIVIDUAL describes the furnace as resting inside cradles above the plant floor, which suggests that it stays in place through gravity, but no explicit reference is made to the presence or absence of any form of attachment to the cradle. Even more significantly, there is no discussion of the ease with which the furnaces are moved. This is especially important since there is no statement of how much a fusion furnace weighs. In light of the sparseness of the record regarding the method and extent of annexation and ease of removal, the ALJ concludes that Petitioner has not established that the furnace retained its character as tangible personal property, and therefore concludes that Petitioner's contention should be denied.

Petitioner alternatively argues that if the ALJ determines that the fusion furnaces should be considered real property, the furnaces could not be considered real property once they had been removed and the repairs were being performed. Petitioner cites to Comptroller policy regarding its treatment of equipment which qualified as exempt manufacturing tangible personal property when purchased and after its removal and repair is not reattached to the realty but is returned to inventory. In the cited Comptroller authority, Letter Ruling State Tax Automated Research System (STAR) Accession No. 200802047L (February 22, 2008), the Comptroller ruled that because the piece of equipment was not reattached to the realty, but rather was put into inventory, it is no longer considered real property, and until reattached to the realty is treated as tangible personal property. Although Staff questions its applicability, the policy appears applicable to the instant case. However, Staff is correct in noting that the same Letter Ruling requires that the Petitioner be able to document that the repaired piece of equipment was put into inventory for the Tax Code Section 151.3111 exemption. INDIVIDUAL'S affidavit is not sufficient in and of itself to substantiate Petitioner's claim that the furnace was returned to inventory. Consequently, Petitioner's contention regarding the exempt repair of the furnace should be denied.

The evidence regarding the degree of attachment and ease of removal of the electric arc furnace is also sparsely detailed. INDIVIDUAL describes the electric arc furnace as measuring five meters in diameter and five meters in height. It is also held in a cradle above the plant floor. It sits on top of supports with a hydraulic lift/hinge that allows the furnace to tilt and pour out its contents. The furnace has a conical roof that contains a feed chute. Although Petitioner claims that the conical roof is removable, INDIVIDUAL makes no such statement. There is no reference to how much the furnace weighs. There also is no discussion of its ease of removal. The evidence in the record is too sparse to draw a conclusion that the furnace had become part of the realty or

retained its character as tangible personal property. Consequently, Petitioner's contention regarding the electric arc furnace should be denied.

Contention No. 4: Scheduled and Periodic Maintenance (Roaster Furnace)

The auditor determined that the roaster furnaces were permanent improvements to real property, and therefore concluded that the services on the furnaces were taxable, nonresidential repairs. Petitioner, however, contends that if the roaster furnaces constitute real property improvements, then the service transactions at issue meet the definition of nontaxable real property maintenance because the services were performed on a scheduled and periodic basis. Under TEX. TAX CODE ANN. Section 151.0047 and 151.0101(a)(13) the repair, restoration, remodeling, or modification of improvements to real property are taxable services. But under 34 TEX. ADMIN. CODE Section 3.357(d), maintenance on real property is a nontaxable service. 34 TEX. ADMIN. CODE Section 3.357(a)(7) defines "maintenance," with respect to operational and functional improvements to real property, as "scheduled, periodic work that is necessary to sustain or support safe, efficient, continuous operations, or to prevent the decline, failure, lapse, or deterioration" of the real property. The term "scheduled" is defined as "anticipated and designated to occur within a given time period or production level." The term "periodic" is defined as "ongoing or continual or at least occurring at intervals of time or production that are reasonably predictable."

Petitioner bears the burden of proof of showing that the auditor erred in scheduling the repair services as taxable. The level of proof required to show scheduled and periodic maintenance is a preponderance of the evidence. SEE COMPTROLLER'S DECISIONS NOS. 39,472 (2004) and 41,840 (2003); and 34 TEX. ADMIN. CODE Section 1.40(2)(B).

The evidence in the record regarding the repair services performed on the roaster furnaces is sketchy at best. INDIVIDUAL in his affidavit states that about every 18 months Petitioner stops production of the roaster furnaces, inspects the hearths and refractory brick lining, makes necessary repairs, and relines the furnace with new refractory bricks. According to INDIVIDUAL, the shutdowns always involve repairing at least two hearths per furnace, but as many as seven hearths could be repaired during a shutdown. The refractory brick is replaced in whole or in part during every shutdown. Petitioner also submitted as part of Exhibit D a timeline of the services performed on the roaster furnaces. The timeline consists of references to invoices and work tickets for work performed on just two of the roaster furnaces, Numbers 3 and 4. The invoices and work tickets establish that work was performed on these furnaces but they do not prove that the work was done according to an established schedule. In addition, maintenance must be both scheduled and periodic, which means that the same type of work must be performed at regular intervals. SEE Letter Ruling STAR Accession Nos. 9708697L (August 25, 1997) and 9405L1301G11 (May 25, 1994). There is no documentation substantiating INDIVIDUAL'S general statement that shutdowns occurred every 18 months or his claim regarding reoccurring repairs. Absent such substantiating documentation, Petitioner's contention should be denied.

Contention No. 5: New Construction

Petitioner contends that it purchased services involving the construction of new improvements to realty. The first job consisted of installing a new pad-mounted transformer to replace a damaged and inoperable transformer. Petitioner hired COMPANY D to install the new transformer. The auditor agreed to delete the materials portion of the transaction because the transformer qualified for the manufacturing exemption. However, Petitioner contends that the labor charges at issue are likewise exempt because Comptroller policy provides that the replacement of a pad-mounted transformer is nontaxable new construction. Petitioner refers to Letter Ruling STAR Accession No. 200111656L (November 20, 2001) in support. Petitioner also claims that the installation and connection of electrical cables to the new pad-mounted transformer is also exempt as new construction under the same policy.

Staff, on the other hand, asserts that the transformer is part of the substation, which is the real property structure. The replacement of a transformer located at the substation is not a real property improvement but is a repair to the existing real property improvement, the substation. Petitioner has not explained how a transformer located at the substation qualifies as a separate real property improvement. In addition, its reliance on Letter Ruling 200111656L is misplaced. In that Letter Ruling the Comptroller modified her earlier policy that the replacement of existing poles in a transmission and distribution system with new poles constituted a taxable repair and remodeling service. SEE COMPTROLLER'S DECISION 28,929 (1996). The Comptroller modified the position to treat each as a separate improvement to realty. The Letter Ruling has not been construed to convert every repair to real property into a real property improvement. SEE COMPTROLLER'S DECISION NO. 39,895 (2003). Petitioner's contention regarding the installation of a new transformer should be rejected.

Petitioner also contends that no tax should have been assessed on Petitioner's lump-sum contract with COMPANY E for repairing the incoming power connection to the transformer and replacing the cable going to the control room. Petitioner raises several reasons in support of this contention: (1) that the disconnecting and reconnecting of power are not among the services subject to tax under TEX. TAX CODE ANN. Section 151.0101; (2) that third-party installation of tangible personal property is not taxable; or (3) that the removal of existing conduit and cable constitutes new construction. The removal of existing cable and conduit and the installation of new cable and conduit to the control room in the substation clearly constitute the repair or remodeling of a real property improvement. SEE COMPTROLLER'S DECISION NO. 34,491 (1997). The same conclusion and reasoning applies with respect to the work performed by Instrumentation, which consisted of pulling new wire to a building to replace the existing underground cable. The purchase order states that the labor for pulling the new wire to the building will be charged to "facilities major repair," which also supports the conclusion that the installation of the new wire constituted the repair and remodeling of the building and not new construction.

Contention No. 6: Nontaxable Service

Petitioner argues that, although it rented electrode equipment from COMPANY B, the invoice scheduled by the auditor was actually for nontaxable consultation and reports. The electrode equipment is a component part of the electric arc furnace, which qualifies as exempt manufacturing equipment pursuant to Tax Code Section 151.318. Petitioner points to the very language of the invoice that specifically refers to consultation and reporting related to the electrode equipment. SEE Exhibit F. Petitioner contends that because the electrode equipment is a component part of exempt manufacturing equipment, the services performed on the equipment are likewise exempt under Tax Code Section 151.3111. In addition Petitioner contends that the consultation services are not identified as a taxable service in Tax Code Section 151.0101. Staff, however, rejects Petitioner's contention because the associated purchase order describes that Petitioner was renting equipment. The invoice is dated October 29, 2003. The purchase order is dated September 18, 2003. The invoice does refer to the purchase order. Contrary to Staff's representation there is evidence that a service was provided, but there is also evidence that tangible personal property was rented.

The burden rests on Petitioner to prove that the auditor erred in scheduling the invoice as taxable. 34 TEX. ADMIN. CODE Section 1.40(2)(B). Petitioner has not offered any explanation for the inconsistency between the service described on the invoice and the rental of tangible personal property described on the purchase order. Absent a credible explanation the evidence fails to establish that Petitioner purchased a nontaxable service. Consequently, this contention should be denied.

Contention No. 7: Gas Detection and Monitoring Service

The invoices from COMPANY C refer to "Model No. GL-61220-10 Monthly." SEE Exhibit G. The purchase orders provide a more detailed description. They state that this is a contract that will be billed monthly for safety and industrial hygiene monitoring equipment. ID. Petitioner refers to the brochure from COMPANY C to support its position that it was being provided a monitoring service and that it had in essence outsourced its gas monitoring and detection responsibilities. A review of the brochure does not support Petitioner's contention that COMPANY C actually performed the monitoring but rather indicates that Petitioner's employees used the gas detectors. The evidence provided by Petitioner does not support its contention that it contracted for a service and not for the rental of equipment.

Petitioner alternatively argues that the rental of the equipment was exempt under Tax Code Section 151.318(a)(10) because it used the gas detection and monitoring equipment to comply with federal public health laws. Staff rejects the contention on the grounds that it has not shown that the equipment is actually used in the manufacturing process. Tax Code Section 151.318(a)(10) exempts "tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and

essential to comply with federal, state, or local laws or rules that establish requirements related to public health." Petitioner's alternative argument fails because it did not show that the gas detection and monitoring equipment was used in the actual manufacturing, processing, or fabrication.

F. Recommendation

Petitioner has failed to show by the applicable burden of proof that it should be granted any of the additional adjustments to the audit assessment that it sought. Consequently, the ALJ recommends that the audit assessment should be affirmed, except for the adjustments agreed to by Staff in its Supplement to the Response to the Reply to the Position Letter.

III. FINDINGS OF FACT

1. ************* (Petitioner) was audited by the Comptroller of Public Accounts (Comptroller) for the audit period April 1, 2003, through December 31, 2006. The Comptroller issued a Texas Notification of Audit Results dated September 5, 2008, assessing a deficiency consisting of tax, the standard 10% penalty, and interest accrued through the date of notification. Petitioner timely requested a redetermination hearing.

2. Comptroller Staff (Staff) referred the case to the State Office of Administrative Hearings for an oral hearing and issued a notice of hearing to Petitioner.

3. The notice of hearing contained a statement of the time, date, and location of the hearing, the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

4. The Administrative Law Judge subsequently granted a motion converting the oral hearing to a hearing based on the parties' written submissions.

5. Staff agreed to multiple adjustments that are set out in its Supplement to the Response to the Reply to the Position Letter.

6. During the audit period, Petitioner operated a plant in CITY, Texas, that processes spent nickel/molybdenum and cobalt/molybdenum catalysts into various grades of molybdenum oxide, vanadium oxide, fused alumina, and nickel/cobalt alloys.

7. Petitioner uses roaster furnaces, electric arc furnaces, and fusion furnaces in its processing.

8. Petitioner purchased items of tangible personal property using company issued American Express cards for use at its CITY, Texas, plant. The only evidence submitted to support its claim that the purchases were exempt under TEX. TAX CODE ANN. Section 151.318 are the accounting codes associated with each purchase.

9. Petitioner purchased respirators, cartridges, and disposable dust masks for use by employee at four locations: at the electric arc furnace, the catalyst storage buildings, inside the catalyst feed pad, and inside the metal production building.

10. The respirators and masks must be worn to prevent the inhalation of harmful metal particulates, which could cause severe respiratory problems.

11. Petitioner did not submit proof that the respirators, filter cartridges, and disposable dust masks are actually used during the manufacturing process.

12. The fusion furnaces are used by Petitioner to process vanadium pentoxide dust. The fusion furnaces melt the vanadium pentoxide dust into a liquid by heating it to approximately 1,300 degrees Fahrenheit. The molten vanadium pentoxide is then poured onto a flaking wheel where it is cooled and transformed into metal flakes.

13. The fusion furnaces measure approximately eight feet in length, four feet in width, and four feet in height. They rest in cradles above the plant floor.

14. Although there are five fusion furnaces at the plant, only three are in operation at any given time. The three offline furnaces undergo repairs and sit in inventory until such time as the furnaces are traded out. Every three to six months, two of the offline furnaces are taken out of inventory, moved into the cradles, and placed into production. The repaired furnaces are placed into inventory once they are returned from the vendor.

15. Petitioner did not provide proof regarding the manner in which the fusion furnaces could be readily removed without damage.

16. Petitioner did not provide proof that the fusion furnaces, once repaired, were returned to inventory before they were reattached to the realty.

17. The electric arc furnaces measure five meters in diameter and five meters in height. The furnace is also held in a cradle above the plant floor. It sits on top of supports with a hydraulic lift/hinge that allows the furnace to tilt and pout out its contents. The furnace has a conical roof that contains a feed chute.

18. Petitioner did not provide proof regarding the manner in which the electric arc furnaces could be readily removed without damage.

19. Petitioner did not submit proof that the work performed on the roaster furnaces used at the Freeport plant was scheduled and periodic.

20. Petitioner contracted for the replacement of a transformer at the substation.

21. Petitioner installed a new pad-mounted transformer to replace a damaged and inoperable transformer at the substation.

22. Petitioner repaired the incoming power connection to the transformer and replaced the cable going to the control room at the substation.

23. Petitioner contracted for new wire to be pulled to a building to replace the existing underground cable.

24. The invoice from COMPANY B states that it was for consultation and reports. The associated purchase orders state that Petitioner rented equipment from COMPANY B.

25. The purchase orders indicate that Petitioner was billed monthly for the rental of safety and industrial hygiene monitoring equipment provided by COMPANY C.

26. Petitioner did not provide proof that the monitoring equipment rented from COMPANY C was used in actual manufacturing, processing, or fabrication.

IV. CONCLUSIONS OF LAW

1. The Comptroller has jurisdiction over this matter pursuant to TEX. TAX CODE ANN. ch. 111.

2. The State Office of Administrative Hearings has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law pursuant to TEX. GOV'T CODE ANN. ch. 2003.

3. The Comptroller provided proper and timely notice of the hearing pursuant to TEX. GOV'T CODE ANN. ch. 2001 and TEX. TAX CODE ANN. Section 111.009.

4. Petitioner bears the burden of proving by the preponderance of the evidence that the auditor erred in assessing tax. 34 TEX. ADMIN CODE SECTION 1.40(2)(B).

5. Petitioner bears the burden of proving by clear and convincing evidence that it is entitled to an exemption from tax. 34 TEX. ADMIN CODE SECTION 1.40(2)(A).

6. Based on Finding of Fact No. 8 and Conclusion of Law No. 5, Petitioner failed to show that its American Express card purchases are exempt under TEX. TAX CODE ANN. Section 151.318.

7. TEX. TAX CODE ANN. SECTION 151.318(a)(9) and 34 TEX. ADMIN. CODE Section 3.300(a)(10) exempt from tax safety apparel or work clothing that is leased, or rented to, or stored, used, or consumed by a manufacturer, which is used during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if:(A) the manufacturing process would not be possible without the use of the apparel or clothing; and (B) the apparel or clothing is not resold to the employee.

8. Based on Findings of Fact Nos. 9 - 11 and Conclusions of Law Nos. 5 and 7, Petitioner failed to show that its purchase of respirators, filter cartridges, and disposable dust masks was exempt.

9. Under TEX. TAX CODE ANN. Section 151.3111 the maintenance or repair services performed on the fusion furnaces and electric arc furnaces are exempt only if the furnaces retain their status as tangible personal property at the time the services are performed. Such services would be taxable as the repair,

restoration, remodeling, or modification of nonresidential real property if the furnaces were permanently attached to the real property. SEE TEX. TAX CODE ANN. Section 151.0047(a) and 151.0101(a)(13).

10. Based on Findings of Fact Nos. 12 - 18 and Conclusions of Law Nos. 4, 5, and 7, Petitioner failed to show that the services performed on the fusion and electric arc furnaces were exempt under TEX. TAX CODE ANN. Section 151.3111.

11. The repair and remodeling of nonresidential real property improvements is taxable. TEX. TAX CODE ANN. SECTION 151.0101(13) and 34 TEX. ADMIN. CODE SECTION 3.357.

12. Based on Findings of Fact Nos. 20 - 23 and Conclusion of Law No. 11, the auditor properly scheduled installation of the new transformer and removal and installation of new conduit and cable as taxable real property repair and remodeling.

13. TEX. TAX CODE ANN. Section 151.318(a)(10) exempts "tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health."

14. Based on Findings of Fact Nos. 24 – 26 and Conclusions of Law Nos. 5 and 13, Petitioner failed to show that it was entitled to the manufacturing exemption for its rental of the monitoring equipment from COMPANY C.

15. Based on the foregoing Findings of Fact and Conclusions of Law, the audit should be affirmed, except for the adjustments agreed to by Staff.

Hearing No. 102,273

ORDER OF THE COMPTROLLER

On December 23, 2010, the State Office of Administrative Hearings' Administrative Law Judge (ALJ), Peter Brooks, issued a Proposal for Decision in the above-referenced matter to which Taxpayer filed Exceptions on January 7, 2011. Comptroller's Staff filed a Reply on January 11, 2011. The Comptroller has considered the Exceptions, Reply, and the ALJ's recommendation letter and determined that the ALJ's Proposal for Decision, except for minor changes to correct typographical or clerical errors, should be adopted without change and this Decision represents the ruling thereon.

The above Decision resulting in Taxpayer's liability as set out in "Attachment A," which is incorporated by reference, is approved and adopted in all respects. The Decision becomes final twenty days after the date Petitioner receives notice of this decision, and the total sum of the tax, penalty, and interest amounts is due and payable within twenty days thereafter. If such sum is not paid within such time, an additional penalty of ten percent of the taxes due will accrue, and interest will continue to accrue. If either party desires a rehearing, that party must file a motion for rehearing, which must state the

grounds for rehearing, no later than twenty days after the date Petitioner receives notice of this Decision. Notice of this Decision is presumed to occur on the third day after the date of this Decision.

Signed on this 20th day of May 2011.

SUSAN COMBS

by:  Martin A. Hubert
Deputy Comptroller

---

ACCESSION NUMBER: 201105246H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2011-05-20
TAX TYPE: SALES

# APPENDIX U

201701009H [Tax Type: Sales] [Document Type: Hearing]

The Comptroller of Public Accounts maintains the STAR system as a public service. STAR provides access to a variety of document types that may be useful in researching Texas tax law and tax policy. Documents which provide the Comptroller's interpretation of the tax laws are accurate for the time periods and facts presented in the documents. Letters on STAR can be the basis of a detrimental reliance claim only for the taxpayer to whom the letter was directly issued. Documents on STAR that no longer represent current policy may be completely or partially superseded, but there is no assurance that a document on STAR represents current policy even if it has not been marked as superseded.

Tax laws are complex and subject to change. Interpretations of the laws may be affected by administrative hearings, court opinions, attorney general opinions and similar authorities. STAR is a research tool, not a substitute for legal advice. If there is a conflict between the law and the information found on STAR, any decisions will be based on the law.

Texas Comptroller of Public Accounts STAR System

## 201701009H

**SOAH DOCKET NO. 30416-2669.27**
**CPA HEARING NO. 106,795**

RE: **************

TAXPAYER NO: **************

AUDIT OFFICE: **************

AUDIT PERIOD: May 1, 2005 THROUGH November 30, 2008

Direct Payment/RDT

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

GLENN HEGAR
Texas Comptroller of Public Accounts

ALISSA JONES ZACHARY
Representing Tax Division

**************

Representing Petitioner

**COMPTROLLER'S DECISION UPON REHEARING**

**For a hearing under the APA set by SOAH *on or after* September 1, 2015:**

**This decision is considered final on February 13, 2017, unless a motion for rehearing is timely filed; this date of finality is calculated based on the Administrative Procedure Act (APA ). [1]  The failure to timely file a motion for rehearing may result in adverse legal consequences.**

On December 19, 2013, an Order Granting Motion for Rehearing was issued and the decision in the above-referenced hearing was vacated. The case was referred to the State Office of Administrative Hearings on March 8, 2016. Administrative Law Judge (ALJ) Victor John Simonds of the State Office of Administrative Hearings (SOAH) issued a Proposal for Decision (PFD) that includes Findings of Fact and Conclusions of Law. SOAH served the PFD on each party and each party was given an opportunity to file exceptions and replies with SOAH in accordance with SOAH's rules of procedure.  The ALJ recommended that the Comptroller adopt the PFD as written.

After review and consideration, IT IS ORDERED that the PFD is adopted as changed. [2]

The result from this Decision Upon Rehearing is Attachment A.  The ALJ's letter to the Comptroller is Attachment B. The PFD as changed is Attachment C. Attachments A, B and C are incorporated by reference.

Attachment A reflects a liability.

The total sum of the tax, penalty and interest is due and payable 20 days after a comptroller's decision becomes final. [3] If such sum is not timely paid, an additional penalty of 10 percent of the taxes due will accrue.

SIGNED on this 24th day of January 2017.

GLENN HEGAR
Comptroller of Public Accounts

By: Mike Reissig
Deputy Comptroller

Attachment A, Texas Notification of Hearing Results
Attachment B, ALJ's letter to the Comptroller
Attachment C, Proposal for Decision as changed
*Publication:* " Frequently Asked Questions Related to Motions for Rehearing"

**ATTACHMENT B**

State Office Of Administrative Hearings
Cathleen Parsley
Chief Administrative Law Judge

June 22, 2016

The Honorable Glenn Hegar
Comptroller of Public Accounts
LBJ Building
111 E. 17th Street, 1st Floor
Austin, TX 78701

RE: SOAH Docket: 304-16-26692.27
TCPA Hearing No.: 106,795

Taxpayer No.: **************
************** v. Texas Comptroller of Public Accounts


Dear Comptroller Hegar:

Please be advised that Petitioner filed exceptions to the Proposal for Decision (PFD) in this matter on June 3, 2016, and Staff filed its response to the exceptions on June 17, 2016. In the exceptions, Petitioner argued that there were numerous stipulated facts that had not been addressed in the Findings of Fact. After reviewing the evidentiary record, the ALJ finds that were no agreed facts submitted during the hearing, and the Findings of Fact in the PFD accurately reflect the available evidence. Having reviewed the filings of the parties, I recommend that the PFD be adopted as written.

Sincerely,

Trevor Moore
Administrative Law Judge


**ATTACHMENT C**


**SOAH DOCKET NO.  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.27**
**TCPA HEARING NO.  106,795**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**Taxpayer No. \*\*\*\*\*\*\*\*\*\*\*\*\*\***
**v.**
**TEXAS COMPTROLLER OF PUBLIC ACCOUNTS**

**BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS**


**PROPOSAL FOR DECISION**

************** (Petitioner) was audited by the Tax Division (Staff) of the Texas Comptroller of Public Accounts (Comptroller) for direct pay permit sales tax compliance for the audit period May 1, 2005, through November 30, 2008. Staff assessed tax, a 10% late-filed penalty, and accrued interest. Petitioner contested the assessment on multiple grounds. Staff agreed to make certain adjustments, but contentions remain in dispute. In this Proposal for Decision, the Administrative Law Judge (ALJ) determines that Petitioner failed to demonstrate error in the audit, and therefore no audit adjustments are warranted other than those agreed to by Staff.

## I.  PROCEDURAL HISTORY, NOTICE, AND JURISDICTION

Staff referred the case to the State Office of Administrative Hearings and, on March 8, 2016, issued a Notice of Hearing by Written Submission to Petitioner. On  March 15, 2016, ALJ Trevor Moore issued Order No. 1, which set the written submission hearing. Petitioner was represented by **************. Staff was represented by Assistant General Counsel Alissa Zachary. The record closed on May 16, 2016. There are no

issues of notice or jurisdiction.  Therefore, those matters are set out in the Findings of Fact and Conclusions of Law without further discussion.

## II.  REASONS FOR DECISION

### A.  Evidence Presented

In addition to the pleadings filed while the case was pending before the Comptroller, Staff presented the following exhibits:

1. Sixty-Day Notice Letter;

2. Texas Notification of Audit Results;

3. Penalty and Interest Waiver Worksheet;

4. Audit Report;

5. Audit Documentation Report;

6. Audit Policy Memorandum 124 (AP 124) schedule;

7. Photo of Ammonia Injection Tank;

8. COMPANY A E-Mail;

9. COMPANY B Conditions of Service;

10. Employee Job List;

11. Letter from Petitioner's Plant Engineer, INDIVIDUAL; and

12. COMPANY B Work Orders.

Petitioner submitted the following exhibits, attached to its pleadings:

1. Photo of Ammonia Injection Tank (duplicate);

2. COMPANY A E-Mail (duplicate);

3. COMPANY B Conditions of Service (duplicate);

4. Employee Job List (duplicate);

5. Letter from INDIVIDUAL (duplicate);

6. Air Quality Permit issued by the Texas Natural Resource Conservation Commission;

7. Invoice and Proposal issued by COMPANY C;

8. Photographs of Power Factor Correction Unit and Shelving; and

9. COMPANY B Work Orders (duplicate).

Each exhibit was admitted to the contested case record without objection.

### B.  Agreed Adjustments

Staff agreed to make adjustments to the audit related to tax assessed on the purchase of a clinker gate (Contention No. 7) and parts purchased for weigh-belt feeders (Contention No. 8). Staff also agreed, in part, to contentions relating to the purchase and installation of an ammonia injection system (Contention No. 3) and the purchase of kiln-room equipment (Contention No. 6). The adjustments are detailed in the AP 124 schedule, Staff's Exhibit No. 6.

## C. Material Facts and Issues in Dispute

Petitioner operates a concrete manufacturing facility in CITY, Texas. The manufacturing process involves taking raw shale and limestone from a quarry and blending it to create a raw meal. The meal is crushed and blended with ancillary ingredients and then heated in a rotary kiln. The product of this process, "clinker," is cooled, crushed, and ground into the final product, cement. Staff audited Petitioner for direct pay permit sales tax compliance during the period of May 1, 2005, through November 30, 2008. The audit consisted of assessments for taxable purchases of expense items (Audit Exams 100, 200, 400, 5000, and 8000), credits for over accrual of tax (Audit Exams 300, 6000, and 7000), and taxable purchases of assets (Audit Exams 1000, 2000, and 3000). On April 7, 2011, Staff issued a Texas Notification of Audit Results assessing a deficiency consisting of tax, a 10% late-filed penalty, and interest. Petitioner requested a redetermination hearing, raising 14 contentions addressing audit transactions and requesting additional credits. Petitioner cited error in the assessments for purchases of, and services performed on, various pieces of equipment used at its facility, safety equipment used by its employees, and work performed at its facility by contract employees. Petitioner submitted scant evidence in support of its contentions, relying primarily on its own descriptions and stressing its disagreement with the analysis put forth by Staff.

## D. ALJ's Analysis and Recommendation

Texas imposes a tax on each sale of a taxable item in this state. Tex. Tax Code § 151.051. The term "taxable item" includes tangible personal property and taxable services. Tex. Tax Code § 151.010. "Thus, it seems clear that the burden of establishing, *prima facie,* a basis for imposition of tax is upon the taxing entity." Comptroller's Decision No. 30,461 (1994). When tax is imposed on tangible personal property the taxing entity's *prima facie* burden of proof is easily met because, unless an exemption applies, all sales of tangible personal property in this state are taxable. *Id.* The legislature has elected to tax only those services that are specifically enumerated in Texas Tax Code § 151.0101. Thus, the Comptroller has long held that, to impose tax on a service, Staff must demonstrate not only that a service was sold but that the service is taxable. *See, e.g.* Comptroller's Decision No. 30,461 (1994). However, it is also true that a taxpayer cannot defeat an assessment based on the burden of proof by withholding documents. *See* Comptroller's Decision No. 105,892 (2012). If Staff demonstrates, *prima facie,* that a transaction is taxable, it becomes the taxpayer's burden to prove either by a preponderance of the evidence that Staff is incorrect ( *e.g.* that the service was not taxable), or by clear and convincing evidence that the taxable service was exempt from taxation. *See, e.g.,* Comptroller's Decision No. 30,461 (1994); 34 Tex. Admin. Code § 1.40(2).

A taxpayer is required to produce contemporaneous records and supporting documentation to substantiate and enable verification of the taxpayer's claim related to the amount of tax, penalty, or interest to be assessed, collected, or refunded in an administrative or judicial proceeding. Tex. Tax Code § 111.0041(c). Moreover, a taxpayer is generally required to support its contentions by source records, and assertions in pleadings are insufficient to meet the burden of proof. *See, e.g.* Comptroller's Decision No. 105,892 (2012).

### Contention No. 1: Dust Suppressant and Dust Collectors

Petitioner contends that a dust suppressant chemical sprayed on roads and dust collecting devices used in a bag storage area are exempt as property used during manufacturing and necessary to a pollution control process, citing Texas Tax Code § 151.318(a)(5). Staff rejects Petitioner's contentions on various

grounds.  First, Staff contends that Petitioner has not shown that the dust suppressant and dust collectors were used or consumed in the manufacturing process.  In addition, Staff argues that, even if it is shown to be part of a manufacturing process, the suppressant and collectors were used in intraplant transportation and maintenance of the finished product and therefore are excluded from the exemption.

Tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale is exempt from sales and use taxes if the use or consumption of the property is necessary and essential to a pollution control process.  Tex. Tax Code § 151.318(a)(5); 34 Tex. Admin. Code § 3.300(d)(6).  Therefore, in order to qualify for the exemption in section 151.318(a)(5), the dust suppressant product and the dust collecting devices must meet two requirements:  1) they must be tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale; and 2) their use or consumption must be necessary and essential to a pollution control process. *See, e.g.,* Comptroller's Decision No. 103,141 (2012).

There is no dispute that Petitioner performs manufacturing at its facility and that the dust suppression chemicals and dust collectors functioned as pollution control.  However, Petitioner's evidence does not demonstrate that the items were used or consumed during the actual manufacturing process.  In its pleadings, Petitioner cited the specific record ID numbers in contention and also requested credit in the audit for tax that was paid in error, but did not submit evidence of the use of the items in contention. Petitioner's focus was on legal arguments, and it relied on statements in its pleadings to establish the fundamental facts.  As noted above, pleadings are not evidence and do not establish the factual elements necessary to support an exemption claim. Other than the argument raised in the pleadings, there is nothing in the record to support factual findings or conclusions regarding the use of the dust suppression chemicals or the dust collectors. Petitioner failed to establish that the contested purchases were exempt, and its contention should be denied.

**Contention No. 2:  Services Related to Manufacturing Equipment**

The repair, restoration, remodeling, or modification of tangible personal property is taxable.  Tex. Tax Code §§151.0101(a)(5).  However, a taxable service that is performed on tangible personal property that, if sold, leased, or rented at the time of the performance of the service, would be exempt because of the nature of the property, its use, or a combination of its nature and use, is exempt.  Tex. Tax Code §151.3111.

Petitioner acknowledges that it purchased taxable assembly and installation services, but it contends that the services were exempt under Section 151.3111 because the items assembled and installed were exempt manufacturing equipment under Texas Tax Code § 151.318(a)(2). [4] To prevail, Petitioner must first establish, as a predicate for the exemption, that the equipment, which is the object of the service, was exempt.

Section 151.318(a)(2) extends the manufacturing exemption to tangible personal property directly used in the manufacturing of tangible personal property for sale if the use of the property is necessary to the manufacturing and causes a chemical or physical changes to the product being manufactured.  In arguing that the audit incorrectly assessed tax on installation services performed on exempt equipment installed at its facility, Petitioner cited a list of record ID numbers that should be removed from the audit.  The description of the equipment at issue rests largely on the unsubstantiated statements made in Petitioner's pleadings.  There is no evidence regarding the equipment that is at issue and, therefore, there is no evidence to support a conclusion that the equipment at issue is necessary to the manufacturing process and causes a chemical or physical change r to the product being manufactured.  And, even if the equipment at issue qualified for exemption, taxable services performed on the equipment are exempt

only if the equipment retained its status as tangible personal property at the time the services were performed. *See* Tex. Tax Code § 151.3111.  If the equipment was installed to be permanently attached to the real property, the services would be taxable as the repair, restoration, remodeling, or modification of nonresidential real property.  Tex. Tax Code §§151.0047(a), .0101(a)(13); 34 Tex. Admin. Code § 3.347(a)(2).  The evidence submitted by Petitioner does not establish what specific services were performed on the equipment or the function of the equipment as exempt tangible personal property. Petitioner's exemption claim should be denied.

**Contention No. 3:  Ammonia Injection System**

Petitioner contends that an ammonia injection system installed at its facility is exempt as property used during manufacturing and necessary to a pollution control process, citing Texas Tax Code § 151.318(a)(5).  Petitioner argues that all purchases related to the system, including purchases of the ammonia storage tank, piping, and installation labor, should be deleted from the audit.  Staff agreed that galvanized metal piping purchased is exempt manufacturing equipment, stating that it would allow a credit for the purchase.  However, the balance of the purchase of the ammonia storage tank and installation services remains in dispute.  The only evidence submitted is a photograph of the ammonia storage tank.

Petitioner did not submit evidence to document the purchases at issue or to demonstrate that the ammonia injection system was pollution control equipment used during the actual manufacturing process.  Thus there is nothing in the record to support factual findings or conclusions regarding the nature of the purchases at issue or the use of the ammonia injection system, except as agreed by Staff.  Petitioner failed to establish that the contested purchases were exempt under Section 151.318(a)(5), and its contention should be denied.

**Contention No. 4:  Temporary Labor**

During the audit period, Petitioner purchased contract labor services from COMPANY A  and COMPANY B.  Petitioner does not dispute that the type of services it purchased were taxable, but it contends that the charges should be excluded from tax as temporary help services, citing Texas Tax Code § 151.057(2).  When a tax exclusion is asserted in an assessment, Staff must make a *prima facie* case that the services in question are taxable services and that the tax exclusion does not apply. *See* , *e.g.* , Comptroller's Decision No. 107,120 (2014).  After such a showing has been made, the burden shifts to the taxpayer to prove that the services are not taxable by a preponderance of the evidence.  34 Tex. Admin Code § 1.40(2)(B).  The parties agree that the services at issue were taxable, and therefore Staff has made a *prima facie* showing regarding the purchases at issue.  The question is whether the otherwise taxable services were excluded from sales tax under Texas Tax Code § 151.057(2).

The purchase by a contracting employer or client of temporary help services is excluded from tax if the following conditions under Texas Tax Code § 151.057(2) are met:

(1) the service is performed by an employee of a temporary employment service as defined by Tex. Labor Code Ann. § 93.001;

(2) the employee of the temporary employment service supplements the client's existing work force on a temporary basis;

(3) the service is normally performed by the client's own employees;

(4) the client provides all supplies and equipment necessary; and

(5) the temporary employee is under the direct or general supervision of the client.

In support of its contention, Petitioner submitted an email from the safety specialist at COMPANY A, the COMPANY B Conditions of Service, and COMPANY B Work Orders, confirming that Petitioner provided all supplies and equipment necessary and the contract employees were under the direct or general supervision of Petitioner while performing services at Petitioner's facility. Staff does not dispute these facts. Petitioner also submitted a list of its own employees, indicating an existing workforce at the plant. However, Petitioner did not submit evidence to address the other requirements of Section 151.057(2).

Section 93.001 of the Labor Code defines a "temporary employment service" as "a person who employs individuals for the purpose of assigning those individuals to the clients of the service to support or supplement the client's workforce in a special work situation, including (A) an employee absence; (B) a temporary skill shortage; (C) a seasonal workload; or (D) a special assignment or project." No evidence was submitted to establish a special work situation, and therefore Petitioner failed to show that the services were performed by an employee of a temporary employment service as defined by Tex. Labor Code Ann. § 93.001. Even if Petitioner established that the services at issue were performed by an employee of a temporary employment service, Texas Tax Code § 151.057(2) requires that the services must be provided on a temporary basis. Petitioner contends that the term "temporary" is subjective and undefined in the statute. However, although there is no bright-line test for determining how long is "temporary," the Comptroller has held that services performed continuously for periods 25½ months or longer are not performed on a temporary basis. *See*, *e.g.*, Comptroller Decision Nos. 49,033 (2008), 44,590 (2005) and 31,665 (1999). In this case, there is no evidence of the duration of the services at issue, and therefore no support for Petitioner's claim that the services at issue were temporary. Considering the requirements of Texas Tax Code § 151.057(2), the ALJ finds that Petitioner failed to submit evidence to support a conclusion that the services purchased from COMPANY A and COMPANY B were excluded from tax. Petitioner's contention should be denied.

## Contention No. 5: Scheduled and Periodic Maintenance

Petitioner contends that certain repair services performed on real property at the facility meet the definition of non-taxable real property maintenance because the services were performed on a scheduled and periodic basis, after every 1 million pounds of production. Petitioner specifically cites the replacement of parts in its "raw roller mill" and audit record ID numbers, but has not otherwise identified the transactions at issue or submitted evidence to support its contention.

Tax is imposed on the sale of real property repair and remodeling services. Tex. Tax Code § 151.0101(a)(13). Thus, all persons who remodel nonresidential real property must collect tax on the total sales price to the customer. *See* Tex. Tax Code §§ 151.0101(a)(13) and 151.0047; 34 Tex. Admin. Code § 3.357(b)(2). To "repair" property is to mend or bring back real property that was broken, damaged, or defective. 34 Tex. Admin. Code § 3.357(a)(12). A "restoration" activity is one that is performed to bring back real property that is still operational and functional but that has faded, declined, or deteriorated. 34 Tex. Admin. Code § 3.357(a)(14). But maintenance on real property is a nontaxable service. 34 Tex. Admin. Code §3.357(c). Real property maintenance is defined as scheduled, periodic work that is necessary to sustain or support safe, efficient, continuous operations, or to prevent the decline, failure, lapse, or deterioration of the improvement. 34 Tex. Admin. Code § 3.357(a)(7). Maintenance does not include work to remodel, modify, upgrade, perform major repair, or restore, even if the work is scheduled and periodic. *Id.* As it relates to maintenance, the term "scheduled" means anticipated and designated to occur within a given time period or production level. *Id.* The term "periodic" means ongoing or continual or at least occurring at intervals of time or production that are reasonably predictable. *Id.*

Petitioner bears the burden of proof of showing that the auditor erred in scheduling the repair services as taxable. Though Petitioner argued that all records are available and would be produced, there is no evidence to support its contention or even identify the specific transactions at issue. Petitioner's contention should be denied.

**Contention No. 6: Kiln Control Room Equipment**

Petitioner contends that the purchase and related assembly and installation of computerized kiln control room equipment were exempt as services performed on exempt equipment. Petitioner cited the audit exam record ID numbers at issue and also cited requests for credit for tax paid on transactions. Staff agreed that some of the equipment at issue was exempt manufacturing equipment and therefore the purchases of that tangible personal property should be removed from the audit.

Petitioner contends that the installation services are exempt as services performed on exempt equipment, citing Section 151.3111. In the alternative, Petitioner contends that the installation was actually the final assembly of a computer system used to "power, supply, support, or control" exempt manufacturing equipment and therefore exempt, citing 34 Texas Administrative Code § 3.300(d)(4). However, other than the references to audit exam record ID numbers, there is no evidence in the record of the installation transactions at issue.

Petitioner bears the burden of proof of showing that the auditor erred in scheduling the repair services as taxable. Though Petitioner argued that all records are available and would be produced, there is no evidence to support its contention or even identify the specific transactions at issue. Petitioner's contention should be denied.

**Contention No. 7: Clinker Cooler Grate**

This contention is agreed, as reflected in Staff's Exhibit No. 6.

**Contention No. 8: Weigh Belt Feeders**

This contention is agreed, as reflected in Staff's Exhibit No. 6.

**Contention No. 9: Power Factor Correction Unit**

Petitioner contends that the third-party installation charges for a power factor correction unit were non-taxable third-party installation services. Petitioner describes the unit as a free-standing device, approximately as large as a commercial refrigerator, used to support its kiln equipment and optimize its electrical usage. Petitioner states that the unit was not attached to realty except through wiring and cables. Petitioner further contends that the unit is easily removable without damage to either the equipment or the existing structure. Thus, according to Petitioner, the unit remained tangible personal property even when installed in its facility. Staff asserts that the unit was an upgrade to the existing realty and the installation was therefore taxable remodeling of real property. Other than a reference to the record ID numbers at issue and two photographs of the unit, there is no evidence of the equipment or the services at issue.

The sales price of tangible personal property includes the total amount for which the item is sold, including the costs for the item, the transportation, and the installation. Tex. Tax Code § 151.007(a). Thus, installation that is billed by the seller of a taxable item is taxed as a part of the total price, even if it is separately stated. *See, e.g.,* Comptroller's Decision No. 110,310 (2015) ; State Tax Automated Research (STAR) Document No. 9903277L (March 12, 1999). But if a vendor is only installing (not assembling) tangible personal property, then its installation charges are not taxable. *See, e.g.,* Comptroller's Decision No. 110,310 (2015); STAR Document No. 200107420L (July 30, 2001).

However, if a vendor is not selling tangible personal property but charges for assembling it, then the assembly charges are taxable. *See, e.g.,* Comptroller's Decision Nos. 25,391 (1989), 24,783 (1990), and 32,417 (1994). Lastly, if tangible personal property is incorporated into realty such that it loses its identity as tangible personal property, then the installation charges may constitute the taxable repair or remodeling of real property. *See* Tex. Tax Code § 151.0101(a)(13).

Whether an item that is attached to real property becomes an improvement to that real property depends upon the particular facts involved. The factors to consider are: intent of the party who annexed the tangible personal property to the realty, the mode and sufficiency of annexation, and the adaptation of the personalty to the use or purpose of the realty. *See Logan v. Mullis* , 686 S.W.2d 605 (Tex. 1985). The intent factor is preeminent whereas the other two factors constitute evidence of intention. *Id.; see also* Comptroller's Decision No. 104,772 (2011) and Decision No. 35,553 (1997) acknowledging that intent of the parties is preeminent. Each case presents different facts and requires an analysis based on the totality of the circumstances. *See* Comptroller's Decision No. 101,724 (2010).

Texas law provides that the party in possession of evidence has the burden of producing the evidence. *Rowe v. Colorado & S. R. Co* ., 205 S.W. 731, 733-34 (Tex. Civ. App.—Amarillo, 1918, error refused). Additionally, the "failure to produce evidence within a party's control raises the presumption that if produced it would operate against him, and every intendment will be in favor of the opposite party." *Brewer v. Dowling* , 862 S.W.2d 156, 159 (Tex. App.—Fort Worth 1993, writ denied); *H. E. Butt Grocery Co. v. Bruner* , 530 S.W.2d 340 ~~330~~ , 343 (Tex. Civ. App.—Waco 1975, writ dism'd). Petitioner's failure to produce documentation of the services is sufficient to defeat the contention that the assessment is erroneous. *See* , *e.g.* , Comptroller's Decision No. 37,620 (2001) and Comptroller's Decision No. 32,256 (1997). In this case, the evidence submitted by Petitioner is insufficient to identify the services performed or the intent of the parties with regards to the installation of the unit. Petitioner's contention should be denied.

**Contention No. 10: Safety Harnesses**

Petitioner requested credit for tax paid on the purchase of 17 safety harnesses issued to its employees. Petitioner contends that the purchases were tangible personal property or safety clothing that was used or consumed in the actual manufacturing, citing 34 Texas Administrative Code § 3.300(d)(10) and (11).

Tangible personal property that is used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements for public health purposes. Tex. Tax Code § 151.318(a)(10); 34 Tex. Admin. Code §3.300(d)(11). Also, safety apparel or work clothing that is leased, or rented to, or stored, used, or consumed by a manufacturer, and which is used during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, is exempt from sales and use tax if: (A) the manufacturing process would not be possible without the use of the apparel or clothing; and (B) the apparel or clothing is not resold to the employee. Tex. Tax Code § 151.318(a)(9); 34 Tex. Admin. Code §3.300(d)(10).

Other than a reference to the audit exam record ID numbers, there is no evidence regarding the transactions at issue. The Comptroller has held that a taxpayer claiming this exemption must show that the items are used during in a processing operation. *See* Comptroller's Decision No. 103,101 (2010). Absent such a showing, Petitioner is not entitled to the exemption and the contention should be denied.

**Contention No. 11: Replacement Parts for EO9 and NO6 Bucket Elevator**

Petitioner withdrew its contention regarding the purchases for the E09 bucket elevator. However, the purchase of parts for the NO6 elevator remain in dispute. In support of its contention Petitioner submitted a letter from its plant engineer, INDIVIDUAL.

Petitioner has not proposed, and the evidence does not support a conclusion, that the NO6 elevator directly made or caused a chemical or physical change to the cement processed at Petitioner's facility. Instead, Petitioner cited Section 151.318(c)(1)(C) in support of its exemption claim. That provision excludes intraplant transportation equipment from the manufacturing exemption, but allows that piping through which the product or an intermediate or preliminary product that will become an ingredient or component part of the product is recycled back to another single item of manufacturing equipment and its ancillary equipment in the same manufacturing process remain eligible. Tex. Tax Code § 151. 318(c)(1)(C). The only evidence regarding the NO6 bucket elevator is the description in the letter from Petitioner's plant engineer, INDIVIDUAL. In the letter, INDIVIDUAL described the elevator as moving raw material from the bottom of the finish mill portion of the plant to the top, where it is transferred to an air slide that moves the material in the Cyclopol. Though the indication is that the elevator is used to route raw material, the evidence is insufficient to demonstrate that it transports a product back to another single item of manufacturing equipment in the manufacturing process. Petitioner failed to meet its burden of establishing by clear and convincing evidence that the NO6 elevator constitutes exempt manufacturing equipment, and the contention should be denied.

**Contention No. 12:  Reimbursement to Contractors**

Petitioner withdrew this contention.

**Contention No. 13:  Rental of Shotguns**

During the audit period Petitioner rented 8-guage shotguns that were used to fire at "clinker" clumps inside of the kiln. Petitioner contends that the shotguns made a physical change to the product and therefore were exempt under Section 151.318(a)(2). Petitioner did not submit any evidence of the rentals at issue or the use of the shotguns.

Staff first contends that the shotguns were hand tools and, as such, are not exempt manufacturing equipment. *See* Tex. Tax Code § 151.318(c)(2). The Comptroller defines hand tools as instruments that are to be used, managed, and powered by the hand (e.g., paint brush, trowel, hammer, screwdriver, files). 34 Tex. Admin. Code § 3.300(a)(6). Equipment that is controlled or operated by the hand, but is moved or powered by electricity, gas, steam, or other fuel, is not a hand tool (e.g., electric drill, chain saw, jack hammer). *Id.* The ALJ concludes that shotguns are not hand tools but are "powered by electricity, gas, steam, or other fuel." Staff's first argument is not applicable.

Staff also argues that the shotguns are excluded from the manufacturing exemption as maintenance supplies, citing Section 151.318(c)(3). Under that section, maintenance supplies not otherwise exempted, maintenance equipment, janitorial supplies or equipment, office equipment or supplies, equipment or supplies used in sales or distribution activities, research or development of new products, or transportation activities are excluded from the exemption. Staff cites Comptroller Decision No. 9,767 (1979) and the holding that shotgun shells used to shoot clinker from kiln walls were items incidental to actual manufacturing and therefore not exempt. There is no indication in that hearing of whether the shotguns themselves would have received the same treatment. Regardless, Petitioner's evidence does not demonstrate how the shotguns were used or if the use was during the actual manufacturing process. Petitioner failed to establish that the contested purchases were exempt under Section 151.318(a)(2) and its contention should be denied.

**Contention No. 14:  New Construction**

During the audit period Petitioner installed steel shelving in its warehouse facility. Petitioner contends that it purchased the shelving and the installation labor for a lump-sum amount and the purchase qualified as non-taxable new construction.  Staff contends that the purchase of shelving and installation is taxable as real property repair, restoration, and remodeling services.

Nonresidential real property repair, restoration, and remodeling services are taxable.  Tex. Tax Code §§ 151.0101(a)(13) and 151.004 7 ;  34 Tex. Admin. Code § 3.357(b)(2).  However, all new improvements to real property, including initial finish-out work to the interior or exterior of the improvement, are considered nontaxable new construction.  34 Tex. Admin. Code § 3.291(a)(9).  A contract for the improvement of realty does not include a contract for the sale and installation of tangible personal property that is not essential to the building structure but which incidentally may be temporarily attached to the realty without losing its identity and, if attached, is readily removable without substantial damage to the realty. 34 Tex. Admin. Code § 3.347(b)(1).

The only evidence of the installation at issue is the photograph of shelving submitted by Petitioner.  No invoices, contracts, or proposals related to the purchase were submitted, and Petitioner contends that none were used.  Therefore, it is not possible to draw a conclusion regarding the scope of work and the degree of incorporation of the items sold.  The record is insufficient to support Petitioner's contention that the shelving at issue was essential to the building structure or that the equipment was not readily removable.  Therefore, Petitioner's contention should be denied.

## III.  FINDINGS OF FACT

1.  ************** (Petitioner) operates a concrete manufacturing facility in San Antonio, Texas.

2.  Petitioner's process involves taking raw shale and limestone from a quarry and blending it to create a raw meal.  The meal is crushed and blended with ancillary ingredients and then  heated in a rotary kiln.  The product of this process, "clinker," is cooled, crushed, and ground into the final product, cement.

3.  The Tax Division (Staff) of the Texas Comptroller of Public Accounts (Comptroller) audited Petitioner for direct pay sales tax compliance for the May 1, 2005, through November 30, 2008.

4.  The audit consisted of assessments for taxable purchases of expense items (Audit Exams 100, 200, 400, 5000, and 8000), credits for over accrual of tax (Audit Exams 300, 6000, and 7000), and taxable purchases of assets (Audit Exams 1000, 2000, and 3000).

5.  On April 7, 2011, Staff issued a Texas Notification of Audit Results assessing a deficiency consisting of tax, a 10% late-filed penalty, and interest.

6.  Petitioner requested redetermination.

7.  Staff referred the contested case to the State Office of Administrative Hearings (SOAH).

8.  On March 8, 2016, Staff issued a Notice of Hearing by Written Submission to Petitioner.  The notice contained a statement of the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

9.  On March 15, 2016, the Administrative Law Judge issued Order No. 1 setting the hearing.

10.  Staff agreed to make adjustments to the audit related to tax assessed on the purchase of a clinker gate (Contention No. 7) and parts purchased for weigh-belt feeders (Contention No. 8).  Staff also agreed, in part,

to contentions relating to the purchase and installation of an ammonia injection system (Contention No. 3) and the purchase of kiln-room equipment (Contention No. 6). The adjustments are summarized in the AP 124 schedule, Staff's Exhibit No. 6.

11. The record closed on May 16, 2016.

## IV. CONCLUSIONS OF LAW

1. The Comptroller has jurisdiction over this matter. Tex. Tax Code ch. 111.

2. SOAH has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law. Tex. Gov't Code ch. 2003.

3. The Comptroller provided proper and timely notice of the hearing. Tex. Gov't Code ch. 2001.

4. Texas imposes a tax on each sale of a taxable item in this state. Tex. Tax Code § 151.051.

5. The term "taxable item" includes tangible personal property and taxable services. Tex. Tax Code § 151.010.

6. When tax is imposed on tangible personal property, the taxing entity's *prima facie* burden of proof is easily met because, unless an exemption applies, all sales of tangible personal property in this state are taxable. Comptroller's Decision No. 30,461 (1994).

7. For purchases of tangible personal property, Petitioner bears the burden of proof and must demonstrate, by a preponderance of the evidence, that the audit results are incorrect, or by clear and convincing evidence that the transactions are exempt from tax. *See* Comptroller's Decision No. 104,464 (2011); 34 Tex. Admin. Code §1.40(2).

8. The legislature has elected to tax only those services that are specifically enumerated in Texas Tax Code § 151.0101.

9. To impose tax on a service, Staff must demonstrate not only that a service was sold but that the service is taxable. *See, e.g.* Comptroller's Decision No. 30,461 (1994).

10. If Staff demonstrates, *prima facie,* that a service is taxable, it becomes the taxpayer's burden to prove either by a preponderance of the evidence that Staff is incorrect ( *e.g.* that the service was not taxable), or by clear and convincing evidence that the taxable service was exempt from taxation. *See, e.g.,* Comptroller's Decision No. 30,461 (1994); 34 Tex. Admin. Code § 1.40(2).

11. When a tax exclusion is asserted in an assessment, Staff must make a *prima facie* case that the services in question are taxable services and that the tax exclusion does not apply. *See* , *e.g.* , Comptroller's Decision No. 107,120 (2014).

12. After Staff makes a *prima facie* case that a transaction is taxable and that an exclusion does not apply, the burden shifts to the taxpayer to prove the services are not taxable by a preponderance of the evidence. 34 Tex. Admin Code § 1.40(2)(B).

13. Texas law provides that the party in possession of evidence has the burden of producing the evidence. *Rowe v. Colorado & S. R. Co* ., 205 S.W. 731, 733-34 (Tex. Civ. App.—Amarillo, 1918, error refused).

14. The "failure to produce evidence within a party's control raises the presumption that if produced it would operate against him, and every intendment will be in favor of the opposite party." *Brewer v. Dowling* , 862

S.W.2d 156, 159 (Tex. App.—Fort Worth 1993, writ denied); *H. E. Butt Grocery Co. v. Bruner* , 530 S.W.2d 340 330 , 343 (Tex. Civ. App.—Waco 1975, writ dism'd).

15.  A taxpayer's failure to produce documentation of services is sufficient to defeat the contention that the assessment is erroneous. *See* , *e.g.* , Comptroller's Decision No. 37,620 (2001) and Comptroller's Decision No. 32,256 (1997).

16.  A taxpayer is required to produce contemporaneous records and supporting documentation to substantiate and enable verification of the taxpayer's claim related to the amount of tax, penalty, or interest to be assessed, collected, or refunded in an administrative or judicial proceeding.  Tex. Tax Code § 111.0041(c) ; 34 Tex. Admin. Code § 3.281.

17.  A taxpayer is generally required to support its contentions by source records, and assertions in pleadings are insufficient to meet the burden of proof. *See, e.g.* Comptroller's Decision No. 105,892 (2012).

18.  Tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale is exempt from sales and use taxes if the use or consumption of the property is necessary and essential to a pollution control process.   Tex. Tax Code § 151.318(a)(5); 34 Tex. Admin. Code § 3.300(d)(6); *See also, e.g.,* Comptroller's Decision No. 103,141 (2012).

19.  The repair, restoration, remodeling, or modification of tangible personal property is taxable. Tex. Tax Code §§151.0101(a)(5).

20.  A taxable service that is performed on tangible personal property that, if sold, leased, or rented, at the time of the performance of the service, would be exempt because of the nature of the property, its use, or a combination of its nature and use, is exempt.  Tex. Tax Code §151.3111.

21.  Taxable services performed on exempt manufacturing equipment are only exempt if the equipment retained its status as tangible personal property at the time the services are performed. *See* Tex. Tax Code § 151.3111.

22.  If equipment is installed to be permanently attached to real property, the installation services performed on the equipment are taxable as the repair, restoration, remodeling, or modification of nonresidential real property. Tex. Tax Code §§151.0047(a), .0101(a)(13); 34 Tex. Admin. Code § 3.347(a)(2).

23.  The purchase by a contracting employer or client of temporary help services is excluded from tax if the following conditions under Texas Tax Code § 151.057(2) are met:

(1) the service is performed by an employee of a temporary employment service as defined by Tex. Labor Code Ann. § 93.001;

(2) the employee of the temporary employment service supplements the client's existing work force on a temporary basis;

(3) the service is normally performed by the client's own employees;

(4) the client provides all supplies and equipment necessary; and

(5) the temporary employee is under the direct or general supervision of the client.

24.  Section 93.001 of the Labor Code defines a "temporary employment service" as "a person who employs individuals for the purpose of assigning those individuals to the clients of the service to support or supplement the client's workforce in a special work situation, including (A) an employee absence; (B) a temporary skill shortage; (C) a seasonal workload; or (D) a special assignment or project."  Tex. Labor Code § 93.001.

25.  Although there is no bright-line test for determining how long is "temporary," the Comptroller has held that services performed continuously for periods 25 ½ months or longer are not performed on a temporary basis. *See* , *e.g.* , Comptroller Decision Nos. 49,033 (2008), 44,590 (2005) and 31,665 (1999).

26.  Real property repair and remodeling services are taxable.  Tex. Tax Code § 151.0101(a)(13).

27.  All persons who remodel nonresidential real property must collect tax on the total sales price to the customer.  See Tex. Tax Code §§ 151.0101(a)(13) and 151.0047; 34 Tex. Admin. Code § 3.357(b)(2).

28.  To "repair" property is to mend or bring back real property that was broken, damaged, or defective.  34 Tex. Admin. Code § 3.357(a)(12).

29. A "restoration" activity is one that is performed to bring back real property that is still operational and functional but that has faded, declined, or deteriorated.  34 Tex. Admin. Code § 3.357(a)(14).

30.  Maintenance on real property is a nontaxable service.  34 Tex. Admin. Code §3.357(c).

31.  Real property maintenance is defined as scheduled, periodic work that is necessary to sustain or support safe, efficient, continuous operations, or to prevent the decline, failure, lapse, or deterioration of the improvement.  34 Tex. Admin. Code § 3.357(a)(7).

32.  Maintenance does not include work to remodel, modify, upgrade, perform major repair, or restore, even if the work is scheduled and periodic.  34 Tex. Admin. Code § 3.357(a)(7).

33.  As it relates to maintenance, the term "scheduled" means anticipated and designated to occur within a given time period or production level.  34 Tex. Admin. Code § 3.357(a)(7).

34.  The term "periodic" means ongoing or continual or at least occurring at intervals of time or production that are reasonably predictable.  34 Tex. Admin. Code § 3.357(a)(7).

35.  To qualify a service as nontaxable real property maintenance, it must be scheduled and periodic work, as opposed to work that is done on an as-needed basis, and must be supported by maintenance schedules or work orders or other similar forms of documentation.  34 Tex. Admin. Code § 3.357(d)(2)(A); *see also* Comptroller's Decision No. 40,789 (2003), and *GATX Terminals Corp. v. Rylander* , 78 S.W.3d 630 (Tex. App. —Austin 2002, no pet.).

36.  The level of proof required to show scheduled and periodic maintenance is a preponderance of the evidence.  See Comptroller's Decisions Nos. 39,472 (2004) and 41,840 (2003); 34 Tex. Admin. Code § 1.40(2)(B).

37.  The sales price of an item of tangible personal property includes the total amount for which the item is sold, including the cost for the item, the transportation, and the installation.  Tex. Tax Code § 151.007(a).

38.  Installation that is billed by the seller of a taxable item is taxed as a part of the total price, even if it is separately stated. *See* , *e.g.* , Comptroller's Decision No. 110,310 (2015); State Tax Automated Research (STAR) Document No. 9903277L (March 12, 1999).

39.  If a vendor is only installing (and not selling) tangible personal property, then its installation charges are not taxable. *See* , *e.g.* , Comptroller's Decision No. 110,310 (2015); STAR Document No. 200107420L (July 30, 2001).

40.  If a vendor is not selling tangible personal property and charges for assembling tangible personal property, then the assembly charges are taxable. *See* , *e.g.* , Comptroller's Decision Nos. 25,391 (1989), 24,783 (1990), and 32,417 (1994).

41.  Whether an item that is attached to real property becomes an improvement to that real property depends upon intent of the party who annexed the tangible personal property to the realty, the mode and sufficiency of annexation, and the adaptation of the personalty to the use or purpose of the realty. *See* Logan v. Mullis, 686 S.W.2d 605 (Tex. 1985).

42.  The intent factor is preeminent whereas the other two factors constitute evidence of intention. *Id.* ; *see also* Comptroller's Decision No. 104,772 (2011) and Decision No. 35,553 (1997) acknowledging that intent of the parties is preeminent.

43.  Each case presents different facts and requires a case-by-case analysis based on the totality of the circumstances. *See* Comptroller's Decision No. 101,724 (2010).

44.  Tangible personal property that is used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements for public health purposes is exempt from sales and use tax. Tex. Tax Code § 151.318(a)(10); 34 Tex. Admin. Code §3.300(d)(11).

45.  Safety apparel or work clothing that is leased, or rented to, or stored, used, or consumed by a manufacturer, which is used during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale, is exempt from sales and use tax if: (A) the manufacturing process would not be possible without the use of the apparel or clothing; and (B) the apparel or clothing is not resold to the employee. Tex. Tax Code § 151.318(a)(9); 34 Tex. Admin. Code §3.300(d)(10).

46.  Intraplant transportation equipment is excluded from the manufacturing exemption. Tex. Tax Code § 151.318(c)(1).

47.  Piping through which the product or an intermediate or preliminary product that will become an ingredient or component part of the product is recycled back to another single item of manufacturing equipment and its ancillary equipment in the same manufacturing process remains eligible for the manufacturing exemption. Tex. Tax Code §151.318(c)(1)(C).

48.  Hand tools are excluded from the manufacturing exemption.  Tex. Tax Code § 151.318(c)(2).

49.  Hand tools are instruments that are to be used, managed, and powered by the hand ( *e.g.* , paint brush, trowel, hammer, screwdriver, files).  34 Tex. Admin. Code § 3.300(a)(6).

50.  Equipment that is controlled or operated by the hand, but is moved or powered by electricity, gas, steam, or other fuel, is not a hand tool (e.g., electric drill, chain saw, jack hammer).  34 Tex. Admin. Code § 3.300(a)(6).

51.  Maintenance supplies not otherwise exempted, maintenance equipment, janitorial supplies or equipment, office equipment or supplies, equipment or supplies used in sales or distribution activities, research or development of new products, or transportation activities are excluded from the manufacturing exemption. Tex. Tax Code § 151.318(c)(3).

52.  Petitioner failed to establish that the contested purchases were tax exempt, and its contentions should be denied, except as agreed by Staff.

53.  Petitioner failed to show audit error by a preponderance of the evidence , or that purchases were exempt from tax by clear and convincing evidence , and its contentions should be denied, except as agreed by Staff.

*Source: See PFD, p. 15 ("Petitioner failed to meet its burden of establishing by clear and convincing evidence that the NO6 elevator constitutes exempt manufacturing equipment, and the contention should be denied.");* *Conclusion of Law No. 7.*

**SIGNED May 20, 2016.**

**TREVOR MOORE**
**ADMINISTRATIVE LAW JUDGE**
**STATE OFFICE OF ADMINISTRATIVE HEARINGS**


ENDNOTES:

[1] For a subsequent motion for rehearing, the date calculated is 20 days after this decision is signed. *See* APA, Tex. Gov't Code § 2001.144(h), (i).  For additional guidance, refer to the Frequently Asked Questions Related to Motions for Rehearing, found here: https://www.comptroller.texas.gov/taxes/publications/rehearing-faq.pdf.

[2] *See* Tex. Gov't Code § 2003.101(e) and (f).

[3] *See* Tex. Tax Code § 111.0081(c).

[4] Petitioner did not contend that the charges at issue were for non-taxable stand-alone installation labor.

ACCESSION NUMBER: 201701009H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 2017-01-24
TAX TYPE: SALES

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carla Dennis on behalf of Deborah Sloan
Bar No. 786230
cydennis@jonesday.com
Envelope ID: 98974229
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellees Brief
Status as of 3/27/2025 2:24 PM CST

Associated Case Party: ChampionX, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Deborah Sloan | 786230 | dsloan@jonesday.com | 3/27/2025 2:14:01 PM | SENT |
| Carla Dennis | | cydennis@jonesday.com | 3/27/2025 2:14:01 PM | SENT |
| John MAllan | | jmallan@jonesday.com | 3/27/2025 2:14:01 PM | SENT |
| Antoinette L.Ellison | | aellison@jonesday.com | 3/27/2025 2:14:01 PM | SENT |

Associated Case Party: Ken Paxton, Attorney General of the State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kelsey Hanson | 24096654 | kelsey.hanson@oag.texas.gov | 3/27/2025 2:14:01 PM | SENT |